**EXHIBIT E**

STATE OF MICHIGAN

IN THE UNITED STATES DISTRICT COURT FOR THE COUNTY OF DETROIT

_____

ADAM COMMUNITY CENTER,

                         Plaintiff,

v                                               Case No. 18-13481-NGE-APP
                                                Hon. Nancy G. Edmunds

CITY OF TROY, ET., AL.

                         Defendant,
_____/

                         DEPOSITION

        BEFORE THE HONORABLE NANCY G. EDMUNDS, DISTRICT JUDGE

              Troy, Michigan, Tuesday, August 6th, 2019

APPEARANCES:

For the Plaintiff:   AMY VELVA DOUKOURE (P80461)
                     Staff Attorney CAIR-MI
                     30201 Orchard Lake Road, Ste 260
                     Farmington Hills, Michigan 48334-2377
                     (248) 559-2247

For the Defendant:   ALLAN T. MOTZNY (P37580)
                     500 West Big Beaver Road
                     Troy, Michigan 48084-5254
                     (248) 524-3324

RECORDED and         Lynn Ledoux-Moore, CER 9046
TRANSCFRIBED BY:     Certified Electronic Recorder
                     Accurate Court Transcription, LLC
                     (248) 807-0045

1

TABLE OF CONTENTS

WITNESSES:   PLAINTIFF                                           Page

GLENN CLARK

    Direct Examination by Amy Doukoure            03



WITNESSES:   DEFENDANT

NONE



EXHIBITS                                        IDENTIFIED     RECEIVED

    PX#1 City of Troy Zoning Board of
       Appeals Application                  42             42

```
 1              Troy, Michigan
 2              Tuesday, August 6th, 2019 - 10:00 a.m.
 3              COURT RECORDER:  On the record.  I will swear you
 4       in, raise your right hand, please.  Do you swear to tell the
 5       truth, the whole truth and nothing but the truth?
 6              GLENN CLARK:  So help me God.
 7              COURT RECORDER:  Thank you.
 8                        GLENN CLARK
 9              (At 10:12 a.m., called by Ms. Doukoure, sworn by the
10       Court Recorder, testified as followed)
11                        DIRECT EXAMINATION
12   BY MS. DOUKOURE:
13   Q.   Just for posterity's purpose, can you state and spell your
14        name for the record, please?
15   A.   Glenn, G-l-e-n-n, Michael, M-i-c-h-a-e-l -- I have a hoarse
16        throat.  I apologize -- Clark, C-l-a-r-k.
17   Q.   And can you tell us what positions you hold with the City of
18        Troy?
19   A.   Just one.  I'm the Chairman of the Zoning Board of Appeals for
20        the City of Troy.
21   Q.   And how long have you been doing -- how long have you been --
22   A.   Well, I'm a member, but I'm also the Chairman.
23   Q.   Sure.  How long have you been a member of the Zoning Board of
24        Appeals?
25   A.   I don't recall.  I've been on that for a long time.
```

```
1   Q.   More than five years?

2   A.   Probably before you were born.

3   Q.   I mean, more than 40 years?

4   A.   Not 40.

5   Q.   Because that's how old I am.

6   A.   I don't know.  City Clerk's right around the corner.  You can

7        find out from her.  I don't know.

8   Q.   Is it more than 10 years?

9   A.   Yes.

10  Q.   More than 20 years?

11  A.   No.

12  Q.   So, somewhere between 10 and 20 years?

13  A.   Yes.

14  Q.   Have you ever held any other positions with the City of Troy?

15  A.   Yes.  I was appointed -- a long time ago, I don't know when --

16       to the Municipal Building Authority.

17  Q.   And what was -- what did you do with the Municipal Building

18       Authority?

19  A.   Nothing.

20  Q.   Okay, fair enough.

21  A.   They never called a meeting.  They only meet when they have a

22       building to build.

23  Q.   So, it's the authority that assists Troy in building their

24       governmental buildings?

25  A.   Yes.
```

4

```
1    Q.    Okay.  How long have you been the Chairman of the ZBA?
2    A.    On and off over -- since I've been on that board.  So,
3          currently, I've been on -- the chairman for a number of terms.
4          I think maybe four.
5    Q.    And a term is how many years?
6    A.    One year.  Maybe five.  It could be longer.
7    Q.    How did you become a member of the ZBA?
8    A.    City Charter calls for the City Council to make those
9          appointments.
10   Q.    So, the Council makes the appointments?
11   A.    To be voted in, yep.
12   Q.    Who nominated you, if you recall?
13   A.    Gosh, originally, Martin Howrylak.  And, you're only nominated
14         once.  As you go through, you just put your paperwork in and
15         then people vote on whoever they want to vote on.  So, it just
16         -- I think there was just one nomination.
17   Q.    And then -- so it's -- it's not like a lifetime appointment?
18   A.    No.  Your term is three, I think, or four years.  I think it
19         staggers back and forth, depending when your turn comes up.
20   Q.    Okay.
21   A.    The next time you change City, you revert to the other -- I
22         believe.
23   Q.    Okay.  And then each time you submit your -- like, basically
24         like a letter of interest application and they vote on you?
25   A.    Right.
```

5

```
 1   Q.   Okay.  What are -- what --

 2   A.   I was also on the Pension Board for -- very briefly.

 3   Q.   Pension Board?

 4   A.   Just City cap -- before I was on the Zoning, City Council

 5        appointed me to the Pension Board and then because I didn't

 6        meet all the criteria -- there's one thing that prohibited me

 7        from serving on that particular board, so they took me off

 8        right away.  So I never had a meeting.

 9   Q.   Okay.

10   A.   But I was appointed and there was a vote and I don't know who

11        nominated me.

12   Q.   Okay.

13   A.   That was a long time ago.

14   Q.   Okay.  You're a city for resident?

15   A.   Uhm-hmm.

16   Q.   How long?

17             MR. MOTZNY:  Just -- you have to answer yes or no.

18        You can't say Uhm-hmm because it's being recorded.

19             THE WITNESS:  Oh, I'm sorry.  Yes.

20             MS. DOUKOURE:  Oh, yeah.  I --

21             THE WITNESS:  How long?  Since 2000.

22   BY MS. DOUKOURE:

23   Q.   And you've been on the ZBA since before 2000 when you lived in

24        --

25   A.   No, I wasn't a resident here.
```

6

1    Q.   So, it's been maybe 19 years?

2    A.   I didn't get appointed right away.

3    Q.   Sure.  Okay.  Is there anything special about being the

4         Chairman?  What are your special duties or --

5    A.   I'm a terrific leader.

6    Q.   That's a quality.  That's not a duty.

7    A.   Duty is just I preside over the meeting.  That's it.

8    Q.   That's -- that's the only --

9    A.   There's no -- outside the board meeting, there's nothing.  I

10        mean, I do talk to City staff, you know, sometimes about an

11        upcoming agenda item.  Paul Evans will sometimes call me.

12        And, like, normally, the only time I ever talk to Paul would

13        be if there were -- there were no petitioners coming and he

14        would -- he always asks the Chairman if I give permission to

15        cancel the meeting, which I do.  So we would -- we don't talk

16        about issues -- like -- 'cause all that information will be in

17        our packet.

18   Q.   Sure.

19   A.   It's usually just administrative, you know; Mr. so-and-so

20        can't be there tonight, we're putting an alternate in.  That's

21        it.

22   Q.   How -- who chooses the alternates?

23   A.   The City Council does.  And, normally Mr. Evans will call who

24        the -- for the two, there's two the Council appoints at any

25        given time.  Doesn't mean we have two right now 'cause I think

7

```
 1          one person resigned.  But he'll just see who is available, and
 2          usually, he rotates back and forth to give them ample
 3          opportunity to sit.
 4    Q.    But you can't testify as to how Mr. Evans chooses or calls --
 5          who he calls?
 6    A.    No idea.
 7    Q.    You just notice that they're not always the same alternate?
 8    A.    Well, there's two.  So there's two different individuals and
 9          he told me once that he --
10    Q.    But we're not going to testify to what somebody told you.  You
11          -- you can't testify to how --
12    A.    Well, then, why are you asking the question?
13    Q.    I didn't ask you.
14    A.    Okay.
15    Q.    I asked you -- I didn't ask you anything about what Mr. Evans
16          said.
17                MR. MOTZNY:  Okay.  Just -- just answer the
18          questions --
19                THE WITNESS:  Okay.
20                MR. MOTZNY:  -- she asks, okay?
21                THE WITNESS:  Okay.
22    BY MS. DOUKOURE:
23    Q.    And, the Zoning Board of Appeals hearing that occurred with
24          Adam Community Center, do you recall that date?
25    A.    I remember the meeting.  I don't even remember what date it
```

```
 1        was.
 2   Q.   It was in June of 2018.
 3   A.   Okay.
 4   Q.   Does that sound correct -- about correct to you?
 5   A.   Perhaps.
 6   Q.   Did you --
 7   A.   I'm not sure.
 8   Q.   -- did you review anything -- anything before coming here to
 9        testify today?
10   A.   No.
11   Q.   So, you're a defendant in a lawsuit coming to give a
12        deposition and you didn't review the video from that date?
13   A.   No.
14   Q.   You didn't review any documents from that date?
15   A.   No.
16   Q.   Emails?
17   A.   No.  I don't have any.
18   Q.   How do you guys get copies of the actual packet that's being
19        submitted by each applicant?
20   A.   The City emails it.
21   Q.   So, you did have an email for this -- of this application?
22   A.   Just with the basic information.
23   Q.   Is that a yes?
24   A.   Yes, it's yes.  I had forgot about the packet.
25   Q.   What -- what's your retention policy for emails?
```

9

```
 1   A.    Uhm-hmm --
 2                   MR. MOTZNY:  Do you mean Mr. Clark's retention
 3         policy?
 4                   MS. DOUKOURE:  The Zoning Board's retention policy.
 5         I'm sorry.  Thank you for clarifying.
 6                   THE WITNESS:  I --
 7                   MS. DOUKOURE:  If there is one.
 8                   THE WITNESS:  I don't -- I don't speak for the City
 9         Administration, so, I can't answer to that.
10   BY MS. DOUKOURE:
11   Q.    You're the Chairman of the Zoning Board of Appeals?
12   A.    I don't run the -- the --
13   Q.    That was a question.
14   A.    I am the chairman.
15   Q.    But you're not familiar with the policies that govern your
16         work on the Zoning Board of Appeals is what you're telling me
17         today?
18   A.    I guess I don't understand.  You'll have to restate that.
19   Q.    Is there a retention policy for the Zoning Board of Appeals
20         for emails?
21   A.    You'd have to speak to the City Administration.  I don't
22         warehouse for the city anything.
23   Q.    I'm asking, do you warehouse for yourself pursuant to a policy
24         that would require you, as a Zoning Board of Appeals member --
25   A.    I'm not required -- no.
```

```
 1   Q.   That's what I was asking.

 2   A.   No.

 3   Q.   Do you routinely, personally, keep any -- track of any emails

 4        that you do as part of your -- that you receive or send as

 5        part of your work through the Zoning Board of Appeals?

 6   A.   Just perhaps the packets if I forget to delete them.  Then I

 7        don't -- I'm not required to retain anything.

 8   Q.   The -- you don't -- you don't retain that new -- so, when you

 9        get an email, how does -- and you have the packet --

10   A.   I try to go through and purge.

11   Q.   How often?

12   A.   I'm not very good at it, but -- uhm -- I don't know.  It's not

13        --

14   Q.   Routine?

15   A.   I don't -- yeah -- exactly.

16   Q.   Okay.  So, they email you the packet how -- how far in advance

17        do you get the packet emailed to you?

18   A.   I don't recall exactly.  I think I usually -- less than a week

19        before.

20   Q.   Is there anything --

21   A.   You mean like on a Tuesday and I think we get it the Thursday

22        before?  I think it's the Friday before.

23   Q.   The Friday before?  Is it after public comments are closed or

24        is it prior to public comments being closed?

25   A.   I -- that's not a proper question.  I don't get a packet
```

11

```
 1        related to public comments.
 2   Q.   You don't get the public comments that are made when -- so,
 3        when a hearing notice goes out and public makes comments on
 4        that application, those are not part of the documents that you
 5        receive?
 6   A.   In the packet, if somebody had sent in, before the packet goes
 7        out, those will be included in the packet.  Then others come
 8        in post facto and they put them on our desk at the meeting.
 9   Q.   The day of the meeting?
10   A.   Right.
11   Q.   And, then once you receive an application -- a Zoning Board of
12        Appeals application for a variance such as the one that was
13        submitted by our client in this matter, what do you do with
14        them?
15   A.   We review them.  You can review them in your packet before the
16        meeting.
17   Q.   I'm asking you what you do with them?
18   A.   Just read it.
19   Q.   When?
20   A.   Sometimes I don't read them.  It depending -- it depending on
21        the circumstances of the application.
22   Q.   Did you read this one?
23   A.   I don't believe I did.
24   Q.   So, the first time you looked at the variance request was at
25        the hearing?
```

12

```
 1   A.   From what I recall.

 2   Q.   When does the agenda come out for this meeting -- for the

 3        meeting?  So, if we had a meeting on June 19th, for instance -

 4        -

 5   A.   It comes in the packet.

 6   Q.   When -- when would the agenda comes out on the -- so the

 7        Thursday or Friday before?

 8   A.   Right.

 9   Q.   When does the notice of hearing -- of public hearing come out?

10   A.   I have no idea.

11   Q.   You don't know?  You don't --

12   A.   That's the city.

13   Q.   Okay.  Did you have any knowledge or information about Adam's

14        Community Center prior to this hearing?

15   A.   None, other than the packet.

16   Q.   So, they've never been in front of the Zoning Board of Appeals

17        before?

18   A.   You -- you said about this agenda item?

19   Q.   That's not what I said.  I said about Adam's Community Center.

20   A.   Well, yeah, they were before our board before for another

21        site.

22   Q.   Do you remember -- do you recall which year that was?

23   A.   No, I don't.

24   Q.   Do you recall any of --

25   A.   Four or five years ago.  Something like that.
```

13

1   Q.   That's fair.  Do you recall any of the circumstances regarding

2        that?

3   A.   Yes.

4   Q.   Could you, please, explain what you recall from two -- four or

5        five years?

6   A.   We denied the request for approval.  I remember -- I recall --

7        really, the only other thing that I recall are the application

8        was originally filed as one thing and then it was changed.

9        That's all I recall.

10  Q.   You don't know why it was changed?

11  A.   I can't recall any of the testimony by -- by the public, by

12       your organization or my colleagues.

13  Q.   Do you have any other knowledge of why that application was

14       changed?

15  A.   Zero.

16  Q.   Did you see any emails from any member of the community?

17  A.   Before the vote?

18  Q.   Yes.

19  A.   No.

20  Q.   During the process of changing the application?

21  A.   Absolutely not.

22  Q.   Did you receive any emails from Brent Savidant during the

23       process of changing that application?

24  A.   Who is that?

25  Q.   Brent -- I don't know how to say his name.  He was the City

14

```
 1          Manager at that time is my belief.
 2   A.     No, I never spoke to him.
 3               MR. MOTZNY:  Yeah, just for the record, Brent
 4          Savidant was -- is the Planning Director.
 5               MS. DOUKOURE:  The Planning Director.  Thank you for
 6          correcting that.
 7               THE WITNESS:  No.
 8   BY MS. DOUKOURE:
 9   Q.     So, you said you saw this application the first time,  on that
10          date, June 19th?
11   A.     From what I recall.
12   Q.     So you -- when you have an application that's looking for a
13          variance -- a zoning variance, what are the criteria that you
14          look for to see whether or not it meets -- meets it's -- its -
15          - it meets the standard for allowing the variance?
16   A.     So, the city ordinance, which is -- was passed by city council
17          years ago, says that all five items on our computer, in front
18          of us, every meeting, have to be met.  And if they're -- if
19          they're not all met, then there is no practical difficulty
20          that runs with the land.  So, those particular items, I don't
21          have them memorized, but they are always in front of us, every
22          meeting and I review them during the meeting.
23   Q.     And, do you take notes during that meeting?
24   A.     No.  Never.  I might jot down something after the action items
25          are considered that I may want to share with the board
```

15

```
1        regarding other matters -- you know -- like, we're going to
2        have a training next month with the city attorney on Open
3        Meetings Act.
4   Q.   Okay.
5   A.   And then I discard that.
6   Q.   So, when somebody's making a case for a variance and you're at
7        the public hearing, what's your process for looking at that
8        variance and determining whether it's applicable?
9   A.   If they meet those five --
10  Q.   How do you determine that?
11  A.   Well, it's pretty clear.  Those are pretty clear items of --
12       of potential hardship.
13  Q.   Let's go over them then, since they're pretty clear, and talk
14       specifically about why you denied this variance.  I'm not
15       going to use an exhibit but thank you.
16            COURT RECORDER:  You're welcome.
17  BY MS. DOUKOURE:
18  Q.   Are you talking specifically about the statement of practical
19       difficulty and the A, B, C, D and E enumerations?
20  A.   I believe so.
21  Q.   Okay.  So let's go over them one by one.  And if you'd like, I
22       can give you a copy of this --
23  A.   Sure.
24  Q.   -- so you can look at it.  I'm not going to enter it as an
25       exhibit.  I'm just going to give it to you to make -- for ease
```

16

```
 1          of -- maybe, I will look if I have another copy.  I actually
 2          don't have another copy.  I didn't plan on using it.  Okay, so
 3          I'm just going to read them to you.  So, if you're looking for
 4          exceptional characteristics of the property for which the
 5          variance is sought, make compliance with the dimensional
 6          requirements, substantially more difficult than would be the
 7          case for the great majority of properties in the same zoning
 8          district.  Characteristics of the property which shall be
 9          considered include; exceptional narrowness, shallowness,
10          smallness, irregular shaped topography, vegetation and other
11          similar characteristics.  How would you determine that?
12  A.      Because the application did not fit that.
13  Q.      That's not what I'm asking.  I'm asking you how you determine
14          that --
15  A.      I determined it because that's a logical --
16  Q.      What would you review in order to determine that?
17  A.      The application in front of us.
18  Q.      What part of the application?
19  A.      Well, in --  in the petitioner's words.
20  Q.      Just the words?
21  A.      Well, not just the words, the totality of everything that
22          comes before us.
23  Q.      Which would include?
24  A.      The application.
25  Q.      The application is four pages?
```

```
 1   A.    Right.

 2   Q.    The application asks for property tax identification numbers.

 3         Would you review that?

 4   A.    We would -- we -- we are briefed by the City Administration.

 5         They tell us about the property --

 6   Q.    When are you briefed?

 7   A.    Right at the meeting.

 8   Q.    You're -- when -- you're briefed when at the meeting?

 9   A.    At the beginning of that action item.

10   Q.    Okay.  So, would you be -- since you're reviewing the

11         application, would review the property identification numbers?

12   A.    Numbers?

13   Q.    Yes.

14   A.    No.

15   Q.    The address of the property?

16   A.    Sure.

17   Q.    The zoning ordinance sections related to the request?

18   A.    Zoning Ordinance sections related to the request?  No.

19   Q.    Whether or not there's appeals for this property?

20   A.    Appeals?  You --

21   Q.    Prior -- previous appeals.  I mean, I'm reading --

22   A.    No.

23   Q.    -- from this application.

24   A.    No.

25   Q.    Would you review the name and information about the
```

18

```
 1          application -- the applicant, I'm sorry.
 2   A.     I would see that on the application, so yeah, it's on our
 3          agenda.
 4   Q.     Would it tell you about the exceptional characteristics of the
 5          property?
 6   A.     No.
 7   Q.     What about the property owner?
 8   A.     No.
 9   Q.     Okay, so that's the application.  So, what part of that would
10          you review for -- to learn about the exceptional
11          characteristics of the property?
12   A.     I often times read what the applicant states.
13   Q.     Do you -- would you look at --
14   A.     And, I balance it up against the practical difficulty list of
15          five.
16   Q.     I'm talking specifically about A on the list of five.
17   A.     On the list of five what?
18   Q.     Practical difficulty list.  The same list that we've been
19          talking about --
20   A.     Yeah.
21   Q.     -- this whole time.
22   A.     Sure.
23   Q.     I'm talking specifically about Action Item A on that list of
24          five which I just read to you.  I'm asking you other than
25          words, do you review anything?  Like, would you review what's
```

19

```
 1        already existing on the property, say, through either a plat
 2        map or, say, through a mortgage survey or, say, through
 3        previously accepted diagrams or site plans that are already
 4        with the city?  Would you review any of those items?
 5   A.   I review what's in our packet, that the city administration
 6        presents to us.  They also pull up different things, that
 7        aren't necessarily in the packet, up on the screen, like an
 8        overview.  They can Google Map.  They have software programs.
 9        I don't know what they're called.  Whatever the city
10        administration presents to us.
11   Q.   So, in -- in this application, specifically, there was a site
12        plan submitted, did you review the site plan?
13   A.   I can't recall.  I'm sure I did.  I go through during the
14        meeting and I review -- I go down and I review the
15        information.
16   Q.   Wouldn't the best way to understand what the characteristics
17        of this building would be, would be to look at what the
18        building looks like?  Wouldn't that be the best?
19   A.   I -- I know what the building looks like.
20   Q.   I know you do because you've stated exactly, on the record,
21        that you knew exactly what this building was?
22   A.   Right.  Because I live in Troy.
23   Q.   Right.
24   A.   I drive by there all the time.
25   Q.   But in your driving by -- in -- in the city, and living in the
```

20

```
 1          city of Troy --
 2    A.    And I've been there.
 3    Q.    -- when -- that is, like, that is sufficiently official enough
 4          for you to see what the dimensions of this property are
 5          without actually looking at the dimensions of the property?
 6    A.    I didn't say that I didn't review -- review that.  I can't
 7          recall.  It was a long time ago.
 8    Q.    Right.  And, you didn't review anything before coming here
 9          today.  Correct?
10    A.    Right.
11    Q.    To help refresh your memory about --
12    A.    No.
13    Q.    Despite the fact that you're a defendant in a lawsuit?
14    A.    No, because I recall the hearing.
15    Q.    Okay.  But you don't recall -- you recall the hearing, but you
16          don't recall whether or not you looked at the site plan?
17    A.    I can't recall everything, no.
18    Q.    Okay.  So, let's move to B "The characteristics which make the
19          compliance with the dimensional requirements difficult must be
20          related to the premises for which the variance is sought and
21          not some other location."  In the case of the June 19th
22          hearing in this case, was that element satisfied?
23    A.    I believe so.
24    Q.    So, that one --
25    A.    No -- no, I'm saying not there -- I don't believe so.
```

21

```
 1    Q.    Why not?

 2    A.    Because it's not about another location.

 3    Q.    That's -- that's what this says.  This says it has to be about

 4          the location and not another location.

 5    A.    Right.  That's what I mean.  It was --

 6    Q.    So was it -- did they satisfy that requirement that they were

 7          asking about --

 8    A.    Who's they?

 9    Q.    The Plaintiff, Adam Community Center, the applicant, because

10          they are the ones applying.

11    A.    No, I don't believe that they satisfied --

12    Q.    Why did they not satisfy it?

13    A.    Because, in my judgment, they didn't.

14    Q.    Why?

15    A.    I don't -- I'm not going to give you an explanation further

16          because I can't --

17    Q.    You're not going to give me?

18    A.    I don't have all the information in front of me.  I -- I don't

19          believe they satisfied it.  That was my judgment.

20    Q.    Why?

21    A.    Because it is not fulfilling what those words say there.

22    Q.    Why not?

23    A.    I don't believe it is.

24    Q.    Based on what facts or what evidence or what document?  What

25          did you use to make that determination --
```

22

```
 1  A.    The packet --
 2  Q.    -- other than your -- your desire to say no?
 3  A.    Please lower your voice.
 4              MR. MOTZNY:  Just listen to the question and answer
 5        to the best of your ability.  That's all.
 6              THE WITNESS:  From what the City Administration
 7        presented to us and what was in our packet and what the
 8        applicant --
 9              MS. DOUKOURE:  Did you base it on a factual basis?
10              MR. MOTZNY:  All right.  Can you let him finish his
11        question, too, please?  He was -- he was responding and you
12        interrupted him.  Let him finish, please.
13              MS. DOUKOURE:  Sure.
14              THE WITNESS:  I think I'm done.
15              MS. DOUKOURE:  Okay.  Did -- did -- I have -- he --
16        he paused.  I had assumed he was done.  I was not trying to be
17        rude.
18              MR. MOTZNY:  Okay.
19  BY MS. DOUKOURE:
20  Q.    Did you base it on a factual basis?
21  A.    Sure.  And the facts --
22  Q.    What factual basis?
23  A.    I don't recall because that was a long time ago.  I -- I -- I
24        reviewed all the material.  I listened to all the testimony.
25  Q.    How long did it take you to review all of the material?
```

23

| | | |
|---|---|---|
| 1 | A. | That was a long meeting.  It was a long, long meeting.  I |
| 2 | | don't recall. |
| 3 | Q. | A lot of people spoke, I do recall that. |
| 4 | A. | Yeah.  I can't answer your question.  I don't recall. |
| 5 | Q. | And, you didn't watch the video to try to refresh your memory? |
| 6 | A. | I've already answered that question. |
| 7 | Q. | Do you believe that you have to make a factual finding, give a |
| 8 | | basis? |
| 9 | A. | I believe I read the practical difficulty list of five.  I |
| 10 | | amount -- I've already answered this question. |
| 11 | Q. | I'm asking you, do you believe that you have to make a factual |
| 12 | | finding and you have not answered this question and if you'd |
| 13 | | like, we can play the tape back.  Do you believe that you have |
| 14 | | to make a factual finding as to why somebody doesn't qualify? |
| 15 | A. | I read that information -- |
| 16 | Q. | I'm asking you a yes or no question.  Do you believe that you |
| 17 | | have to make -- |
| 18 | A. | I believe -- |
| 19 | Q. | -- a factual finding as to why somebody doesn't qualify for a |
| 20 | | variance? |
| 21 | A. | I believe a factual finding, in my perspective, is taking the |
| 22 | | information, looking at those reasons -- |
| 23 | Q. | Mr. Motzny, I'm asking your client a yes or no question.  Can |
| 24 | | you please instruct him to answer yes or no. |
| 25 | | MR. MOTZNY:  If you could answer yes or no, answer |

1     yes or no.  Listen to the question --

2               MS. DOUKOURE:  Do you have to make a --

3               MR. MOTZNY:  -- and answer to the best of your

4     knowledge.

5               MS. DOUKOURE:  -- factual finding as to why somebody

6     does not qualify, or some organization does not qualify for a

7     variance?

8               THE WITNESS:  For -- if I'm understanding the

9     question, the answer is no.  We can take a look at the

10    information, look at the rules that are summing up the whole

11    thing.  We don't -- we don't go through Ordinance 1215.B and

12    say they didn't meet this one, this one, this one, this one --

13  BY MS. DOUKOURE:

14  Q.   Do you think somebody is breaking the law when they're asking

15       for a variance?

16  A.   I believe it is a relaxation of the law so -- the zoning

17       ordinance is the law regarding that respective area of

18       government, so the answer is yes, they're asking to break the

19       zoning ordinance.

20  Q.   Is the var --- is there -- is the variance part of the zoning

21       ordinance?

22  A.   (no response)

23  Q.   The process for applying for a variance, is that part of the

24       Zoning Ordinance?

25  A.   I -- I don't know.  That's administrative or in the ordinance.

```
 1        I don't know.

 2   Q.   Is -- are there regulation set forth for applying for a

 3        variance and being granted one?

 4   A.   That's a question for the city government.

 5   Q.   You sit on the Zoning Board of Appeals.  You don't know what -

 6        - you don't know what this is?  You don't know whether or not

 7        there are regulations set forth?

 8   A.   I assume there are.  I don't know what the regulations are.

 9   Q.   Part of your -- part of your job, as the Zoning Board of

10        Appeals, is not to read and understand the zoning ordinance?

11   A.   We don't go line by line through the zoning ordinance.

12   Q.   Yes or no?

13   A.   No.

14   Q.   Are you suppose to understand the zoning ordinance?

15   A.   We're suppose to understand the big picture of what the zoning

16        ordinance is, not every specific thing, no.

17   Q.   So, when somebody comes and asks for a variance for 62 --

18        6.21E, you're not supposed to see what the requirements of

19        62.1E are?

20   A.   We're briefed on that by the city administration and the city

21        attorney.

22   Q.   So, is that a yes?  You're expected to understand when

23        somebody is asking for a variance on a specific portion of the

24        ordinance, you're supposed to understand what they're -- what

25        that ordinance is?
```

26

1   A.   Yeah.  But we're briefed on it.

2   Q.   And, you're suppose to understand what they're asking for?

3   A.   We're briefed on it, yes.

4   Q.   And, you're suppose to understand that -- but you know whether

5        or not the zoning -- you understand that there's a zoning

6        ordinance, yes?

7   A.   Yeah, I assume the regulations are part of the zoning

8        ordinance.

9   Q.   And you -- so then -- but you don't assume that the variance

10       is part of the zoning ordinance?

11  A.   Yes, because they can come before us, our board, to request --

12  Q.   So, it's part of the law then, yes?

13  A.   It -- we can, according to the practical difficulties --

14  Q.   I'm asking you, so, the variance -- the variance is written

15       into the law, how you --

16  A.   Sure, but --

17  Q.   So, it's -- it's not --

18  A.   -- they have to meet the criteria.

19  Q.   So, it's not breaking the law?

20  A.   If they don't meet the criteria.

21  Q.   I'm not asking you that.  I'm asking you whether or not --

22  A.   It can be -- it can be approved by the board, absolutely, yes.

23  Q.   So, if it's approved by the board, then you're -- you would

24       agree that you're not being asked to break the law?

25  A.   If they're not meeting the criteria --

27

```
 1   Q.   I'm asking you --
 2   A.   Yes.
 3   Q.   -- if somebody is asking for a variance --
 4   A.   We don't use that terminology so --
 5   Q.   You used that terminology 15 times at the hearing -- 15 times
 6        at the hearing.
 7   A.   Right.
 8   Q.   So, I'm trying to understand whether you think that everybody
 9        who comes before you is asking -- and asks for a variance, and
10        according with the zoning ordinance regulations, which is the
11        process for getting an ordinance -- a variance, correct, to
12        come in front of the board?
13   A.   Yes.
14   Q.   So, everybody that's coming before the board, you're -- you're
15        assuming that they're asking you to break the law, is what I'm
16        asking?
17   A.   Break the regulation, break the zoning ordinance --
18   Q.   I'm asking if you think that they are asking you to break the
19        law?
20   A.   The zoning law, yes.
21   Q.   So, every person who's ever asked for a variance in front of
22        you, including the three that were granted -- or two that were
23        granted that day, asked you to break the law?
24   A.   The zoning ordinance law?  Yes.
25   Q.   So, the Zoning Ordinance Law does not have a place in it for a
```

28

1      variance?

2   A.   That's not true.  We can relax the law based on the

3        circumstances.

4   Q.   So, we'd be asking for a relaxation of the law or breaking of

5        the law?

6   A.   It's really a relaxation of the law.  Maybe I misspoke.

7   Q.   So, you -- did you use -- have you ever used that terminology

8        with any other zoning application before?

9   A.   I think I probably have.

10  Q.   Can you recall any specific circumstances --

11  A.   No.

12  Q.   -- in which you have, that somebody is asking you to break the

13       law?

14  A.   No.

15  Q.   Fifteen times?

16  A.   I don't recall.

17  Q.   If they were qualified for the variance, would they have asked

18       -- would they have been breaking the law then?

19            MR. MOTZNY:  Can you expound on what you mean by

20       "qualify"?

21            MS. DOUKOURE:  If they had been -- if -- instead of

22       you denying the variance, you had voted to approve it, much

23       like the lady who came before them, the first hearing of that

24       date, she was asking for a dimensional variance for her

25       backyard -- to build, I believe, either a gazebo or some

29

```
 1        enclosed structure, not -- I didn't review it, what her
 2        application was.  But she didn't have enough room in her yard
 3        to do it.  You approved that.  You voted to approve that --
 4        that variance.  Was she asking to break the law or no because
 5        she --
 6    A.  I don't recall that circumstance, I can't answer the question.
 7    Q.  But she was -- if -- if she was approved, would she -- would
 8        she still be asking you to break the law?
 9    A.  That's a hypothetical, I can't answer.
10    Q.  You can answer it because that's actually what -- what you
11        said is that you're breaking --
12    A.  Okay.
13    Q.  -- you're breaking the law.
14    A.  I don't recall.
15    Q.  So, if somebody is qualified for a variance, are they then
16        also breaking the law?
17    A.  They're requesting to relax -- for us to break the zoning
18        ordinance based on a practical difficulty runs with land.
19    Q.  Do you think people who break the law should be punished?
20    A.  That's silly.
21                MR. MOTZNY:  Objection.
22                MS. DOUKOURE:  That's not silly.  I'm trying to get
23        to your state of mind, Sir.
24                MR. MOTZNY:  I will object to the question because
25        it's not likely to lead to admissible evidence --
```

30

```
 1              MS. DOUKOURE:  Your objection --
 2              MR. MOTZNY:  You could file -- you could respond if
 3      you have a response, but, again, listen to the question and
 4      answer if you -- if you can answer it.
 5   BY MS. DOUKOURE:
 6   Q.   Do you think that people who break the law should be punished?
 7   A.   In a criminal matter, sure.
 8   Q.   What about a code violation?
 9   A.   No.
10   Q.   So, you believe that the --
11   A.   I do -- punishment is an open-ended question.  Fined, yes.
12   Q.   That's not a punishment?  Because the city sees it as a
13        punishment, I'm sure.
14   A.   I -- I don't know if they've ever used that phrase.  I never
15        have.
16   Q.   So, do you think that there should be some consequence for
17        people who break the law?
18   A.   For criminal cases, absolutely.
19   Q.   What about zoning ordinances?
20   A.   Punishment?  No.
21   Q.   I didn't say punishment.  I said consequence.  It could be a
22        ticket, it could be anything.
23   A.   It's -- we don't -- we're not involved in ticketing.
24   Q.   I'm not asking you if you're involved in ticketing.  I'm
25        asking you your state of mind.  You decided this application.
```

31

```
 1            Your state of mind is highly relevant to what was going

 2            through your head when you were making comments --

 3   A.   We approve them --

 4   Q.   -- on the record.

 5   A.   We approve them --

 6   Q.   I'm asking you if you think that somebody --

 7   A.   Lower your voice, please.

 8   Q.   I'm asking you --

 9   A.   Lower your voice -- I have high blood pressure.

10   Q.   I'm asking you if somebody, who is breaking the law, should

11            have a consequence to their action?

12   A.   Not before our Board.

13   Q.   I'm not asking about for before your Board.  I'm asking about

14            in general -- do you have kids?

15   A.   No.

16   Q.   You don't have any kids?

17   A.   I already answered your question.

18   Q.   Have you ever had any children?

19   A.   I don't have children.  No.

20   Q.   Have you been to school?

21   A.   Yes.

22   Q.   If the teacher sets a rule in a class and somebody breaks it,

23            should there be a consequence?

24   A.   Sure, according to the teacher's or principal's office, what

25            have you, yeah.
```

32

1    Q.    The city sets rules.  If somebody is breaking those rules,

2          should they have a consequence?

3    A.    Not regarding our board.

4    Q.    I'm not asking about your Board.

5    A.    Sure, if you're speeding, you should get a ticket.

6    Q.    If you have --

7    A.    That's a consequence.

8    Q.    What if you build a structure that's not permitted.  Should

9          you have a consequence for that?

10   A.    We sometimes -- yes.

11   Q.    Okay.

12   A.    Perhaps.

13   Q.    So, if there is a rule violation or a violation of the law,

14         should there be a consequence?

15   A.    Not in a yes-or-no vote regarding a zoning ordinance.

16   Q.    I'm not asking about a yes-or-no vote.  I'm asking --

17   A.    Yes.  Regarding a parking or a speeding ticket, sure.

18   Q.    I'm not asking you specifically -- the problem is, you don't

19         want to admit, that you said that my client was breaking the

20         law and that there should be -- because you see how that looks

21         for you --

22   A.    I've never said --

23   Q.    And I'm asking you --

24   A.    Sorry.  You're wrong.  I never said that you were breaking the

25         law.

33

```
 1                    MR. MOTZNY:  All right.  Let her finish her

 2        question.

 3                    MS. DOUKOURE:  So, I'm asking you a very straight

 4        forward question.  People who break rules, should they be

 5        punished?

 6                    THE WITNESS:  In most circumstances, yes, and some

 7        no -- not.

 8   BY MS. DOUKOURE:

 9   Q.   If somebody breaks a law of the city, does the city have a

10        right to bring a consequence on them?

11   A.   Not in this circumstance, no.

12   Q.   I'm not asking about this circumstance, Sir.  That is a yes-

13        or-no question?

14   A.   If they shoot somebody, yes.

15   Q.   I'm not asking about if they shoot somebody.

16   A.   If they ask for relaxation of the law?  No.

17   Q.   But it's still breaking the law?

18   A.   It's breaking the Zoning Ordinance that we give permission to

19        do that or we do not.

20   Q.   So, they're asking you to break the law?

21   A.   Break the Zoning Ordinance, which is a form of a law.  It's

22        regarding can I do this with my property, can I not do this

23        with my property?

24   Q.   Let's talk about this church that you belong to.

25   A.   I don't belong to a church.
```

34

```
 1    Q.    Did you not speak on the record --

 2    A.    I used to --

 3    Q.    -- about your church?

 4    A.    I used to belong to a church that I --

 5    Q.    What church is that?

 6    A.    -- think I referenced.  Woodside Bible Church.

 7    Q.    And where is that located?

 8    A.    Troy.

 9    Q.    What's the address, if you have it?

10    A.    I don't know.

11    Q.    Do you know about where it's located?

12    A.    On Rochester Road in North Troy.

13    Q.    Do you know the cross street?

14    A.    Between -- north of Square Lake Road.

15    Q.    How long were you a member there?

16    A.    Never.

17    Q.    You said 30 seconds ago that you used to be a member there.

18          Now you're saying you were not?

19    A.    I may have misspoken.  I don't think I said that.

20    Q.    Yes, I believe you did.

21    A.    You can play the tape back.

22    Q.    So -- you -- you -- but you've attended services there?

23    A.    I did.

24    Q.    For how long?

25    A.    I don't know.  Many years.
```

```
 1   Q.    More than five?

 2   A.    Yes.

 3   Q.    More than ten?

 4   A.    I'm not sure.

 5   Q.    So, somewhere between five and ten, maybe more?

 6   A.    Yeah.

 7   Q.    You said they built a new church.  Do you remember -- recall

 8         when that was built?

 9   A.    No.

10   Q.    Because you spoke at length about it on the video.

11   A.    I didn't speak at length about it.  I mentioned it and then

12         moved on.

13   Q.    For five minutes.

14   A.    Not for five minutes.  Sorry.  You're wrong.

15              MR. MOTZNY:  Just answer her questions.  Don't argue

16         with her, okay?  Just answer the questions.

17              MS. DOUKOURE:  I mean, I'm not sure you can recall

18         that since you didn't watch the video that I watched

19         yesterday.

20              THE WITNESS:  I recall the meeting or parts of the

21         meeting.

22   BY MS. DOUKOURE:

23   Q.    Do you recall that you said that it was built around 2016?

24   A.    Nope.

25   Q.    DO you recall that you said that it was built on the last
```

```
 1          usable piece of land in the city of Troy possibly for place --
 2          religious place of worship to build a new property?
 3    A.    I didn't say that.
 4    Q.    You said --
 5    A.    I referenced two churches that bought two of the last large
 6          parcels.
 7    Q.    So, two churches bought two of the last large parcels?
 8    A.    It's true.
 9    Q.    Is what you recall?
10    A.    Yeah.
11    Q.    Do you recall when they purchased those?
12    A.    No.
13    Q.    Do you know about a date?
14    A.    No.
15    Q.    Were you attending -- were you attending church services there
16          when they built the new building and purchased that land?
17    A.    I believe I was.
18    Q.    Did you assist them in purchasing the property?
19    A.    No.
20    Q.    Did you advise them?
21    A.    No.
22    Q.    Did you look over any of their site plans?
23    A.    Never.
24    Q.    Did they come in front of the Zoning Board of Appeals?
25    A.    Never.
```

```
 1   Q.   Do you believe that a -- is it your understanding that a
 2        community center can have a prayer space in it?
 3   A.   I don't recall.  I know we -- we -- I think we addressed that
 4        at the old Marianelli (sp) site and I don't recall, and it's
 5        never come before us again.  So I -- I don't recall.
 6   Q.   Would it surprise you if I told you that the City of Troy's
 7        Community Center has a prayer space in it?
 8   A.   I don't know that that's true.
 9   Q.   Would I -- would it surprise you if I told you that their
10        website listed as having a --
11   A.   I don't know that's true.
12   Q.   Would a community center that needed -- that wanted a prayer
13        space inside have to come before the Zoning Board of Appeals?
14   A.   I don't know.
15   Q.   Would they be considered a place of worship?
16   A.   I don't know.
17   Q.   Who would know that?
18   A.   City Administration here.
19   Q.   City administrative who?
20   A.   I think you already spoke -- you deposed him.
21   Q.   Mr. Evans?
22   A.   Uhm-hmm.  I'm sure he can find out.
23   Q.   What was your purpose for bringing up the large-scale Woodside
24        Bible Church during a Zoning Board Hearing for a completely
25        different location?
```

```
 1   A.   Just that that church and the Kensington Community Church both
 2        bought -- you have the tape, you reviewed it.  You know my
 3        words.
 4   Q.   I'm asking for your intent, not your words, because, yes, I do
 5        have your words.
 6   A.   Yeah.  If the intent was simply to point out that if you're --
 7        you're a restaurant and you're trying to have an extreme
 8        variance request, I could --
 9   Q.   What makes this variance request extreme?
10   A.   Fifteen feet of variance on all four sides.  We've never
11        approved anything like that on a Zoning Board since I've been
12        on -- for I don't know, perhaps 15 years.  I don't know how
13        long.
14   Q.   Is this commercial building in use?
15   A.   I don't know.
16   Q.   Was it in use at the time of this hearing?
17   A.   I don't know.
18   Q.   But you said you, as a resident of the City of Troy, you're
19        very familiar with this building because you've been there,
20        but you don't know?
21   A.   In use during the time -- just because I've there does not
22        mean I'm familiar with every business in operation in the City
23        of Troy.
24   Q.   Because -- because you used that, a few minutes ago, as a
25        basis for how you judged a portion of your decision on -- on
```

39

```
1          this application was your extensive knowledge as a resident of
2          the City of Troy --
3   A.     I shopped there when it was a DSW Warehouse and I ate there
4          one time at the Asian Eatery.  I drive by there now -- do I go
5          in there and try the door?  No.  I drive by there now.  It
6          doesn't look like it's in operation.  I don't think it's been
7          in operation for quite some time.  I don't know.  Just because
8          --
9   Q.     It actually is in operation but --
10  A.     Just because they have two cars outside doesn't mean that
11         they're in operation.
12  Q.     Let's talk about --
13             MR. MOTZNY:  Stop.  Just listen to her questions and
14         answer, okay?  All right?  Let her finish her question, then
15         you answer, and we move on.
16             MS. DOUKOURE:  So, let's talk about when this was in
17         operation as a DSW warehouse.  Is there a 50-foot setback on
18         any of the sides of the property?
19             THE WITNESS:  I don't know if anything had changed
20         regarding the building.  I'm not sure.
21  BY MS. DOUKOURE:
22  Q.     I'm asking when it was a DSW and you said you were there, and
23         you have extensive knowledge because you shop there and that
24         was part of the basis for your decision on this application.
25         Was there a 50-foot setback at that time?
```

40

```
 1              MR. MOTZNY:  Just for the record, I object.  That is
 2         a compound question.  There was several questions there.
 3              MS. DOUKOURE:  There was, actually, only one
 4         question and a statement, but you may answer.
 5              THE WITNESS:  I didn't -- I didn't pay any attention
 6         because I wasn't on the Zoning Board back then.  I went in a
 7         bought shoes.
 8  BY MS. DOUKOURE:
 9  Q.  But, didn't you say, a few minutes ago, that you use -- that
10      your extensive knowledge is partly how you based your decision
11      on this application?
12  A.  I drive by the building and I've shopped there.  I don't
13      always look at things about a ZBA.  I do know when the City
14      Administration presented to us and then your application was a
15      50-foot setback on every side --
16  Q.  Is there any setback on that building now?
17  A.  I don't -- I don't know, I haven't been by there recently.
18  Q.  Did you review the documents at the ZBA hearing?
19  A.  Yes.
20  Q.  Did the documents from the ZBA hearing --
21  A.  That was a long time ago.
22  Q.  Okay.  I'm going to get them to you.
23              MS. DOUKOURE:  Can you mark this as Plaintiff's
24         Exhibit No. 1, please?  It might already be marked.
25              COURT RECORDER:  Yep, it's marked on it.
```

```
 1                   MS. DOUKOURE:  I don't have another copy. I
 2          apologize because I did not expect to have to submit this
 3          today.
 4                   MR. MOTZNY:  Okay.
 5                   COURT RECORDER:  I have a copy in my bag, do you
 6          want to borrow it?
 7                   MS. DOUKOURE:  If I may.
 8                   COURT RECORDER:  Yes.  I'll give you that.
 9                   MS. DOUKOURE:  I'm going to give this to you.  I
10          have my own.
11                   COURT RECORDER:  This is my copy.
12                   MS. DOUKOURE:  Thank you.  I'll give it right back.
13                   COURT RECORDER:  Okay.
14                   (At 10:17 a.m., PX1 admitted)
15    BY MS. DOUKOURE:
16    Q.   I'm going to give you a few seconds to look through this.
17    A.   (no response).
18                   MS. DOUKOURE:  Are you recording this Ms. Kuppa?
19                   MS. KUPPA:  No, I'm replying to emails.
20                   MS. DOUKOURE:  Okay.
21                   THE WITNESS:  I don't have my glasses.  This is very
22    --
23                   MS. DOUKOURE:  Would you like to get them?
24                   THE WITNESS:  I don't have them with me.
25                   COURT RECORDER:  I have readers.  That might help?
```

42

```
 1                    THE WITNESS:  Well, I'm not going to use someone
 2         else's glasses.  I'm sorry.
 3                    MS. DOUKOURE:  Okay, I mean, we can -- we can pause
 4         this and give you a chance to get your glasses if you think
 5         that's necessary to read --
 6                    THE WITNESS:  I don't -- I don't have reading
 7         glasses.  I have sight vision.  My eyes just --
 8                    MS. DOUKOURE:  No, no.  That's not what I mean.  I
 9         mean, we can pause the deposition if you think that you need
10         them to read these documents?
11                    THE WITNESS:  I don't -- I'd have to go get -- at a
12         doctor.  My eye -- my eye vision --
13                    MS. DOUKOURE:  I got you.  I got you.
14                    THE WITNESS:  -- just changed in the last two weeks.
15         I need to go to an eye doctor, but --
16                    MS. DOUKOURE:  Your vision changed in the last two
17         weeks?
18                    THE WITNESS:  Yeah, pretty significantly.
19                    MS. DOUKOURE:  That's from the high blood pressure
20         probably.
21                    THE WITNESS:  Please -- please --
22                    MS. DOUKOURE:  I'm not --
23                    THE WITNESS:  -- don't speculate about my health.
24                    MS. DOUKOURE:  I'm not.  No, my stepdad has the same
25         issue.
```

1              THE WITNESS:  Please, don't do it.

2              MS. DOUKOURE:  He's had glasses three times this

3      year.

4   BY MS. DOUKOURE:

5   Q.   Did you have your glasses at the time of the ZBA hearing?

6   A.   I didn't have problems back then.

7   Q.   You had perfect 20/20 vision at that time?

8   A.   That's a silly question.  Perfect?  No, I didn't have perfect

9        vision.  No.

10  Q.   But you did need glasses?

11  A.   Not for reading.

12  Q.   Okay.  Your hostility is noted.

13  A.   Yours is legendary.  So, what I recall about the hearing was

14       that --

15  Q.   Okay, I'm asking you a specific question.  I'd like you to

16       answer my question.

17  A.   Okay.

18  Q.   Looking at what is marked as -- I'm going to -- just for the

19       record, what I have given him is the Zoning Board of Appeals

20       application it's marked as Plaintiff's Exhibit 1.  This was

21       the application that was submitted for the hearing, which you

22       should have gotten at your packet.  We are looking, Mr.

23       Motzny, for your notes at the same exhibit we looked at Mr.

24       Evans, which is marked as Exhibit B in the Zoning Board

25       application.  If we're looking at this exhibit, can you see

44

1      the -- the subject property?

2  A.   Yes.

3  Q.   Can you see the boundary lines on the subject property?

4  A.   I believe so, yes.

5  Q.   Is there parking up to -- is there any -- scratch that.

6      Strike that.  Is there any -- is -- is -- is there any setback

7      on any portion of the property according to this exhibit?

8  A.   I believe so.

9  Q.   What -- where is the setback?

10  A.   I can't read that print.

11  Q.   I'm -- I'm confused by what you mean print.  We're looking at

12      a diagram.

13  A.   Right.  But there's information here.  I'm not -- I know

14      there's setback because it's not up against all the property

15      lines.

16  Q.   Is it up -- the building.  Correct?

17  A.   Right.

18  Q.   Okay.  So, can you tell from this diagram whether there is any

19      setback from the -- I'm trying to look for the demarcation.

20      So, according to this, the location map, at the top North is

21      up, South is down, East is to the right and West is to the

22      left.  Is that correct?

23  A.   Right is to the what?

24  Q.   Right is to the East.

25  A.   I don't believe that's correct because the parking lot is over

1           here.

2      Q.   There's parking lot on two sides of this building.  According

3           to this map, there is a marcation on it in the top right-hand

4           not-quite corner where it says location map, it says North is

5           up.  Is that correct?

6      A.   From Exhibit No. B?

7      Q.   That is correct.  There's like a little tiny arrow with a

8           circle around it.  Below it, it says North.

9      A.   The large parking lot is on the --

10     Q.   That's not what I'm asking you.

11     A.   I see that, yes.

12     Q.   Is that correct?

13     A.   It seems to me that --

14     Q.   So, on the East side of this property, that would be what

15          road?  That would be Rochester Road, correct?

16     A.   Yeah, okay.  Yes.

17     Q.   So, that's on the right side of the property.  Correct?

18     A.   Uhm-hmm.

19     Q.   On the back side of this property, what is located there?

20     A.   (no response).

21     Q.   That would be the left side of the paper?

22     A.   Lines.

23     Q.   That's the property margin -- or the property -- I'm sorry,

24          margin is not the appropriate word.  That's the property

25          boundary line.  Is that correct?

46

```
 1    A.    Yes, I think that's correct --

 2    Q.    Do you recall --

 3    A.    -- there's a wall there.

 4    Q.    A little wall.  Correct?

 5    A.    Not a little.  It's pretty tall.

 6    Q.    Okay.

 7    A.    I don't know, five feet.

 8    Q.    You said "little wall."  I just reiterated your words.  Do you

 9          know what's on the other side of that wall?

10    A.    I didn't say little wall.  I said wall.

11    Q.    Do you recall what's on the other side of that wall?

12    A.    Houses.

13    Q.    Residential property.  Correct?

14    A.    Right.

15    Q.    So, can you -- what are those little tick lines on the edge of

16          that property line?

17    A.    I don't know.  Parking spots?

18    Q.    Parking spots.  Do the parking spots appear from this diagram

19          to go all the way to the edge of the property line?

20    A.    Yes.

21    Q.    Is there parking permitted in the setback of a commercial

22          building?

23    A.    In a setback of a commercial building?  We never have

24          addressed that, I don't believe on the Zoning Board.

25    Q.    You've never addressed parking -- are you -- are you aware --
```

1  A.   Within the setback that's been -- like the variance has been

2       granted.

3  Q.   So, there's a variance on this building?

4  A.   I don't believe so, but I don't know.  I never did the

5       research.

6  Q.   So, when somebody came before you for a Zoning Board of Appeal

7       Application, you don't research the property at all?

8  A.   I do.

9  Q.   But you didn't research this property?

10 A.   The night of the meeting.  I didn't want to prejudge anything.

11      So, I went through with extensive overview by the City

12      Administration, with a very extensive packet --

13 Q.   And what do they talk about in that interview -- that

14      overview?  What exactly was talked about?

15 A.   What the -- what the setbacks are for a commercial property,

16      which you were there for versus a house of worship, which are

17      different.  That's what I based my vote on because there was

18      no practical difficulty running with the land for a 50-foot

19      variance on all five -- four sides.  Seven to zero vote.

20 Q.   I recall.

21 A.   Yeah.

22 Q.   I recall.

23           MR. MOTZNY:  Again, just answer what she asks you,

24      okay?

25           MS. DOUKOURE:  I recall the entire thing and I've

48

1      watched the video multiple times, so, has the Department of

2      Justice, by the way.  I don't know if Mr. Motzny told you that

3      or not, but --

4                    THE WITNESS:  Is that a question?

5   BY MS. DOUKOURE:

6   Q.   I'm asking you whether or not a commercial building requires a

7        variance to have parking in a setback?

8   A.   I don't believe so, but --

9   Q.   What if I told you that Mr. Evans stated the opposite of what

10       you've stated?

11                   MR. MOTZNY:  Objection.  That assumes facts not in

12       evidence.

13  BY MS. DOUKOURE:

14  Q.   What if I told you Chapter 13 -- Section 13.06 C3 states "that

15       pavement for a commercial building must be 10-feet from a

16       single-family home?"

17  A.   That's what I'm recalling, now, that you're sharing that with

18       me.  Which, I think my initial answer kind of lent to that.

19  Q.   I -- I don't think -- I mean, we'll agree to disagree on that.

20       Is this parking lot paved all the way to the edge of the

21       property?

22  A.   I'm not sure now.  I think it was when I was eating there once

23       and shopping there.  I don't recall seeing gravel.

24  Q.   That's not something that you would necessarily needed to look

25       into prior to deciding whether or not a variance is necessary?

49

1  A.   No.

2  Q.   So, according to E, "The proposed variance will not be harmful

3       or alter the essential character of the area which the

4       property is located."  You don't think that part of the

5       essential character is whether or not this is already paved

6       for parking?

7  A.   I don't -- I don't believe that that was the aspect of what

8       the Board even -- we didn't even discuss that that night.  You

9       didn't bring it up and I don't think it was part of the

10      application --

11 Q.   I mean, I disagree that I didn't bring it up because we talked

12      extensively on it in that hearing.

13 A.   About parking?

14 Q.   Yes, Sir.

15 A.   Just -- I think enough parking is what I recall.

16 Q.   No, that's --

17 A.   That was a long time ago.  I don't recall.

18 Q.   It was a long time ago and we haven't reviewed anything so --

19      Do you notice anything about the site plan, possibly that it

20      was approved by the City of Troy?

21 A.   That it was approved?

22 Q.   Yes.

23 A.   I assume since it was in our packet, that it was.

24 Q.   I mean, this was submitted by my client.  This was not

25      submitted to you by the City.

50

1  A.   Okay, I'm sorry.  I don't -- what was the question?

2  Q.   Do you notice that -- that -- there's stamps on it indicating

3       that it was received and approved by the City?

4  A.   (no response)

5  Q.   Are you familiar with those types of markings?

6  A.   We really -- we really don't --

7  Q.   Consider that?

8  A.   -- consider that, yeah.  I mean, there was a Board member

9       recently who mentioned another application, but it wasn't part

10      of what we process.

11 Q.   Excuse me, I'm sorry.  At the time that you give a denial or

12      approval, for a zoning variance, pursuant to your official

13      duties, do you ever state on the record the reasons why the

14      variance was either granted or denied?

15 A.   Yes.

16 Q.   In this case, do you recall stating anything as to why?

17 A.   I do not.  A long time ago.

18 Q.   If you -- you've just looked through the application again.

19      Correct?

20 A.   I mean, I glanced -- I mean, not every page.

21 Q.   Would you like a few minutes to review it?

22 A.   No.

23 Q.   I'd like to know why you denied the variance for an

24      application?

25 A.   I already told you.  I answered that question.

51

1    Q.    You told me it was your belief, but you didn't tell me

2          anything about what your belief was based on.

3    A.    That's not true.

4    Q.    What did you say?

5    A.    I think this will be the third time, maybe the fourth I'll

6          state it so, maybe, we can get it for sure on the record here.

7          We get a list of practical difficulties, the Zoning Ordinance

8          says they have to meet -- you have to meet all -- you can't

9          not meet all five of those.  The Board did not believe that

10         you --

11   Q.    I'm not asking about the Board.  I'm asking about you?

12   A.    It was a seven to zero vote.

13   Q.    I'm asking about your vote only?

14   A.    I voted --

15   Q.    You can't testify to other people's votes so I'm asking you

16         about your vote --

17   A.    The Board and myself --

18   Q.    I'm asking about your vote?

19   A.    Please, lower your voice.  I'm not going to ask you again.

20   Q.    Please, answer the questions that I'm asking you.

21   A.    Please, lower your -- you don't have to yell at me.

22   Q.    I'm not yelling.

23   A.    Yes, your voice is elevated.

24   Q.    You may not like my tone, but I'm not yelling.

25   A.    It's elevated.

1               MR. MOTZNY:  Can we take a break?

2               MS. DOUKOURE:  Sure, that would be great.  Maybe we

3    could review our packet in the meantime.

4            (At 11:04 a.m., deposition recessed)

5            (At 11:14 a.m., deposition reconvened)

6  BY MS. DOUKOURE:

7  Q.  Mr. Clark, I -- have you had a chance to review the

8      application to your satisfaction?

9  A.  I've reviewed parts of it.

10  Q.  Did you need more time to review?

11  A.  No, because we're going to be talking about these five items.

12  Q.  That, and some other things, but yes.

13  A.  Okay.

14  Q.  So, with regards to Statement of Practical Difficulty letter

15      A, "The exceptional characteristics of the property for which

16      the variance is sought, make compliance with dimensional

17      requirements substantially more difficult than would be case

18      for the great majority of properties in the same zoning

19      district.  Characteristics of the property which shall be

20      considered include exceptional narrowness, shallowness,

21      smallness, irregular shaped topography, vegetation, other

22      similar characteristics."  Did Adam Community Center, in their

23      application packet, satisfy this requirement?

24  A.  I don't believe so.

25  Q.  Why?

```
 1   A.   Because this talks about a irregular shape, smallness,

 2        shallowness, narrowness, topography, vegetation and other

 3        similar characteristics.  It -- the parcel itself is perfectly

 4        good and there's not a problem that is running with the land.

 5        That's what we consider and putting a building that doesn't

 6        fit the zoning setbacks does not -- we deny these type of

 7        requests all the time.

 8   Q.   So, they don't submit A because the shape of the property is

 9        fine?

10   A.   Right.

11   Q.   Is there already a building on the property?

12   A.   I believe it is now.  I haven't been by there in a couple

13        days.

14   Q.   Was there a building on the property at the time of this

15        hearing?

16   A.   Yep.

17   Q.   Went?

18   A.   Uhm-hmm.

19   Q.   Is that a yes?  I'm sorry.

20   A.   Went?  What do you mean went?

21   Q.   When this hearing took place.

22   A.   Yes.

23   Q.   You can't say uhm-hmm just because it reads both as yes and no

24        on the transcript.

25   A.   I'm not used to that so --
```

54

1    Q.   I know -- I know.  It's a common thing.  But on the
2         transcript, it reads umm-hmm and uh-uh read exactly the same.
3         But there is a building on this property at the time of the
4         hearing.  Correct?
5    A.   Yes.
6    Q.   Substantially large building?
7    A.   It's a good size building.
8    Q.   Where -- was Adam Community Center asking to make any changes
9         to the building?
10   A.   I don't believe so.
11   Q.   With regards to number -- not number -- letter B, "The
12        characteristics which make compliance with the dimensional
13        requirements difficult must be related to the premises for
14        which the variance is sought, not some other location."  Did
15        they satisfy that requirement?
16   A.   I don't believe so because of the setbacks.  It's a different
17        type of application.
18   Q.   Were they asking for something related to the property at
19        issue in this case?  Were they asking for a variance based on
20        that property?
21   A.   Sure.
22   Q.   Were they asking for a variance based on the property next
23        door?
24   A.   I don't believe so.
25   Q.   Were they asking for --

55

1    A.   Well, I'm not sure about that.  I can't recall 'cause there is

2         a pizza place, I believe, right there.

3    Q.   Did we talk about the pizza place in the hearing?

4    A.   I don't recall.

5    Q.   Does this application talk about the pizza place?

6    A.   I don't recall.

7    Q.   Did you just look through it?

8    A.   This is a very thick packet.  I don't know if it's in here or

9         not.

10   Q.   Were they asking for a -- were they discussing at that hearing

11        or in this application packet any other property other than

12        the subject property?

13   A.   I don't believe so.

14   Q.   So, they're asking for a variance based on the characteristics

15        of this property.  Is that correct?

16   A.   Right.

17   Q.   But you're saying that B is not met despite the fact that they

18        were not talking about some other location but the location?

19   A.   Well, I didn't see -- did not see dimensional requirements,

20        that operative word there.

21   Q.   You didn't -- that is not the operative word here.

22   A.   I believe it is.

23   Q.   Related to --

24   A.   It's my opinion.

25   Q.   That's your opinion that the dimensional requirements --

56

|    |    |                                                                                     |
|----|----|-------------------------------------------------------------------------------------|
| 1  |    | because the actual things -- "The characteristics which makes                       |
| 2  |    | compliance with dimensional requirements difficult must be --                       |
| 3  |    | must is an actual operative word -- must be related to the                          |
| 4  |    | premises for which the variance is sought and not some other                        |
| 5  |    | location."  Is it your belief that you can read only half of                        |
| 6  |    | the requirement and make a determination?                                           |
| 7  | A. | No, I mean, I actually don't think I even used this Item B as                        |
| 8  |    | precursor for my vote.  I don't recall that.  I definitely                          |
| 9  |    | know Item A and then I think there's a couple more here.                            |
| 10 | Q. | So, you don't believe that you have to make a basis on each                         |
| 11 |    | and every five factual basis's that are set forth here?                             |
| 12 | A. | The applicant can be denied if any one of these are not in                          |
| 13 |    | compliance.                                                                          |
| 14 | Q. | So, it's your requirement that they have to meet all five --                        |
| 15 |    | your belief that they have to meet all five requirements?                           |
| 16 | A. | Yes.  The City Ordinance says that.                                                 |
| 17 | Q. | But this application says "The practical difficulty must be                         |
| 18 |    | clearly related to as many of the five standards as possible."                      |
| 19 | A. | I'm just telling you what the City Ordinance says.                                  |
| 20 | Q. | Where in the City Ordinance does it say that?                                        |
| 21 | A. | I was briefed by the city attorney and that -- told me that                         |
| 22 |    | that is in the City Ordinance.                                                      |
| 23 | Q. | So, you remember that but you don't remember whether or not we                      |
| 24 |    | talked about the pizza place?                                                       |
| 25 | A. | Ma'am, I don't remember what the weather was that night, so,                        |

57

```
 1        no.
 2   Q.   But you remember specifically that they told you that you had
 3        to meet all five requirements?
 4   A.   I've been on the Zoning Board for quite some time, so, we do -
 5        - we are briefed regularly.
 6   Q.   But you can't tell me where in the Zoning Ordinance?
 7   A.   No.
 8   Q.   Do you ever read the Zoning Ordinances?
 9   A.   Many years ago.
10   Q.   Do you ever refer back to them when you're assigning your
11        applications?
12   A.   No, I look at these items and this is what Board uses --
13        myself.
14   Q.   But these are related to the ordinance?
15   A.   Yeah, they sum up the ordinance.
16   Q.   They sum up the ordinance?
17   A.   Yeah, it's a summary of what the ordinance say.
18   Q.   And so Number -- Letter C, "The characteristics which make
19        compliance with dimensional requirements shall not be of a
20        personal nature."
21   A.   Right.
22   Q.   Do they meet this requirement?
23   A.   I don't think I even considered that because I don't believe
24        it was of a personal nature.
25   Q.   You don't believe it was of a personal nature?
```

```
 1   A.   No.

 2   Q.   So, they --

 3   A.   Normally --

 4   Q.   -- they may have met the requirement.  You just don't know

 5        because you didn't consider it?

 6   A.   I don't recall what I considered back then on every dimension.

 7        We were briefed that night, so, I don't recall.

 8   Q.   You don't recall?

 9   A.   No.

10   Q.   So, it's your testimony that you don't recall your decision,

11        at all, that night?

12   A.   I remember what my decision was.

13   Q.   No.

14   A.   I don't recall every aspect of my decision that night.

15   Q.   Do you recall any aspects of your decision that night?

16   A.   Sure.  I just answered one of them.  Item A.

17   Q.   And that was based on reviewing this because you -- or your

18        decision that night?  Because you couldn't tell me before you

19        reviewed this application.

20   A.   Because we always have this information before us.

21   Q.   And when you're looking at this and you're being briefed by

22        the City, do you take any notes?

23   A.   I already answered your question.

24   Q.   That was a no.  Correct?

25   A.   I already answered -- answered that question.
```

59

```
 1   Q.   Your question -- your answer was a no.  Correct?

 2   A.   Yes.

 3   Q.   So, when you're briefed by the City about how to decide on

 4        these votes, who briefs you?

 5   A.   I already answered that question, too.

 6   Q.   Please, refresh my memory.

 7   A.   Mr. Evans and sometimes Mr. Motzny.

 8   Q.   And anybody else besides Mr. Motzny if he's not available?

 9   A.   Another member of the City Attorney staff.

10   Q.   Okay.  But it's always an attorney and -- and Mr. Evans?

11   A.   Not always.  Mr. Evans can't always be there so, another --

12        other people have rotated in, but it's been a long time since

13        we haven't had Mr. Evans.

14   Q.   Okay.  And when they're going over and they're briefing you,

15        it's at the public hearing.  Correct?

16   A.   Not at the public hearing, before the public hearing.

17   Q.   Before it starts?

18   A.   Yes.

19   Q.   Okay.  And, do they brief you with regards to each and every

20        application that's being heard that day or just in general?

21   A.   No, each one very extensively.

22   Q.   And, do they advise you about whether they think that it is --

23        as to their opinion --

24   A.   No.

25   Q.   -- of whether it meets the appeals process?
```

60

```
 1   A.   No.  I've answered it.
 2   Q.   Well, I wasn't finished with my question, so, I wanted to make
 3        sure you heard the whole question before you answered.  What
 4        information do they give you with regards to A for this
 5        application?  When you were briefed, what information were you
 6        briefed about with regards to Letter A on the statement of
 7        practical difficulty with regards to this specific
 8        application?
 9   A.   They don't say A is this and B is that, regarding the packet,
10        that they deliver to us electronically or the night -- what --
11        what they do, this is for the Board and myself to take the
12        information in --
13   Q.   Okay, so, how do you analyze it?
14   A.   -- and apply this?
15   Q.   How do you analyze it?
16   A.   I think about it.
17   Q.   How?  Like, what's your process?
18   A.   I think we've addressed this quite a few times.  The
19        information is presented to us.
20   Q.   Uhm-hmm.
21   A.   It was also in the packet.
22   Q.   Right.  I know what information you got.  I know how you --
23   A.   Our Board colleagues discuss it.  Oftentimes, Board colleagues
24        will say, well, Item A this --
25   Q.   Did you do that for this application?
```

61

```
 1    A.    I don't recall.  It's on the videotape.
 2    Q.    That was at the hearing.
 3    A.    No, we don't consult ahead -- ahead of time.
 4    Q.    But you're being -- but you're briefed by the City ahead of
 5          time?
 6    A.    No.
 7    Q.    That's what I asked you.
 8    A.    I told you before the public hearing meeting at the meeting,
 9          which you were at --
10    Q.    Right.
11    A.    That's the only briefing I ever received.
12    Q.    Is during the actual open hearing?
13    A.    No, it's not -- well not, no.
14    Q.    It's during the open meeting?
15    A.    You're being -- the open meeting.  That is correct.  You're
16          using wrong terminology.  So, I'm just --
17    Q.    I mean, I don't work for the City and I'm not on ZBA so, I'm
18          trying to do the best that I can.
19    A.    It is the law.
20    Q.    It is the law?  The open hearing -- the open meeting is the
21          law?  How --
22    A.    And then there' a hearing -- public hearing.
23    Q.    Right.  So, before they call our case or our application,
24          you're being briefed right there, at the open hearing?
25    A.    Not before.  After your case is called.
```

```
 1   Q.   Right.  Which, when does the hearing start, before or after
 2        the case is called?
 3   A.   After.  Immediately after.
 4   Q.   So, you call the case, then the hearing starts?
 5   A.   We get briefed, we call the petitioner forward, you spoke.
 6   Q.   So, you're briefed before you call the case?  Because I think
 7        that's where the confusion is.  You're using the wrong
 8        terminology.
 9   A.   No, it's not correct.  The open meeting is the totality of the
10        meeting that night.
11   Q.   Correct.
12   A.   We open the meeting.  I call the case.  The City
13        Administration briefs us.
14   Q.   And ,that's part of the case -- that's part of the hearing,
15        right, the briefing?
16   A.   It's not a hearing.  The public hearing is following --
17        immediately following a part of it. They --
18   Q.   So, you don't put any facts on the record at the hearing?  The
19        City -- when we go for a Zoning Application, there's a
20        hearing, but the City has put no evidence on at the hearing.
21        The only person putting evidence on is the -- is the applicant
22        is what you're saying?
23   A.   No.  I'm sorry.  I've said this many times.  Mr. Evans will
24        brief us.
25   Q.   At the meeting?
```

```
 1   A.   At the meeting after I gave the meeting open --
 2   Q.   Right.
 3   A.   -- and I call the case.
 4   Q.   And you call the case.
 5   A.   And then Mr. Evans goes with information that may be in our
 6        packet, maybe meets some new information based on what a Board
 7        Member asks.  You know, can you, please, show us another map
 8        of the area?  Boom, there it goes on the screen.  And then we
 9        then close that portion out, call the applicant's
10        representative, which was you.
11   Q.   But that's still part of the hearing.  Correct?
12   A.   It's -- the public hearing is very specific.  Then after -- if
13        I can finish -- after the applicant's representative speaks,
14        we ask them to sit down and then I open up public hearing.
15        That's the very specific period of time.
16   Q.   Only when the public speaks?
17   A.   Right.
18   Q.   Maybe that's where the confusion is.
19   A.   Well, you were there.
20   Q.   I mean, I was.  But usually when you call the case, that's
21        when the hearing starts.  Because everybody has to put
22        evidence on the record at the hearing.  That's required by law
23        and I understand that you're not an attorney, but that's
24        required by law.  There has to be a factual basis put on the
25        record.  That's why we're allowed to appeal this in Circuit
```

1          Court.  Have you ever been appealed in Circuit Court before?

2                    MR. MOTZNY:  What is it -- are you asking if the

3          ZBA's been appealed or if Mr. Clark's been appealed?

4                    MS. DOUKOURE:  Any of the decisions that he's been

5          part of on the ZBA.

6                    THE WITNESS:  I don't believe so.  I believe there

7          was a lawsuit, but I don't -- I think it was perhaps

8          dismissed.

9                    MS. DOUKOURE:  When was that lawsuit?

10                   MR. MOTZNY:  Just answer the question.

11                   THE WITNESS:  No, I don't believe so.

12                   MS. DOUKOURE:  When was that lawsuit?

13                   THE WITNESS:  I don't know.

14                   MS. DOUKOURE:  Was it -- it's been since 2000?

15                   THE WITNESS:  Yeah.

16                   MS. DOUKOURE:  Who sued you?  Who sued the ZBA?

17                   THE WITNESS:  I don't recall the man's name.

18                   MS. DOUKOURE:  It was an individual or an entity?

19                   THE WITNESS:  I don't know.

20                   MS. DOUKOURE:  Do you know what the basis of that

21         lawsuit was?

22                   THE WITNESS:  A denial of a hotel.

23                   MS. DOUKOURE:  Was it more than five years ago?

24                   THE WITNESS:  Thereabouts.  I don't know.

25                   MS. DOUKOURE:  Was it less than ten years ago?

65

1                    THE WITNESS:  Yes.

2                    MS. DOUKOURE:  Was it more than three years ago?

3                    THE WITNESS:  I don't think -- I think so.

4                    MS. DOUKOURE:  Less than three years ago?

5                    THE WITNESS:  No, I think more than --

6                    MS. DOUKOURE:  More than three?

7                    THE WITNESS:  I believe so.

8                    MS. DOUKOURE:  But less than ten?  Possibly more

9        than five?

10                   THE WITNESS:  Yes.

11                   MS. DOUKOURE:  Was it in State or Federal Court, if

12       you recall?

13                   THE WITNESS:  I don't -- I'm not involved in this,

14       I'm not going to answer that question.  I can't.

15                   MR. MOTZNY:  If you don't know, it's okay --

16                   THE WITNESS:  I don't know.

17                   MR. MOTZNY:  -- to say I don't know.

18                   MS. DOUKOURE:  Yeah, I mean, yeah, you can say you

19       don't know, but --

20                   THE WITNESS:  I don't know.

21                   MS. DOUKOURE:  You brought it up.

22  BY MS. DOUKOURE:

23  Q.   So, what information did Paul Evans give you on that day, that

24       you used when you were trying to make your determination on

25       item -- line item number -- line item Letter A?

66

1   A.   He doesn't give us specific information regarding these five

2        items.

3   Q.   I understand that.

4   A.   It's the total information and then we apply these rules.

5   Q.   Right.  I'm asking you what information that he gave you did

6        you apply to Item A?

7   A.   I think I already addressed that.

8   Q.   I don't think you did.

9   A.   I talked about shallowness.  It wasn't irregularly shaped.

10       It's a perfectly good --

11  Q.   How do you make that determination?  What document or what

12       specific information did you use?

13  A.   Information in this packet and on the overhead.

14  Q.   What specific information in this packet?

15  A.   The diagram -- the --- the picture of the house.  He talks

16       about the setbacks -- I mean the building.  He goes over very

17       specifically what the zoning requirement is and this building

18       is -- you were applying for a different set of rules.

19  Q.   Did you use the diagram in this packet?

20  A.   Yeah, I looked at everything that night.

21  Q.   Okay.  I mean, that's really all I'm asking.  I'm not asking

22       for -- when I'm asking that question, that's what I'm asking.

23       I'm asking you what did you look at?

24  A.   I looked at everything.

25  Q.   And, what about that diagram -- strike that.  What did you --

1      what information, that you were given in totality that night,
2      did you use?  What specific information did you use when
3      making a consideration on Line Item B?
4  A.  He talked -- he talked about the dimensional requirements for
5      that parcel, for that building.  That's what I recall.  I
6      don't recall anything else.
7  Q.  Just the dimensional requirements?
8  A.  The setback requirements.  I think he also talked about square
9      footage.
10 Q.  Of the building or of the outside, if you recall?
11 A.  I think the building, too.
12 Q.  Maybe both?
13 A.  Perhaps both.  I'm not sure.  I'm sure that probably was the
14     case, but I'm not sure a 100%.
15 Q.  Sure.  That's fair.  What specific information did you look at
16     in the packet or the information that was given to you in the
17     briefing that you utilized -- you said that you did not
18     consider C?
19 A.  I don't recall that I did.
20 Q.  Okay, so let's move on to D.
21 A.  I don't believe -- I don't think I applied this one either
22     because it wasn't related to -- your organization doesn't own
23     that building, the (inaudible) is not current and there wasn't
24     anything built by the old -- the previous owner that made an
25     issue --

68

1   Q.    Okay.

2   A.    -- from what I recall.

3   Q.    So you -- so, they may have satisfied that requirement?

4   A.    Perhaps.

5   Q.    What information did you specifically look at when you made

6         your determination on Line Item E?  And -- well, strike that.

7         First, did Line Item E come out in favor or against Adam

8         Community Center?

9   A.    I think there was a lot of debate amongst Board members and I

10        factor that into my vote.  There was a conversation about

11        traffic on public streets because the perspective was this was

12        a -- going to be a very high impact operation and that that

13        abuts a residential area.  Public safety, I think, came into

14        factor.  I may have considered that regarding the traffic

15        'cause then you're worried about kids getting hit and so

16        forth.  There was some concern by residents about property

17        values, so, I think I considered that.  Comfort, there was a

18        lot of resident opposition, even though there were some that

19        were in favor.  And, I think just the general welfare of the

20        inhabitants of that neighborhood, namely, once again, a high-

21        impact building so close to a residential area.

22   Q.    How many -- if you recall, how many -- how many residents --

23        (clears throat) I'm sorry, I'm losing my voice.  How many

24        residents spoke out against the granting of this variance?

25   A.    Quite a few from that neighborhood as I recall.  I don't --

1       you mean -- you want a number?  I can't do that.

2   Q.  What if I told you that the only person -- the only resident

3       from that neighborhood that spoke out against the variance was

4       one person.

5   A.  I'm sorry.  That's not correct.  There were at least two that

6       I recall that lived right behind the building.

7   Q.  Two -- two residents from one home.

8   A.  I know that there was resident's opposition so, I can't give

9       you a number.

10  Q.  There are -- do you know how many homes that are behind that

11      building?

12  A.  Quite a few.

13  Q.  Five.

14  A.  It's not just abutting directly the building --

15  Q.  Right.

16  A.  -- it's the whole neighborhood.

17  Q.  How -- okay.  What if I told you -- and I've reviewed the tape

18      and the addresses given by people -- that only one person from

19      that neighborhood -- that entire neighborhood -- spoke out

20      against the variance?

21  A.  I'm sorry.  I don't recall that.  It's not my recollection.

22  Q.  What specifically about the property value gave you pause with

23      regards to B?

24  A.  I have a long career of making sure that high-impact buildings

25      don't come right up to a neighborhood and that's what -- what

```
 1          I considered.
 2   Q.    Is a restaurant with a 300-seating capacity considered a high-
 3          impact property?
 4   A.    No, because it isn't necessarily open late, and I didn't have
 5          a vote on that.
 6   Q.    Is there a regulation that requires it not to be open late?
 7   A.    I'm not sure.
 8   Q.    What about a restaurant with a liquor license?
 9   A.    It --
10   Q.    It seats 300 or more people and can be rented out as a hall.
11          Would that create a high-impact building?
12   A.    Based on the circumstances.  I -- I don't know.
13   Q.    What about this specific building?
14   A.    No, it was a family restaurant.
15   Q.    No, it had a liquor license.
16   A.    It was a family restaurant.
17   Q.    Do you know that for a fact?
18   A.    Yeah, I was there before.
19   Q.    Okay.  Does it have a -- did it -- was it zoned or was it --
20          was it -- did it have an occupancy permit for a large --
21   A.    I don't know.
22   Q.    Would you be able to tell that from the --
23   A.    I don't believe so.
24   Q.    What if it's on there?
25   A.    I don't believe -- I don't believe it's in there.
```

71

```
 1   Q.   It is.  Look at --
 2   A.   Okay.
 3   Q.   Let's refer to Exhibit B again.  It's still Exhibit -- it's
 4        Plaintiff's Exhibit 1, demarcated as Exhibit B.  Under code
 5        analysis.
 6   A.   Uhm-hmm.
 7   Q.   Article 3, Use Group Classification.  Use Group A3.  Is it
 8        there?
 9   A.   I can't read that.
10   Q.   Would you have been able to read it on the date of the
11        hearing?
12   A.   Yes.  I've already answered that question.  My eyesight has
13        gotten very bad in the last couple weeks.
14   Q.   Do you know what an A3 Use Group is?
15   A.   No, not specifically and Mr. Evans briefs us on the various
16        specifics of the ordinance.
17   Q.   If you're tasked with the ZB- -- through the ZBA with
18        considering the current characteristics in conjunction with
19        the proposed use and you're considering impact, do you feel
20        that the current use is an important factor?
21   A.   I don't know that's a current use.
22   Q.   I'm asking you, do you think that the current use of a
23        building, when you're considering an application and you're
24        supposed to consider it -- the current use, the current
25        characteristics with the proposed use, do you feel that the
```

```
 1        current use is an important characteristic of that analysis?
 2   A.   I think it's something to be considered in the total picture.
 3        Once again, we go back to the five --
 4   Q.   I'm asking --
 5   A.   items.
 6   Q.   -- a yes-or-no question.
 7   A.   I just answered --
 8   Q.   Yes or no, is -- when the requirement is --
 9   A.   No, because this is a different zoning set of rules.
10   Q.   But the variance it says -- itself, the variance analysis
11        pursuant to the variance rules and regulations set forth by
12        the City of Troy, do you feel that you have to follow those
13        when you're making your application decisions?
14   A.   No, because I'm not even sure that, you know, that is
15        currently in operation.
16   Q.   So, the City of Troy makes regulations that governs the
17        application of variances and you just testified that you don't
18        feel that you have to follow those rules?
19              MR. MOTZNY:  Objection.  I think that
20        mischaracterizes what he says.
21              MS. DOUKOURE:  He said no.
22              THE WITNESS:  I think I answered the questions that
23        we take a look at everything.
24   BY MS. DOUKOURE:
25   Q.   I'm asking you if the City of Troy promulgates rules and
```

73

```
 1          regulations regarding the application in consideration of
 2          applications for variances?
 3   A.     I'm not the City of Troy.
 4   Q.     Do you believe, that you, as a Zoning Board of Appeals member,
 5          has to follow those rules?
 6   A.     I think that --
 7   Q.     Yes or no?
 8   A.     I think in a --
 9   Q.     Yes or no?
10   A.     Please, lower your voice.
11              MR. MOTZNY:  You can answer yes or no.  Please,
12          answer.
13              THE WITNESS:  Please, be professional.
14              MS. DOUKOURE:  You, too.
15              THE WITNESS:  I haven't raised my voice.
16              MR. MOTZNY:  Just answer her question.
17   BY MS. DOUKOURE:
18   Q.     Yes or no?
19   A.     I think yes.
20   Q.     You have to follow the rules of the City of Troy when you are
21          sitting on the City of Troy Zoning Board, correct?
22   A.     Yes, I mean, we -- we --
23   Q.     Okay, thank you.  I don't understand why that was difficult to
24          get to.
25   A.     I think I answered the question earlier.
```

74

```
 1                    MR. MOTZNY:  Just -- is there a question?
 2                    THE WITNESS:  Is there a question?
 3                    MS. DOUKOURE:  Yeah, there was a question.
 4                    THE WITNESS:  Don't -- don't lecture me, please.
 5   BY MS. DOUKOURE:
 6   Q.   The question is --
 7   A.   I think I just answered your question.
 8   Q.   I didn't ask a question yet.
 9                    MR. MOTZNY:  Okay, just wait till she asks a
10           question and then answer it --
11                    THE WITNESS:  Wow.
12                    MR. MOTZNY:  -- to the best of your ability.  Just
13           move on.
14                    THE WITNESS:  (Inaudible) she's being so --
15                    MS. DOUKOURE:  I hope you're getting all of those
16           little side comments that he's making right now.
17                    COURT RECORDER:  (nods)
18                    MS. DOUKOURE:  I hope.
19   BY MS. DOUKOURE:
20   Q.   I'm asking you the zoning variance requires you to look at the
21           current use in comparison with the proposed use and the
22           current characteristics of the building with the proposed
23           characteristics of the use.  Do you think that it is important
24           to understand what the current use and characteristics of the
25           building are?
```

75

```
 1   A.    Sure.  I already answered that question.

 2   Q.    Is that a yes?

 3   A.    I already said yes.

 4   Q.    Okay.  Thank you.  You did not say yes.

 5   A.    Yes, I did.

 6              MR. MOTZNY:  Okay, don't argue.  Just answer the

 7         questions.

 8              THE WITNESS:  Three times in a row?

 9              MR. MOTZNY:  Just listen to the question and answer

10         it.

11   BY MS. DOUKOURE:

12   Q.    Did you know or understand the current characteristics of the

13         building and use that is the subject of this variance request

14         prior to making your decision?

15   A.    Yes.

16   Q.    And what is the use of this building?

17   A.    A restaurant.  A family restaurant.

18   Q.    Is there a hall for rent in this restaurant?

19   A.    I don't recall.

20   Q.    So, you did not know or understand the characteristics --

21   A.    I don't recall.

22   Q.    Because what if I told you there was?

23   A.    I don't recall.  I answered your question.

24   Q.    If you have to understand the current use and characteristics

25         of the building, do you -- you do not believe that you have to
```

1    understand the use type of --

2  A.  I answered that question.

3  Q.  I'm asking you again.  The use type.  The A3 Use Type.  Do you

4      under -- do you believe that you should have understood what

5      an A3 Use Type is?

6  A.  Yes.

7  Q.  But you're testifying, here today earlier, that you did not

8      know and that you do not know what the A3 Use Type Code stands

9      for?  Isn't that correct?

10 A.  We don't go through code names and numbers and so forth.  Mr.

11     Evans briefs us about what all the facts are and it's in our

12     packet and we review it, and we go line by line through

13     everything.

14 Q.  And I'm asking you what specific characteristics of the

15     traffic gave you pause?  Did you do a traffic study?

16 A.  No.

17 Q.  How many parking spaces are in this building?

18 A.  I don't recall.

19 Q.  Could you read it from the map that was given to you on the

20     date of that hearing?

21 A.  Yes, I think it was -- we were even briefed about it.

22 Q.  You think that you were briefed about it?

23 A.  I don't recall every specific of that meeting.

24 Q.  But you -- you can read how many parking spots are there?

25 A.  I -- and I believe that we were even briefed on it the night

77

```
 1          of the meeting.
 2   Q.     Do you know how many parking spots are required for a
 3          religious building --
 4   A.     I don't recall.
 5   Q.     -- such as what was being applied for the variance?
 6   A.     I don't recall.
 7   Q.     Did you review the traffic study that was done prior to this
 8          building being approved by the City?
 9   A.     (no response)
10   Q.     Prior to this application?
11              MR. MOTZNY:  Do you mean the traffic study for the
12          prior building?
13              MS. DOUKOURE:  That's correct.
14              THE WITNESS:  No.
15   BY MS. DOUKOURE:
16   Q.     Did you do a traffic study to look at the impact of traffic
17          for a religious place of worship on this street at this place?
18   A.     I don't do traffic studies.
19   Q.     Did you -- did -- was one provided for you?
20   A.     I don't believe so.
21   Q.     Did you ask for one?
22   A.     No, we don't --
23   Q.     How did you determine that there would be a traffic impact
24          from this building without that?
25   A.     Based on the app -- your representation of your client saying
```

78

```
 1        about all the different programs and all the different people
 2        that would be coming and going and I know that restaurant --
 3        I've been by there many, many, many times and there's
 4        practically no cars there.
 5   Q.   That restaurant?
 6   A.   Yes.
 7   Q.   What if that was Andiamos or a more -- would they have a
 8        problem getting in there right now?
 9   A.   I don't know.  I can't answer that.
10   Q.   If a -- if a commercial building bought this, would they have
11        to ask for a variance?
12   A.   I don't believe so.
13   Q.   So, if a really nice restaurant opened up --
14   A.   I can't speculate.
15   Q.   -- they'd be able to use this building?
16   A.   I believe so.
17   Q.   And, it could create more traffic flow to this building?
18   A.   I can't answer that question.
19   Q.   But it could?
20   A.   I can't answer that question.  I'm not a traffic expert or a
21        restaurant expert.
22   Q.   But you determine traffic.  You determine what traffic impact
23        would be --
24   A.   Based on your words about all the programming --
25   Q.   What specific words?
```

```
 1  A.     -- that was going to be going on.

 2                 MR. MOTZNY:  Can we just ask relevant questions,

 3         please?

 4                 MS. DOUKOURE:  It is relevant.  I'm asking what his

 5         factual basis was?  It's hard to appeal a factual basis when

 6         none was made.

 7                 MR. MOTZNY:  I think he's answered the question --

 8                 MS. DOUKOURE:  Sure.

 9                 MR. MOTZNY: -- several times.

10  BY MS. DOUKOURE:

11  Q.     So, what specific programs are bringing a lot of traffic to

12         this area -- from -- to this building on the proposed use?

13  A.     I'm not a traffic expert in but --

14  Q.     You said you consider traffic.  Correct?

15  A.     -- you mentioned tremendous amounts of programs.

16  Q.     What programs?

17  A.     I can't recall.  It was a long time ago.

18  Q.     But you remember there was tremendous amounts of programs?

19  A.     Yes, 'cause you went on and on and on and on.

20  Q.     So, that's why you denied it, because we went on and on and on

21         and on?

22  A.     No, you mentioned -- I think I answered your question.  I

23         mentioned many programs --

24  Q.     What programs?

25  A.     I already answered that question.
```

```
 1   Q.   You don't know?

 2   A.   I already answered the question.

 3   Q.   Your answer was you don't know.  Correct?

 4   A.   I don't recall every specific program.

 5   Q.   Do you recall any?

 6   A.   Yeah.  Health clinic, youth programs and many others.

 7   Q.   What specifically about the residential property values gave

 8        you pause?

 9   A.   A huge high-impact building -- I already answered this

10        question -- abutting the residential area would have lots of

11        traffic and I believe --

12   Q.   This is a commercial street it's on.  Correct?

13   A.   It abuts a residential area.  We've established that.

14   Q.   Yes or no?  Is it a commercial street that it's on?

15   A.   It's a busy thoroughfare.

16   Q.   Yes or no?

17   A.   I don't know what its classification is.  I can't answer that

18        question.

19   Q.   Is it Rochester Road?

20   A.   Yes.

21   Q.   Is it a main thoroughfare?

22   A.   I already answered that.

23   Q.   Is it in a business district?

24   A.   Yes.

25   Q.   Are there other businesses on this street?
```

81

```
 1   A.   Sure.

 2   Q.   How many?

 3   A.   I don't know.

 4   Q.   How many businesses touch this piece of property?

 5   A.   One, I think.

 6   Q.   Three.  You can look at the map I gave you on Exhibit B, if

 7        you'd like to refresh your memory.

 8   A.   Okay.  I'll take your word.

 9   Q.   Do you know what those other businesses are?

10   A.   No.

11   Q.   One of them is a pizza place, isn't that correct?

12   A.   Oh, I already addressed that, yes.

13   Q.   But you don't know what the other is?

14   A.   But it doesn't abut the property.

15   Q.   No, it doesn't because it shares a parking lot.  What about

16        the commercial building next door?  Does it abut the property?

17   A.   I believe it does.

18   Q.   You can look at your Exhibit B if you'd like to refresh your

19        memory.

20   A.   It's okay.  I believe it does.

21   Q.   Are there any other commercial buildings in -- on this street

22        that you are aware of that abut a residential property?

23   A.   I'm not sure.

24   Q.   What if I said all of them?  Would that surprise you?

25   A.   I don't know.
```

82

1   Q.   But a commercial building would not need a variance for this

2        property.  That's your testimony?

3   A.   I don't know if they had got -- got a variance -- well, to

4        begin with or not.  I can't recall.  But I believe so.

5   Q.   Is there a variance on that document Exhibit B?

6   A.   I think that that building didn't need a variance.

7   Q.   Okay.  And if another commercial building bought it, would

8        they need a variance to use the property?

9   A.   I don't know if the zoning ordinance has changed in that

10       regard.  So, I don't know.  It's something --

11  Q.   If -- if -- so, that's a good question.  So, if a --

12  A.   I don't think so.

13  Q.   Okay.

14  A.   You could say I don't think so.

15  Q.   Let me ask a question for clarity's sake.  If a commercial

16       building -- perhaps this one, perhaps another commercial

17       building, was built under a different municipal code prior to

18       2016 -- because the current code was built in 20 -- or was

19       enacted in 2016, correct?

20  A.   I don't know.

21  Q.   I believe it is.  Let me see.  Well, in mine it says 2017.

22       But it's irrelevant what year, it was enacted.  So, if it was

23       enacted prior to this current code, which says effective April

24       10, 2017.  So ,if it was built, like, say, in 1996 and it was

25       being used continuously as a commercial building and they sold

83

```
 1         that building and it did not meet current zoning standards,
 2         would the new commercial owner be required to come in front of
 3         the ZBA?
 4    A.   I don't know.
 5    Q.   You don't know?  Okay.  Do you recall how many variances were
 6         requested on -- for this application?
 7    A.   I believe it was one for the whole.
 8    Q.   You believe it was one, but you don't recall?
 9    A.   I believe it was, but I could be wrong.
10    Q.   If I told you it was three, would that surprise you?
11    A.   No, sometimes different -- I think whatever you're trying to
12         do is sometimes it's multiple.  It -- it varies.
13    Q.   And, you can't tell from the application itself how many are
14         requested?
15    A.   I don't recall the application.  I haven't had time to review
16         everything here.
17    Q.   Would you be able to recall -- tell?
18    A.   If it's one or three, we would have gone through every
19         variance request that night.
20    Q.   Okay, but you -- I'm asking a question and you might not --
21    A.   Is it on a sheet that you want to point out to me?
22    Q.   No, I'm asking you -- I'm -- I'm just asking you.
23    A.   It wouldn't matter.
24    Q.   I'm just -- that's not what I'm asking you either.  I'm asking
25         you if you can look at an application and tell how many
```

1        variances are requested or if that's something that you have

2        to be told by somebody else?  That's all I'm asking.

3    A.  No, I mean in our packet, it'll say, you know, they're asking

4        for this, this, and this.  And then if you look in the

5        application, you can determine if --

6    Q.  Who?  Who -- go ahead.  I'm sorry.  I don't mean to cut you

7        off.

8    A.  No, I just -- it's summarized and then --

9    Q.  Who summarizes it?

10   A.  Mr. Evans does.  And then the applicant's paperwork is

11       presented and then we go through all this information so, it's

12       very obvious.  It doesn't matter what piece of paper you file.

13       And if there's a way to do it on one or multiple, we look at

14       everything.  We review everything.

15   Q.  Sure.  I'm -- that's not what I'm asking, but you're answer

16       gave me the understanding that I needed.  And you -- it's your

17       testimony that you don't remember how many variances?

18   A.  No, I don't.

19   Q.  Okay.  When you filed an answer to the complaint in this

20       matter.  Correct?

21   A.  I believe so, through Mr. Motzny.

22   Q.  Did you go over any of your answers in that complaint with Mr.

23       Motzny prior to him filing them?

24   A.  We briefly had spoke, I think.

25   Q.  So, everything that Mr. Motzny put in that -- that complaint -

85

```
 1         - have you -- did you have a chance to review it prior to him

 2         filing it?

 3   A.    I did review it.

 4   Q.    And you agreed with everything in that complaint?

 5   A.    I don't recall that I didn't.

 6   Q.    Would you have allowed him to file something that you didn't -

 7         -

 8   A.    No.

 9   Q.    -- think was factually correct?

10   A.    Mm-mm.

11               MS. DOUKOURE:  Okay, I have nothing further, Mr.

12         Motzny.

13               MR. MOTZNY:  Okay, I have no questions.

14               MS. DOUKOURE:  Thank you.  Would you like a two

15         minute break --

16               MR. MOTZNY:  Sure.

17               MS. DOUKOURE:  -- before we start with Ms. Kuppa.

18               MR. MOTZNY:  Sure.

19               (At 11:53 a.m., deposition convened)

20

21

22

23

24

25
```

86

        I certify that this transcript, consisting of 87 pages, is a complete, true, and correct transcript of the [Deposition for GLENN CLARK and testimony taken in this case as recorded on Tuesday, the 6th of August, 2019.

_____September 28, 2019_____        _____*Lynn Ledoux-Moore*_____

                                         Lynn Ledoux-Moore, CER 9046

                                         Accurate Court Transcription LLC

                                         Walled Lake, Michigan 48390

                                         (248) 807-0045

I certify that this transcript, consisting of 87 pages, is a complete, true, and correct transcript of the [Deposition for GLENN CLARK and testimony taken in this case as recorded on Tuesday, the 6th of August, 2019.

September 28, 2019

Lynn Ledoux-Moore, CER 9046

Accurate Court Transcription LLC

Walled Lake, Michigan 48390

(248) 807-0045