# EXHIBIT G

**Glenn Clark**
**08/10/2020**

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF MICHIGAN

3              SOUTHERN DIVISION

4

5    UNITED STATES OF AMERICA,

6              Plaintiff,

7         vs.          Civil Action No. 2:19-cv-12736

8

9    CITY OF TROY, MICHIGAN,

10              Defendant.

11    _____/

12    PAGE 1 TO 171

13

14         The Deposition of GLENN CLARK,

15         Taken at 500 West Big Beaver Road,

16         Troy, Michigan,

17         Commencing at 10:36 a.m.,

18         Monday, August 10, 2020,

19         Before Laurel A. Frogner, RMR, CRR, CSR-2495.

20

21

22

23

24

25



 1   APPEARANCES:

 2

 3   MS. SUSAN K. DECLERCQ (P60545)

 4   Assistant United States Attorney

 5   United States Attorney's Office

 6   211 West Fort Street

 7   Suite 2001

 8   Detroit, Michigan  48226

 9   313-226-9730

10   Susan.DeClercq@usdoj.gov

11       Appearing on behalf of the Plaintiff

12

13   MS. ABIGAIL B. MARSHAK (NY 5350053)    (Via Virtual Video-

14   United States Department of Justice      Conference)

15   4 Constitution Square

16   150 M Street NE

17   Washington, DC  20530

18   202-514-1968

19   Abigail.Marshak@usdoj.gov

20       Appearing on behalf of the Plaintiff

21

22

23

24

25



**Glenn Clark**
**08/10/2020**                                                    **Page 3**

```
1    APPEARANCES (Continued):

2

3    MR. ALLAN T. MOTZNY (P37580)

4    City of Troy, Assistant City Attorney

5    500 West Big Beaver Road

6    Troy, Michigan  48084

7    248-524-3324

8    motznyat@troymi.gov

9        Appearing on behalf of the Defendant

10

11   MR. RICHARD THOMPSON (P21410)

12   Thomas More Law Center

13   24 Frank Lloyd Wright Drive

14   P.O. Box 393

15   Ann Arbor, Michigan  48106

16   734-827-2001

17   rthompson@thomasmore.org

18        Appearing on behalf of the Deponent

19

20   ALSO PRESENT:  Marc Myers, Videographer

21                      *   *   *   *   *   *   *

22

23

24

25
```



**Glenn Clark**
**08/10/2020**                                                **Page 4**

 1                    TABLE OF CONTENTS

 2   Witness                                          Page

 3   EXAMINATION BY MS. DECLERCQ                          5

 4   EXAMINATION BY MR. MOTZNY                          157

 5   FURTHER EXAMINATION BY MS. DECLERCQ               168

 6

 7

 8                     INDEX TO EXHIBITS

 9                (Exhibit attached to transcript)

10

11   Exhibit                                         Page

12   GOVERNMENT EXHIBIT NUMBER 1,                       92

13   JULY 7, 2020 EMAIL CHAIN AND MOSQUES

14   IN AMERICA, A GUIDE TO ACCOUNTABLE PERMIT

15   HEARINGS AND CONTINUING CITIZEN OVERSIGHT

16

17

18

19

20

21

22

23

24

25

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

1            Troy, Michigan
2            Monday, August 10, 2020

3            About 10:36 a.m.

4            THE VIDEOGRAPHER:  We are now on the

5       record.  This is the video recorded deposition of

6       Glenn Clark, being taken in Troy, Michigan.  Today's

7       date is August 10th, 2020.  The time is now 10:36

8       a.m., and at this time will the attorneys please

9       state your appearances for the record and the court

10      reporter please swear in the witness.

11            MS. DECLERCQ:  Susan DeClercq on behalf of

12      the United States.

13            MR. THOMPSON:  Richard Thompson

14      representing Mr. Clark from the Thomas More Law

15      Center.

16            MR. MOTZNY:  Allan Motzny on behalf of the

17      City of Troy.

18                  GLENN CLARK,

19      having first been duly sworn, was examined and

20      testified on his oath as follows:

21   EXAMINATION BY MS. DECLERCQ:

22   Q.  Mr. Clark, it's to nice to meet you.  As you just

23      heard me say, my name is Susan DeClercq.  I represent

24      the United States.  Today is your deposition, and you

25      are represented here by your attorney, Richard



**Glenn Clark**
08/10/2020                                                      **Page 6**

1      Thompson, correct?

**2**  **A.**  **Correct.**

3  Q.  If you do not understand a question that I ask, or

4      you can't understand me because of these masks, just

5      let me know and I'll rephrase or explain the

6      question, but if you answer I'll assume that you

7      understood my question; is that fair?

**8**  **A.**  **Say that last part again.**

9  Q.  If you don't understand a question, let me know --

**10**  **A.**  **Right.**

11  Q.  -- I'll be happy to rephrase it, but if you answer,

12      I'll assume that you did understand my question.

**13**  **A.**  **Correct.**

14  Q.  Is that fair?

**15**  **A.**  **Yeah.**

16  Q.  Also, the court reporter is here.  She can only take

17      down one person speaking at a time.  So it's best if

18      you let me finish speaking before you answer --

**19**  **A.**  **Sure.**

20  Q.  -- and I will try to do the same for you.  And you've

21      been deposed before, correct?

**22**  **A.**  **Yes.**

23  Q.  Okay.  So you understand that you just took an oath

24      before we started, and that the oath requires you to

25      answer honestly and as --



Glenn Clark<br>08/10/2020

Page 7

```
 1   A.   Sure.

 2   Q.   -- fully as you possibly can.  Do you understand

 3        that?

 4   A.   Uh-huh.

 5   Q.   Okay.  And that the answer must be spoken.  Again,

 6        the court reporter cannot understand head nods or

 7        uh-huhs or uh-uhs, so every once in awhile your

 8        attorney or I may have to remind you because it's

 9        just natural speak --

10   A.   That happened a year ago.  I say uh-huh a lot, and I

11        know it's not supposed to happen, but anyway.

12   Q.   Have you taken any medication or any substance this

13        morning that would affect your ability to testify

14        accurately and honestly?

15   A.   I spoke to my counsel yesterday.  I do have quite a

16        few meds that I take for blood pressure.

17   Q.   But do any of those medications affect your

18        ability --

19   A.   Not that I know of.  But I have had blood pressure

20        problems, so --

21   Q.   Okay.

22   A.   That's it.

23   Q.   So, again, just let me finish my question before you

24        answer.

25   A.   Okay.  I apologize.
```



1    Q.   From time to time your lawyer may object to a

2         question that I ask you.  That's totally normal.

3         However, after his objection, I will ask you to go

4         ahead and answer the question.  The only time that

5         you are to not answer the question is if your

6         attorney specifically directs you not to answer.  Do

7         you understand?

8    A.   **Right.**

9    Q.   Okay.  And if at any point you need a break, let me

10        know.  This is -- hopefully this will not be a

11        marathon but, you know, we want to make this as

12        pleasant as possible.

13   A.   **Sure.**

14   Q.   All right.  So you are here mainly because of your

15        position on the Zoning Board of Appeals for Troy.

16        How long have you held that position?

17   A.   **I just stopped -- I called the City Clerk a couple**

18        **days ago and asked that question, and I wrote it**

19        **down.  It's on my kitchen table.  And I stopped at**

20        **the window which is right outside that door and asked**

21        **them, I'm like, I forgot to bring that sheet of**

22        **paper.**

23             **So I think what they told me on the phone**

24        **was -- I'm not even sure -- 2001-2011.  There were a**

25        **couple 1's.  And this gentleman over at the clerk is**



Glenn Clark
08/10/2020                                    Page 9

1   supposed to walk it in here.  He hasn't done that

2   yet.  So I've been on that board for a long time.

3   Q.  Do you think it was before 2011?

4   A.  I honestly don't know.

5   Q.  Okay.

6   A.  I'm not going to -- I can't answer that question.

7   I've been on that board a long time.

8   Q.  Okay.  And currently you are the chairperson of the

9   ZBA?

10  A.  Chairman.

11  Q.  And how long have you held that particular position?

12  A.  I honestly don't know that answer, either, because it

13  is an annual term.  So since I was sworn in a long

14  time ago, I've been chairman and not chairman.  I

15  started as a board member.  I became vice-chairman,

16  and then since my service I've been mostly the

17  chairman on that board.

18  Q.  And what makes that particular position different

19  than just being on the board?

20  A.  Really nothing.  I'm the presiding officer, so when

21  the public comes before the board and someone doesn't

22  follow the rules, I have to call them out of order.

23  I don't have any more control over anyone's votes.  I

24  have my vote, that's it.  And I call the meeting to

25  order, I conclude it, that's it.  I confer with the



Glenn Clark
08/10/2020                                      Page 10

1       City Attorney representative, but any member can do

2       that, and they do.

3    Q.  So would it be fair to say that your position as

4       chairman affects mainly the meetings themselves, that

5       you run the meeting and that's pretty much it?

6    A.  The board runs the meeting, but I preside over the

7       board.

8    Q.  Let me ask you in a different way.  Is there any

9       other organizational or coordination that you have to

10      do for other members of the board as the chairperson

11      either before a meeting or after a meeting?

12   A.  Occasionally, I do reach out to Mr. Motzny and say,

13      oh, this agenda item is going to be on the agenda,

14      what about this, what about that?

15           I more regularly speak to Mr. Evans, who's

16      the City Administrator, who supports the board, but

17      it's just procedural stuff.  I don't ever inquire

18      about, you know, are these good people, are they bad

19      people, is there a request -- I'm sorry -- did you

20      want to speak?

21           MR. THOMPSON:  Just answer the question.

22           THE WITNESS:  Okay.  The answer's no.

23   BY MS. DECLERCQ:

24   Q.  Why did you take this position?

25   A.  I was asked a really long time ago by the Mayor pro



Glenn Clark
08/10/2020                                       Page 11

```
 1         tem to serve on the board, and he's somebody I knew
 2         and I know.  And I've lived here in Troy for a long
 3         time, and my perspective is it's giving back to the
 4         community.
 5    Q.   And how long have you lived in Troy?
 6    A.   So there's an official -- can I refer to my counsel
 7         for a second?
 8    Q.   You can ballpark it.  I mean, this is not that --
 9    A.   I moved into the City in '94.
10    Q.   Okay.
11    A.   Okay.
12    Q.   I'm just trying to get a sense of how long --
13    A.   Yeah.
14    Q.   -- you've been with the City.
15    A.   Yeah, '94.
16    Q.   Have you ever held any other positions affiliated
17         with the City?
18    A.   Yes.
19    Q.   What --
20    A.   Two others.  So I was asked by the former Mayor Pro
21         Tem Horlech (sic), to serve on the Municipal Building
22         Authority, and we never had a meeting.  So I was a
23         distinguished member of a board that never met.
24               And then I was asked by him again, I
25         believe, I'm almost positive that Former Mayor Pro
```



Glenn Clark
08/10/2020                                              Page 12

```
 1        Tem Horlech asked me to do that, and I was appointed
 2        by the City Council to be on the Pension Board.
 3                 But after a little research by somebody I
 4        think in the community they found out that I can't be
 5        on the Pension Board because I'm part of a political
 6        party.  So City Council voted for me to be on the
 7        board, and then I think the very next meeting or two
 8        they removed me because under our City ordinance or
 9        City charter, I'm sorry, I can't serve because I do
10        have, you know, a political persuasion.
11   Q.   Was that simply because you were a registered member
12        of a political party, or did you hold --
13   A.   I'm not registered as a member, but I've been
14        identified with a particular political party my whole
15        life.  There's no registration in Michigan.  The law
16        is clear about that.
17   Q.   So what do you do for a living?
18   A.   I'm self-employed.  I'm a publisher of a magazine.
19   Q.   What magazine?
20   A.   It's called Rockville -- I just started, Rockville
21        Disciples.  I'm sorry, Rockford Disciples.
22        Literally, I just started.
23   Q.   And what is the audience of that magazine?
24   A.   It goes to -- it's a direct mail magazine, and it
25        goes to Roman Catholic families in the north part of
```



```
 1        Kent County.

 2   Q.   And is this magazine affiliated with a particular

 3        church?

 4   A.   No.

 5   Q.   And are you a member of the Roman Catholic Church?

 6   A.   No.

 7   Q.   All right.  And prior to being a magazine publisher,

 8        what did you do?

 9   A.   I was a publisher right here in Troy, and I published

10        a magazine that had nothing to do with faith or

11        religion in the north part of the City.  So I did

12        that for, gosh, five, five and a half years, maybe

13        six.  I think it's about five and a half.

14   Q.   What was the name of that magazine?

15   A.   That is called -- well, it's gone through a couple

16        name changes because I changed it.  So it originally

17        was Firefighters Park, which is I think the largest

18        park in the City of Troy.  So it goes -- or it did --

19        it still exists in and around the north Troy area.

20        And then I changed it to North Troy Living.  And so I

21        did that for quite a few years.

22   Q.   Before joining the ZBA, did you have any prior

23        planning or land use experience?

24   A.   None.

25   Q.   Did you have any prior planning or land use training?
```



Glenn Clark
08/10/2020                                    Page 14

```
 1   A.   Yes.  I had a very extensive meeting with Mark
 2        something.  He used to work here at the City.
 3   Q.   Do you know what his position was?
 4   A.   He was in the Planning Department, and it's
 5        Steinbeck?  I'm not sure.  Steinmark?  So he and I
 6        met for I think a whole afternoon or a whole morning
 7        after City Council appointed me, and he just wanted
 8        to walk me through the A to Z about zoning,
 9        not planning, zoning.
10   Q.   Did you have any subsequent training?
11   A.   Yes.  Mr. Evans regularly instructs the board on the
12        ins and outs of anything new, the hot now, you know.
13   Q.   How often is --
14   A.   Not often, but it's maybe quarterly, thereabouts.
15   Q.   And is that done as part of a meeting?
16   A.   Yes.
17   Q.   And is that done as a separate agenda item to the
18        meeting?
19   A.   I can't answer that question.  Please restate it.
20   Q.   Sure.  You said that it happens as part of a meeting.
21        Does it happen as its own separate portion of the
22        meeting --
23   A.   Yes.
24   Q.   -- where he gives training --
25   A.   Yes.
```



Glenn Clark
08/10/2020                                               Page 15

1   Q.   Hang on one second.

2   A.   I'm sorry.

3   Q.   It's okay.  It just makes for a very ugly transcript.

4        It makes it difficult --

5   A.   I appreciate that, thank you.

6   Q.   And, of course, now I've lost my train of thought.

7        So is it just a separate part of the meeting where he

8        gives you training, or is it training that is just

9        accompanying part of like consideration of an

10       application?  Do you understand?

11  A.   It's a hard question.  I understand, but it's really

12       both.  So sometimes it's a passing comment, you know,

13       oh, you the board should know this.  And then

14       sometimes we put it on the agenda, so it's more

15       formalized, if you will.  And, you know, we've had a

16       number of those over the years.  I can't tell you how

17       many, but oftentimes it's really a quick comment by

18       him.

19  Q.   Do you have any sort of annual training that every

20       member of the ZBA has to participate in?

21  A.   No.  I have requested specific training issues

22       before, and any board member can, but since I'm the

23       chairman, I feel like it's kind of my responsibility.

24       So, you know, Open Meetings Act, that kind of thing.

25  Q.   Is the training typically given only by Mr. Evans?



Glenn Clark
08/10/2020                                              Page 16

1    A.    And I would say that Mr. Motzny does it as well, but
2          I would say by and large it's Mr. Evans.
3    Q.    So if it implicates some legal issue, it might be
4          Mr. Motzny, but typically it would be Mr. Evans; is
5          that fair?
6    A.    Yes.
7    Q.    Okay.
8    A.    Yeah.
9    Q.    Have you received any planning or land use training
10         by anyone not in the City of Troy?
11   A.    No.
12   Q.    Are you given any particular documents?
13   A.    Not that I can recall.
14   Q.    Are you going back to your previous answer?
15   A.    Yes, I don't recall ever, but maybe at one point, you
16         know.
17   Q.    But of all the training that you're currently sitting
18         here remembering --
19   A.    Right.
20   Q.    -- those were all given to you --
21   A.    Yes.
22   Q.    -- by someone --
23   A.    Yes, ma'am.
24   Q.    Hold on.
25   A.    Oh, I'm sorry.



HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
                          313.567.8100

Glenn Clark
08/10/2020                                                   Page 17

1  Q.   They were all given to you by someone from the City

2       of Troy?

3  A.   Correct.

4  Q.   Were you given any particular documents as part of

5       that training such as handouts or a handbook?

6  A.   Yes.  I think I referenced this already.  Maybe I

7       didn't.  When I met with Mr. Stimac -- that was his

8       name I think -- he worked in the Planning Department,

9       when I first joined the board he gave me a binder

10      this big, and we went through a ton of it when I met

11      with him that day which I referenced.  I don't even

12      know where that binder is.  I can't find it.  And I'm

13      sure it's been updated a lot by City Council.

14 Q.   Would you have received those updates to put into

15      your --

16 A.   No, I never have.  But then at my meetings monthly

17      Mr. Evans regularly puts paper in front of us.  I

18      can't tell you the name of the organization, but it

19      provides planning and zoning.  It's like a

20      newsletter, and I rarely read it.  Sometimes I glance

21      at it and then I discard it, so I don't have any

22      copies of that.

23 Q.   But you said Mr. Evans gives you this newsletter

24      every month?

25 A.   Not every month.  I think largely every month.  I



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Glenn Clark
08/10/2020                                    Page 18

1        can't honestly answer that question.  I don't know.

2   Q.   Have you ever been trained or received any

3        instruction on RLUIPA, which is the Religious Land

4        Use and Institutionalized Persons Act?

5   A.   **No, other than by Motzny that was at that meeting in**

6        **question.**

7   Q.   The public comments that were made at the public

8        meeting?

9   A.   **Not public comments.  He's not the public.**

10  Q.   The comments that Mr. Motzny made during that meeting

11       in front of the public?

12  A.   **Yes, correct.**

13  Q.   And that is the only time that you received any

14       instruction on RLUIPA?

15  A.   **Correct.**

16  Q.   What is your -- as you're sitting here today, what is

17       your understanding of RLUIPA?

18                  MR. THOMPSON:  I object.  That calls for a

19       legal conclusion.  He's not a lawyer.  He cannot give

20       an understanding of a legal -- of a statute and have

21       any kind of relevancy to this complaint that we have.

22       He's just not a lawyer.

23                  MS. DECLERCQ:  Right.  I understand that.

24                  You can answer the question, though.

25                  **THE WITNESS:  I can't answer it.**



Glenn Clark
08/10/2020                                          Page 19

1   BY MS. DECLERCQ:

2   Q.   You just mentioned that you received some guidance

3        from Mr. Motzny at the hearing on Adam's application,

4        and I'm assuming it's the 2018 application, correct?

5   **A.   Well, they were before us twice.**

6   Q.   Right.

7   **A.   I don't know what --**

8   Q.   The first time or the second time did Mr. Motzny then

9        give you the instruction?

10  **A.   The second time.**

11  Q.   Okay.  Prior to that application, had you ever had to

12       deal with RLUIPA --

13  **A.   No.  I'm sorry.**

14            MR. THOMPSON:  Wait till she finishes the

15       question.

16            **THE WITNESS:  I'm sorry.  But I knew the**

17       **answer, so I apologize.**

18  BY MS. DECLERCQ:

19  Q.   I understand, and it's very understandable when

20       people try to do that, but it's very difficult for

21       the court reporter and it makes for a very ugly

22       transcript.

23  **A.   Okay.  Thank you.**

24  Q.   So wait until I finish.

25  **A.   Right.**



Glenn Clark
08/10/2020                                        Page 20

```
 1   Q.   Like take two breaths and then answer.  All right.

 2        So, again, I'm sorry.  I keep losing my train of

 3        thought because this keeps happening.

 4             So prior to that particular application and

 5        that particular exchange with Mr. Motzny, that was

 6        the only time you've ever had to deal with RLUIPA?

 7   A.   I'd never even heard of it before.

 8   Q.   And if something comes up that you've never heard of

 9        before, do you typically rely on the City for

10        instruction?

11   A.   Yes.  In the past I have called for a meeting with

12        Mr. Motzny and Mr. Evans.  But by and large, it's

13        done at a board table, and I felt like Mr. Motzny's

14        given us very good, excellent advice, and Mr. Evans

15        is very knowledgeable as well.

16             But on those legal matters I always defer

17        to Mr. Motzny, and of course not always because he's

18        not the only attorney that ever served the board.

19        The City rotates over the years I've been on that

20        board, which feels like 100 years.  But Lori Bluhm

21        has provided us legal advice, and there was somebody

22        else from his department as well.  So I think three

23        attorneys in my time, in my service.

24   Q.   And in what circumstances would you have called

25        Mr. Motzny or Mr. Evans before a meeting?
```



Glenn Clark
08/10/2020                                    Page 21

1   A.   It really -- you know, I don't really speak to anyone

2        about a particular issue.  I sometimes call about a

3        process question, if you will.  So, you know, we have

4        different things that come up over all these years,

5        and I ask Mr. Motzny an occasional question which is

6        not very common.  I generally call Mr. Evans, and I

7        may ask him, well, okay, the paperwork is saying

8        this, but what's going on with that, meaning if I'm

9        not fully clear, and any board member can ask those

10       questions ahead of time, but it's very rare that I've

11       ever done that.

12  Q.   So what type of information would you need to get

13       that was outside of the application packet?

14  A.   I can't answer that question.  I don't recall what

15       I've asked in the past.

16  Q.   But once you received your application package --

17  A.   Uh-huh.

18  Q.   -- if there is something that you feel is missing or

19       that you would like to get further information on,

20       who would you typically call?

21            MR. THOMPSON:  Objection, that's

22       speculation.  You're asking a conditional question as

23       a hypothetical, and there is no evidence that that

24       has ever been brought up that you could ask that

25       particular question.



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Glenn Clark
08/10/2020                                            Page 22

1                MS. DECLERCQ:  Mr. Clark testified that

2        sometimes he in the past has called Mr. Motzny or

3        Mr. Evans.  And then he also then testified that

4        sometimes he would ask Mr. Motzny if there was some

5        information that he wanted to find out that wasn't in

6        the packet.  And so I'm simply asking him to follow

7        up.  He was the one that brought up this issue.  So

8        if you're thinking of a particular instance when you

9        were answering that, I just want to follow up with

10       you and find out what information did you want to get

11       from either one of those people?

**12**                **THE WITNESS:  I don't recall.**

13   BY MS. DECLERCQ:

14   Q.   Do you ever have communication with your fellow board

15        members before a meeting?

16                MR. THOMPSON:  Objection.  That's pretty

17       vague and general.  What time, on a particular case,

18       or just in conversation?

19   BY MS. DECLERCQ:

20   Q.   So between the time that you would receive your

21        agenda packet and the meeting, would you ever have

22        reason to call one of your fellow board members for

23        questions?

**24   A.   Not that I can recall.**

25   Q.   Okay.  And so, again, if you had questions about



Glenn Clark
08/10/2020                                          Page 23

```
 1        things that you had received in your application
 2        packet, if you were to call anybody to seek
 3        clarification, would it be someone who worked for the
 4        City?
 5   A.   Mr. Evans, and it doesn't happen very often.
 6   Q.   Okay.  So tell me a little bit about the relationship
 7        between the ZBA and the Planning Department.  I know
 8        that the ZBA is a separate board and the Planning
 9        Department is a department of the City, but what is
10        the relationship between the two?
11   A.   I think it's very simple.  If I have a question I
12        call Mr. Evans.  His assistant is Kathy, and it's
13        very rare that I've ever spoken with her, but
14        sometimes I'll have to talk to her.  It's usually her
15        calling me to say, well, this is going to happen or
16        that's going to happen, and then they give me
17        deference because I am the chairman of the board.
18        But it's very rare that I ever talk to her, and we
19        really don't talk about anything other than process
20        things, you know, the ball needs to go from A to B to
21        C, you know, that's it.
22   Q.   So you speak with Kathy about process questions,
23        right?
24   A.   And I can't even tell you what I've ever spoken to
25        her about.  I can't recall.
```



Glenn Clark
08/10/2020                                            Page 24

1   Q.   If there were specific facts in your application

2        packet that you were unclear about, would you ask for

3        clarification from somebody from the Planning

4        Department, or -- I guess that's the question.  Would

5        you ask for clarification from somebody from the

6        Planning Department?

7   A.   **Mr. Evans.**

8                  MR. THOMPSON:  I'm going to object again.

9        It's speculation if, you know, we don't have the

10       specific case where you could ask that question.

11  BY MS. DECLERCQ:

12  Q.   I'm asking in your experience, in your multiple years

13       of being on the board, just typically again if you

14       were to have a question about facts that are either

15       in the planning packet or not in the agenda packet,

16       would you contact the Planning Department and ask for

17       information or clarification from Mr. Evans?

18                  MR. THOMPSON:  Same objection, but if you

19       can answer it, go ahead and answer it.

20                  **THE WITNESS:  I guess I would call him.**

21       **And I can't tell you anytime that I ever called him**

22       **about anything because I've been on the board for a**

23       **long time, so -- but by and large it's a quick**

24       **question here and there and that's it, nothing**

25       **substantial.**



Glenn Clark
08/10/2020                                                        Page 25

```
 1   BY MS. DECLERCQ:

 2   Q.   That's fine.  I just want to know again the process,

 3        the typical process.  What is the relationship

 4        between, if any, the ZBA and the Planning Commission?

 5        Do you have any communication with each other?

 6   A.   Well, our ordinance for the City -- I'm sorry, our

 7        charter for the City of Troy has one planning

 8        commissioner in bed on the Zoning Board, and that

 9        rotates.  We had one that served a couple years but

10        that's unusual.  It's usually one year in and out, so

11        that's it.  We don't have any other communication.

12             I've met -- well, I know one of the

13        commissioners, but I don't talk to him about zoning

14        at all.  And I couldn't honestly other than that one

15        commissioner, I couldn't even tell you who else is on

16        that board.

17   Q.   And we've already talked about the zoning

18        administrator, right?  That's Mr. Evans, right?

19   A.   He's a City Administrator, he's not the Zoning

20        Administrator, but --

21   Q.   Is there -- do you have any communication as a board

22        member or chairman with the City Manager?

23   A.   There was one time years ago, I can't recall the

24        issue, that he actually showed up to our zoning

25        meeting.  And what that issue was, you've got to go
```



Glenn Clark
08/10/2020                                         Page 26

1        back to the video.  I don't know.

2   Q.   But that was unusual?

3   A.   **Very unusual.**

4   Q.   Okay.

5   A.   **I mean he kind of recognizes me and I kind of**

6        **recognize him when I see him, but that's it.  I don't**

7        **think I've ever spoken with him.**

8   Q.   And is there any communication that you would have in

9        your ZBA or chairman position with the Mayor?

10  A.   **With the -- I'm sorry --**

11  Q.   With the Mayor?

12  A.   **Yes, I know the Mayor --**

13  Q.   Uh-huh.

14  A.   **-- and I like the Mayor, but we spoke a number of**

15       **days ago.  I haven't --**

16  Q.   Let me stop you.  As part of your ZBA duties.

17  A.   **No.**

18  Q.   Not just as a --

19  A.   **Yeah, friendly.**

20  Q.   -- friendly hello?

21  A.   **Yeah.**

22  Q.   As part of your ZBA duties would you have reason --

23  A.   **No, nothing.**

24  Q.   -- would you have reason to speak with the Mayor?

25  A.   **Never.**



HANSON RENAISSANCE
COURT REPORTERS & VIDEO      hansonreporting.com
                             313.567.8100

Glenn Clark
08/10/2020                                              Page 27

```
1   Q.   Thank you.  How do you typically get information from

2        the City?  Is it by telephone?  Is it by email?  And

3        I know things change, and I'm saying typically how do

4        you typically get information?

5   A.   Well, it's not typical.

6             MR. THOMPSON:  Hold on a minute.  Are you

7        talking about a zoning issue that would be coming

8        before his board?

9             MS. DECLERCQ:  I'm talking about in his

10       position as a ZBA board member or chairman.

11            THE WITNESS:  Email, hundred percent.

12  BY MS. DECLERCQ:

13  Q.   And who would be the person emailing?

14  A.   I think Kathy.  She's who sends the packet out, and

15       we really just -- we get the one packet, and that's

16       all available online.  What I get is what any member

17       of the public gets.

18  Q.   So the typical process is applications come in.  If

19       it's going to be on the agenda, they put it together

20       in a packet, and then Kathy emails you and all the

21       rest of the board members the entire packet?

22  A.   Correct.  Like I said before, occasionally there's

23       some wiggle there, you know, either the City has

24       something or I have something, and I just ask a quick

25       question, that's it.  And sometimes they want to know
```



Glenn Clark
08/10/2020                                          Page 28

1         my thoughts on -- you know, because of the virus,

2         we've had issues meeting.

3    Q.   And in those circumstances that you're thinking of

4         when you were just giving that answer, would your

5         communication be primarily through email or some

6         other method?

7    A.   Usually by phone call.  I like to talk to people, so

8         occasionally it's by email.  It's a little bit of

9         both, I guess.

10   Q.   So would it be fair, then, to say that you will get

11        the packet by email, but if you need clarifications

12        or there's questions, that is more typically done by

13        phone?

14   A.   By and large, yes.

15   Q.   Would there ever be an instance that you can recall

16        where you would consult with the City Attorney on an

17        application prior to the meeting?

18   A.   Have I done that?  Perhaps.  I honestly don't recall.

19        Mr. Motzny and I rarely speak, and if I speak to him,

20        by and large almost 100 percent of the time it's at

21        the board meeting.  So, yeah, I don't -- I really

22        don't call him.

23   Q.   Does he ever call you?

24   A.   I can't ever recall Mr. Motzny -- I think he called

25        me back.  I had a question about something, a couple



Glenn Clark
08/10/2020                                         Page 29

1       five, six, seven months ago, and I think he -- maybe

2       we talked a couple times, but that's it.

3   Q.  But are they available to you?  Do you feel like if

4       you had a question and you wanted to consult with

5       them, is Mr. Motzny or anyone in that position, do

6       you feel that they're available to you as a board

7       member?

8   A.  Sure.

9   Q.  Okay.  And did you consult with your City Attorneys

10      prior to the meeting on Adam's 2018 application?

11  A.  No.

12  Q.  Okay.  Did you consult with anyone from the City?

13  A.  No.

14  Q.  Prior to the meeting, is there a proposed motion that

15      is drafted, or are all the motions just done

16      spontaneously at the meeting itself?

17  A.  Absolutely there's no prior written motion ever, not

18      one time.

19  Q.  Okay.  In your agenda packet, I understand that it's

20      probably the application that is filled out by the

21      applicant, correct?

22  A.  Uh-huh.

23  Q.  Is there ever material that the City prepares as part

24      of that application as well, or does all the

25      information that you're presented in your packet



Glenn Clark
08/10/2020                                              Page 30

```
 1          generally come from the applicant?
 2    A.    As far as I recall, 100 percent comes from the
 3          applicant.  Everything else that the City shares with
 4          us is verbally at the meeting by Mr. Evans, and
 5          sometimes Mr. Motzny jumps in and has a few words.
 6          But that's all on video evidence.
 7    Q.    So anything that like Mr. Evans pulls up at the
 8          beginning of the meeting when he's sort of setting
 9          out the application, that is either in the agenda
10          packet or you haven't seen it before?
11    A.    No, he pulls it up on site.
12    Q.    Okay.  As part of the training that you received when
13          you became a board member, did that include training
14          on the zoning ordinance?
15    A.    Yes.
16    Q.    Did that --
17    A.    I got the book.
18    Q.    The very big book?
19    A.    The huge book.
20    Q.    Did your training also include the master plan?
21    A.    I don't recall.
22    Q.    If you can recall, what specific training did you
23          receive on the zoning ordinance?  Did they just give
24          you the zoning ordinance and say here you go, or did
25          they --
```



Glenn Clark
08/10/2020                                    Page 31

1    A.    Plop.  But Mr. Stimac went through it, but we didn't

2          have time to go through everything, so -- but by and

3          large he gave me an overview, if you will.

4    Q.    And what is your understanding on how the zoning

5          ordinance and the master plans work together?

6                MR. THOMPSON:  Objection, no foundation.

7          How would he know that?

8    BY MS. DECLERCQ:

9    Q.    I'm just asking as part of your experience as a ZBA

10         member for many years, do you have any idea how the

11         master plan and the zoning ordinance work together?

12   A.    I'm somewhat familiar with the master plan, but how

13         those two things reconcile, I can't answer that.

14   Q.    Okay.  And obviously the zoning ordinance is huge,

15         your initial training could not have covered every

16         single aspect of it.

17   A.    Correct.

18   Q.    Would it be fair to say that if an application

19         pertained to a certain portion of the zoning

20         ordinance, you would learn about that zoning

21         ordinance as part of that application?

22   A.    Correct.  Mr. Evans does a phenomenal job.

23         Mr. Motzny does a phenomenal job.  We're briefed.

24   Q.    And that briefing you said always occurs at the

25         hearing?



**Glenn Clark**
08/10/2020                                                    Page 32

```
 1   A.   Yes.

 2   Q.   And so that is the only explanation that you would

 3        have received from anybody from the City?

 4   A.   Correct.

 5   Q.   Okay.

 6   A.   It's against the law to do it outside -- you know,

 7        for the whole board or for members of the board.

 8   Q.   Because of the Open Meetings Act?

 9   A.   Correct.

10   Q.   All right.  So would it be fair, though, to say that

11        you do need to have an understanding of specific

12        aspects of the zoning ordinance to decide on any

13        given application?

14             MR. THOMPSON:  Objection, that's very

15        vague.

16   BY MS. DECLERCQ:

17   Q.   But in your experience as a ZBA member, would that be

18        a fair statement that you have to understand

19        particular aspects of the zoning ordinance as it

20        pertains to that particular application?

21             MR. THOMPSON:  Again, that's speculation.

22             MS. DECLERCQ:  It's okay.

23             MR. THOMPSON:  Objection.

24             THE WITNESS:  I'm not going to answer.

25
```

 

**Glenn Clark**
**08/10/2020**                                                    **Page 33**

1    BY MS. DECLERCQ:

2    Q.   Well, would it be fair to say that your job as a ZBA

3         member is to understand and apply the zoning rules?

4         I'm asking you.

5    **A.   Yes.  There are five areas.  Mr. Evans and Mr. Motzny**

6         **do a very good job of briefing us about issues with**

7         **the parcel or whatever.**

8    Q.   What are the five areas that you're talking about?

9    **A.   Irregular shaped parcel.  I think it's, you know,**

10        **public safety, that's one.  There are five issues**

11        **that are always on the laptop before us, and in the**

12        **meeting that's what we look at.**

13   Q.   So there are five issues regardless of the type of

14        application that's in front of you?

15   **A.   All are dealt through that prism.**

16   Q.   Going a little bit more specifically, what is the

17        difference in your understanding between a use

18        variance and a dimensional variance?

19             MR. THOMPSON:  It calls for a legal

20        conclusion.  He's not a lawyer.

21             MS. DECLERCQ:  I'm asking what your

22        understanding of these two things are as a long-time

23        ZBA member.

24             MR. THOMPSON:  Still, he's not a lawyer.

25             MS. DECLERCQ:  I'm not asking --



Glenn Clark
08/10/2020                                              Page 34

```
 1                    MR. THOMPSON:  It's calling for a legal
 2          conclusion, what's the difference between one law and
 3          the other.
 4   BY MS. DECLERCQ:
 5   Q.     You can go ahead.  I'm asking what is your
 6          understanding of the two?
 7   A.     I don't think I have to go ahead.
 8   Q.     What is a use variance?
 9   A.     Use variance, as far as my knowledge, is like we want
10          to set up a floral situation.  The Kmart site on
11          Maple Road in Troy requested that years ago, came
12          before our board, and I believe we approved it.
13                    So there's a Greek Orthodox church on
14          Wattles Road.  They wanted a summer festival which
15          was outside the scope of the ordinance.  So they
16          wanted to be able to operate for their usage, if I
17          recall, and I might be wrong, like a Friday to Sunday
18          between certain hours.  The City ordinance didn't
19          allow it.  We approved it because it was only for a
20          couple days, and the neighbors didn't object.
21   Q.     So the use variance has to do with the use of the
22          property; is that correct?
23   A.     Correct, as far as I know.  We don't use that term.
24   Q.     You don't use the term use variance?
25   A.     No.
```



Glenn Clark
08/10/2020                                         Page 35

1    Q.   What do you use?

2    **A.   I don't know what you're asking me.**

3    Q.   Can you tell me what is a dimensional variance?

4    **A.   Dimensional, in my opinion, is an irregular-shaped**

5    **parcel, and somebody is coming to us because what**

6    **they're trying to do with the property doesn't meet**

7    **the ordinance.  So we look at how the property's**

8    **shaped, how it impacts the community, and so forth.**

9    Q.   So when you're deciding a dimensional variance, is

10        there any aspect of use that is considered?  I'm just

11        trying to figure out the difference between the two.

12             MR. THOMPSON:  Well, objection.  He just

13        indicated he doesn't really know what use is.  He

14        doesn't ever use that term, which was one of the

15        objections I made earlier.  He's not a lawyer or a

16        zoning lawyer to understand those nuances.

17   BY MS. DECLERCQ:

18   Q.   You don't understand what the word use is with

19        respect to how somebody uses a property?

20   **A.   I think it's very specific to zoning, not very**

21   **specific in common vernacular.**

22   Q.   When you are considering a dimensional variance, do

23        you consider what activities are going to be done on

24        that property?

25   **A.   Yes.  Once again, we don't use that phraseology, but**



Glenn Clark
08/10/2020                                          Page 36

1       yeah.  I mean, we have denied certain requests over

2       the years.  There was a group that wanted to do

3       something in a subdivision.  We said no because it

4       would have perhaps brought a lot of traffic to that

5       quiet neighborhood.

6   Q.  And that was a dimensional variance that they were

7       seeking?

8   A.  No, I believe it was a usage --

9   Q.  Well, that's what I'm asking.

10  A.  -- of a property.

11  Q.  So I'm asking you --

12  A.  We don't use these phrases.

13  Q.  You don't use the phrase use variance?

14  A.  No.

15  Q.  Or dimensional variance?

16  A.  No.

17  Q.  What phrase do you use, then?

18  A.  Ma'am, I don't use phrases.  We get a packet from the

19      City, and we review the application, and we're

20      briefed by our City Administrator and attorney.  So

21      it's not like here are the use variances, here are

22      the dimensional variances, so --

23  Q.  Are you aware that under the zoning ordinance there

24      are different considerations for use variance versus

25      a dimensional variance?



Glenn Clark
08/10/2020                                    Page 37

1    A.   I think I understand our five practical difficulties,

2         and that's what I look at when I cast a vote.

3    Q.   For any variance regardless of whether or not they're

4         talking about a usage or a dimensional issue?

5    A.   That's our charge from City Council to look at the

6         five practical difficulties.

7    Q.   So let me -- just so that we're clear, just so that I

8         understand what five things you're talking about, I'm

9         turning to the zoning ordinance.

10   A.   Can I have a break?

11             MR. THOMPSON:  How long we been on?

12             MS. DECLERCQ:  Less than an hour.

13             MR. THOMPSON:  Well, why don't we take a

14        break at the hour, that would be fine.

15             THE WITNESS:  On the half hour.

16   BY MS. DECLERCQ:

17   Q.   These five issues or areas that you referred to that

18        you consider for every variance application that

19        comes before you, where does that come from?  Do you

20        know in the zoning ordinance where that comes from?

21   A.   The City Council.

22   Q.   No, do you know where in the zoning ordinance it is?

23        I'm asking you, are you familiar with it?

24   A.   What do you want, a number for the --

25   Q.   All right.  Here, I'm going to send you this.  This



Glenn Clark
08/10/2020                                    Page 38

1          is just a copy of the Troy Zoning Ordinance.  I did

2          not bring a copy for everyone here, but I'm assuming,

3          Mr. Motzny, you're familiar with it.

4                    MR. THOMPSON:  You don't want to touch it?

5                    MS. DECLERCQ:  You can use gloves or

6          something or whatever you want to do.

7                    MR. THOMPSON:  Does anybody have any

8          gloves?

9                    THE COURT REPORTER:  I do.

10                   **THE WITNESS:  I'm sorry.  What was the**

11         **question?**

12    BY MS. DECLERCQ:

13    Q.   I would like you to turn to Page 325 in that packet.

14    **A.   325.  The very end of this very thick document.**

15    Q.   Right.

16                   MR. MOTZNY:  Did you identify that

17         document?

18    BY MS. DECLERCQ:

19    Q.   Not yet.  So for the record, I handed the witness a

20         copy of the City of Troy Zoning Ordinance.  I'm

21         asking him to turn to a specific page.

22    **A.   What item?**

23    Q.   So looking at Page 325, there are paragraphs letter A

24         through E.  Are those the five aspects that you are

25         talking about?



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Glenn Clark**
**08/10/2020**                                                 Page 39

 1    A.   I'm going to have to take this apart.

 2    Q.   Yeah, that's fine.

 3    A.   Okay, A.  Yes, I believe this is correct.

 4    Q.   So in your previous answer when you said you consider

 5         five areas --

 6    A.   Uh-huh.

 7    Q.   -- these are the areas that you're referring to that

 8         are listed?

 9    A.   I believe that's correct.

10    Q.   Okay.  And these are the areas that you consider for

11         both use and dimensional variances?

12    A.   I believe that's correct.

13    Q.   When you are considering a practical difficulty, you

14         mentioned a practical difficulty?

15    A.   That's what these five items are called.

16    Q.   So in order to have a practical difficulty, you have

17         to meet all five of these paragraphs?

18    A.   According to our legal advisor, Mr. Motzny, that's

19         correct.

20    Q.   When you are considering these five aspects and,

21         therefore, practical difficulty, do you consider the

22         structures or features that are already existing on

23         that piece of property?

24    A.   Yes.

25    Q.   Would you also consider compliance with other aspects



**Glenn Clark**
**08/10/2020**                                              **Page 40**

1      of the City ordinance as part of a practical

2      difficulty?

3  **A.   I don't understand your question.**

4  Q.   So, for example, if there were a situation where

5      because of the City zoning ordinance interpretation

6      of what a front yard is, and because of that

7      interpretation a particular piece of property looks

8      like it has three front yards, would you consider

9      that aspect, that zoning interpretation aspect as

10      part of the practical difficulty when evaluating the

11      application?

12  **A.   I disagree with your perspective.  It's not the**

13  **city's interpretation, it is the people's**

14  **representatives who have decided that.**

15  Q.   Okay, what people's representatives?

16  **A.   City Council.**

17  Q.   Okay.  So if in the zoning ordinance there is

18      specific rules about what happens in a front yard and

19      what is considered to be a front yard, would that

20      aspect be considered as part of an application on a

21      piece of property whether or not someone could comply

22      with both things?

23  **A.   Well, once again I disagree with your perspective.**

24  **You said three sides?**

25  Q.   It's fine, never mind.  We'll move on.  So looking at



1       Page 324, which is where they're talking about

2       practical difficulties, look at paragraph E-1,

3       practical difficulties.

4    A.   **I'm sorry E-1, I don't see -- oh, there's E-1, got**

5       **it.**

6    Q.   Can you read Paragraph 1, E-1, just to yourself.

7       Just read it.

8    A.   **Do I have to read it?**

9    Q.   Yes, you have to.  Just read it to yourself and then

10      I'll ask you some questions.

11   A.   **I thought you were asking me to do it publicly.**

12   Q.   No.

13   A.   **Okay, thank you.  Okay.**

14              MR. THOMPSON:  Before you answer, let me

15      see what you're looking at.

16              **THE WITNESS:  Okay.  Thank you.**

17              MS. DECLERCQ:  Sure.  For the record, I'm

18      having the deponent read to himself a portion of the

19      City of Troy Zoning Ordinance.  It is located on

20      Page 324.  It is actually Section 15.04, E-1.

21              MR. THOMPSON:  What's the subtitle to it,

22      D-1?

23              MS. DECLERCQ:  E as in elephant, E-1.  That

24      is the paragraph that I have just asked the deponent

25      to read.



Glenn Clark
08/10/2020                                        Page 42

1             MR. THOMPSON:  Thank you.

2             MS. DECLERCQ:  Okay.

3    BY MS. DECLERCQ:

4    Q.   Mr. Clark, have you read that paragraph?

5             MR. THOMPSON:  Let me read it.

6             MS. DECLERCQ:  Okay.

7    BY MS. DECLERCQ:

8    Q.   Now, is this the aspect of the zoning ordinance that

9         you were referring to when you say that you have to

10        determine practical difficulty?

11   **A.   No.  The five that we just went over, that's what I**

12   **       by and large consider.**

13   Q.   Okay.  So in the paragraph that I just had you read,

14        there is a mention of substantial justice at the end.

15        What does that mean to you?  What is your

16        understanding of that, and how does that come into

17        play with a particular application?

18   **A.   I'm a just person.  I honestly don't know what you're**

19   **       trying to ask.  I think substantial justice probably**

20   **       means if somebody's being persecuted or something**

21   **       along those lines, and they are not being fairly**

22   **       treated.**

23   Q.   So that's what you understand substantial justice to

24        mean in the context of this zoning ordinance here?

25   **A.   Yes, I guess.**



Glenn Clark
08/10/2020                                          Page 43

```
 1   Q.   Okay.

 2   A.   Yeah.

 3   Q.   That's fine.  So in deciding a dimensional variance,

 4        and in your consideration of these five factors we

 5        agreed is what you think about, is there any

 6        consideration of hardship to the owner?

 7   A.   Regarding what?

 8   Q.   Just hardship in general, I mean if a variance were

 9        not to be given, is there --

10   A.   Yeah.

11   Q.   -- a hardship?

12   A.   If there's something that runs with the land

13        that's -- like we have voted as a board, when there's

14        a corner lot because it's two front yards, we have

15        granted variances for that.  So I'm not really sure

16        what you're asking.

17   Q.   So because in the example that you just used on a

18        corner lot with two front yards --

19   A.   In a residential area.

20   Q.   -- the fact that they have two front yards as defined

21        in the zoning ordinance, that is something that you

22        would consider as part of your decision on whether or

23        not there's a practical difficulty?

24   A.   It depends.  Every case is different.

25   Q.   I'm trying to figure out what it is that you consider
```



**Glenn Clark**
08/10/2020                                                            **Page 44**

1      in deciding your applications, and it can't possibly

2      be that every single application is completely and

3      totally different.  Do you consider --

4    **A.   That's not correct.**

5    Q.   All right.

6                    MR. THOMPSON:  Let her finish the question.

7                    MS. DECLERCQ:  I withdraw that question.

8    BY MS. DECLERCQ:

9    Q.   So you mentioned something about running with the

10     land.  Do variances run with the land?

11   **A.   If there is an issue with the parcel, so, yes.**

12   Q.   What do you mean by that, if there's an issue with

13     the parcel?

14   **A.   Irregular shaped topography, so forth.**

15   Q.   If you grant a variance, does that variance then "run

16     with the land"?

17   **A.   I can't answer that question.  I've never dealt with**

18   **that.**

19   Q.   So if a variance is granted on a piece of property,

20     can the subsequent owner then continue using that

21     property with that variance?

22                   MR. THOMPSON:  Objection.  It calls for a

23     legal conclusion, and he just said he can't answer

24     the question.

25                   MS. DECLERCQ:  I just asked a different



1    question.  So if somebody, if a variance is granted

2    on a piece of property, based upon your understanding

3    as a multi-year ZBA member and chairman, can a

4    subsequent owner continue with that variance or --

5              MR. THOMPSON:  Again, speculation.  I'm

6    sorry.  Go ahead, finish your question.  Objection,

7    speculation, hypothetical situation, and he already

8    indicated he can't answer it.  It's been asked and

9    answered.

10   BY MS. DECLERCQ:

11   Q.   You can answer, Mr. Clark.

12   **A.   On advice of counsel I'm not going to.**

13   Q.   I don't think actually your counsel told you not to

14   answer.

15             MR. THOMPSON:  If you can answer it, you

16   can answer it.  I haven't instructed you not to

17   answer it.  You ca answer it.

18   **         THE WITNESS:  I can't answer it.  I'm not**

19   **an attorney.**

20   BY MS. DECLERCQ:

21   Q.   So let's pretend -- and this is obviously speculation

22   because we're pretending, okay -- so, for purposes of

23   this question let's pretend that I am a primary

24   school owner, that I run a school in a GB district

25   and I'm granted a dimensional variance, okay.  If I



Glenn Clark
08/10/2020                                    Page 46

1      sell my property to another school, can they continue

2      operating on that property the way that it is, or

3      would they have to come before the ZBA and get

4      another variance?

5               MR. THOMPSON:  Objection, speculation,

6      hypothetical situation, and I don't think he can

7      answer a question like that.

8               MS. DECLERCQ:  I think that he can answer

9      it and I'm asking you to answer it.

10              **THE WITNESS:  I'm not going to pretend.**

11     **I'm not here to pretend.**

12     BY MS. DECLERCQ:

13     Q.   All right.  So what does it mean, then, when you say

14          run with the land?  You're the one who said it.  What

15          did you mean by it?

16     **A.   There are certain parcels that have a problem,**

17          **dimensional problem that runs with the land.  That's**

18          **a legal term.**

19     Q.   I thought you weren't a lawyer.

20     **A.   It's not.  Our City Attorney has used that**

21          **phraseology many years in front of me.  So**

22          **pie-shaped, corner lot, things of that nature.**

23          **Topography is another.**

24     Q.   All right.  What is -- I'm going to shift to another

25          sort of aspect.  What is the role of community input



Glenn Clark
08/10/2020                                          Page 47

```
 1          into your decision-making process as a ZBA member?
 2    A.    I can't answer that question.  Every case is
 3          different.
 4    Q.    Do you consider community input?
 5    A.    I like to hear from the neighbors, but that's not my
 6          main concern.
 7    Q.    What is your --
 8    A.    Those five practical difficulties.  I know we're
 9          having a hard time understanding that here.  That's
10          what I base my votes on, but I do listen to the
11          neighbors.  I like to hear from them.  I live in this
12          community and I respect people's opinion.  I don't
13          always agree with it.
14    Q.    And so what is your general approach if neighbors are
15          split over a project?
16    A.    Ma'am, those five practical difficulties is what I
17          fall back on each and every time.
18    Q.    I understand that, but I also asked what is the role
19          of community input in your decision-making process,
20          and I'm asking you what is your approach when
21          neighbors are split?
22    A.    They have a right to address the board under the
23          Michigan Open Meetings Act.
24    Q.    Uh-huh.
25    A.    So I listen to them, and I go back to my five
```



Glenn Clark
08/10/2020                                                  Page 48

1   practical difficulties here.

2   Q.   So do you take their input into consideration in your

3        decision, or do you only look at these five practical

4        difficulties?

5   A.   **I have voted with a majority of the neighbors who**

6        **have come before us before, and I've voted against a**

7        **majority of the neighbors who have come before us**

8        **before.**

9   Q.   That's not the question that I asked.  The question

10       that I asked is what consideration do you give to the

11       neighbors' input in making your decision?

12  A.   **I listen to logical arguments.  Sometimes I don't**

13       **know the neighborhood like they do.  I don't know**

14       **that parcel like someone who lives right next to it.**

15       **Even if I walk it, drive by it, I don't know it like**

16       **people who live right there.  So I listen and I'm**

17       **looking for pieces of the puzzle that perhaps I**

18       **didn't know.  And I listen.  I think I'm a very good**

19       **community member.  I want to hear from the people who**

20       **live here.**

21  Q.   Is it your philosophy to generally vote opposed to

22       anything where there is neighborhood opposition?

23  A.   **It weighs on me to know that people are very upset**

24       **about maybe a project or a concern or a variance.**

25       **And I think I've said in the past by and large I**



Glenn Clark
08/10/2020                                    Page 49

1       listen to the neighbors, but I can't cast every vote

2       based on that because it's not possible with these

3       five practical difficulties.  So I voted, like I said

4       before, with the neighbors and against the neighbors.

5   Q.  So there have been instances, then, where you've

6       approved an application even when there has been some

7       neighborhood opposition?

8   A.  Absolutely.

9   Q.  So you testified that you have received some training

10      on the zoning ordinance and that you've been a member

11      of the ZBA for multiple years.  What is your

12      understanding of where places of worship are allowed

13      in Troy?

14  A.  They're not allowed in a residential area because I

15      know we dealt with that years ago.  I think they can

16      be located pretty much anywhere except -- I don't

17      think Mr. Motzny was with the board at the time, but

18      we denied one request on a house of worship going

19      into a subdivision at a residential location.  So I

20      know that is not permitted, and that's why they had

21      to come before us for a variance.

22              We could have given them that permission,

23      but by and large I think it's largely in large

24      streets and roads.  But I know that there's -- before

25      Troy became a City there's some exceptions to that



Glenn Clark
08/10/2020                                        Page 50

1        rule.

2   Q.   Now, it's my understanding that there was a

3        significant zoning ordinance change in 2011; is that

4        correct --

5   A.   I don't know.

6   Q.   -- based on your understanding?  You don't know?

7   A.   I don't know.  I'm not on the City Council.

8   Q.   Is it your understanding that places of worship

9        currently are allowed in commercial areas?  You said

10       that they were allowed practically everywhere except

11       residential, right, so would that include commercial

12       areas?

13  A.   Driving around the town I see lots of them on major

14       roads and they're in commercial areas, so -- just

15       over here there's --

16  Q.   Do you recall the zoning ordinance change in 2011 at

17       all?

18  A.   No.

19  Q.   So you were not part of any discussion relating to

20       the zoning ordinance change at all, just to be clear?

21  A.   Ma'am, I'm not on the City Council.

22  Q.   I understand.

23  A.   That is completely their jurisdiction.  It usually

24       goes through Planning, then to City Council, but I'm

25       not on either of those boards.



Glenn Clark
08/10/2020                                    Page 51

1    Q.   But you were a member of the ZBA in 2011, you think?

2    A.   **I believe, but we are not a part of any conversation**

3         **like that.**

4    Q.   Right.  I'm simply asking whether or not you're aware

5         of the changes to the zoning ordinance in 2011?

6    A.   **There are always changes to the zoning ordinance,**

7         **always.**

8    Q.   So that did not stick out to you in any way?

9    A.   **No, huh-uh.**

10   Q.   Is it your understanding that under the current

11        zoning ordinance, places of worship are required to

12        have a 50-foot setback on all sides?

13   A.   **I was instructed by our attorney that is the case.**

14   Q.   And that instruction came when?

15   A.   **At the zoning meeting.**

16   Q.   Okay.

17   A.   **Because as I've instructed you, I did not review any**

18        **documents or have any conversations with anyone**

19        **before that meeting.**

20   Q.   What is your understanding of why places of worship

21        need that 50-foot setback on all sides?

22             MR. THOMPSON:  I didn't hear that question.

23   BY MS. DECLERCQ:

24   Q.   What is your understanding of why places of worship

25        need the 50-foot setback on all sides?



Glenn Clark
08/10/2020                                              Page 52

1                    MR. THOMPSON:  That calls for speculation.

2         Why -- how would he know that?

3    BY MS. DECLERCQ:

4    Q.   Go ahead.  You can answer.

5    A.   **Ma'am, I am not on City Council.  I did not have a**

6         **vote on that, nor was I consulted by why City Council**

7         **passed that law, nor was I -- discussed or have any**

8         **conversation about why certain roads have a 25-mile**

9         **speed limit or 45-mile speed limit.  I wasn't part of**

10        **any of those dialogues, so I can't answer.**

11   Q.   But it is your understanding that places of worship

12        do need the 50-foot setbacks on all sides?

13   A.   **That's what our City Attorney, associate attorney**

14        **instructed the board the night of the meeting in**

15        **question.**

16   Q.   And that is because that is a rule that's contained

17        in the zoning ordinance?

18   A.   **It's because what City Council passed.**

19   Q.   Which is reflected in the zoning ordinance?

20   A.   **Correct.**

21   Q.   Okay.

22   A.   **When City Council votes on something regarding**

23        **zoning, it goes to the zoning ordinance.  It's pretty**

24        **clear.**

25   Q.   So would it be fair, then, to say you have no idea



```
 1        why they added that provision to the zoning

 2        ordinance, you just live with it and enforce it?

 3   A.   I don't know why fire suppression systems cost so

 4        much money, either, but they're required here in the

 5        City and cost a lot of money for --

 6   Q.   I'm not asking about fire suppression systems.  I'm

 7        asking you would it be fair to say that you don't

 8        understand why that provision is in the zoning

 9        ordinance, but since it is in the zoning ordinance,

10        you, as a ZBA member, then, have to enforce that?

11   A.   Nobody instructed me as to their perspective about

12        why they were passing this on City Council.

13   Q.   I understand that.  That's not what I'm asking you.

14                MR. THOMPSON:  I'll object.  You're asking

15        him to plumb the motivations of City Council.

16                MS. DECLERCQ:  I'm not.

17                MR. THOMPSON:  You're asking him why was

18        that in there.  That's what he says, he doesn't know.

19                MS. DECLERCQ:  No.  I accept that he does

20        not understand why there is a 50-foot setback

21        requirement.  I am now asking him is it your

22        understanding that that 50-foot setback requirement

23        is part of the zoning ordinance?

24                MR. THOMPSON:  But that wasn't the question

25        you asked.  I objected to --
```



Glenn Clark
08/10/2020                                    Page 54

```
 1                 MS. DECLERCQ:  Fine.  That's the question
 2        I'm asking now.
 3                 MR. THOMPSON:  Okay.  Well, you've
 4        withdrawn that other question when you asked him why,
 5        because that was up to the City Council, not him, and
 6        he could not plumb the motivations of the members of
 7        the City Council as to why they put a 50-foot
 8        setback.  But go ahead.  I just want to make clear my
 9        objection was to your previous question.
10                 MS. DECLERCQ:  Fine.
11                 MR. THOMPSON:  Okay.
12      BY MS. DECLERCQ:
13      Q.   So do you understand the question that is currently
14           before you?
15      A.   No, because you put several questions in front of me.
16      Q.   Okay.  So the question is, is it your understanding
17           that the 50-foot setback requirement for places of
18           worship are required in the zoning ordinance?
19      A.   Yes.
20      Q.   And as a member of the ZBA, you have to enforce that
21           regardless of whether or not you understand why it
22           happened to be there?
23      A.   I'm sorry.  You're simply wrong.  I don't enforce
24           anything, so I can't answer your question.
25      Q.   Okay.
```



Glenn Clark
08/10/2020                                          Page 55

1   A.   The City of Troy administration and staff enforce the

2        zoning ordinances.  Mr. Clark of the Zoning Board

3        enforces nothing.

4   Q.   Okay.  So then what do you do, then?  How would you

5        characterize what you do?

6   A.   I vote on variance requests.

7   Q.   So --

8   A.   So if you want to consider that an enforcement,

9        that's -- your perspective is very, very wrong --

10                 MR. THOMPSON:  Do not argue.

11                 THE WITNESS:  I'm sorry.

12                 MR. THOMPSON:  Do not argue with the

13       lawyer, okay?

14                 Sorry, go ahead.

15  BY MS. DECLERCQ:

16  Q.   Are you aware of any places of worship in Troy that

17       have less than a 50-foot setback --

18  A.   No.

19  Q.   -- on all sides?  Have you granted variances for any

20       other places of worship as a member of the ZBA?

21  A.   Not that I know of.  Not that I can recall.  Let me

22       just restate that, not that I can recall.

23  Q.   Are you aware of whether or not there are any Islamic

24       places of worship in Troy?

25  A.   I have no knowledge of that.



Glenn Clark
08/10/2020                                    Page 56

1  Q.  Do you know whether Adam and its members have a place

2      to worship in Troy?

3  A.  **I have no knowledge of that.  No, I'm sorry.  Let me**

4      **restate that.  I think something that was sent to me**

5      **showed that they worship in a rented building in a**

6      **basement or something in Troy.  That's what I think**

7      **now that you mention it.  I think I read that, but I**

8      **have no knowledge of --**

9  Q.  When do you think you read that?

10 A.  **Two weeks ago?  I could be wrong.  Two, two and a**

11     **half weeks ago, thereabouts.**

12 Q.  And did the issue of whether or not Adam had a place

13     to worship in Troy factor at all into your

14     consideration of their 2018 variance application?

15 A.  **I don't consider anything related to anything similar**

16     **to that ever.**

17 Q.  So that would be no?

18 A.  **No.**

19 Q.  Are you personally familiar with any particular place

20     of worship in Troy, whether you belong to a church in

21     Troy or --

22 A.  **Of course I am.  I live here.**

23 Q.  Are you familiar with Kensington Church?

24 A.  **Yeah.**

25 Q.  Did you also attend Woodside Bible?



Glenn Clark
08/10/2020                                    Page 57

1    A.   Yes.

2    Q.   Do you know whether or not those churches ever had to

3         apply for a variance?

4    A.   **Not before me, not ever on my board.**

5    Q.   Do you know whether or not either of those churches

6         has had any health and safety problems?

7    A.   **Not to my knowledge.**

8    Q.   All right.  So turning specifically to Adam's 2018

9         variance application, I'm assuming based upon your

10        previous answers that you received their materials in

11        an agenda packet?

12   A.   **Yes.**

13   Q.   And it was emailed to you by someone in the City,

14        correct?

15   A.   **Yes.**

16   Q.   Okay.  Did you review the materials in advance of the

17        hearing?

18   A.   **No.**

19   Q.   You didn't look at any of the agenda packet before

20        the hearing?

21   A.   **Okay, that's not correct.**

22   Q.   Okay.

23   A.   **Let me restate it.  I got the packet from Mr. Evans'**

24        **office, I think it was Kathy, who's a wonderful**

25        **person.  And I looked at the -- there's a front form**


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Glenn Clark
08/10/2020                                    Page 58

1       or first page, and it's the agenda for the night.

2       And I went through, I always look at that, and I just

3       want to see who's coming before us.  And I noticed

4       that group was on the agenda, and I'm like oh, okay,

5       and I chose not to read anything --

6    Q.  Why was --

7    A.  -- beyond the front page.

8    Q.  Why was it significant to you that that group was

9       coming before you?

10   A.  I didn't want to pre-assume anything because they had

11      been before us before.  That's very unusual for our

12      board, somebody who's been denied as they were at the

13      Marinelli's site.  I looked at it like, you know

14      what, I'm going to listen to Mr. Evans, I'm going to

15      listen to Mr. Motzny, and we're going to have clean

16      hands and a pure heart here.  And I didn't talk to a

17      soul about that action item.  And I got all my

18      information the night of the meeting.  I didn't speak

19      to another board member.  I just wanted to walk in

20      with a fresh perspective, if you will.

21   Q.  Were you familiar with that particular property?

22   A.  Yeah.

23   Q.  Had you ever --

24   A.  My previous deposition shows that.  It was a DSW when

25      I moved to Troy or thereabouts.  I used to shop



Glenn Clark
08/10/2020                                    Page 59

```
 1        there.  And then a couple, three years ago, maybe

 2        longer, a friend of mine asked me, he goes, oh,

 3        there's this great Asian eatery in Troy.  And we were

 4        out on a Sunday afternoon, and I didn't even know it

 5        had turned into an Asian eatery.  But I went and had

 6        a great meal with him.  So I ate in the restaurant,

 7        not the other space they have apparently.

 8   Q.   So in the 2018 variance application what was Adam

 9        seeking?

10   A.   They wanted a 50-foot setback -- I'm sorry.  I

11        honestly can't answer that question.  It was a long

12        time ago.  All I remember was 50 feet here, 50 feet

13        there, so forth and so on.

14   Q.   Do you recall what changes to the property Adam was

15        seeking to make?

16   A.   No, I don't recall.

17   Q.   Do you know if they were seeking to make any changes

18        to the physical property?

19   A.   I don't recall.  We deal with a lot of agenda items

20        on the Zoning Board.  It's impossible to know all

21        that.

22   Q.   Is it your understanding, though, that they needed a

23        50-foot setback?

24   A.   Yes.

25   Q.   And why --
```



Glenn Clark
08/10/2020                                          Page 60

1   A.   **That's what I do recall.**

2   Q.   And why specifically did they need a 50-foot setback

3        on that property?

4   A.   **Because of the zoning ordinance.**

5   Q.   What part of the zoning ordinance?

6   A.   **The one that calls for a 50-foot setback.**

7   Q.   For that specific property --

8   A.   **Yeah, that's what I recall.**

9   Q.   -- or for that specific use?  Don't look at your

10       lawyer.

11  A.   **I can look at whoever I want to, ma'am, I'm sorry.**

12            MR. THOMPSON:  I think the best answer

13       would be from the record itself which we have a

14       videotape of which I'm sure you've reviewed.  All the

15       application that was presented by the Adams community

16       was laid out, questions were asked, and ultimately a

17       decision was made by the Zoning Board of Appeals.

18            So instead of trying to test his

19       recollection or his memory, you can go back and see

20       exactly what happened and what was presented.  So I

21       don't know why you're asking him, because all he's

22       going to do is refer you back to the record, the

23       transcribed record and/or the videotape.

24  BY MS. DECLERCQ:

25  Q.   So, Mr. Clark, I am not trying to test your



1    recollection.  This is not a memory test.  What I am

2    trying to understand is what was your understanding

3    of what was going on at the time?  I understand all

4    the videotape and I understand what happened, but

5    what I am asking you personally about is what is your

6    understanding about what was going on and why?

7                    MR. THOMPSON:  That's very vague and

8    general.  His understanding of what, of the entire

9    meeting that night?

10   BY MS. DECLERCQ:

11   Q.   My question is what is your understanding about what

12        changes Adam wanted to make to their property?

13   **A.   I can't answer that question because I don't remember**

14   **     that there were any changes that they were trying to**

15   **     make.  Once again, that was a year and a half ago.**

16   Q.   So it's your testimony that you don't recall what

17        Adam was seeking?

18   **A.   They wanted setback variances, that's what I recall.**

19   Q.   And I'm asking you as a ZBA member, why did they need

20        those setback variances?

21                    MR. THOMPSON:  That question has been asked

22        and answered several times.  He said according to the

23        ordinance.

24   BY MS. DECLERCQ:

25   Q.   And I'm asking what portion of the ordinance?


HANSON RENAISSANCE
COURT REPORTERS & VIDEO        hansonreporting.com
                               313.567.8100

Glenn Clark
08/10/2020                                                    Page 62

1   A.   What portion?   What do you mean?

2   Q.   Well, as we discussed, the zoning ordinance is a huge

3        document.   Your answer is they needed it because of

4        the ordinance.   I'm simply asking you what portion of

5        the ordinance?

6   A.   **They did not meet these five practical difficulties.**

7        **That's my answer.   Thank you.**

8   Q.   I'm asking you why did they even have to meet these

9        practical difficulties?

10  A.   **Ma'am, I'm not on City Council, and I didn't vote on**

11       **any --**

12  Q.   Okay.

13  A.   **-- ordinance in the City of Troy in my entire life.**

14  Q.   Is it your understanding that the only reason why

15       they needed to have those 50-foot variances was

16       because they were a place of worship?

17  A.   **My understanding is they didn't meet these five**

18       **practical difficulties, and different businesses,**

19       **different residential sites, different houses of**

20       **worship have different ordinances.   It's not a**

21       **one-size-fits-all for the City of Troy.**

22  Q.   They have different ordinances?

23  A.   **Of course they do.   A commercial enterprise is not**

24       **the same as my house.   It's a residential location.**

25  Q.   So again, is it your understanding that they needed



1      the 50-foot variance because they were going to

2      operate a place of worship on that property?  Why

3      were they there?  That's all I'm asking.  Why were

4      they there?

5   A.  **I didn't ask them to come.  They chose to come.  They**

6      **filled out their paperwork, we considered it, and we**

7      **rejected their request.  So you have to ask them why**

8      **they were there.**

9   Q.  So you don't -- so your testimony is that you don't

10      know why they were seeking a 50-foot variance?

11  A.  **Yeah.  I reviewed the packet.  I know that the City**

12      **ordinance requires it.**

13  Q.  Requires what?

14  A.  **The 50-foot variance or 50-foot setback.  I'm sorry,**

15      **not variance, the 50-foot setback on all the sides.**

16      **I listened to our attorney, Mr. Motzny, and he told**

17      **us -- you know, I don't want to put words in his**

18      **mouth, but it's clear that they would require a**

19      **variance on -- if I recall properly, I might have it**

20      **wrong, once again, you want total recall from me, I**

21      **can't do that, but I believe he said on all 50**

22      **sides -- I'm sorry, all four sides, 50 feet of**

23      **setback relief.**

24  Q.  So is it your understanding that if they were

25      operating something other than a place of worship,



Glenn Clark
08/10/2020                                    Page 64

1        they would not have to have the 50-foot variance?

2   A.   That's -- I don't have knowledge of that.

3   Q.   I'm asking your understanding.

4   A.   I don't know.

5   Q.   In your time as a ZBA member have you ever

6        been presented with a dimensional variance

7        application where the owner was not seeking to change

8        any aspect of the property?

9   A.   I can't answer that.

10  Q.   Why?

11  A.   Ma'am, I've been on that board for a really long

12       time.  I don't recall.

13  Q.   Okay.  What is your understanding about the types of

14       activities that Adam was going to be doing on that

15       property had they received their variance?

16  A.   In my deposition a year ago I said I recalled that

17       they were talking about like youth programs, sports,

18       and I think they mentioned like a health clinic or

19       something along those lines.  And I honestly don't

20       recall anything else.

21  Q.   Educational classes?

22  A.   I don't recall.

23  Q.   Banquets or weddings and funerals?

24  A.   I have no knowledge of that to my recollection.

25  Q.   So the youth clinic -- or excuse me -- the youth



Glenn Clark
08/10/2020                                          Page 65

```
 1          activities and the health clinic?

 2   A.     And sports.

 3   Q.     And sports --

 4   A.     That's all I recall.  I assume worship, too.

 5   Q.     Are those -- putting aside the worship aspect,

 6          talking specifically just about the youth activities

 7          and the health clinics and the sports, aren't those

 8          activities very similar to the other types of uses

 9          that you can do in the GB district as well?

10   A.     I don't know.

11   Q.     Do you know the types of uses or activities that are

12          allowed in the GB district?

13                  MR. THOMPSON:  If you know, say yes.

14   BY MS. DECLERCQ:

15   Q.     This isn't a test.  I just want to know what you

16          know.

17   A.     No.  If I consult my attorney, that's my privilege.

18                  MR. THOMPSON:  Wait.

19   BY MS. DECLERCQ:

20   Q.     What is your understanding of places of assembly as

21          it is defined in the zoning ordinance?

22   A.     I'm sorry, what was the first part?

23   Q.     What is your understanding of what a place of

24          assembly is as set forth in the zoning ordinance?

25   A.     An assembly, what is an assembly?
```



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Glenn Clark**
**08/10/2020**                                                    **Page 66**

```
 1   Q.   Places of assembly is a term that is used in the

 2        zoning ordinance.  What is your understanding of

 3        that?

 4             MR. THOMPSON:  Again, object.  It calls for

 5        a legal conclusion.  It's a definition probably in

 6        the zoning ordinance someplace.

 7             MS. DECLERCQ:  I'm not asking you to tell

 8        me what it is; I'm asking you to tell me what is your

 9        understanding?

10             THE WITNESS:  I don't know.

11   BY MS. DECLERCQ:

12   Q.   Do you think that it would encompass like a YMCA?

13   A.   I don't know.

14   Q.   A community center?

15   A.   I don't know.

16   Q.   All right.  So turning to the hearing on Adam's 2018

17        variance application, have you ever had a meeting

18        that was that crowded with people?

19   A.   Yes.  I don't recall which one, but I do believe when

20        they originally applied before the board it was

21        pretty crowded like that.

22   Q.   Have you ever had --

23   A.   But I honestly -- there may have been one or two

24        other ones.

25   Q.   Okay.  Has there ever been a meeting that you can
```



Glenn Clark
08/10/2020                                    Page 67

```
 1        recall that was that heavily attended that didn't

 2        involve Adam?

 3    A.  So your question is can I recall?  No.  I think there

 4        was one or two.

 5    Q.  Okay.  And in those meetings did you also have to

 6        impose like a three-minute speaking requirement?

 7    A.  Yes.  I might be wrong because I've been on the board

 8        for feels like 100 years.  We have imposed the

 9        three-minute rule numerous times.  How many times, I

10        can't tell you.  But that's what City Council does

11        when there's a well attended meeting or event.

12               And I've been to a lot of those City

13        Council meetings where that's happened.  People show

14        up when they're not happy.  So, yeah, but how many

15        times, I honestly can't answer that.

16    Q.  Okay.  So at the meeting -- and I have watched the

17        video, so I do understand that Mr. Evans sort of

18        starts it off by explaining the application and the

19        property, correct?

20    A.  Correct, yes.

21    Q.  And you --

22    A.  Well, he doesn't start the meeting off with that; he

23        starts his portion, correct.

24    Q.  And you testified earlier that you had not read any

25        of the written materials relating to this application
```



Glenn Clark
08/10/2020

Page 68

```
 1        prior to the meeting, correct?

 2   A.   I read nothing about this --

 3   Q.   So --

 4   A.   -- issue.

 5   Q.   So when Mr. Evans started his presentation, that was

 6        the first time that you --

 7   A.   Other than the first page which was the agenda.

 8        That's it.  So I knew what Adam was attempting to do.

 9        I saw their variance request because it's listed

10        there.  And then you drill down further in the

11        packet, but I didn't know what they were trying to

12        accomplish.

13   Q.   Okay.  So when Mr. Evans was doing his presentation,

14        was that the first time that you were getting

15        detailed information about what it was that Adam

16        wanted to do?

17   A.   Yes.

18   Q.   And what were your initial impressions when --

19             MR. THOMPSON:  Objection.  First of all,

20        he -- I'll make this objection so I, you know, carry

21        through.  He's a quasi-judicial officer.  Under the

22        rules of the Supreme Court of the United States and

23        the Sixth Circuit Court of Appeals, he has a

24        privilege not to reveal his thought process, and

25        that's a privilege that the Supreme Court has
```



**Glenn Clark**
**08/10/2020**                                                    **Page 69**

1    recognized.

2              And as a judicial officer, he -- making a

3    decision over two years ago and then trying to recall

4    for you or anybody else or for the Court what his

5    thought process was when he arrives at the decision,

6    the Courts have said that that is not permissible as

7    it relates to Judges or people in quasi-judicial

8    positions because the Court cannot really evaluate a

9    person's thought process, especially when this

10   occurred two years ago or five years ago or 10 years

11   ago.

12             So that's why I'm making that objection.

13   If he can answer it, I'm not going to say don't

14   answer it, but I think it's a privilege that I will

15   exercise at the right time.  So I'm making that

16   objection now, but I don't want to waive that

17   privilege.

18             So you can force me to instruct him not to

19   answer it, but I'm willing to let him answer it as

20   long as you understand that I'm going to exercise

21   that at the right time because there's a Sixth

22   Circuit Court of Appeals case which would have

23   jurisdiction over this Federal Court that says that

24   there is that privilege.

25             MS. DECLERCQ:  And so if I understand that


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Glenn Clark**
**08/10/2020**                                              **Page 70**

1    line of cases, the issue is that his decisions are

2    what his decisions are?

3              MR. THOMPSON:  No.  Excuse me.  You can ask

4    him what his decision was.  What I'm objecting to is

5    if you try to ask him what his thought process was.

6    We know what his decision was, and it wasn't just his

7    decision; it was the Board's decision.

8              There was a motion made to deny the request

9    and for several reasons that were listed in that

10   resolution or that motion, but now you're asking him

11   today what is your thought process?  And I think

12   that's a privilege.

13             I've got the cases, here, U.S. -- Morrison

14   is one of them, that was the Department of

15   Agriculture.  There's another case in the Sixth

16   Circuit.  I won't go through it.  I have it in my

17   briefcase.

18             MS. DECLERCQ:  So for purposes of this dep,

19   then, are you saying that you will allow him to

20   answer, but if we want to then later argue about

21   whether or not we can use those answers --

22             MR. THOMPSON:  Right.

23             MS. DECLERCQ:  -- with respect to the

24   privilege, because I don't like -- we're not going to

25   decide whether or not, you know --



**Glenn Clark**
**08/10/2020**                                    **Page 71**

1            MR. THOMPSON:  Yeah, as long as you're

2       agreeing that I can raise that privilege later on,

3       you know.  As you know, and you're an experienced

4       lawyer, if I don't object now, then I've lost that

5       ability to raise that issue.  So I'm objecting on the

6       basis of privilege.  If it were attorney-client

7       privilege, I would, you know, direct him not to

8       answer it, but this one is a little unique, and it

9       may take an Appellate Division on this particular

10      fact situation with a judicial officer of a city, not

11      a Federal Government judicial officer.  So I'm asking

12      you for that --

13           MS. DECLERCQ:  So I will note your

14      objection and that you are preserving your claim of

15      privilege.

16           MR. THOMPSON:  Right.

17           MS. DECLERCQ:  But you are not going to

18      instruct him to not answer the question?

19           MR. THOMPSON:  Correct.

20  BY MS. DECLERCQ:

21  Q.   So, Mr. Clark, do you understand what that means?

22  **A.   I think I understand him, but I can't remember the**

23  **     question, so you have to repeat your question.**

24  Q.   So I just wanted to make clear between you and I, so

25       the issue is, you're still going to answer the



1      questions that I'm going to ask you.  Do you

2      understand that to be the case?

3                  MR. THOMPSON:  As it -- yeah, as it relates

4      to that specific question you asked.

5                  MS. DECLERCQ:  Yes.

6                  MR. THOMPSON:  Now, I guess we could have

7      the reporter read it back, or if you remember the

8      question.

9                  MS. DECLERCQ:  No.  I remember the question

10     and I'll pose it again.

11                 MR. THOMPSON:  Okay.

12                 MS. DECLERCQ:  But I suspect that this

13     whole issue about thought processes may come up

14     again, and what your attorney and I were talking

15     about is the fact that this issue will still be

16     preserved, but for purposes of today you will still

17     answer the questions that I ask even if it relates to

18     that issue.

19                 MR. THOMPSON:  If you can.

20                 **THE WITNESS:  To my ability.**

21     BY MS. DECLERCQ:

22     Q.   Yes, okay.  So the question was, during Mr. Evans'

23          presentation of the details of Adam's application,

24          which you have testified before this was the first

25          time you were hearing, what were your impressions?


HANSON RENAISSANCE
COURT REPORTERS & VIDEO   hansonreporting.com
313.567.8100

Glenn Clark
08/10/2020                                              Page 73

```
 1   A.    Quite frankly, I was like, okay, well, here are these
 2         folks again.  I know them.  I treated them with a lot
 3         of respect when they were here before the board the
 4         first time.  And I said, oh, they're attempting to
 5         buy -- or I don't know their circumstances -- they're
 6         buying the old DSW, and I used to shop there a lot.
 7         And that was it, nothing else.
 8   Q.    Do you recall RLUIPA being referenced at that
 9         hearing?
10   A.    Yes, Mr. Motzny addressed it, and then the attorney
11         for the plaintiff or the petitioner referenced it and
12         they had a legal disagreement.  And I always go with
13         the City Attorney because he's our attorney for the
14         board, so --
15   Q.    And so what is -- what was the relevance of RLUIPA
16         with respect to this particular application?
17   A.    Essentially what I recall, and I honestly don't
18         recall that conversation well, but Mr. Motzny said
19         look at the City ordinances, not at RLUIPA.  And like
20         I said, the other attorney was pretty upset about
21         that, but -- so just that there's -- you can't
22         discriminate against a house of worship that wants to
23         locate on a parcel.  That's how I interpreted it.
24         And so that's it from their attorney's perspective.
25   Q.    Do you recall one of your fellow board members at
```



Glenn Clark
08/10/2020                                          Page 74

1       that hearing asking a question to Mr. Evans about

2       whether or not a commercial entity could use that

3       property without a variance?

4   A.  No.

5   Q.  Did you know any of the speakers who commented

6       publicly at that meeting?

7   A.  No, not that I recall, but I'm about 100 percent

8       certain I didn't know anybody.  Well, I'm sorry,

9       that's wrong.  I knew Dr. -- what is his name, Min?

10      Armin?

11  Q.  You knew the petitioner?

12  A.  Well, I don't know him.  He was before my board

13      before, and I think their attorney was before our

14      board.  And no one else from their organization rang

15      a bell with me that night.  And as far as the

16      neighbors, I did not recognize anyone.

17  Q.  During the hearing you mentioned several different

18      churches in Troy including St. Anastasia, Woodside

19      Bible.  What was the point that you were trying to

20      make about them?

21  A.  I'm far more familiar with Woodside and Kensington

22      because I saw them being built.  So I read in the

23      deposition -- or, I'm sorry, one of the pieces of

24      paper I think from the petitioner's or the

25      plaintiff's attorney that I probably had it wrong,



Glenn Clark
08/10/2020                                    Page 75

1     that St. Anastasia probably conformed to the parcel

2     back in the day, and that was changed over time is my

3     guess.

4               Regardless, something about the side

5     parking lot, whatever, so -- but my point was that I

6     saw these two very large churches being built, and I

7     said they conform to the zoning.  And I think I said

8     something about being good neighbors because I

9     know -- although Kensington doesn't have any direct

10    like really close neighbors.  There's still a

11    subdivision right over there.  And Woodside does have

12    neighbors.  There's the condos there.

13              So they bought parcels that met what they

14    were trying to do, and they never came before the

15    Zoning Board that I'm aware of.  And I may or -- I

16    think I was on the Zoning Board when Woodside got

17    built, and I don't think I was on the Zoning Board

18    when Kensington was built.  I certainly wasn't on the

19    Zoning Board when St. Anastasia was built because

20    that predates my time here.

21              But all I was saying was you buy the parcel

22    that meets zoning and be a good neighbor.  That's all

23    I was saying.

24  Q.  So if you needed a variance on a parcel that you

25      bought, does that mean that you're not being a good



Glenn Clark
08/10/2020                                              Page 76

```
 1        neighbor?

 2   A.   I can't answer that question.  Every variance is

 3        different.  If it's a problem that runs with the

 4        land -- how many times did I say that today?  A lot.

 5        You can't help that there's a problem with the land,

 6        irregular-shaped, topography, so forth.  So I just

 7        thought it was admirable that a couple of these very

 8        large churches bought tracts that fit what they were

 9        trying to do.

10                   But I would say that of any

11        other enterprise, a commercial enterprise, even, you

12        know, a person trying to build a house.  We've had

13        people before us in all those categories before, and

14        I voted no and I voted yes.  It just depends on the

15        practical difficulties.

16   Q.   So ultimately you voted to deny the variance

17        application, correct?

18   A.   As part of that evidence, yes.

19   Q.   And at the hearing would it be fair to say that you

20        put your reasons on the record at the hearing for why

21        you denied it?

22   A.   I don't think all of them, but I put a lot of things

23        on the record that day.

24   Q.   Okay.  Then what were your other reasons that were

25        not stated at the hearing?
```



Glenn Clark
08/10/2020                                          Page 77

 1   A.   I don't recall.

 2   Q.   You recall that there were other reasons but you

 3        don't recall what they were?

 4   A.   I'm not saying that there were.  I'm saying perhaps

 5        there were.  I'm not -- it was a long time ago.  I

 6        don't recall.

 7   Q.   Do you recall what your stated concerns were?

 8   A.   I think I talked about public safety.  I think I

 9        talked about 50-foot variances.  And I recall there

10        were some neighbors that were very upset, and I

11        addressed that in my comments.

12             People who live right behind the property

13        were lied about.  Read the deposition.  The

14        plaintiffs' attorney claimed that they didn't live

15        right abutting the property and they did, and they

16        came up to the board.

17             And I remember hearing a bunch of wonderful

18        things that night from the group Adam about all these

19        wonderful things that they were planning to do with

20        the property.  And they seemed to be very, very nice

21        people, but I don't base my vote on who's nice and

22        who's not, you know.  But that's what I recall.

23   Q.   So I'm sorry, I don't understand.  So the neighbors

24        were --

25   A.   Who live right behind.  The plaintiffs' attorney lied



Glenn Clark
08/10/2020                                              Page 78

1        and said that they didn't live there.  They do.

2   Q.   And did they speak at the meeting?

3   A.   They did.  It's on the video.

4   Q.   All right.  And did that factor into your

5        consideration?

6   A.   No, but I found it interesting.  I found the positive

7        things that Adam wanted to do interesting, too.

8   Q.   So you mentioned one of your concerns was public

9        safety?

10  A.   Yes, always.

11  Q.   How does that relate to the 50-foot setback

12       requirement?

13  A.   The parking and just the congestion that potentially

14       could have occurred if they located right there

15       because there's a side drive into the subdivision,

16       and I think my comments speak for themselves on the

17       video that I just had some concern.  I think there

18       were other comments of others on that point.

19  Q.   But those setbacks and parking, they had existed on

20       that property before?

21  A.   Right, but living here -- I live here, I don't think

22       you do, I do.  I've driven by there a ton,

23       practically every day, and when DSW operated there

24       they never had huge events with monstrously -- or

25       monster amounts of cars.  And then the Asian eatery,



Glenn Clark
08/10/2020                                      Page 79

1      same thing.  And our concern -- and you already saw

2      the video so you know what I'm talking about -- our

3      concern as a board and one of my concerns was on

4      significant days to that house of worship they were

5      going to have a lot of traffic, a lot of cars.

6                  So public safety factors into my concern

7      about people spilling out of the parking lot onto the

8      street where kids are playing or people are walking,

9      what have you.

10  Q.   So that relates more to how that property was going

11       to be used than any changes to the property that was

12       going to be made, right?

13  A.   **You keep referring to changes of the property.  I**

14       **can't recall that there were proposed changes to the**

15       **property.**

16  Q.   Right.  So the building and the parking and the

17       setbacks, those are all going to stay the same if the

18       variance had been granted, right?

19  A.   **I don't have the packet in front of me.  I don't**

20       **recall if they wanted to make a change.  I've already**

21       **explained that to you.**

22  Q.   But I'm trying to figure out -- but the change you're

23       talking about is the change in the use of the

24       property as a place of worship now instead of a DSW?

25  A.   **And potentially a change to the structure, too,**



Glenn Clark
08/10/2020                                      Page 80

1       because I don't recall if that was part of the packet

2       of the, you know, the variance request.  I don't

3       recall.  That was a year and a half ago.

4    Q. So do you know whether or not there were any problems

5       or complaints about the Asian eatery restaurant?

6    A. No.  I don't work at the City of Troy.  That would be

7       the police department.

8    Q. So when you say, then, they -- strike that.

9    A. I drove by and didn't notice a lot of traffic ever.

10   Q. So, again, if it would have remained a

11      restaurant/banquet hall, it would not have come

12      before your board, right?

13   A. No -- well, no, that's not true.  Depending if they

14      wanted to change the physical establishment.  If they

15      went into the setback, it would have had to come

16      before our board, but if somebody bought that

17      property and wanted everything to be the same -- I

18      don't know all of the ordinances, you know.  If it

19      went to a commercial retail space, maybe, I honestly

20      don't know.

21   Q. Well, you do know this.  Did it ever come before your

22      board --

23   A. Never.

24   Q. Hold on.  That wasn't my question.  My question is

25      did it ever come before your board when it switched



Glenn Clark
08/10/2020                                    Page 81

1       from the DSW to the Asian restaurant?

2    A.  **That may have been before I was on the board.**

3    Q.  Before the 100 years that you've been on the board?

4    A.  **It feels like that.**

5    Q.  But as far as you --

6    A.  **It switched.**

7    Q.  Go ahead.

8    A.  **It switched a long time ago, so it may have been**

9        **before I served on the board.**

10   Q.  But at the very least you don't recall it --

11   A.  **No.**

12   Q.  -- considering it as you --

13   A.  **I would have known, yeah -- sorry, sorry.**

14   Q.  Are you aware of any other commercial buildings or

15       properties that directly abut a residential property

16       in that same area?

17   A.  **Of course.**

18   Q.  And are you aware of any of them having parking all

19       the way up to the property line?

20   A.  **I can't answer that.  I've never inspected that.**

21   Q.  Do you know what is around there?  What other

22       businesses are around that area?

23   A.  **Sure.**

24   Q.  Can you tell me what they are?

25   A.  **Hungry Howie's, the car wash, which I think is a BP**


HANSON RENAISSANCE
COURT REPORTERS & VIDEO   *hansonreporting.com*
313.567.8100

Glenn Clark
08/10/2020                                              Page 82

```
 1        branded gas station.

 2   Q.   Is that on the same side or is that across the

 3        street?

 4   A.   Same side -- well, no.  It's on both sides.  They

 5        have two of them.  Good for some people doing well

 6        with the economy, right?  I don't know the name.

 7        There's a Wendy's up at Wattles.  There are two, I

 8        think there are two churches now, the First

 9        Evangelical, which I think was in some of my

10        paperwork that I got from Plaintiff's attorney, and

11        then there's a church next to that, and then there's

12        Qdoba, and what else do you want to know?

13   Q.   Do you know what businesses or entities are

14        immediately on either side of this property?

15   A.   Hungry Howie's to the south, and then the car wash to

16        the north.

17   Q.   And is it your understanding that both of those

18        businesses abut the residential property behind them?

19   A.   That's not correct.  I think the -- sorry, I think

20        the car wash does, but Hungry Howie's doesn't.

21        They're set towards the front of the property towards

22        Rochester Road, so that's not correct.

23   Q.   Okay.  All right.  So let's talk a little bit about

24        these five variance criteria that you say directs

25        your dissidence.  And if you want to, while we talk
```



**Glenn Clark**
**08/10/2020**                                                    **Page 83**

 1      about it you can refer --

 2  **A.   What page again?**

 3  Q.    325.

 4  **A.   320 -- I have to take this stupid clip off again.**

 5  Q.    Yeah.  It's too big for a staple so you have to have

 6        a clip.  325.

 7  **A.   I think it's right around here.  Somehow I jumbled**

 8  **      all these pages and now everything that was at the**

 9  **      back is at the front now.  Okay.  328, 329, 325.**

10  **              I'm sorry.  I have to step out and get some**

11  **      water.**

12  Q.    Okay, that's fine.

13                MR. THOMPSON:  Can we take a break?

14                MS. DECLERCQ:  Yep.  Let's take a break.

15                THE VIDEOGRAPHER:  Going off the record at

16        12:41 p.m.

17                (A short recess was taken.)

18                THE VIDEOGRAPHER:  We're back on the record

19        at 12:56 p.m.

20  BY MS. DECLERCQ:

21  Q.    Mr. Clark, during our break did you have your memory

22        refreshed as to when you joined the Zoning Board of

23        Appeals?

24  **A.   My memory was not refreshed.  I was told what date it**

25  **      was by the City Clerk.**



Glenn Clark
08/10/2020                                    Page 84

1   Q.   Okay, and what date was that?

2   A.   **January 7th, 2008.**

3   Q.   And does that date coincide with your general

4        recollection of when you joined the ZBA?

5   A.   **Honestly, no.  It seems like that was a lot of time**

6        **ago.  I don't remember being on the board this long,**

7        **but that's what happens when old people turn old.**

8        **You just don't remember.**

9   Q.   But for purposes of your testimony, are you willing

10       to let us use January 8th, 2008 as --

11  A.   **January 7th, 2008, and that could be confirmed with**

12       **the City Clerk.**

13  Q.   Okay.  So we will use that as the operative date.

14  A.   **That's what I was just told, so yeah, let's go with**

15       **that.**

16  Q.   As part of your Deposition Notice asking for your

17       presence here today, we also asked you to bring any

18       documents relating to this matter that you may have

19       had in your possession.  Did you bring any documents

20       today?

21  A.   **I disclosed with my attorney a document that someone**

22       **emailed me, and I don't know that that document**

23       **actually has anything to do with this matter.  It**

24       **does have something to do with the faith community,**

25       **which I have never read that document.**



**Glenn Clark**
**08/10/2020**         **Page 85**

1   Q.   Okay. Let's back up for one second. So this

2       document that you're referring to that your attorney

3       handed to me during the break is a document entitled

4       Mosques in America. A Guide to Accountable Permit

5       Hearings and Continuing Citizen Oversight. Is this

6       the document that you --

7   **A.**   **Yes.**

8           MR. THOMPSON: For the record, I would

9       indicate we did receive the Notice of Deposition, and

10      there was an Appendix A, and it requests us bring

11      various documents.

12           The only document that we had and that

13      Mr. Clark had in his possession, and I asked him to

14      look after we got that -- we got involved in the case

15      was to make sure he didn't have any documents that

16      related to the particular lawsuit because at that

17      time Mr. Motzny was also asking me to provide them.

18      He asked me orally if there was anything that

19      Mr. Clark had. At the time Mr. Clark said no.

20           And then later on at my request he did

21      another search, and the only document he found was

22      the one that you are mentioning there, Mosques in

23      America. It was a document that he received in

24      November of 2018, several months after the decision

25      was actually made.



Glenn Clark
08/10/2020                                    Page 86

1                    And you can question him about it, but he

2           indicated that he has never read the document.  But I

3           thought rather than try to guess whether it was

4           covered by your Request for Documents, I'd rather

5           provide it to you and you can make of it what you

6           want.

7                    MS. DECLERCQ:  Great, thank you.  I

8           appreciate you bringing it.

9      BY MS. DECLERCQ:

10     Q.   So Mr. Clark, when did you receive this document?

11     A.   **Mr. Thompson said November 2018.  It was quite some**

12          **time ago, I remember that.  Per his request, I went**

13          **back to the drawing board, and I found that after**

14          **doing some pretty extensive research on my Gmail**

15          **account.  And I remember getting it, but as soon as I**

16          **saw the title, I said I don't want any part of this.**

17     Q.   Do you know who sent it to you?

18     A.   **Yes.**

19     Q.   Who?

20     A.   **Ruthann Dawley.**

21     Q.   And who is that to you?

22     A.   **She is somebody I know through the political process.**

23          **She goes to church here in Troy.  She doesn't live**

24          **here; she lives in Rochester Hills.  She's spoken**

25          **before I think the City Council and the Zoning Board**



Glenn Clark
08/10/2020                                                Page 87

1     before, and she decided I needed to see that.  And I

2     got it and I've never read it.

3  Q.  Was there any email text in her message to you that

4     attached this?

5  A.  No.  Whatever I got I sent to Mr. Thompson.  And she

6     may have said something like please read this or

7     something simple like that.

8  Q.  So you brought the document that she attached but you

9     didn't bring the actual email?

10 A.  I think I sent Mr. Thompson everything I had, to my

11    recollection.

12 Q.  Okay.  So just for the record, Mr. Thompson said he'd

13    look and see if he could find an email.

14           And have you read this?

15 A.  No.

16 Q.  Did you share this with anyone else?

17 A.  Just Mr. Thompson.

18 Q.  Do people from the community ever send you stuff

19    directly because they know you're on the Zoning Board

20    rather than send it to the City?

21 A.  No.  I honestly can't answer that question because of

22    my lengthy time on the board, but I don't ever recall

23    getting anything.  I even had a neighbor one time,

24    and he had an issue and we never even spoke.

25 Q.  So if it were to happen that someone would send you



**Glenn Clark**
**08/10/2020**                                                    **Page 88**

1     something directly, would it be your practice to then

2     send it to the City?

3  A.  **Yes, that's required under the State law.**

4  Q.  What about if somebody just, you know, in passing,

5     they know you're on the board, they make a comment.

6     Would you then share that comment with the City or

7     your other board members?

8  A.  **No, because it's not required.**

9  Q.  So if you receive something in writing, that's

10     required to be sent on to the City, but if you --

11  A.  **Writing or email, yes.**

12  Q.  But just verbal communication --

13  A.  **Yeah.  I'm a member of this community, I mean, so I**

14     **hate this, I love that, you know.  That's part of**

15     **living life in Troy, Michigan, you know.**

16  Q.  What about if it was specific to an application that

17     was coming before you for consideration, would you

18     then share that with either your fellow board members

19     or the City?

20  A.  **Through the City Attorney's Office I've never been**

21     **informed that I have to do that.  I think in all**

22     **these years there's a lady I know who had a**

23     **residential development concern, and I got to know**

24     **her through the senior -- I used to work for the**

25     **Michigan Attorney General's Office, Consumer**



Glenn Clark
08/10/2020                                      Page 89

1     Protection Division.  I used to be a public

2     presenter.  So I used to spend a lot of time in the

3     community.  I've done community groups, senior

4     groups.  I've done it all.  And so I got to know her

5     through me being on the Zoning Board.  And then I

6     came to speak to the senior group which meets right

7     over here at the community center.

8               And so she approached me; how are you

9     doing?  So she did approach me one time.  I think

10    maybe it was before my zoning meeting started, and I

11    think that's perhaps the only time.

12 Q.   And that had nothing to do with the Adam application?

13 A.   Nothing, so --

14               MR. THOMPSON:  I found -- just to describe

15    it, I found an email that was printed off by my

16    executive assistant, and it's an email from Glenn

17    Clark to me with the attachment, that attachment

18    Mosques in America.  And he is also forwarding to me

19    the email he received from Ruthann Dawley, who is the

20    lady who he spoke about.  And it's dated November 29,

21    2018, and it's referenced Current Case With Adam

22    Center Versus Troy.  And I'll let you see it.

23               MS. DECLERCQ:  Can I have this or are you

24    just letting me look?

25               MR. THOMPSON:  I can get another copy of



Glenn Clark
08/10/2020                                            Page 90

```
 1      it.
 2                   MS. DECLERCQ:  Okay, thanks.  Give me one
 3      second.
 4                   THE WITNESS:  Uh-huh.
 5   BY MS. DECLERCQ:
 6   Q.   So you said that this Ruthann Dawley was just
 7        somebody that you knew through your political party.
 8        Would you consider her to be a personal friend?
 9                   MR. THOMPSON:  Don't shrug.  Answer yes or
10        no so she can put it on the record.
11                   MS. DECLERCQ:  Thank you.
12                   THE WITNESS:  That's a hard question to
13        answer.  I'm friendly with everyone, so --
14   BY MS. DECLERCQ:
15   Q.   Do you agree with the comments and thoughts that Miss
16        Dawley has written in this email about Islam?
17   A.   I didn't read them.
18                   MR. THOMPSON:  Can you show it to him so he
19        knows exactly --
20   BY MS. DECLERCQ:
21   Q.   I guess let me back up.  Did you read this email from
22        Miss Dawley?
23   A.   I don't believe I did, because I was aware of her
24        thoughts and perspectives, so I purposely just walked
25        away from having anything to do with that.
```



Glenn Clark
08/10/2020                                    Page 91

```
 1   Q.   So you knew her thoughts and perspectives prior to
 2        receiving this email?
 3   A.   I believe she spoke to the Zoning Board when the Adam
 4        group came before us the first time, whatever date
 5        that was.  So the next go-around I got that, and I'm
 6        like, okay, I'm not going to even touch this.
 7   Q.   And did she send you any emails in advance of the
 8        2018 --
 9   A.   No.
10   Q.   -- hearing?
11   A.   No, huh-uh.
12   Q.   Have you had any discussion with her between Adam's
13        first application and Adam's second application about
14        Adam specifically in any way?
15   A.   In any way, any way?
16   Q.   Yeah, about Adam in any way.
17   A.   No, not regarding Adam.  I don't recall.  I don't
18        think I did.
19   Q.   Did you have any conversations with her between
20        Adam's first and second applications relating to
21        Islam in general?
22   A.   First and second, she's a very opinionated person.  I
23        honestly don't recall, but my thought process
24        probably is yes, because she likes to talk, you know,
25        about this issue.  So probably after the first vote
```



**Glenn Clark**
**08/10/2020**                                    **Page 92**

 1      she may have said, you know, thank God this was, you

 2      know, rejected or whatever.  But I did not speak to

 3      her before either vote.

 4   Q.   I'm going to have this marked as an exhibit, and then

 5      I'm going to let you read it, and then I'm going to

 6      ask you some questions about it, okay?

 7   A.   **Okay.**

 8          MS. DECLERCQ:  And you don't have another

 9      copy of this?

10          MR. THOMPSON:  Not with me.

11      GOVERNMENT EXHIBIT NUMBER 1,

12      JULY 7, 2020 EMAIL CHAIN AND MOSQUES

13      IN AMERICA, A GUIDE TO ACCOUNTABLE PERMIT

14      HEARINGS AND CONTINUING CITIZEN OVERSIGHT,

15      WAS MARKED BY THE REPORTER

16      FOR IDENTIFICATION

17          MS. DECLERCQ:  Okay.

18          MR. MOTZNY:  Would you like me to make

19      copies of that?

20          MS. DECLERCQ:  Yes, could you?  I'll mark

21      it here, and then there's a front and a back.  So

22      let's do that.

23          MR. MOTZNY:  I'll probably just make two

24      pages.

25          MS. DECLERCQ:  Yeah, that would be fine.



Glenn Clark
08/10/2020                                          **Page 93**

1     Do you want us to wait for you?  I'm not going to ask

2     questions about that document until we get copies

3     because I want it in front of me, too.

4                    MR. MOTZNY:  I'll be quick.

5                    MS. DECLERCQ:  Okay.

6                    MR. MOTZNY:  So if you can wait.

7                    MS. DECLERCQ:  Yeah, I'll wait.

8                    Let's go off the record right now.

9                    THE VIDEOGRAPHER:  Going off the record at

10    1:10 p.m.

11                   (A short recess was taken.)

12                   THE VIDEOGRAPHER:  We're back on the record

13    at 1:15 p.m.

14    BY MS. DECLERCQ:

15    Q.   Okay.  Before we took our break we started talking

16         about some new documents that you brought to the

17         deposition.  I had it marked as Government Exhibit 1.

18         We're going to actually come back to this.  I'm going

19         to ask you questions about some other topics and then

20         we'll come back around, so --

21                   Right now I'm going to direct you back to

22         what we were talking about before the break and

23         before we received this email.

24                   On Page 325 of the zoning ordinance, so

25         that is the -- just so that you can confirm that



Glenn Clark
08/10/2020                                    Page 94

```
 1        we're looking at the same thing, this has to do with

 2        Section 1504, Paragraph E, and then there's a

 3        Paragraph 1, 2, and then several letter numerated

 4        paragraphs, correct?

 5   A.   I'm sorry.  I think you might have that wrong.  So

 6        there's E, and then there's Paragraph 1, which is

 7        F-1, and then (a) and (b), so I don't know where the

 8        2 and 3 --

 9   Q.   No.

10   A.   I'm sorry, there's 3 and 4.

11   Q.   No.  So, okay --

12   A.   What page?

13   Q.   So let's start on Page 323.

14   A.   Oh, I'm sorry.  I have 325.

15   Q.   Yeah, 323.

16   A.   If I can find it.  322 -- I don't know that I can

17        find it.

18   Q.   It's double-sided paper.

19   A.   Oh, I'm sorry, you're right.

20   Q.   So follow along.  So Section 1504, right, Powers and

21        Duties?

22   A.   15 -- yeah.

23   Q.   Okay.  So it goes A, B, C, and then onto Page 324 it

24        goes 4, correct?

25   A.   Right.
```



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**Glenn Clark**
**08/10/2020**                                                    **Page 95**

 1   Q.   And then it says D, Interpretation, E Dimensional,

 2        and Other Nonuse Variances.

 **3   A.   Uh-huh.**

 4   Q.   You see where I'm looking?

 **5   A.   E, yeah.**

 6   Q.   Yeah.  And then as part of E there's Paragraph 1.

 **7   A.   Uh-huh.**

 8   Q.   Paragraph 2, right?

 **9   A.   Uh-huh.**

10   Q.   And then as part of Paragraph 2 there's (a) through

11        (e), little (a) through little (e).

**12   A.   On 325.**

13   Q.   Correct.

**14   A.   Yes.**

15   Q.   You see what I'm talking about?

**16   A.   Yeah.**

17   Q.   Okay.  This is what we're going to be talking about.

18        So looking at E can you -- it says that it is

19        Dimensional and Other Non-Use Variances, correct?

**20   A.   Proposed, on 325?**

21   Q.   No, 324, Paragraph E.

**22   A.   There we go, I'm sorry.  Dimensional and Other**

**23        Non-Use, yes.**

24   Q.   Okay.  And so is this the provision that you would

25        use, this portion, both Paragraphs 1 and 2, to decide



**Glenn Clark**
**08/10/2020**                                          **Page 96**

1     your dimensional variance application?

2   A.   **Yes, I believe that's correct.**

3   Q.   And so just for brevity's sake, I'm going to call it

4        the variance criteria.

5   A.   **Thank you, because we've been talking way too much**

6        **about this.**

7   Q.   So just to clarify, though, would you use these

8        variance criteria that we just discussed in Section E

9        would you use that only for a dimensional variance,

10       or would you also use that for a use variance, or do

11       you not make a distinction?

12  A.   **We really don't deal with use variances.  Now, like I**

13       **said before in my previous comments, a long, long**

14       **time ago we did at the Greek Orthodox Church, and we**

15       **did at the Kmart site.  And other than those two, I**

16       **don't ever recall having a use variance because**

17       **that's how infrequent it comes up.**

18            **So this Item E 2, this is practically all**

19       **we ever do.  It's dimensional and other, you know,**

20       **pieces of the puzzle about a particular parcel.  It's**

21       **not about a use.**

22  Q.   Okay.  And so use variances are a different thing,

23       right?  You said that they don't --

24  A.   **Yeah -- I'm sorry.  I apologize.**

25  Q.   You said that they don't come before you very often,



Glenn Clark
08/10/2020                                                    Page 97

1         but they are a different thing, correct?

2    A.   They are, if I understand that, and, quite frankly,

3         if this was my Zoning Board right now meeting, I

4         would inquire of Mr. Motzny and say please brief me

5         about this, and he would do a very elegant job of

6         doing that.  But, yeah, dimensional is different and

7         use is different.

8    Q.   Okay.  So when we are talking about these variance

9         criteria, these all relate to the proposed changes to

10        the property, right?

11   A.   No.  I think you have that wrong.

12   Q.   Okay.

13   A.   May I ask a question?  Are you referring to the

14        petitioner's litigation against the City or are you

15        talking in general?

16   Q.   No, I'm talking about in general.

17   A.   But I can't generalize it because not everything is

18        being changed.  Sometimes they want to do something,

19        and so by and large it's mostly changes but not

20        necessarily.

21   Q.   Do these relate to the specific characteristics of

22        the property that is the subject of the application?

23   A.   (A) through (e)?

24   Q.   Yes.

25   A.   Yes.  I think if you watch the video, which I'm sure



Glenn Clark
08/10/2020                                    Page 98

1      you did, I reference a few of those items.  I can't

2      specifically remember what I said.  I know (e) I

3      mentioned, and, once again, I can't recall everything

4      that I was thinking from a year and a half ago.

5  Q.  All right.  So we're going to go through each one of

6      these, and maybe it will become a little bit more

7      clear for me.

8           So I'd asked you at some point earlier

9      whether or not you consider the existing structures

10     or features that exist on the property when you're

11     reviewing an application, correct?

12 A.  Uh-huh.

13 Q.  And you said yes, correct?

14 A.  I consider everything.

15 Q.  So if you're looking at (a), Exceptional

16     Characteristics of the Property for Which the

17     Variance is Sought that make compliance with

18     dimensional requirements substantially more difficult

19     than would be the case for the great majority of

20     properties in the same zoning district.

21           In order to comply with the places of

22     worship setback requirements, Adam says that it would

23     have had to have demolished a substantial portion of

24     the existing building on their property.  Is that

25     correct?  Is that your understanding?



Glenn Clark
08/10/2020                                        Page 99

```
 1   A.   From my recall, yes.

 2   Q.   And they would also end up losing about 60 percent of

 3        buildable area of the plot?

 4   A.   That sounds about right, yeah.

 5   Q.   So why wouldn't you consider that to be an

 6        exceptional characteristic of the property?

 7   A.   Because it's not.

 8   Q.   Why would -- I thought you just said that you do

 9        consider existing structures and aspects of the

10        property to be part of it.

11   A.   Ma'am, I've been on this board a long time.  I have

12        never considered informing a property owner to

13        demolish most of their building.  So I think

14        we didn't reference that during the meeting.  And it

15        may have even been me, I'm not even sure, myself or

16        one of my colleagues said you can own this property,

17        you can exist there, but you'd have to follow -- you

18        have to comply with the zoning.  But I'm not in the

19        business of knocking walls down.

20   Q.   I don't understand your answer.  So, again, why

21        wouldn't the fact that the existing property had an

22        existing building on it be part of the consideration

23        of the exceptional characteristics of the property?

24   A.   It's not exceptional.  They could have purchased that

25        building and made it a community center, if I'm not
```


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Glenn Clark
08/10/2020                                    Page 100

1       wrong, and I'm not proficient in, you know, what

2       other options they could have done with that

3       building.  But our zoning here is quite clear about a

4       house of worship.  And I think I even addressed that

5       in my talk before the Zoning Board.  But once again,

6       they could have operated there if they chose.  They

7       would have to have done something to the building.

8  Q.   Right.  They would have had to demolish a substantial

9       portion of their building --

10  A.   Right.

11  Q.   -- in order --

12  A.   And if I could say, if they didn't like that -- I'm

13       not saying that they should have liked it -- but I am

14       saying this, they could redress it through City

15       Council to change the zoning that -- those are the

16       people's elected representatives, and I am not.

17  Q.   So their only recourse, then, was to petition the

18       City Council to amend the zoning ordinance; is that

19       what you're saying?

20  A.   If I read these five criteria, five items, I don't --

21       I didn't walk away, nor did any of my colleagues on

22       the board see their hardship.  Yes, indeed, anybody

23       could petition our elected representatives and ask

24       for re-reviewing the City ordinance.  It happens all

25       the time.



Glenn Clark
08/10/2020                                        Page 101

```
 1   Q.   So you didn't view it as a hardship that in order for

 2        them to use that property, they were going to have to

 3        demolish a substantial portion of the existing

 4        building?

 5   A.   I did not see that they met Item (a).

 6   Q.   Do you recall handling a variance application from

 7        North Hills Christian Reformed Church?

 8   A.   Is that on Adams Road?

 9   Q.   Correct, yes.  Good memory.

10   A.   Sometimes.  If I'm not -- if my memory serves, they

11        wanted to put a little, tiny little --

12   Q.   They wanted to build a shed?

13   A.   Yeah, a shed.  And I think I voted yes.  And the

14        neighbors were in agreement.  And we required them to

15        have screening, meaning trees, like permanent bushes

16        I think they were.  I don't remember.  Anyway --

17   Q.   Was that a condition of the approval?

18   A.   It was.  And I think that was my idea.  That was a

19        long time ago.

20   Q.   Do you recall why they needed a variance from the

21        50-foot setback requirement for the shed?

22   A.   No, I don't recall.

23   Q.   If I were to tell you that it was because they had a

24        driveway that was already existing there --

25   A.   A what?
```



Glenn Clark
08/10/2020                                    Page 102

1    Q.   A driveway that already existed so that that was the

2         only place that they could put the shed, does that

3         ring any bells with you?

4    A.   **I don't recall anything about a driveway at that**

5         **site.  All I remember are the bushes, and the**

6         **neighbors were really happy that -- like I said, I**

7         **think it was my idea to put that screening in there.**

8    Q.   And so in that case, you did grant the variance from

9         the 50-foot setback requirement?

10   A.   **I don't recall how many feet it was.  I can't answer**

11        **that question.**

12   Q.   So if that church had an existing driveway, and then

13        the only place that they could put the shed was in

14        the setback area, would you ever consider making them

15        move the driveway so that they could then comply with

16        the 50-foot setback?

17             MR. THOMPSON:  Objection, speculation.

18             **THE WITNESS:  Yeah, I'm not going to**

19        **address that because I don't have any of the facts**

20        **about that case, and, like I said, it was a long,**

21        **long time ago.**

22   BY MS. DECLERCQ:

23   Q.   Okay.

24   A.   **And I know you want me to recall everything about**

25        **every vote I ever cast, and it's just not possible.**



Glenn Clark
08/10/2020                                    Page 103

1    Q.    Would you consider the placement of an existing
2          driveway to be a component of the exceptional
3          characteristics of that particular piece of property?
4    A.    **My perspective is, without having more details, the**
5          **answer's no.  So it's just really hard.  You have to**
6          **look at the whole totality of everything, but --**
7    Q.    So, again, so do you look then at the fact that there
8          are existing structures and features of a property or
9          not, or do you just view the property as if it were
10         vacant when you are deciding whether or not there is
11         an exceptional characteristic of the property?
12   A.    **I want to know all the details.  I think everything**
13         **is described in the word totality.  So I don't want**
14         **to know -- you know, I want more facts than less, and**
15         **the petitioner needs to make their argument to us.**
16         **We are a quasi-judicial board, and that's important.**
17         **I mean --**
18   Q.    Right, so that's what I'm asking you is in your
19         consideration of an application, if it is put before
20         you that there are existing structures on the
21         property, would that be part of your consideration as
22         to whether or not there are exceptional
23         characteristics of the property?
24   A.    **I can't answer that question.  Quite frankly, I don't**
25         **think I have ever voted on anything with multiple**



Glenn Clark
08/10/2020                                    Page 104

```
 1        structures.  Maybe there was a commercial building on

 2        Stephenson Highway.  I honestly don't recall.

 3   Q.   You've never voted on an application where there was

 4        an existing structure on a piece of property?

 5   A.   No other than like -- you do mostly residential, so

 6        maybe a detached garage or, you know, an out shed.

 7   Q.   Right.  So if someone --

 8   A.   But I'm not going to let somebody add on via my vote

 9        a monster great room off the back of a house because

10        they have a shed at the back of their property.  I

11        just -- that doesn't make any sense to me.

12               So I don't know about driveways and so

13        forth.  I don't think I've ever cast a vote based on

14        denying or approving something because of a driveway

15        was in the way.  I don't recall that.

16   Q.   So then what do you consider to be part of the

17        property that is this exceptional characteristic of

18        the property?  What do you look at?

19   A.   You mean Item (a)?

20   Q.   Yes.  What do you look at?

21   A.   Narrowness.

22   Q.   The shape?

23   A.   Shallowness, smallness, irregular shaped, we get a

24        lot of that.

25   Q.   So, again, this all has to do with the shape of the
```



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Glenn Clark
08/10/2020                                        Page 105

```
 1        property; not necessarily what is physically located
 2        on the property, right?
 3   A.   Right.  But have I cast a vote based on what was
 4        physically on the property?  I'm sure I have,
 5        probably quite a few times.  I can't -- like I
 6        said --
 7   Q.   Okay, so why --
 8   A.   -- commercial site on Stephenson Highway, Kmart site,
 9        the --
10   Q.   So then why --
11   A.   -- Orthodox church.
12   Q.   Okay.  So then why would you not consider the
13        existing structure that was on Adam's property to be
14        part of this exceptional characteristics of property?
15   A.   I don't recall.  I think I addressed that.
16   Q.   You don't recall what?
17   A.   Other than that they wanted to put a shed on there, I
18        don't recall anything about the property other than
19        the bushes that I --
20   Q.   No, I'm asking about Adam.
21   A.   Oh, I'm sorry.  I heard Adams, okay, because that
22        Northfield or whatever they are.
23   Q.   So Adam, so going back to again the Adam application,
24        why would you not consider as part of A the existing
25        structures?
```



Glenn Clark
08/10/2020                                        Page 106

```
 1   A.   I think I did.  And I think I answered your question
 2        already, which was if they wanted a house of worship
 3        on that site, they could have it.
 4   Q.   If they demolished that building?
 5   A.   And I'm not in charge of demolishing anything.  They
 6        could choose to do that, or they could go to City
 7        Council and change the zoning ordinance, and I think
 8        I've addressed this numerous times now.
 9   Q.   And have you ever required somebody to demolish a
10        building on their property in order to comply with
11        the setback ordinance?
12   A.   I'm going to be very open but frank.  I don't think
13        you know one thing about what the Zoning Board of
14        Appeals does.  I'm not required to do anything about
15        demanding anyone demolishing anything.  That -- they
16        go to the Planning Department, they submit their
17        paperwork, and it comports with the zoning --
18        kachunk, it's approved.  I don't -- nothing comes
19        before me to say, oh, you know, you've done this and
20        I'm going to demolish anything.  I don't demolish
21        anything.
22   Q.   I'm not saying you had anyone to demolish anything.
23        I'm asking whether or not you consider whether or not
24        a piece of existing structure on a property has to be
25        demolished as part of your consideration of
```



Glenn Clark
08/10/2020                                    Page 107

1        exceptional characteristics of the property?

2    A.   I never have had to do it before, so you're asking --

3         this is like all new ground.  It's never come except

4         one time I can honestly remember off the top of my

5         head.  There was a shed on my street that the man put

6         up, and it was slightly oversize like by that much.

7         And the old shed was raggedy, rusty, and dangerous,

8         so he'd spent a lot of money putting up this new

9         shed.  And the board voted in favor of allowing him

10        to keep it.  We could have, I guess to your point, we

11        could have required him to take it down because he

12        did not get a permit, but I mean the variance was so

13        tiny it was not even worth talking about.  And so he

14        got an approval with that.

15             But you're talking about -- I'm sorry.

16        You're talking about like 60 percent of a building.

17        I'm sorry, this doesn't compute.  I've never been

18        down this road before, driveway or otherwise.

19   Q.   All right  so let me ask you a different way then.

20        So would you agree that without the dimensional

21        variance, the only way that Adam could use the

22        existing building is if they -- or excuse me.  The

23        only way that Adam could use the property is if they

24        tore down the existing building and rebuilt with

25        50-foot setbacks?



Glenn Clark
08/10/2020                                    Page 108

1    A.    I don't know what they can and cannot do with that

2          building.  It's pure speculation on your part asking

3          me, you know, what do they want to do with it.  What

4          they presented to us was a house of worship.  So if

5          you're specifically saying what can they do other

6          than that, I'm not going to guess.

7    Q.    I'm not asking that.  I'm asking the only way that

8          they could have used that piece of property as a

9          place of worship is if that existing building was

10         removed; is that correct?  Is that your

11         understanding?

12   A.    From what our attorney told me, that was correct.

13   Q.    And have you ever had a situation where that was

14         required in order to operate?

15   A.    Not that I recall.  Maybe, I don't recall, though.

16   Q.    And so if they were going to have to do that, if they

17         were going to have to take down a building and then,

18         as you said, they would then if they wanted to put up

19         a new building they'd have to go in front of the

20         Planning Commission, right, that's not you, how is

21         that not a practical difficulty or exceptional

22         characteristic of that particular property?

23   A.    I'm sorry.  I don't have an answer to that because I

24         think --

25   Q.    That's fine.



Glenn Clark
08/10/2020                                    Page 109

```
 1   A.   As I said before, you know, Troy is a tight town, and
 2        we have very few parcels available.  So people need
 3        to consider the zoning before they purchase.  That's
 4        my perspective.
 5   Q.   All right.  So you don't have an answer for (a).  And
 6        what about, again, the provisions of the zoning
 7        ordinance themselves creating the sort of exceptional
 8        characteristic of the property.  So, for example,
 9        again, if there was a --
10   A.   I'm sorry.
11   Q.   If there was a property --
12   A.   There's no exceptional characteristic of that
13        property.
14   Q.   Why?
15             MR. THOMPSON:  Let her finish --
16   BY MS. DECLERCQ:
17   Q.   Why --
18             MR. THOMPSON:  Let her finish her question.
19   BY MS. DECLERCQ:
20   Q.   Why is there no exceptional characteristics of that
21        property?
22   A.   Because it's a perfectly good building on a parcel,
23        and it's been built and occupied numerous times.  And
24        those are your words, not mine.
25   Q.   What are my words?
```



Glenn Clark
08/10/2020                                        Page 110

1   A.   Exceptional characteristic.

2   Q.   Those are actually the words of the zoning ordinance,

3        of the five aspects that you said that you take into

4        account every time you decide an application.

5   A.   And I do.

6   Q.   So I am asking you about what you consider to be an

7        exceptional characteristic of the property?

8   A.   Of that property.

9   Q.   I'm asking you when you -- you said that you consider

10       these components for every application.  So when you

11       are reviewing every application, what do you consider

12       as part of the exceptional characteristic of the

13       property?

14  A.   I'm going to quote it again, narrowness, shallowness,

15       smallness, irregular-shaped, topography, vegetation,

16       and other characteristics.

17  Q.   And so the existing structure or an existing aspect

18       of the property is not taken into consideration by

19       you as part of this Section (a) --

20  A.   I never have.  We haven't --

21            THE COURT REPORTER:  I'm sorry.  You're

22       talking over her.

23            MR. THOMPSON:  Answer the question.

24  BY MS. DECLERCQ:

25  Q.   You can answer the question now.



Glenn Clark
08/10/2020                          Page 111

1   A.   Please restate your question.

2             MS. DECLERCQ:  Can you read it back?

3             (Record repeated as requested.)

4             THE WITNESS:  I have looked -- there is

5        nothing on this page that has to be followed from

6        letter to letter, but as we've been instructed by our

7        attorney in the past, we have to meet all the -- the

8        petitioner needs to meet all of these.  So if you're

9        asking me -- which you keep coming back to this and I

10       just think it's highly unfair -- I've never dealt

11       with having to destroy a structure to meet the

12       zoning.  And I know you want me to say that, but I

13       can't.

14            And I would not say -- I mean the zoning

15       was crystal clear when they bought that parcel, that

16       property.  If they want to operate, I'm not required

17       to tell them anything about shallowness, smallness,

18       irregular shape.  I can just simply sit on that board

19       and cast a vote.  But at the end of the day I just

20       said we've been told what kind of parcel -- I mean

21       what kind of property, building should be on that

22       parcel.  That's how I cast my vote.

23  Q.   So you don't have to give any justification for your

24       decisions ever?

25  A.   No.  Take a look at the video of our many, many,



Glenn Clark
08/10/2020                                    Page 112

1        many, meetings.  I don't -- I'm not on trial when I'm

2        on the Zoning Board, nor is a City Council member,

3        nor is a legislator, nor is a Congressman.  You cast

4        your vote.  You don't have to go down a list of 25

5        reasons why you approved it or disapproved it.  I

6        mean, what kind of form of government would that

7        cause us?  We're seven members on that board.  We'd

8        be there until the cows come home.

9    Q.  Right.  So I understand that, but that's why now I'm

10       coming back to ask you why you did what you did?

11   A.  I don't vote --

12   Q.  So --

13   A.  -- to destroy buildings.

14   Q.  But that is essentially what would have happened here

15       with your vote.  Okay --

16   A.  I think I've addressed this, and I think I'm ready to

17       move on.

18              MR. THOMPSON:  Wait.  It's not your --

19   BY MS. DECLERCQ:

20   Q.  It's not your call as to whether you move on or not.

21              MR. THOMPSON:  It's not your call.

22   BY MS. DECLERCQ:

23   Q.  But I agree with you.  This does not appear to be

24       going anywhere because you don't answer my question.

25       So I will move on to another question, which I'm sure



Glenn Clark
08/10/2020                                    Page 113

 1    probably you're not going to answer, either, but

 2    we'll still go through with this.

 3              So, once again, in determining what is an

 4    exceptional characteristic of the property, do you

 5    consider other aspects of the zoning ordinance as

 6    part of that consideration?  So whether or not a

 7    property can comply with other aspects of the zoning

 8    ordinance in addition to whatever variance they are

 9    asking for, is that taken into consideration by you?

10 A.  Ma'am, I've cast so many votes.  I consider, as I

11    have already explained to you, the totality of the

12    whole situation.  These are our go-to baselines, but,

13    you know, there are -- there's always something to

14    consider.  And I think I've been a very, very fair

15    member of the public serving on this board in that

16    regard.

17 Q.  So, again, going to a question of if the zoning

18    ordinance stated that a piece of property had three

19    front yards because each of them fronted a street,

20    would you consider the fact that the zoning ordinance

21    considers that to be all three front yards to be part

22    of the exceptional characteristic of the property?

23 A.  I honestly don't know.  I would base my

24    interpretation of everything based on what Mr. Evans

25    says and Mr. Motzny.  And I've never dealt with three



Glenn Clark
08/10/2020                                    Page 114

1      front yards, nor have I dealt with four front yards

2      or five.

3  Q.  Okay.  Do you recall handling a variance application

4      for 125 East Big Beaver which is now the site of

5      Cooper's Hawk wine bar?

6  A.  **I don't even know what that place is.  Is that --**

7  Q.  So if you were concerned and had a question about how

8      you should apply or what any of these zoning

9      ordinances meant with respect to the Adam

10     application, you could have asked Mr. Evans or Mr.

11     Motzny for advice, right?

12 A.  **And they're very -- correct, but they're very open**

13     **about jumping in and offering advice.**

14 Q.  But you didn't ask them any specific advice about

15     what you should be considering --

16 A.  **Yes.**

17 Q.  -- as part of the -- stop, please, until I'm done

18     with my question -- you did not ask them for advice

19     on what you should be considering with respect to

20     what constitutes the exceptional characteristic of

21     the property with respect to Adam?

22 A.  **I don't recall that.  I remember having dialogue with**

23     **them that night, so I'm sure you have the answer**

24     **because you have the video evidence.**

25 Q.  All right.  Well, again, sticking with this (a),



Glenn Clark
08/10/2020                                        Page 115

```
 1        exceptional characteristics of the property, given
 2        that places of worship have to have a 50-foot setback
 3        on all sides, wouldn't most properties in this GB
 4        district have sort of the same problem as this one?
 5   A.   I don't know that.
 6   Q.   Well, I mean in the GB district it only requires a 10
 7        to 30-foot setback on either side, so if there was
 8        an existing piece of -- if there's an existing
 9        building, what's the likelihood that it would be a
10        50-foot setback?
11   A.   That's a question for the Planning Department.  So
12        they're down the hallway to your left.
13   Q.   So you don't consider, then, whether or not this
14        particular property is any different than the other
15        properties in the GB district when you're deciding an
16        applicant --
17   A.   I cast my vote based on what the City administration
18        shared with me and our legal advisor said to consider
19        and not to consider.
20   Q.   And that is what, then?
21   A.   That it didn't comport with the zoning.  I think
22        we've been down this road quite a bit.
23   Q.   Yes.
24   A.   I don't think you want to hear --
25                  MR. THOMPSON:  Listen.  Be respectful for
```



Glenn Clark
08/10/2020                                    Page 116

1        counsel.  Don't argue.  Answer the questions if you

2        can.

3    BY MS. DECLERCQ:

4    Q.   All right.  So we're going to move on to, then, (b),

5         the characteristics which makes compliance with

6         dimensional requirements difficult must be related to

7         the premises for which the variance is sought, not

8         some other location.

9              With respect to Adam's application, would

10        you agree that they met this aspect?

11   A.   I don't recall.

12   Q.   You don't recall what?

13   A.   I don't recall all their paperwork which was a huge

14        packet like that.  I don't recall.

15   Q.   What about (c), the characteristics which makes

16        compliance with the dimensional requirement shall not

17        be of a personal nature?

18   A.   Yeah.  I didn't consider that at all, which you

19        already have my deposition from a year ago, and you

20        know I already answered that as a no.  There's no

21        personal nature here.

22   Q.   All right.  So then (d), not created by the current

23        or previous owner.  Would you agree that they --

24   A.   I don't recall if I applied this one or not.  I don't

25        think I did, but I'm honestly --



Glenn Clark
08/10/2020                                    Page 117

1   Q.   I don't understand what you just said, what -- you

2        don't recall whether or not you applied this or not.

3        Do you mean you don't know whether or not they met

4        this or not?

5   A.   **I'm not sure if I felt like there was a noncompliance**

6        **with this particular item.  I don't think I did**

7        **because they were new owners, not a previous owner.**

8        **That usually applies to a room built off the back of**

9        **a house or something like that, so obviously they**

10       **bought that and they wanted to do what they wanted to**

11       **do with it.  They didn't change the structure at all.**

12  Q.   So you agree, then, that they met (c) and (d)?

13  A.   **No.  I told you I don't recall what I -- right, (c),**

14       **yes.  Personal nature, yes, they met it, (d), yes.**

15  Q.   So let's go to (e), then, which is the proposed

16       variance will not be harmful or alter the essential

17       characteristics of the area in which the property is

18       located.

19            Do you believe that Adam met that

20       requirement?

21  A.   **As per my deposition from a year ago, you already**

22       **know that I said no.**

23  Q.   So how did they not meet it?

24  A.   **I was very concerned about public safety.**

25  Q.   Hold on.  Let's break this down a little bit.



Glenn Clark
08/10/2020                              Page 118

1   A.   Which I believe I already addressed it.

2   Q.   So how was it that the proposed variance was going to

3        harm or alter the essential character of the area?

4   A.   I didn't say it was going to harm the character of

5        the area.  I have already answered your question.  I

6        was concerned about public safety.

7   Q.   Hold on.  So --

8   A.   Which I addressed earlier.

9   Q.   But the plans were not going to change the property's

10       footprint or the parking, so what is the public

11       safety that you're talking about?

12  A.   As I addressed earlier in this deposition, I was

13       concerned about parking on the outflow streets.  So

14       that was, what, about an hour and a half ago I told

15       you that?

16  Q.   But the parking wasn't going to change.

17  A.   I didn't say it was going to.

18  Q.   So again --

19  A.   Different use means different things.

20  Q.   So really what you were focused on was the use of the

21       property; not the physical aspect of the property?

22  A.   For item (e) I was concerned about public safety.

23  Q.   But places of worship are allowed in that district on

24       that -- in that property district.

25  A.   Not that size of a building.



Glenn Clark
08/10/2020                                    Page 119

1    Q.   But that use is --

2    A.   Right.

3    Q.   -- right?

4    A.   You can set up a tent, too, and it'll be a lot

5         smaller and it'll have a lot less safety issues.

6    Q.   But what was the safety issue with the building that

7         was already in existence?  Did that have safety

8         issues before?

9    A.   Ma'am, I've already addressed this with you.

10   Q.   No, you have not.

11   A.   Yes, I did.  I talked about how I've been by DSW many

12        times, shopped there many times, and then it turned

13        into the Asian eatery.

14   Q.   Yes.

15   A.   And I never saw a monstrously large problem with

16        traffic.  But when --

17   Q.   But --

18   A.   -- when Adam -- please let me finish.

19   Q.   Go ahead.

20   A.   When Adam talked about all their high impact things

21        they were going to do, and if you watch the video,

22        which I know you've probably done three, four, ten

23        times of that meeting, you know my colleagues

24        addressed that, too, or several of them did.  And so

25        there was I would say great concern by the board



Glenn Clark
08/10/2020                          Page 120

```
 1         about a traffic problem.  And this board has dealt

 2         with traffic issues before.

 3    Q.   Did you ever consider asking for a traffic study,

 4         then, if that was your concern?

 5    A.   I am not the City of Troy.

 6    Q.   I'm not asking you to be the City of Troy; I'm asking

 7         you.

 8    A.   I can't request one dollar of expenditure.

 9    Q.   Did you ever consider asking Adam to have a traffic

10         study done?

11    A.   I don't engage with petitioners until they're in

12         front of the board.  I know you really think that I'm

13         a City employee and I'm not.  So I know you have a

14         hard time with that, but that's okay.  I am a citizen

15         of the City of Troy, and I sit on that board to

16         represent the citizens of Troy.

17    Q.   So, again, did you consider asking Adam to have a

18         traffic study conducted if what you were concerned

19         about was traffic?  It's a yes or no answer.

20    A.   It really isn't.  Many years ago during my training,

21         which you seem to be so focused on, I was told not to

22         engage with petitioners by Mr. Stimac.  And so his

23         department formally, because he's gone from the City

24         now, they were to engage with petitioners.  They

25         would give answers.  Occasionally Mr. Steinbeck or
```



Glenn Clark
08/10/2020                                    Page 121

1      somebody else would call me and say, well, this is

2      coming up, just want you to know about this.

3                    So I don't -- you're asking me to call up

4      Adam -- yes, you are -- and to request something of

5      them which is going to cost them money, and I never

6      in all my years have requested anything from anyone,

7      ever.  Whatever the City requires they ask for when

8      the documents are filed.  And if somebody comes in

9      and doesn't file appropriate documents, bring --

10     they're going to get a phone call saying we can't

11     proceed, we can't take this to the board unless you

12     submit further documents, whatever the City requires.

13     I as a board member can't request any documents

14     except from what the City has shared with me.

15  Q.  Do you ever impose conditions upon your approvals?

16  A.  Well, I already shared with you earlier, we've done

17     it only for vegetation.  That church on Adams Road,

18     we did that.  There's been a number of other times.

19  Q.  Have you ever imposed a condition that somebody has

20     to do a traffic study as part of their condition?

21  A.  Never, not that I recall.

22  Q.  So you don't recall any instance where the Zoning

23     Board has requested that the petitioner do a traffic

24     study as part of their application?

25  A.  I think many, many, many years ago we asked



Glenn Clark
08/10/2020                                Page 122

1       Dr. Abraham -- is that his name?  I know you can't

2       answer that.  He was the traffic engineer for Troy,

3       Dr. Somebody, I think it was Abraham -- to come

4       before the board.  And I don't know that he actually

5       ever came before the board.  I think maybe he just

6       shared some information.

7                   And I remember one time a long time ago

8       there was some -- I don't even know what petitioner

9       it was, but we asked the police department to share

10      their thoughts, which is not a study or a survey.  It

11      was like yea or nay; do you think this is a good

12      idea?  And I don't remember who the police department

13      responded, but they didn't come to us.  They simply

14      sent I think an email to whoever the City Attorney

15      was dealing with us at that moment in time and

16      basically said we don't have a problem.  But that

17      was about traffic, but it was not a study.

18  Q.  So, again, Adam was asking for a variance on a

19      setback requirement.  How does the traffic relate to

20      a setback requirement?

21  **A.  Item (e), public safety.**

22  Q.  Okay.  So, again, how does a setback requirement have

23      to do with traffic?  In your mind explain to me --

24      you clearly think that I'm an idiot, and so why don't

25      you explain to me how --



Glenn Clark
08/10/2020                                    Page 123

1   A.   I don't think you're an idiot.  I think you're very

2        smart.

3   Q.   -- explain to me how it is that traffic relates to a

4        setback requirement.

5   A.   Okay.  If you watch the video yet again you saw our

6        conversation as a board, and we were concerned about

7        the high impact use.  I've already answered this

8        question at least once.  Maybe this is the second

9        time, maybe third.  Because of the enumerated

10       programs, services that they were going to offer, we

11       were -- and I only speak for myself, but I think

12       there were other board members -- concerned about the

13       traffic.

14            Regarding that side street, parking on the

15       side streets, remember what I said to you earlier

16       today?  We were concerned about children getting hit

17       by cars or people walking getting hit by cars, but

18       I've already addressed this with you.

19  Q.   And how is that different for a place of worship than

20       for the restaurant, banquet hall?  I mean there's

21       still children that are going to be in the parking

22       lot, right?

23  A.   Right.  And I've already answered this question I

24       think twice now.  As I have said, and I'm just going

25       to repeat myself now, that I drove by -- how many


HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO        313.567.8100

Glenn Clark
08/10/2020                                          Page 124

1        times I tell you -- DSW like almost every day.  That

2        means that Mr. Clark has a very comfortable knowledge

3        about what used to operate on that site.

4              And then as the Asian eatery moved in, and

5        I have never seen a problem with traffic.  And,

6        again, they mentioned so many programs and services

7        that they were going to offer that it seemed very

8        disconcerting to several of my colleagues and myself.

9        And so --

10   Q.   Okay.  What else besides traffic, if anything, were

11        you concerned about with respect to (e)?

12   A.   Well, how about right there, unreasonable increase of

13        congestion on public streets.

14   Q.   I said other than traffic.

15   A.   No.

16   Q.   What else --

17   A.   That's a different item completely than traffic

18        because public safety in my eyes is what I've been

19        talking about.  So public safety is mentioned a

20        couple times in this letter item, and there were some

21        concerns by some residents about property value.

22   Q.   And how would having a place of worship be

23        detrimental to their property value?

24   A.   We -- years ago St. Joseph Catholic Chaldean Church

25        on Big Beaver Road, we denied them.  They wanted to



Glenn Clark
08/10/2020                                    Page 125

1        do an ingress/egress lane right along their property

2        line.  And we -- those are very nice people over

3        there, just like the people at the Adam group, very

4        nice people, but we denied it.

5    Q.  But they were looking to change their property,

6        right?

7    A.  Right, but in a very similar way -- no, I can answer

8        my question -- in a very similar way they would be

9        abutting the neighborhood right there, the condo

10       association.  And so the board voted, including me,

11       voted no.  So the use -- the use is one thing, the

12       setbacks are another.  And I think the whole board

13       when we cast our vote voted in the totality of

14       everything before us.

15   Q.  So it wasn't just the setbacks and the parking, it

16       was the use of the property --

17   A.  For --

18   Q.  -- for the Adam application that you were

19       considering?

20   A.  For the 10th, 12th, 15th time now, the enumerated

21       items that they wanted to run with was a very lengthy

22       list, and that would change a lot of these items here

23       in Item (e).

24   Q.  So my initial question was why it is that you think

25       that being located near a place of worship is going



Glenn Clark
08/10/2020                                        Page 126

1       to diminish the property value?

2   A.  **Because that's what a couple neighbors said.**

3   Q.  So a couple of neighbors stated that, and that's what

4       you --

5   A.  **That's what I recall.**

6   Q.  Do you think it's worse to be near a place of worship

7       than it is to be near a retail store or a restaurant?

8   A.  **I'm not going to answer that.**

9               MR. THOMPSON:  Answer the question, if you

10      can.

11  BY MS. DECLERCQ:

12  Q.  You have to answer it.

13  A.  **I have no knowledge.**

14  Q.  So you don't have any knowledge as to whether or not

15      being located near a place of worship would diminish

16      the property value from that of being located near a

17      restaurant or a retail store?

18  A.  **A high impact one, yes.**

19  Q.  A high impact one what?  I don't understand what

20      you're talking about.

21  A.  **Like I said, I've answered this question over and**

22      **over and over.  They mentioned -- so please write**

23      **this down so we don't have to come back to it -- they**

24      **mentioned many, many programs and services, so please**

25      **write down programs and services.**



Glenn Clark
08/10/2020                                    Page 127

1   Q.   I understand.

2   A.   **And they watched the videotape.  They went on and on**

3        **and on about all these very honorable things that**

4        **they wanted to do.  That changes the characteristic**

5        **of what is going to be located on that property with**

6        **the setbacks and the concern for traffic and public**

7        **safety.**

8   Q.   So then you think that it is detrimental to property

9        values to be near an entity that is going to be

10       offering lots of programs and services in an

11       honorable way?

12  A.   **I think the programs they're offering are honorable.**

13       **I think -- I don't want to be located next to a**

14       **building that has people coming and going 15 hours a**

15       **day, and I think --**

16  Q.   But they already were located near a restaurant.

17       Couldn't people be coming and going 15 hours a day

18       from a restaurant or a banquet hall?

19  A.   **They weren't because I live here, and I know my City.**

20  Q.   So when I asked you earlier whether or not there were

21       any health or safety problems with this property

22       beforehand, you said, well, I'm not from the police,

23       I don't know.  I have no idea.  Do you recall that --

24  A.   **I never --**

25  Q.   -- answer?



Glenn Clark
08/10/2020                                    Page 128

1  A.   -- noticed a parking or traffic problem once when the

2       restaurant was there or DSW was there, and I drive by

3       there, as I have explained many times already, many

4       times during the course of a week.  So I have

5       knowledge of my City.  I live here and I work here.

6       I -- in my perfect world I don't leave the City of

7       Troy, and I've driven by that property more times

8       than I could even count.  So I know you have a hard

9       time grasping that, but, you know, I know what has

10      been there.  And I know you want me to be a traffic

11      study survey engineer and all that.  I can't do that.

12      But I do know what I know.

13  Q.  And what you know is that it is a bad thing to be

14      located near a place of worship?

15  A.  I didn't say that, and please don't put those words

16      in my mouth.  That's very rude.

17           MR. THOMPSON:  You know what, just answer

18      the question and don't argue, okay?  Just answer the

19      question.

20  BY MS. DECLERCQ:

21  Q.  Did you ever consider imposing any conditions on

22      Adam's use of the property that would alleviate your

23      stated concerns of traffic, congestion, public

24      safety?

25  A.  I don't recall.



Glenn Clark
08/10/2020                                    Page 129

1   Q.   Is there anything that Adam could have agreed to that

2        would have changed your mind?

3                MR. THOMPSON:   That's pretty speculative;

4        objection.

5   BY MS. DECLERCQ:

6   Q.   I'm asking is there anything that Adam could have

7        done as a condition, which he's testified to they're

8        allowed to impose conditions upon their application

9        decisions, is there anything that Adam could have

10       done that would have changed your vote with respect

11       to these practical difficulties?  What about

12       maintaining their green space or building a higher

13       wall between them and the neighbors?

14  A.   **We never got into any of that nor did I contemplate**

15       **it.**

16  Q.   Why not?

17  A.   **It was clear because our attorney was very direct,**

18       **and he said this doesn't comply with the ordinance.**

19       **And Mr. Evans said to build on there we have to --**

20       **you know, they'd have to scale down their building.**

21       **We never even asked them to because I think that**

22       **would be offensive.  But -- so I don't know how --**

23       **putting up a couple shrubs, you know, was never even**

24       **discussed.**

25  Q.   I mean isn't the whole purpose of coming before the



Glenn Clark
08/10/2020                                    Page 130

```
 1        ZBA is that, of course, it does not comply with the
 2        ordinance?
 3   A.   If there's a problem that runs with the land -- and I
 4        don't interpret anything I've seen here nor a year
 5        and a half ago that runs with the land, that building
 6        can -- could be used for a good purpose right now.
 7        It's just not compliant with the City Council's
 8        ordinance regarding a house of worship, which I
 9        follow.
10   Q.   So it could be used by some other use, but just not a
11        place of worship?
12   A.   I don't know.  I'm not a zoning expert.  I might be
13        the chairman of the board.  Can an oil change shop go
14        in there?  I don't know.  We are briefed by the City,
15        and they do tireless work to drill down on the City
16        ordinances and then we get a briefing; this can
17        operate there, that can't operate there.  And I am
18        not an expert in oil change places or manufacturing
19        so close to a residential area.  And I love
20        manufacturing.  And you seem to imply that if
21        something good happens on that site I would be
22        opposed to it.  That's not true.  I don't know if
23        manufacturing's allowed there or not, but that's why
24        I have City staff to brief me.
25   Q.   But the decision is ultimately yours and the board's?
```



Glenn Clark
08/10/2020                                    Page 131

1   A.   With information which Mr. Evans and Mr. Motzny make

2        readily available.

3   Q.   So have you spoken with any other ZBA members about

4        this application since the hearing?

5   A.   Yeah, I spoke to, if I can recall correctly,

6        Mr. Agauas, who's now the former vice-chairman, he's

7        gone, and Mr. Eisenbacher, and simply said how

8        disappointed I am that my city's being sued and I'm

9        being personally sued.  That's all he said.

10  Q.   And that was your conversation with Mr. Eisenbacher.

11       What was your conversation with Mr. Agauas?

12  A.   Same.

13  Q.   And that was the only -- those are the only two

14       conversations that you had with anybody from the ZBA

15       after that hearing on Adam's application?

16  A.   No.  Miss -- Representative Kuppa, she was at my

17       deposition here a year ago, and she, Mr. Motzny, and

18       I briefly spoke out in the hallway after I was done.

19       And she saw my deposition, I did not see hers, but I

20       just said, wow, that was ugly, and it was.

21  Q.   Have you spoken with anyone else from the City?

22  A.   The City staff?

23  Q.   Sure.

24  A.   Mr. Motzny used to represent me but that's

25       privileged.  I did -- I haven't spoken to him since



Glenn Clark
08/10/2020                                    Page 132

1      he was elected.  So I called our Mayor a couple, 10

2      days ago, something like that, and I congratulated

3      him because somehow I escaped connecting with him

4      after his win.  And I said -- he's being sued as

5      well.  And so I said, gosh, once again, like Agauas

6      and Eisenbacher, this is a shame, and the City should

7      not have to be going through this.  He said, I know,

8      I know, I know.  That's all we talked about.  There

9      were really no other words.

10  Q.  So you said about two weeks ago you got some

11      information about Adam having a space in Troy to

12      worship.  Where did you get that information from?

13  A.  I think from my attorney.

14                  MR. THOMPSON:  What's that?

15                  THE WITNESS:  I think that's one of the

16      forms regarding Adam's worshipping at a basement here

17      in Troy in a commercial -- I think it's at a

18      commercial building, and I think it was one of the

19      documents you sent me, but that's privileged, so --

20  BY MS. DECLERCQ:

21  Q.  Yeah.  I don't want to know any communication that

22      you had with your lawyer, but I did want to find out

23      who you had gotten this information from.

24  A.  I don't recall.

25                  MR. THOMPSON:  I believe it's in one of the



Glenn Clark
08/10/2020                                    Page 133

1      documents or even statements made by Adam Community

2      Center, but I don't have a specific recollection

3      right now.

4   BY MS. DECLERCQ:

5   Q.   So prior to your communication with your counsel, you

6        were not aware of whether or not Adam had a place to

7        worship --

8   A.   I don't know.  You know, I may have heard something

9        one time, but I think maybe I heard it and it went in

10       one ear and out the other.

11  Q.   When do you think that you might have heard this?

12  A.   And I'm not sure I did, because I read it and it

13       seemed familiar.  That's all I can say.

14  Q.   You read what and it seemed familiar?

15  A.   My communication with my counsel.  It just seemed

16       familiar.  Maybe somebody in passing said, you know,

17       I don't know, a year, year and a half ago.

18  Q.   Were you aware of whether or not they had a place to

19       worship at the time of your decision on their

20       variance application?

21  A.   No, I did not, and somebody told -- maybe it was in

22       the document.  I think it listed the address.  I

23       think they meet on Rochester Road if I'm not wrong.

24       But, anyway, nobody said a word positive, negative,

25       if I did hear from somebody.  Maybe someone said I



Glenn Clark
08/10/2020                                        Page 134

1        just know that that group meets.  But now that I

2        think about it, I don't think anyone told me.

3   Q.   Do you ever have communications with -- in your role

4        as being on the ZBA with the Community Development

5        Director?

6   A.   Never.  I don't even know who that is.

7                  MR. THOMPSON:  If I might interject, it's

8        actually in the Complaint of the United States of

9        America versus City of Troy under Paragraph 11,

10       Page 3.  It starts there, and it talks about the

11       building lacks the capacity to hold Adam's members

12       especially for better attended Friday Jumah, prayers,

13       religious rituals, for marriages and funerals and

14       community engagement events.  The basement's size and

15       configurations impede Adam's ability to hold

16       simultaneous event, limits class size, et cetera.

17                  So it was in there where they mention --

18                  THE WITNESS:  That's what I recall now,

19       because I heard class size and so forth.  Does it say

20       it's on Rochester Road?

21                  MR. THOMPSON:  It's 4700 Rochester Road.

22                  THE WITNESS:  That's what I remember.

23                  MR. THOMPSON:  So they would do it in the

24       basement.

25                  THE WITNESS:  Yeah.



Glenn Clark
08/10/2020                                      Page 135

 1   BY MS. DECLERCQ:

 2   Q.   So you had mentioned that you were familiar with Adam

 3        because they had previously come before the Zoning

 4        Board once before.

 5   A.   **That's how.  I never even knew they existed before**

 6        **that.**

 7   Q.   Okay.  How -- what was -- I mean how did the ZBA get

 8        involved in that aspect?  Did they do an application

 9        for a variance?

10   A.   **Nobody talks to us without an application, period.**

11   Q.   Okay.

12   A.   **So they actually, from what I recall, they filed as a**

13        **community center for that site, the restaurant, a**

14        **different restaurant.**

15   Q.   Right.

16   A.   **And then there was -- I can't recall everything, but**

17        **I believe what happened was they refiled as a house**

18        **of worship, which gives different rules as we've been**

19        **talking on setbacks.  So they didn't comply or they**

20        **wouldn't comply with that if they were approved.**

21              **So they requested I believe it was a number**

22        **of variances.  I can't remember how many.  And so we**

23        **discussed it and we rejected it, and that was that.**

24        **There was really no -- there was no lawsuits.**

25   Q.   And I'm sorry, I thought it was -- I thought it came



Glenn Clark
08/10/2020                                    Page 136

1      before you guys because the City needed an

2      interpretation on whether or not their use was going

3      to be a place of worship or not.  Am I -- is there a

4      different thing that I'm thinking of or --

5   A.  I think you might be right.

6   Q.  Okay.

7   A.  Because, gosh, our former City Manager I think wanted

8      us to consider it, and I think there was some

9      discussion.  And I could have this very wrong because

10     that was quite some time ago, but I think they were

11     deciding would City Council take this or the Zoning

12     Board, which has been the only time that's ever

13     happened.  And I kind of understand why they put it

14     to us because it was dealing with zoning or the

15     paperwork or however you want to put it.  I just

16     remember they seemed to have -- Adam seemed to kind

17     of bounce back and forth about what they wanted to do

18     with that property.

19  Q.  So is that the only time that you've been involved in

20     like a zoning interpretation?

21  A.  I don't know that I can answer that.  Seems like

22     there may have been another one.  Remember, when I go

23     to a Zoning Board meeting, I might have seven action

24     items.  It's hard to remember.  It's a lot of

25     business to take care of in about an hour and a half,



Glenn Clark
08/10/2020                                    Page 137

1      two hours, you know, but I honestly -- I'm not going

2      to answer that question.  I honestly don't know.

3  Q.  So at that meeting, I mean granted, this was, you

4      know, years and years and years ago, so if you don't

5      remember that's fine, but I'm still going to ask you

6      because who knows what you remember.  Sometimes you

7      have a great memory; sometimes you don't.

8              But at that meeting one of the ZBA members,

9      not you, asked what the rationale was for why a

10     community center had a different setback requirement

11     than a place of worship because that was ultimately

12     like sort of the issue, and Mr. Miller indicated that

13     he was going to check and get back to you guys.  Do

14     you recall whether or not he ever gave you an answer

15     on that?

16 A.  I honestly don't remember any answer because I

17     think -- you sound to be familiar with it -- that we

18     had a vote that night; is that true?

19 Q.  No.

20 A.  We didn't?

21 Q.  Basically, then, the question just becomes, then,

22     regardless of what you remember about that night --

23 A.  Yeah, I don't recall.

24 Q.  -- do you know whether or not Mr. Miller ever gave

25     you an explanation on why setback requirements were



Glenn Clark
08/10/2020                                    Page 138

```
 1        different from places of worship than community

 2        centers?

 3   A.   He did, and I can't tell you one word of what he said

 4        because I just -- I remember it was this set of rules

 5        or those set of rules.  And once again, going back to

 6        my comment hours ago, it's the people's elected

 7        representatives.  They get to decide those things, I

 8        don't.  So the council at whatever year decided

 9        that.

10   Q.   And so it sounded as if the City or the Zoning Board,

11        somebody had received information that Adam was going

12        to be using that restaurant as something other than a

13        community center, something that was more akin to --

14   A.   The first restaurant we're talking about?

15   Q.   Yes, the first restaurant.  Is that your

16        understanding?

17   A.   Yeah.  It seems like somebody came through our

18        meeting that night and handed some paperwork out.

19   Q.   Do you know who the person was?

20   A.   It was -- I think it was a copy of their Facebook fan

21        page, and I honestly don't know who passed it out.

22        And I did get it.  Anyone has the right to walk into

23        our meetings and put things down on the table in

24        front of us.  So I don't know if that ever got

25        written into the record, meaning it didn't come from
```



Glenn Clark
08/10/2020                                    Page 139

1      the City.  It came from a person outside of City

2      government.  So I honestly don't know if they ever

3      kept it, or I don't know if the City Administrator

4      even got it.

5  Q.  Did you know who the person was who gave it to you?

6  A.  There were -- I knew a bunch of people there that

7      night.

8  Q.  But that wasn't my question.  My question was did you

9      know the person who gave that to you?

10  A.  It may have been Ruthann Dawley because I remember

11      that she spoke that night, and I don't think I knew

12      anybody else well that came and spoke.  I remember

13      there was a lot of public comments, but it may have

14      been her.  I honestly -- did I see her hand me

15      anything?  No, but -- and I don't even know if I was

16      chairman back then.  Sometimes people just dump paper

17      on your desk, and you go out to the bathroom or

18      something, you don't know who gave it to you.

19  Q.  So you don't know whether or not what she gave to you

20      ever was forwarded to the City Administrator?

21  A.  Yeah, I'm not aware.  That would generally be the

22      policy from my understanding how the City runs

23      itself.  But if the person didn't give it to the City

24      Administrator, and none of the Zoning Board members

25      thought to give it, then it may have just appeared.



Glenn Clark
08/10/2020                                      Page 140

1   Q.   But I thought you said earlier today that if somebody

2        gives you something in writing relating to a ZBA

3        action, that you had to forward it on to the City?

4   A.   **That's correct, and I don't know that that didn't go**

5        **to City Administrator.  It just was such a long time**

6        **ago, so I don't recall that I gave it to anyone.**

7        **But -- and maybe whoever was our administrator at**

8        **that point.  I don't think it was Mr. Evans.  I**

9        **could have that wrong.  So honestly I can't answer**

10       **that question.**

11  Q.   So even if it didn't get to the City Administrator,

12       though, you had knowledge of it as part of the

13       application process?

14  A.   **It wasn't part of the application process.  This**

15       **was --**

16  Q.   It was at a hearing, right?

17  A.   **It was at a hearing.  That's not part of the**

18       **application process.  That's when the representative**

19       **of -- oftentimes it's either a homeowner or a**

20       **contractor.  And if I knew that Mr. Evans or whoever**

21       **the City Administrator was at the time got it, maybe**

22       **I just walked out and went home.  I think that was a**

23       **very long meeting, so it's probably -- and I'm not**

24       **honestly sure if that's correct.  I'm going to**

25       **consult with Mr. Motzny after the meeting and ask him**



Glenn Clark
08/10/2020                                    Page 141

```
 1        what his interpretation is if somebody like walks up
 2        and hands you, you know, an email or something, if I
 3        have to give that to the City or not.  I honestly
 4        don't know.  So that's probably my wrong
 5        interpretation, but it could be right, I'm not sure.
 6        But that's a good thing to know because I'm a big
 7        Open Meetings Act fan.
 8   Q.   And so ultimately in that application/interpretation,
 9        whatever you want to call it --
10   A.   It was an application.
11   Q.   By the City for an interpretation?
12   A.   I see where you're going with this.  I think you're
13        right, it's both.
14   Q.   Okay.
15   A.   But we don't consider anything that's not an
16        application, so I don't know because I can't remember
17        what happened that far -- long time ago, but I bet
18        you the City said, okay, file this paperwork, and
19        then we'll forward it on to the Zoning Board.  Do I
20        know that for a fact?  No, but the City would have
21        copies of that if they did.
22   Q.   So either way it came in front of you?
23   A.   Right, yeah.
24   Q.   So you and the ZBA voted that it was -- Adam's use
25        was going to be a place of worship, not a community
```



Glenn Clark
08/10/2020                                    Page 142

1       center?

2   A.  I think that's correct.

3   Q.  Okay.

4   A.  But I'm not -- once again, that's a lot of votes ago,

5       so --

6   Q.  Right.  But you seem to have some memory of Adam

7       because --

8   A.  Oh, no, I remember them coming.  And they did the

9       same thing as they did last time.  They came before

10      us and talked about all the programs and all the

11      services and so forth.  And like I said, it's all

12      admirable.  I mean it's all keeping kids busy, that's

13      great, you know, sports and all that, you know.  But

14      yeah, I remember them, and I even remember Dr. --

15      what's his name, Amin?  I remember him coming before

16      us back then, too.

17  Q.  And so then all of the different programs and

18      services that they were talking about back then, were

19      they all religious based or --

20  A.  No, sorry.  I really don't remember, but my gut tells

21      me it was like this last time, we're going to do this

22      for the kids, do that.  I think this location, the

23      new one or newer, it was the first time I heard about

24      a health clinic.  I remember they talked about kids

25      and classes, and I think they were talking something



Glenn Clark
08/10/2020                                          Page 143

1        about like women's groups.

2   Q.   So what about those activities then led to the

3        decision that it was more a place of worship than a

4        community center?

5   A.   I think their own words.  I think there was a

6        Facebook fan page where they actually said it, so --

7   Q.   The Facebook fan page that you don't know if it ever

8        got to the City?

9   A.   I remember reading the sheets.

10  Q.   So that played a part in your decision?

11  A.   I don't -- I can't recall what played a part.  I

12       remember our City advisors were very specific that

13       this doesn't comport with the zoning.

14  Q.   I'm sorry.  I thought that that's what you were to be

15       deciding was whether or not it comported with the

16       zoning, I thought that's --

17  A.   No, it didn't.  The setbacks weren't even close if it

18       was a house of worship, which in their own words,

19       from what I recall, they made that allegation, that

20       allegation statement.

21  Q.   So it's your understanding that they were seeking a

22       variance from setbacks?

23  A.   For a house of worship.

24  Q.   Even in that other property?

25  A.   I believe so, or we may have -- what word did you



Glenn Clark
08/10/2020                                    Page 144

1       use -- interpreted that.  I can't remember.  I'm

2       sorry, I just --

3    Q.  Okay.  That's fine.  Give me a second.

4            Sorry, because we normally would have done

5       this really close together, but I need to confer.

6            Okay.  So going back to the whole concept

7       of conditions, like you said that the screening for

8       the trees as a condition for the North Hills Church,

9       that was your idea.  Why generally would the ZBA

10      impose conditions?

11   A.  We have that right if we feel there's a problem with

12      the parcel, and we have requested screening, bushes,

13      trees, mostly evergreens and things like that.  I

14      think we did that on one commercial site, mostly

15      residential.  And most people who buy a commercial

16      property write that into their plan and submit it

17      with the City.  So does that answer your question?

18   Q.  Not really.  But I guess would you impose a condition

19      that has to be met in order for you to grant the

20      variance?

21   A.  We can do that.

22   Q.  Okay.

23   A.  And we consult with our attorney and Mr. Evans for

24      guidance on that because that's a little bit out of

25      our wheelhouse.  We don't do it a lot, so -- and we



Glenn Clark
08/10/2020                                    Page 145

1        get new members all the time, so it's just kind of

2        good for everyone to get briefed again, you know.

3   Q.   But generally it's -- you would impose a condition so

4        that they would do something so that they could

5        then -- that's part of your granting the application.

6        It's not just something that you would grant the

7        application, then add stuff on top of, right?

8   A.   Yeah.  We write it into the ordinance.  I think when

9        I first started on the board we would ask people,

10       well, would you be willing to do this?  And I think

11       we were briefed later to write it in so that's -- the

12       City can enforce that.  So like if somebody is

13       required to have bushes and a year later there are no

14       bushes, the City can cite them.

15  Q.   So you give them this opportunity to do this extra

16       stuff in order to get the variance, right?

17  A.   No.  I think most of the board members think it's

18       good.  I've had some tell me in the past, yeah,

19       we shouldn't be doing this.  What people want to do

20       with their property they should do with their

21       property without trying to put trees or bushes or

22       whatever.  So it's just, it's a mixed bag.  Every

23       situation is different.

24  Q.   But you as a ZBA member can come up with conditions

25       on your own, if you have a particular concern and you



Glenn Clark
08/10/2020                                          Page 146

```
 1        think that something could be done to alleviate that

 2        concern, you could impose that as a condition, right?

 3   A.   No, I'm one member of seven, so you're acting like

 4        I'm dictatorial, and I don't have that power.

 5   Q.   As a board?

 6   A.   As a board.  You didn't say that, you said me or

 7        whatever word you used.  So as a board majority, we

 8        can do that.

 9   Q.   But can the suggestion of what the condition can be,

10        can that be raised by an individual board member?

11   A.   Yes, and I've done that.

12   Q.   Right, okay.  Okay.  Let me go back to this

13        Government Exhibit 1, this new document that we just

14        got.  Have you had a chance to take a look at it and

15        read the email?

16   A.   Yeah.

17               MR. THOMPSON:  Read it.

18   BY MS. DECLERCQ:

19   Q.   Did you read the whole thing, both pages?

20   A.   Mostly.

21   Q.   Okay.  You had a chance to read it?

22   A.   Uh-huh.

23   Q.   So in this email Miss Dawley sets forth some of her

24        beliefs about Islam and Muslims.  Do you share this

25        belief by her as to what it is that Muslims stand for
```



Glenn Clark
08/10/2020                                              Page 147

1      and --

2   A.   No.

3   Q.   And are you aware of her -- you were aware of her

4        viewpoints before you got this email, right?

5   A.   Well, from the other case, the first one from Adam

6        because she spoke in front of our board.

7   Q.   Right.  But you also said that you had --

8   A.   Yeah.  I bump into her every once in a while.  In

9        fact -- well, go ahead.

10  Q.   Had you ever seen any like social media postings or

11       anything like that from her?

12  A.   Never, huh-uh.

13  Q.   Do you have any social media presence at all?  Do you

14       have an account?

15  A.   I do.

16  Q.   Where do you have social media accounts?  Do you have

17       a Facebook account?

18  A.   I do.

19  Q.   Do you have --

20  A.   Twitter, and I have Instagram but I never use it.

21  Q.   And so if we were to check your Facebook accounts or

22       your Twitter accounts, your Instagram accounts, we

23       wouldn't find anything that was similar to Miss

24       Dawley's world view?

25  A.   No.



Glenn Clark
08/10/2020                                    Page 148

```
 1   Q.   And so you're represented here by your own private

 2        counsel?

 3   A.   Uh-huh.

 4   Q.   You were previously represented by a different person

 5        but the same firm, right, in this case?

 6   A.   Yeah, right.

 7   Q.   I don't want to know about any discussions you had

 8        with either of your attorneys, but how did you become

 9        aware of this firm?

10   A.   This is my old boss.

11   Q.   Okay.

12   A.   I worked for him a long time ago, and so I knew he

13        was with this firm.  And I was talking to somebody,

14        and I'm like, you know -- because I didn't know what

15        this direction was going to take, and I certainly

16        didn't know my Federal Government was going to sue my

17        City.

18             So at a certain point I thought, you know

19        what, I'm going to give him a call.  And I was

20        talking to a friend, I don't remember who, and my

21        friend said that is a good idea.  So I was very --

22        well, I've always been impressed with him, but he

23        said, well, let me get back to you.  And that's when

24        I had my first attorney from Thomas More.

25             And then Mr. Thompson called me and said he
```



Glenn Clark
08/10/2020                                    Page 149

```
 1        was -- that gentleman was going to be leaving, so he

 2        said I'm going to take your case.  Don't worry, we're

 3        not going anywhere.  So I was happy to hear that, and

 4        that's how I know him.

 5   Q.   And are you familiar with the firm's website?

 6   A.   I've never been on there.  I met his boss,

 7        Mr. Monaghan, one time, and I think I spoke to

 8        Mr. Monaghan a little bit about Thomas More, and then

 9        I think maybe I saw him somewhere sometime.  I've

10        never read any of their material.

11   Q.   Okay.  Well, according to their website, the mission

12        of the Thomas More Law Center is to preserve

13        America's Judeo-Christian heritage and to defend the

14        religious freedom of Christians.

15             Do you feel that your religious freedoms

16        are under attack?

17   A.   By who?

18   Q.   By anybody.

19   A.   No.  I freely exercise my faith however I want.

20   Q.   And then, also, according to their website, one of

21        Thomas More Law Center's key issues is confronting

22        the threats of radical Islam and states that "Radical

23        Muslims and Islamic organizations in America take

24        advantage of our legal system and are waging a

25        Stealth Jihad within our borders.  Their aim is to
```



Glenn Clark
08/10/2020                                   Page 150

1       transform America into an Islamic nation."

2                    Is that what you think Adam is doing here?

3   **A.   I'm going to just --**

4                    MR. THOMPSON:  I don't know where you're

5       going with this.  Are you attacking the Thomas More

6       Law Center now?

7                    MS. DECLERCQ:  No.  I'm asking --

8                    MR. THOMPSON:  Are you attacking him

9       because he chose the Thomas More Law Center?

10                   MS. DECLERCQ:  I'm asking him --

11                   MR. THOMPSON:  Are you attacking him

12      because he chose the Thomas More Law Center, or are

13      you attacking the Thomas More Law Center?

14                   **THE WITNESS:  This is very unusual.**

15                   MS. DECLERCQ:  I'm not attacking anyone.

16      I'm simply asking you --

17                   MR. THOMPSON:  What is the purpose of your

18      questions, then?

19                   MS. DECLERCQ:  I'm asking if that's what

20      you think that Adam is doing here.  Do you think

21      that --

22                   MR. THOMPSON:  That's not the question you

23      asked.

24   BY MS. DECLERCQ:

25   Q.   That is the question that I asked, so --



Glenn Clark
08/10/2020                              Page 151

1   A.   I have the right to hire anybody I want.

2   Q.   Absolutely.

3   A.   And you know, my mother's opinions, my late mom, and

4        I didn't always agree, so that doesn't mean I have to

5        be on the exact same page as somebody that I respect.

6             So I don't know what Adam is trying to do.

7        I honestly don't know that group.  I've never been --

8        other than that one sheet of paper I saw one time

9        where they seemed to flip from a community center to

10       a house of worship, I really don't know anything

11       about them other than I know that they're Muslim,

12       because they've been very clear about that.  So I

13       don't know what you want me to say.

14  Q.   Did the fact that Adam is an Islamic organization

15       play any role in your decision on this application?

16  A.   Oh, absolutely not.  It's ridiculous.  I'm sorry, I

17       shouldn't have said that.

18            MS. DECLERCQ:  I think I'm going to take a

19       break, and give me five minutes and then we'll turn

20       it over to you guys for --

21            MR. THOMPSON:  Sure.

22            THE VIDEOGRAPHER:  We're going off the

23       record at 2:49 p.m.

24            (A short recess was taken.)

25            THE VIDEOGRAPHER:  We're back on the record



1    at 3:03 p.m.

2            MS. DECLERCQ:  All right.  Thank you for

3    allowing me to take a break.

4            I actually don't have any further

5    questions.  I know Mr. Thompson said that he wanted

6    to say something on the record and then I believe Mr.

7    Motzny --

8            MR. THOMPSON:  I want to make a statement

9    on the record based upon a couple of questions that

10   the government's attorney made to my client asking

11   whether he was familiar with the Thomas More Law

12   Center's website and some of the positions that have

13   been taken by the Thomas More Law Center.

14           I believe that that was totally uncalled

15   for, unprofessional, that you were attacking my

16   client because he selected the Thomas More Law

17   Center, and then you by -- the second question was

18   attacking the Thomas More Law Center.

19           The Thomas More Law Center has been in

20   existence for 22 years.  It's a national public

21   interest law firm.  It's handled cases all across the

22   country.  It's opposed and filed suits against the

23   government.  The DOJ attorneys have been involved in

24   it, and never have they ever before said something

25   about, well, you're the Thomas More Law Center and



1    you support this and this and this.  Nor have we ever

2    attacked ACLU attorneys because they're a public

3    interest law firm and they take philosophical

4    positions different than ours.

5              I refrain from talking about CAIR, the

6    attorney for CAIR who was representing Adam.  CAIR

7    was un unindicted co-conspirator in the Holy Land

8    Foundation trial in 2008 in Texas where CAIR was

9    involved in the money laundering of $12 million to

10   the Holy Land Foundation which was supplying that

11   money to Hamas.

12             In fact, the U.S. Attorneys in Texas wanted

13   to indict CAIR, and it was the DOJ in D.C. that

14   stopped that indictment.  The co-founder of CAIR said

15   this.

16             "Islam isn't in America to be equal to any

17   other faith but to become dominant.  The Quran should

18   be the highest authority in America, and Islam the

19   only accepted religion on earth."

20             That's what the co-founder said.  I never

21   brought that up when the CAIR attorney who had filed

22   a lawsuit was deposing my client, and I think it's

23   irrelevant to the issues involved.  As lawyers, we

24   should be looking at the arguments that the lawyers

25   make, not whether they belong to a public interest



**Glenn Clark**
08/10/2020                                            Page 154

1    law firm, which the Supreme Court has indicated is

2    one of the great ways that constitutional law is

3    made.

4              And so I was very concerned about those

5    arguments, and I don't think they came -- those

6    questions -- I don't think they came from you.  I

7    think they came from Washington D.C.  Because as

8    lawyers, I think we have to respect each other from

9    whatever position we take.  You know -- I'm sure

10   you've looked at our history, but I know something

11   about your history and I know something about your

12   boss' history, and I would never raise it in any

13   derogatory manner.

14             So I don't know why you brought that up to

15   my client, who is probably not aware of the things

16   that you were saying about the Thomas More Law

17   Center.  And so I wanted to make that on the record.

18   And I expect an apology from the Department of

19   Justice, not necessarily you, Susan, but I don't -- I

20   can't believe you went down that line.

21             That's all I have to say.

22             MS. DECLERCQ:  Sure.  And since we're on

23   the record, I'll respond.  This was not in any way

24   meant to attack the Thomas More Law Center.  It was

25   simply a question as to whether or not he was aware



**Glenn Clark**
08/10/2020                                    Page 155

1    of those positions, and especially given the email

2    that we received this morning, we just wanted to know

3    if there was any sort of discriminatory aspect to

4    this.

5              And, you know, given what I understand

6    about Thomas More Law Center, I'm just surprised,

7    because I think that if this case -- I mean this is

8    all about like religious freedom, and I would have

9    actually assumed that the Thomas More Law Center

10   would have been on our side of the V instead of the

11   defendant's side of the V.  But it's not a slight

12   against --

13             MR. THOMPSON:  We're on the side of the

14   Constitution, okay, and we're on the side of the fact

15   that there's an overreach by the Federal Government.

16   And we're on the side of the fact that we believe

17   that RLUIPA is an unconstitutional invasion violating

18   the Tenth Amendment, that they're now involved in

19   zoning laws and are telling individual cities on what

20   their zoning laws should be.  That's what we're on

21   the side of, okay?

22             MS. DECLERCQ:  Sure.

23             MR. THOMPSON:  We have a right to advocate

24   what we feel is unconstitutional and what is not,

25   just like the ACLU and a lot of other organizations


HANSON RENAISSANCE
COURT REPORTERS & VIDEO      hansonreporting.com
313.567.8100

**Glenn Clark**
08/10/2020                                              Page 156

1    do.  But I don't know why you went down that line

2    about asking Mr. Clark about the Thomas More Law

3    Center and what he knew about it.

4              We represent -- you know, we filed a

5    lawsuit against the Federal Government.  That case is

6    now pending in the Supreme Court.  At no time did a

7    DOJ attorney ever say anything about why we were

8    filing this lawsuit and why, you know, our philosophy

9    is wrong.  They argued the law, and that's, you know,

10   that's what lawyers ought to do; not attack the

11   lawyer that is arguing it.

12             And I think this was a very veiled attack

13   on the Thomas More Law Center, and I just think it's

14   wrong.  I was surprised.  I was shocked.  I think

15   it's a cheap shot.

16             MS. DECLERCQ:  Well, I apologize if that's

17   how you took it as that is not the way in which it

18   was meant to be.  We were just trying to get at

19   questions as to why it was that he retained the

20   counsel that he did.  So --

21             MR. THOMPSON:  And the other thing is that

22   email that you are referring to is an email that we

23   produced for you that we brought to your attention,

24   that when at the break we said you never asked if

25   there were any documents that you brought with you,



**Glenn Clark**
08/10/2020                                              Page 157

1     and I said we have a document that may or may not fit

2     within the Request for Documents, but we're going to

3     give them to you.  We're going to give you the email.

4              So we're acting as lawyers as I think

5     lawyers should be, above and following our canons of

6     professional ethics and civility.  And then when

7     you're attacking a lawyer, I took that as an attack

8     not only of me as the president and chief counsel,

9     but also of the Thomas More Law Center, which is a

10    501(c)corporation, and it's been around for 22 years.

11             So I just want to put that on the record,

12    and however that came out, whoever thought that that

13    was something that was relevant to any issue that we

14    were discussing now I'm surprised.

15             Anyway, that's all I have to say.

16             MR. MOTZNY:  I have a few questions mostly

17    for clarification.

18             MR. THOMPSON:  Are you finished?

19             MS. DECLERCQ:  Yes.

20             MR. MOTZNY:  Do you have any questions?

21             MR. THOMPSON:  No, I don't.

22    EXAMINATION BY MR. MOTZNY:

23    Q.   Mr. Clark, when you --

24    **A.   I'm sorry, can I turn this away from me, the**

25    **computer?**



**Glenn Clark**
**08/10/2020**                                              **Page 158**

1  Q.   Is there something wrong with it?

**2  A.   Yeah, there's someone wrong on it.  I don't want to**

**3        have to look at her.**

4             MR. MOTZNY:  Go off the record.

5             THE VIDEOGRAPHER:  Going off the record at

6        3:12 p.m.

7             (A short recess was taken.)

8             THE VIDEOGRAPHER:  We're back on the record

9        at 3:16 p.m.

10  BY MR. MOTZNY:

11  Q.   All right.  Mr. Clark, when you testified earlier,

12       you talked about use variances and dimensional

13       variances.  You do understand that under the zoning

14       ordinance there is a difference in how those are

15       treated now, correct?

**16  A.   Yes.**

17  Q.   Okay.  And is it fair to say that in your experience

18       on the ZBA, that you hardly ever had to even consider

19       a use variance?

**20  A.   Correct.**

21  Q.   Is it fair to say that the majority of what you do or

22       what you have done has always involved what's known

23       as a dimensional or a nonuse variance?

**24  A.   Correct.**

25  Q.   Earlier you kept using the phrase run with the land.



**Glenn Clark**
08/10/2020                                                    Page 159

1       Do you recall saying that?

2   A.  Yeah, run, yeah.  It runs with the land, yeah.

3   Q.  Is it possible that what you meant was in order for a

4       variance to be granted it has to -- the reason for

5       the variance has to be related to the land?

6   A.  Yeah, yeah.

7   Q.  So you used the term run with the land, but do you

8       understand that term is actually related to the land,

9       correct?

10  A.  Correct.

11  Q.  And when you talk about the reason a variance has to

12      be related to the land, that refers to things like

13      whether or not the land is too narrow or it's shaped

14      funny, or it might have an unusual amount of front

15      yards depending on the interpretation.  That's what

16      you meant, correct?

17  A.  Yes.

18  Q.  And with regard to the Adam case, the variance

19      denial, do you recall Adam ever presenting any

20      evidence showing that they had an irregular shape or

21      an unusual amount of front yards or anything to that

22      effect related to the land?

23  A.  I don't recall that ever coming up by them.

24  Q.  Now, the Zoning Board of Appeals has nothing to do

25      with the drafting of the ordinance; is that correct?



Glenn Clark
08/10/2020                                    Page 160

1   A.   Very correct.

2   Q.   So the Zoning Board of Appeals has nothing to do with

3        establishing what a setback should be for a

4        particular use; would you agree with that --

5   A.   Correct, uh-huh.

6   Q.   And, again, wait until I'm done.

7   A.   I'm sorry, I apologize.

8   Q.   And you would agree that the Zoning Board of Appeals

9        has nothing to do with the definitions that are

10       included in the zoning ordinance; would you agree

11       with that?

12  A.   Correct.

13  Q.   For instance, if the zoning ordinance describes when

14       a nonconforming use can be continued, that's not

15       within the purview of the Zoning Board of Appeals;

16       would you agree?

17  A.   Correct.

18  Q.   In fact, it would be the zoning ordinance that's

19       approved by City Council that would tell when a

20       nonconforming use would need approval, correct?

21  A.   Very fair.

22  Q.   So is it fair to say when you go to a Zoning Board of

23       Appeals meeting, your job is to determine whether or

24       not the applicant has presented evidence to prove

25       they're entitled to the variance; is that correct?



Glenn Clark
08/10/2020                                          Page 161

```
 1   A.   Correct.

 2   Q.   Now, when you go to a Zoning Board of Appeals

 3        meeting, you're provided with information from

 4        Mr. Evans or Miss Sarnacki, Kathy Sarnacki, correct?

 5   A.   Correct.

 6   Q.   And for each variance request, it will tell you the

 7        particular section of the zoning ordinance for which

 8        the applicant is seeking a variance; is that correct?

 9   A.   Correct.

10   Q.   Now, you are also provided with a copy of the five

11        criteria you've mentioned, correct?

12   A.   Yes.

13   Q.   Is it fair to say that every time you're at a Zoning

14        Board of Appeals meeting, all members of the Zoning

15        Board of Appeals have those five criteria in front of

16        them; is that correct?

17   A.   Yes, on the computer, yeah.

18   Q.   And at the Zoning Board of Appeals meetings you allow

19        everybody to speak at the public meeting that wishes

20        to speak, correct?

21   A.   Correct.

22   Q.   And the Zoning Board of Appeals takes into

23        consideration everything that's presented at that

24        meeting before deciding whether or not the five

25        criteria are met, correct?
```



**Glenn Clark**
08/10/2020                                              **Page 162**

1    **A.**   **Correct.**

2    Q.   Now, would you apply a different set of criteria to a

3        nonreligious entity seeking a variance than you did

4        for Adam?

5    **A.**   **No.**

6    Q.   Do you apply those same five criteria regardless of

7        who the applicant is seeking the variance?

8    **A.**   **Absolutely.**

9    Q.   And is it fair to say that each variance request is

10       dependent on the particular facts of that specific

11       request, correct?

12   **A.**   **Correct.**

13    Q.   For instance, what Adam is requesting when they asked

14       for their variance was not exactly the same as the

15       variance request from another entity, correct?

16   **A.**   **Correct, yes.**

17    Q.   In fact, in your experience on the ZBA, do you

18       remember any other entity asking for the exact same

19       variances that Adam was seeking?

20   **A.**   **No.**

21    Q.   One of the things that Adam was seeking was a

22       variance from the setback requirements.  You agree

23       with that, correct?

24   **A.**   **Yes.**

25    Q.   And one of the setback variances they were asking for



Glenn Clark
08/10/2020                                    Page 163

1      was basically to have a zero setback.  Do you recall

2      that, only if you recall it?

3  A.  I believe the answer is yes.  I guess I need to say

4      "yes" or "no," right.

5  Q.  How often does someone seek a variance request asking

6      for a zero -- let me rephrase that.  How often does

7      someone come before the Planning Commission seeking a

8      variance to have a zero setback?

9  A.  You mean the Zoning Board?

10 Q.  Yes, Zoning Board.

11 A.  To my recollection, never.

12 Q.  So would you say it was pretty unusual for somebody

13     to be asking for such a substantial variance?

14 A.  Highly unusual.

15 Q.  One of the things that the Zoning Board of Appeals

16     can also do in addition to granting variances is to

17     do an interpretation of the zoning ordinance; is that

18     correct?

19 A.  Correct.

20 Q.  How often does the Zoning Board of Appeals -- let me

21     rephrase that.  How often is there a request for an

22     interpretation of the Zoning Board of Appeals based

23     on your experience?

24 A.  I think one time, and maybe it was more, but I think

25     it was the first and only time I ever had that before



Glenn Clark
08/10/2020                                        Page 164

 1      me.

 2   Q.   And do you agree that the first time that individuals

 3        from Adam Community Center spoke before the Zoning

 4        Board of Appeals was a request for an interpretation?

 5   A.   **Yes.**

 6   Q.   And that was quite some time ago?

 7   A.   **Quite some time.**

 8   Q.   Is it fair to say that based on the lapse of time,

 9        you don't remember all the details of that particular

10        meeting?

11   A.   **Correct.**

12   Q.   At the beginning of every Zoning Board of Appeals

13        meeting, is there a statement read to the public?

14   A.   **Yes.**

15   Q.   And who normally reads that statement?

16   A.   **At my request, Vice Chairman Agauas, but he's now**

17        **gone, so it will be -- if I'm still the chairman,**

18        **it'll be the next vice-chairman.**

19   Q.   And I'm not going to ask you to say what that

20        statement is word for word, but what is the substance

21        of that statement?

22   A.   **It talks about how we have a public hearing.  No one**

23        **can speak during the meeting other than someone who's**

24        **called by the chairman.  When the public hearing is**

25        **opened, we allow any member of the public.  They**



Glenn Clark
08/10/2020                                    Page 165

1       don't have to live in Troy.  They can come from as

2       far away as Farmington Hills or Lansing.  And then we

3       just go over the practical difficulties, not word for

4       word, but we apply them.  And does that answer your

5       question?

6    Q.  And is there ever any mention of whether or not a

7       person denied a variance can file an appeal?

8    A.  Yes.  It's mentioned that the only way to have

9       recourse over our decision is to file in Oakland

10      County Circuit Court.

11   Q.  An appeal?

12   A.  An appeal.

13   Q.  To your knowledge, did Adam ever file for an appeal

14      in this case?

15   A.  No.

16   Q.  In your earlier testimony you talked about the fact

17      that the Zoning Board of Appeals can apply conditions

18      to a variance, correct?

19   A.  Correct.

20   Q.  Does applying conditions to a variance excuse the

21      requirement to meet the five standards?

22   A.  Can you restate that?

23   Q.  Yeah, it's not a very well -- let's say, for

24      instance, someone came to the ZBA and said we want

25      the variance and we want you to impose this



Glenn Clark
08/10/2020                                    Page 166

```
 1          condition.  Does that excuse the requirement that

 2          they have to still meet the five criteria?

 3    A.    Who's asking for the condition?

 4    Q.    The applicant, any applicant; this is a hypothetical.

 5    A.    I don't think I've ever had a case where the

 6          applicant asked for a condition.  It's usually the

 7          board wanting to put a condition on like my example

 8          earlier with bushes.  That was the board, not the

 9          applicant.

10    Q.    Okay.  I'll ask a different question.

11    A.    Okay.

12    Q.    That's all right.  It probably was not a well-worded

13          question.

14    A.    That's okay.

15    Q.    Do you recall any representative of Adam Community

16          Center volunteering to have conditions imposed at the

17          hearing?

18    A.    No.

19    Q.    Do you recall anybody from Adam Community Center

20          offering to provide a traffic study?

21    A.    No.

22    Q.    Do you believe it's the Zoning Board of Appeals'

23          obligation to get their own traffic study before

24          deciding a variance?

25    A.    Absolutely not.
```



**Glenn Clark**
08/10/2020                                              **Page 167**

 1    Q.    There was discussion at the ZBA meeting with Adam

 2          regarding the ability to remove the present structure

 3          and build another structure.  Do you recall anything

 4          to that effect?

 5    **A.    If I recall correctly, I think their attorney brought**

 6          **it up, and I think the board talked about it.**

 7    Q.    Is it your understanding that under the zoning

 8          ordinance, if a person could comply with the zoning

 9          ordinance without a variance, that the variance

10          should be denied?

11    **A.    Yes.**

12    Q.    So would you agree that if an applicant could change

13          the building and eliminate the need for a variance,

14          that the variance should be denied?

15    **A.    Correct.**

16    Q.    When you are at a ZBA meeting, do you take in

17          consideration the comments of other ZBA members

18          before you make your decision on a variance?

19    **A.    Absolutely.**

20    Q.    And at the meeting regarding Adam, did other ZBA

21          members make comments regarding the need for the

22          variance, if you recall?

23    **A.    The need for the variance or the need to not support**

24          **the variance request?**

25    Q.    Let me rephrase the question.



Glenn Clark
08/10/2020                                    Page 168

1    A.    Okay.

2    Q.    Did other ZBA members at the meeting make comments

3          related to the variance at all?

4    A.    I'm sorry, after?

5    Q.    At the ZBA meeting?

6    A.    Oh, at, yes.

7    Q.    And did you take those comments in consideration in

8          making your individual decision?

9    A.    Yes.  I respect my colleagues.

10   Q.    Did your decision for your particular vote to deny

11         the variance have anything to do with the fact that

12         Adam was a Muslim organization?

13   A.    No.

14   Q.    Is it fair to say that your decision was based just

15         on the standards in the zoning ordinance --

16   A.    Absolutely.

17   Q.    -- and the evidence presented at the meeting?

18   A.    Correct.

19   Q.    I don't have anything further.  No further questions.

20   A.    Okay.

21               MR. THOMPSON:  No further questions.

22               MS. DECLERCQ:  I have one follow-up

23         question.

24   FURTHER EXAMINATION BY MS. DECLERCQ:

25   Q.    So Mr. Motzny just asked you whether or not you would



Glenn Clark
08/10/2020                                    Page 169

1    deny a variance if someone was able to demolish the

2    structure on their property and -- because they then

3    wouldn't need a variance.  Do you remember this line

4    of questioning two minutes ago?

5    A.   So if I'm understanding correctly --

6    Q.   Yeah.  Do you want me to rephrase?

7    A.   Please rephrase.

8    Q.   So Mr. Motzny had asked you whether or not it would

9         be appropriate to deny a variance if someone could

10        use their property without a variance, correct?

11   A.   Correct, yes.

12   Q.   And one of the ways that he had said that if somebody

13        could use their property without a variance is if you

14        removed the structure that was there and put a new

15        structure on, then you wouldn't need a variance,

16        right?

17   A.   Correct.

18   Q.   Have you ever had an application that you decided to

19        deny a variance because the owner could have

20        demolished their property and built a new one?

21   A.   No, not that I recall, but it's -- yeah, I feel like

22        I'm pretty solid on that.

23   Q.   Okay.  That's all I have.

24   A.   Okay.

25                THE VIDEOGRAPHER:  This concludes the



Glenn Clark
08/10/2020                                        Page 170

1    deposition, and we're going off the record at 3:32

2    p.m.

3              (The deposition was concluded at 3:32 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Glenn Clark
08/10/2020                                          Page 171

1                    CERTIFICATE OF NOTARY

2

3    STATE OF MICHIGAN          )

4                               ) SS

5    COUNTY OF OAKLAND          )

6          I, Laurel A. Frogner, Certified Shorthand

7    Reporter, a Notary Public in and for the above county

8    and state, do hereby certify that the above

9    deposition was taken before me at the time and place

10   hereinbefore set forth; that the witness was first

11   duly sworn to testify to the truth and nothing but

12   the truth; that the foregoing questions asked and

13   answers made by the witness were duly recorded by me

14   stenographically and reduced to computer

15   transcription; that this is a true, full, and correct

16   transcript of my stenographic notes so taken; and

17   that I am not related to, nor of counsel to any

18   party, nor interested in the event of this cause.

19

20

21

22         Laurel A. Frogner, CSR-2495, RMR, CRR

23         Notary Public,

24         Oakland County, Michigan

25         My Commission expires:  4-22-2022



**$**

**$12** 153:9

**(**

**(a)** 94:7 95:10,11 97:23 98:15 101:5 104:19 109:5 110:19 114:25

**(b)** 94:7 116:4

**(c)** 116:15 117:12,13

**(d)** 116:22 117:12,14

**(e)** 95:11 97:23 98:2 117:15 118:22 122:21 124:11 125:23

**1**

**1** 41:6 92:11 93:17 94:3,6 95:6,25 146:13

**1's** 8:25

**10** 5:2 69:10 115:6 132:1

**100** 20:20 28:20 30:2 67:8 74:7 81:3

**10:36** 5:3,7

**10th** 5:7 125:20

**11** 134:9

**125** 114:4

**12:41** 83:16

**12:56** 83:19

**12th** 125:20

**15** 94:22 127:14,17

**15.04** 41:20

**1504** 94:2,20

**15th** 125:20

**1:10** 93:10

**1:15** 93:13

**2**

**2** 94:3,8 95:8,10,25 96:18

**2001-2011** 8:24

**2008** 84:2,10,11 153:8

**2011** 9:3 50:3,16 51:1,5

**2018** 19:4 29:10 56:14 57:8 59:8 66:16 85:24 86:11 89:21 91:8

**2020** 5:2,7 92:12

**22** 152:20 157:10

**25** 112:4

**25-mile** 52:8

**29** 89:20

**2:49** 151:23

**3**

**3** 94:8,10 134:10

**30-foot** 115:7

**320** 83:4

**322** 94:16

**323** 94:13,15

**324** 41:1,20 94:23 95:21

**325** 38:13,14,23 83:3,6,9 93:24 94:14 95:12,20

**328** 83:9

**329** 83:9

**3:03** 152:1

**3:12** 158:6

**3:16** 158:9

**3:32** 170:1,3

**4**

**4** 94:10,24

**45-mile** 52:9

**4700** 134:21

**5**

**50** 59:12 63:21,22

**50-foot** 51:12,21,25 52:12 53:20,22 54:7,17 55:17 59:10, 23 60:2,6 62:15 63:1,10,14,15 64:1 77:9 78:11 101:21 102:9, 16 107:25 115:2,10

**501(c)corporation** 157:10

**6**

**60** 99:2 107:16

**7**

**7** 92:12

**7th** 84:2,11

**8**

**8th** 84:10

**9**

**94** 11:9,15

**A**

**a.m.** 5:3,8

**ability** 7:13,18 71:5 72:20 134:15 167:2

**Abraham** 122:1,3

**absolutely** 29:17 49:8 151:2, 16 162:8 166:25 167:19 168:16

**abut** 81:15 82:18

**abutting** 77:15 125:9

**accept** 53:19

**accepted** 153:19



Glenn Clark
08/10/2020

**accompanying** 15:9

**accomplish** 68:12

**account** 86:15 110:4 147:14, 17

**Accountable** 85:4 92:13

**accounts** 147:16,21,22

**accurately** 7:14

**ACLU** 153:2 155:25

**Act** 15:24 18:4 32:8 47:23 141:7

**acting** 146:3 157:4

**action** 58:17 136:23 140:3

**activities** 35:23 64:14 65:1,6, 8,11 143:2

**actual** 87:9

**Adam** 56:1,12 59:8,14 61:12, 17 64:14 67:2 68:8,15 77:18 78:7 89:12,21 91:3,14,16,17 98:22 105:20,23 107:21,23 114:9,21 117:19 119:18,20 120:9,17 121:4 122:18 125:3, 18 129:1,6,9 132:11 133:1,6 135:2 136:16 138:11 142:6 147:5 150:2,20 151:6,14 153:6 159:18,19 162:4,13,19, 21 164:3 165:13 166:15,19 167:1,20 168:12

**Adam's** 19:3 29:10 57:8 66:16 72:23 91:12,13,20 105:13 116:9 128:22 131:15 132:16 134:11,15 141:24

**Adams** 60:15 101:8 105:21 121:17

**add** 104:8 145:7

**added** 53:1

**addition** 113:8 163:16

**address** 47:22 102:19 133:22

**addressed** 73:10 77:11 100:4 105:15 106:8 112:16 118:1,8, 12 119:9,24 123:18

**administration** 55:1 115:17

**administrator** 10:16 25:18,19, 20 36:20 139:3,20,24 140:5,7, 11,21

**admirable** 76:7 142:12

**advance** 57:16 91:7

**advantage** 149:24

**advice** 20:14,21 45:12 114:11, 13,14,18

**advisor** 39:18 115:18

**advisors** 143:12

**advocate** 155:23

**affect** 7:13,17

**affects** 10:4

**affiliated** 11:16 13:2

**afternoon** 14:6 59:4

**Aguaus** 131:6,11 132:5 164:16

**agenda** 10:13 14:17 15:14 22:21 24:15 27:19 29:19 30:9 57:11,19 58:1,4 59:19 68:7

**agree** 47:13 90:15 107:20 112:23 116:10,23 117:12 151:4 160:4,8,10,16 162:22 164:2 167:12

**agreed** 43:5 129:1

**agreeing** 71:2

**agreement** 101:14

**Agriculture** 70:15

**ahead** 8:4 21:10 24:19 34:5,7 45:6 52:4 54:8 55:14 81:7 119:19 147:9

**aim** 149:25

**akin** 138:13

**Allan** 5:16

**allegation** 143:19,20

**alleviate** 128:22 146:1

**allowed** 49:12,14 50:9,10 65:12 118:23 129:8 130:23

**allowing** 107:9 152:3

**alter** 117:16 118:3

**amend** 100:18

**Amendment** 155:18

**America** 85:4,23 89:18 92:13 134:9 149:23 150:1 153:16,18

**America's** 149:13

**Amin** 142:15

**amount** 159:14,21

**amounts** 78:25

**Anastasia** 74:18 75:1,19

**and/or** 60:23

**annual** 9:13 15:19

**answer's** 10:22 103:5

**answering** 22:9

**answers** 57:10 70:21 120:25

**anyone's** 9:23

**anytime** 24:21

**apologize** 7:25 19:17 96:24 156:16 160:7

**apology** 154:18

**apparently** 59:7

**appeal** 165:7,11,12,13

**Appeals** 8:15 60:17 68:23 69:22 83:23 106:14 159:24 160:2,8,15,23 161:2,14,15,18, 22 163:15,20,22 164:4,12 165:17

**Appeals'** 166:22

**appearances** 5:9

**appeared** 139:25

**Appellate** 71:9

**Appendix** 85:10

**applicant** 29:21 30:1,3 115:16 160:24 161:8 162:7 166:4,6,9

167:12

**application** 15:10 19:3,4,11
20:4 21:13,16 23:1 24:1 28:17
29:10,20,24 30:9 31:18,21
32:13,20 33:14 36:19 37:18
40:11,20 42:17 44:2 49:6
56:14 57:9 59:8 60:15 64:7
66:17 67:18,25 72:23 73:16
76:17 88:16 89:12 91:13 96:1
97:22 98:11 101:6 103:19
104:3 105:23 110:4,10,11
114:3,10 116:9 121:24 125:18
129:8 131:4,15 133:20 135:8,
10 140:13,14,18 141:10,16
145:5,7 151:15 169:18

**application/interpretation**
141:8

**applications** 27:18 44:1 91:20

**applied** 66:20 116:24 117:2

**applies** 117:8

**apply** 33:3 57:3 114:8 162:2,6
165:4,17

**applying** 165:20

**appointed** 12:1 14:7

**approach** 47:14,20 89:9

**approached** 89:8

**approval** 101:17 107:14
160:20

**approvals** 121:15

**approved** 34:12,19 49:6
106:18 112:5 135:20 160:19

**approving** 104:14

**area** 13:19 43:19 49:14 81:16,
22 99:3 102:14 117:17 118:3,
5 130:19

**areas** 33:5,8 37:17 39:5,7,10
50:9,12,14

**argue** 55:10,12 70:20 116:1
128:18

**argued** 156:9

**arguing** 156:11

**argument** 103:15

**arguments** 48:12 153:24
154:5

**Armin** 74:10

**arrives** 69:5

**Asian** 59:3,5 78:25 80:5 81:1
119:13 124:4

**aspect** 31:16 35:10 40:9,20
42:8 46:25 64:8 65:5 110:17
116:10 118:21 135:8 155:3

**aspects** 32:12,19 38:24 39:20,
25 99:9 110:3 113:5,7

**assembly** 65:20,24,25 66:1

**assistant** 23:12 89:16

**associate** 52:13

**association** 125:10

**assume** 6:6,12 65:4

**assumed** 155:9

**assuming** 19:4 38:2 57:9

**ate** 59:6

**attached** 87:4,8

**attachment** 89:17

**attack** 149:16 154:24 156:10,
12 157:7

**attacked** 153:2

**attacking** 150:5,8,11,13,15
152:15,18 157:7

**attempting** 68:8 73:4

**attend** 56:25

**attended** 67:1,11 134:12

**attention** 156:23

**attorney** 5:25 7:8 8:6 10:1
20:18 28:16 36:20 45:19
46:20 51:13 52:13 63:16
65:17 72:14 73:10,13,20
74:13,25 77:14,25 82:10
84:21 85:2 88:25 108:12
111:7 122:14 129:17 132:13
144:23 148:24 152:10 153:6,

21 156:7 167:5

**attorney's** 73:24 88:20

**attorney-client** 71:6

**attorneys** 5:8 20:23 29:9
148:8 152:23 153:2,12

**audience** 12:23

**August** 5:2,7

**authority** 11:22 153:18

**aware** 36:23 51:4 55:16,23
75:15 81:14,18 90:23 133:6,
18 139:21 147:3 148:9
154:15,25

**awhile** 7:7

---

**B**

**back** 11:3 16:14 26:1 28:25
47:17,25 60:19,22 72:7 75:2
83:9,18 85:1 86:13 90:21
92:21 93:12,18,20,21 104:9,
10 105:23 111:2,9 112:10
117:8 126:23 136:17 137:13
138:5 139:16 142:16,18 144:6
146:12 148:23 151:25 158:8

**bad** 10:18 128:13

**bag** 145:22

**ball** 23:20

**ballpark** 11:8

**banquet** 123:20 127:18

**Banquets** 64:23

**bar** 114:5

**base** 47:10 77:21 113:23

**based** 45:2 49:2 50:6 57:9
104:13 105:3 113:24 115:17
142:19 152:9 163:22 164:8
168:14

**baselines** 113:12

**basement** 56:6 132:16 134:24

**basement's** 134:14



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

Glenn Clark
08/10/2020

4

**basically** 122:16 137:21 163:1

**basis** 71:6

**bathroom** 139:17

**Beaver** 114:4 124:25

**bed** 25:8

**beginning** 30:8 164:12

**behalf** 5:11,16

**belief** 146:25

**beliefs** 146:24

**bell** 74:15

**bells** 102:3

**belong** 56:20 153:25

**bet** 141:17

**Bible** 56:25 74:19

**big** 17:10 30:18 83:5 114:4 124:25 141:6

**binder** 17:9,12

**bit** 23:6 28:8 33:16 82:23 98:6 115:22 117:25 144:24 149:8

**blood** 7:16,19

**Bluhm** 20:20

**board** 8:15 9:2,7,15,17,19,21 10:6,7,10,16 11:1,23 12:2,5,7 14:11 15:13,22 17:9 20:13,18, 20 21:9 22:14,22 23:8,17 24:13,22 25:8,16,21 27:8,10, 21 28:21 29:6 30:13 32:7 34:12 43:13 47:22 49:17 52:14 55:2 57:4 58:12,19 59:20 60:17 64:11 66:20 67:7 73:3,14,25 74:12,14 75:15,16, 17,19 77:16 79:3 80:12,16,22, 25 81:2,3,9 83:22 84:6 86:13, 25 87:19,22 88:5,7,18 89:5 91:3 97:3 99:11 100:5,22 103:16 106:13 107:9 111:18 112:2,7 113:15 119:25 120:1, 12,15 121:11,13,23 122:4,5 123:6,12 125:10,12 130:13 135:4 136:12,23 138:10 139:24 141:19 145:9,17

146:5,6,7,10 147:6 159:24 160:2,8,15,22 161:2,14,15,18, 22 163:9,10,15,20,22 164:4, 12 165:17 166:7,8,22 167:6

**board's** 70:7 130:25

**boards** 50:25

**book** 30:17,18,19

**borders** 149:25

**boss** 148:10 149:6

**boss'** 154:12

**bought** 75:13,25 76:8 80:16 111:15 117:10

**bounce** 136:17

**BP** 81:25

**branded** 82:1

**break** 8:9 37:10,14 83:13,14, 21 85:3 93:15,22 117:25 151:19 152:3 156:24

**breaths** 20:1

**brevity's** 96:3

**briefcase** 70:17

**briefed** 31:23 36:20 130:14 145:2,11

**briefing** 31:24 33:6 130:16

**briefly** 131:18

**bring** 8:21 38:2 84:17,19 85:10 87:9 121:9

**bringing** 86:8

**brought** 21:24 22:7 36:4 87:8 93:16 153:21 154:14 156:23, 25 167:5

**build** 76:12 101:12 129:19 167:3

**buildable** 99:3

**building** 11:21 56:5 79:16 98:24 99:13,22,25 100:3,7,9 101:4 104:1 106:4,10 107:16, 22,24 108:2,9,17,19 109:22 111:21 115:9 118:25 119:6

127:14 129:12,20 130:5 132:18 134:11 167:13

**buildings** 81:14 112:13

**built** 74:22 75:6,17,18,19 109:23 117:8 169:20

**bump** 147:8

**bunch** 77:17 139:6

**bushes** 101:15 102:5 105:19 144:12 145:13,14,21 166:8

**business** 99:19 136:25

**businesses** 62:18 81:22 82:13,18

**busy** 142:12

**buy** 73:5 75:21 144:15

**buying** 73:6

---

**C**

**ca** 45:17

**CAIR** 153:5,6,8,13,14,21

**call** 9:22,24 21:2,6,20 22:22 23:2,12 24:20 28:7,22,23 96:3 112:20,21 121:1,3,10 141:9 148:19

**called** 8:17 12:20 13:15 20:11, 24 22:2 24:21 28:24 39:15 132:1 148:25 164:24

**calling** 23:15 34:1

**calls** 18:18 33:19 44:22 52:1 60:6 66:4

**canons** 157:5

**capacity** 134:11

**car** 81:25 82:15,20

**care** 136:25

**carry** 68:20

**cars** 78:25 79:5 123:17

**case** 22:17 24:10 43:24 47:2 51:13 69:22 70:15 72:2 85:14 89:21 98:19 102:8,20 147:5



Glenn Clark
08/10/2020

5

148:5 149:2 155:7 156:5
159:18 165:14 166:5

cases 70:1,13 152:21

cast 37:2 49:1 102:25 104:13
105:3 111:19,22 112:3 113:10
115:17 125:13

categories 76:13

Catholic 12:25 13:5 124:24

center 5:15 66:14 89:7,22
99:25 133:2 135:13 137:10
138:13 142:1 143:4 149:12
150:6,9,12,13 151:9 152:13,
17,18,19,25 154:17,24 155:6,
9 156:3,13 157:9 164:3
166:16,19

Center's 149:21 152:12

centers 138:2

cetera 134:16

CHAIN 92:12

chairman 9:10,14,17 10:4
15:23 23:17 25:22 26:9 27:10
45:3 130:13 139:16 164:16,
17,24

chairperson 9:8 10:10

Chaldean 124:24

chance 146:14,21

change 27:3 50:3,16,20 64:7
79:20,22,23,25 80:14 100:15
106:7 117:11 118:9,16 125:5,
22 130:13,18 167:12

changed 13:16,20 75:2 97:18
129:2,10

character 118:3,4

characteristic 99:6 103:11
104:17 108:22 109:8,12
110:1,7,12 113:4,22 114:20
127:4

characteristics 97:21 98:16
99:23 103:3,23 105:14 107:1
109:20 110:16 115:1 116:5,15
117:17

characterize 55:5

charge 37:5 106:5

charter 12:9 25:7

cheap 156:15

check 137:13 147:21

chief 157:8

children 123:16,21

choose 106:6

chose 58:5 63:5 100:6 150:9,
12

Christian 101:7

Christians 149:14

church 13:3,5 34:13 56:20,23
82:11 86:23 96:14 101:7
102:12 105:11 121:17 124:24
144:8

churches 57:2,5 74:18 75:6
76:8 82:8

Circuit 68:23 69:22 70:16
165:10

circumstances 20:24 28:3
73:5

cite 145:14

cities 155:19

citizen 85:5 92:14 120:14

citizens 120:16

city 5:17 8:17 10:1,16 11:9,14,
17 12:2,6,8,9 13:11,18 14:2,7
16:10 17:1,13 20:9,19 23:4,9
25:6,7,19,22 27:2,23 28:16
29:9,12,23 30:3 32:3 34:18
36:19,20 37:5,21 38:20 40:1,
5,16 41:19 46:20 49:25 50:7,
21,24 52:5,6,13,18,22 53:5,
12,15 54:5,7 55:1 57:13
62:10,13,21 63:11 67:10,12
71:10 73:13,19 80:6 83:25
84:12 86:25 87:20 88:2,6,10,
19,20 97:14 100:14,18,24
106:6 112:2 115:17 120:5,6,
13,15,23 121:7,12,14 122:14

127:19 128:5,6 130:7,14,15,
24 131:21,22 132:6 134:9
136:1,7,11 138:10 139:1,3,20,
22,23 140:3,5,11,21 141:3,11,
18,20 143:8,12 144:17
145:12,14 148:17 160:19

city's 40:13 131:8

civility 157:6

claim 71:14

claimed 77:14

clarification 23:3 24:3,5,17
157:17

clarifications 28:11

clarify 96:7

Clark 5:6,14,18,22 22:1 42:4
45:11 55:2 60:25 71:21 83:21
85:13,19 86:10 89:17 124:2
156:2 157:23 158:11

class 134:16,19

classes 64:21 142:25

clean 58:15

clear 12:16 21:9 37:7 50:20
52:24 54:8 63:18 71:24 98:7
100:3 111:15 129:17 151:12

clerk 8:17,25 83:25 84:12

client 152:10,16 153:22
154:15

clinic 64:18,25 65:1 142:24

clinics 65:7

clip 83:4,6

close 75:10 130:19 143:17
144:5

co-conspirator 153:7

co-founder 153:14,20

coincide 84:3

colleagues 99:16 100:21
119:23 124:8 168:9

comfortable 124:2

Glenn Clark
08/10/2020

6

comment 15:12,17 88:5,6 138:6

commented 74:5

comments 18:7,9,10 77:11 78:16,18 90:15 96:13 139:13 167:17,21 168:2,7

commercial 50:9,11,14 62:23 74:2 76:11 80:19 81:14 104:1 105:8 132:17,18 144:14,15

Commission 25:4 108:20 163:7

commissioner 25:8,15

commissioners 25:13

common 21:6 35:21

communication 22:14 25:5, 11,21 26:8 28:5 88:12 132:21 133:5,15

communications 134:3

community 11:4 12:4 35:8 46:25 47:4,12,19 48:19 60:15 66:14 84:24 87:18 88:13 89:3, 7 99:25 133:1 134:4,14 135:13 137:10 138:1,13 141:25 143:4 151:9 164:3 166:15,19

complaint 18:21 134:8

complaints 80:5

completely 44:2 50:23 124:17

compliance 39:25 98:17 116:5,16

compliant 130:7

comply 40:21 98:21 99:18 102:15 106:10 113:7 129:18 130:1 135:19,20 167:8

component 103:2

components 110:10

comport 115:21 143:13

comported 143:15

comports 106:17

compute 107:17

computer 157:25 161:17

concept 144:6

concern 47:6 48:24 78:17 79:1,3,6 88:23 119:25 120:4 127:6 145:25 146:2

concerned 114:7 117:24 118:6,13,22 120:18 123:6,12, 16 124:11 154:4

concerns 77:7 78:8 79:3 124:21 128:23

conclude 9:25

concluded 170:3

concludes 169:25

conclusion 18:19 33:20 34:2 44:23 66:5

condition 101:17 121:19,20 129:7 144:8,18 145:3 146:2,9 166:1,3,6,7

conditional 21:22

conditions 121:15 128:21 129:8 144:7,10 145:24 165:17,20 166:16

condo 125:9

condos 75:12

conducted 120:18

confer 9:25 144:5

configurations 134:15

confirm 93:25

confirmed 84:11

conform 75:7

conformed 75:1

confronting 149:21

congestion 78:13 124:13 128:23

congratulated 132:2

Congressman 112:3

connecting 132:3

consideration 15:9 43:4,6 48:2,10 56:14 78:5 88:17 99:22 103:19,21 106:25 110:18 113:6,9 161:23 167:17 168:7

considerations 36:24

considered 35:10 40:19,20 63:6 99:12

considers 113:21

constitutes 114:20

Constitution 155:14

constitutional 154:2

consult 28:16 29:4,9,12 65:17 140:25 144:23

consulted 52:6

Consumer 88:25

contact 24:16

contained 52:16

contemplate 129:14

context 42:24

continue 44:20 45:4 46:1

continued 160:14

Continuing 85:5 92:14

contractor 140:20

control 9:23

conversation 22:18 51:2 52:8 73:18 123:6 131:10,11

conversations 51:18 91:19 131:14

Cooper's 114:5

coordination 10:9

copies 17:22 92:19 93:2 141:21

copy 38:1,2,20 89:25 92:9 138:20 161:10

corner 43:14,18 46:22



**correct** 6:1,2,13,21 17:3
18:12,15 19:4 27:22 29:21
31:17,22 32:4,9 34:22,23
39:3,9,12,19 44:4 50:4 52:20
57:14,21 67:19,20,23 68:1
71:19 76:17 82:19,22 94:4,24
95:13,19 96:2 97:1 98:11,13,
25 101:9 108:10,12 114:12
140:4,24 142:2 158:15,20,24
159:9,10,16,25 160:1,5,12,17,
20,25 161:1,4,5,8,9,11,16,20,
21,25 162:1,11,12,15,16,23
163:18,19 164:11 165:18,19
167:15 168:18 169:10,11,17

**correctly** 131:5 167:5 169:5

**cost** 53:3,5 121:5

**council** 12:2,6 14:7 17:13
37:5,21 40:16 50:7,21,24
52:5,6,18,22 53:12,15 54:5,7
62:10 67:10,13 86:25 100:15,
18 106:7 112:2 136:11 138:8
160:19

**Council's** 130:7

**counsel** 7:15 11:6 45:12,13
116:1 133:5,15 148:2 156:20
157:8

**count** 128:8

**country** 152:22

**County** 13:1 165:10

**couple** 8:17,25 13:15 25:9
28:25 29:2 34:20 59:1 76:7
124:20 126:2,3 129:23 132:1
152:9

**court** 5:9 6:16 7:6 19:21 38:9
68:22,23,25 69:4,8,22,23
110:21 154:1 156:6 165:10

**Courts** 69:6

**covered** 31:15 86:4

**cows** 112:8

**created** 116:22

**creating** 109:7

**criteria** 82:24 96:4,8 97:9
100:20 161:11,15,25 162:2,6

166:2

**crowded** 66:18,21

**crystal** 111:15

**current** 51:10 89:21 116:22

---

**D**

**D-1** 41:22

**D.C.** 153:13 154:7

**dangerous** 107:7

**date** 5:7 83:24 84:1,3,13 91:4

**dated** 89:20

**Dawley** 86:20 89:19 90:6,16,
22 139:10 146:23

**Dawley's** 147:24

**day** 17:11 75:2 76:23 78:23
111:19 124:1 127:15,17

**days** 8:18 26:15 34:20 79:4
132:2

**deal** 19:12 20:6 59:19 96:12

**dealing** 122:15 136:14

**dealt** 33:15 44:17 49:15
111:10 113:25 114:1 120:1

**decide** 32:12 70:25 95:25
110:4 138:7

**decided** 40:14 87:1 138:8
169:18

**deciding** 35:9 43:3 44:1
103:10 115:15 136:11 143:15
161:24 166:24

**decision** 43:22 48:3,11 60:17
69:3,5 70:4,6,7 85:24 130:25
133:19 143:3,10 151:15 165:9
167:18 168:8,10,14

**decision-making** 47:1,19

**decisions** 70:1,2 111:24 129:9

**Declercq** 5:11,21,23 10:23
18:23 19:1,18 22:1,13,19
24:11 25:1 27:9,12 31:8
32:16,22 33:1,21,25 34:4

35:17 37:12,16 38:5,12,18
41:17,23 42:2,3,6,7 44:7,8,25
45:10,20 46:8,12 51:23 52:3
53:16,19 54:1,10,12 55:15
60:24 61:10,24 65:14,19 66:7,
11 69:25 70:18,23 71:13,17,
20 72:5,9,12,21 83:14,20
86:7,9 89:23 90:2,5,11,14,20
92:8,17,20,25 93:5,7,14
102:22 109:16,19 110:24
111:2 112:19,22 116:3 126:11
128:20 129:5 132:20 133:4
135:1 146:18 150:7,10,15,19,
24 151:18 152:2 154:22
155:22 156:16 157:19 168:22,
24

**defend** 149:13

**defendant's** 155:11

**defer** 20:16

**deference** 23:17

**defined** 43:20 65:21

**definition** 66:5

**definitions** 160:9

**demanding** 106:15

**demolish** 99:13 100:8 101:3
106:9,20,22 169:1

**demolished** 98:23 106:4,25
169:20

**demolishing** 106:5,15

**denial** 159:19

**denied** 36:1 49:18 58:12 76:21
124:25 125:4 165:7 167:10,14

**deny** 70:8 76:16 168:10 169:1,
9,19

**denying** 104:14

**dep** 70:18

**department** 14:4 17:8 20:22
23:7,9 24:4,6,16 70:14 80:7
106:16 115:11 120:23 122:9,
12 154:18

**dependent** 162:10



depending 80:13 159:15

depends 43:24 76:14

deponent 41:18,24

deposed 6:21

deposing 153:22

deposition 5:5,24 58:24 64:16
74:23 77:13 84:16 85:9 93:17
116:19 117:21 118:12 131:17,
19 170:1,3

derogatory 154:13

describe 89:14

describes 160:13

desk 139:17

destroy 111:11 112:13

detached 104:6

detailed 68:15

details 72:23 103:4,12 164:9

determine 42:10 160:23

determining 113:3

detrimental 124:23 127:8

development 88:23 134:4

dialogue 114:22

dialogues 52:10

dictatorial 146:4

difference 33:17 34:2 35:11
158:14

difficult 15:4 19:20 98:18
116:6

difficulties 37:1,6 41:2,3 47:8,
16 48:1,4 49:3 62:6,9,18
76:15 129:11 165:3

difficulty 39:13,14,16,21 40:2,
10 42:10 43:23 108:21

dimensional 33:18 35:3,4,9,
22 36:6,15,22,25 37:4 39:11
43:3 45:25 46:17 64:6 95:1,
19,22 96:1,9,19 97:6 98:18
107:20 116:6,16 158:12,23

diminish 126:1,15

direct 12:24 71:7 75:9 93:21
129:17

direction 148:15

directly 81:15 87:19 88:1

Director 134:5

directs 8:6 82:24

disagree 40:12,23

disagreement 73:12

disappointed 131:8

disapproved 112:5

discard 17:21

Disciples 12:21

disclosed 84:21

disconcerting 124:8

discriminate 73:22

discriminatory 155:3

discussed 52:7 62:2 96:8
129:24 135:23

discussing 157:14

discussion 50:19 91:12 136:9
167:1

discussions 148:7

dissidence 82:25

distinction 96:11

distinguished 11:23

district 45:24 65:9,12 98:20
115:4,6,15 118:23,24

Division 71:9 89:1

document 38:14,17 62:3
84:21,22,25 85:2,3,6,12,21,23
86:2,10 87:8 93:2 133:22
146:13 157:1

documents 16:12 17:4 51:18
84:18,19 85:11,15 86:4 93:16
121:8,9,12,13 132:19 133:1
156:25 157:2

DOJ 152:23 153:13 156:7

dollar 120:8

dominant 153:17

door 8:20

double-sided 94:18

drafted 29:15

drafting 159:25

drawing 86:13

drill 68:10 130:15

drive 48:15 78:15 128:2

driven 78:22 128:7

driveway 101:24 102:1,4,12,
15 103:2 104:14 107:18

driveways 104:12

Driving 50:13

drove 80:9 123:25

DSW 58:24 73:6 78:23 79:24
81:1 119:11 124:1 128:2

duly 5:19

dump 139:16

duties 26:16,22 94:21

---

**E**

E-1 41:2,4,6,20,23

ear 133:10

earlier 35:15 67:24 98:8 118:8,
12 121:16 123:15 127:20
140:1 158:11,25 165:16 166:8

earth 153:19

East 114:4

eatery 59:3,5 78:25 80:5
119:13 124:4

economy 82:6

Educational 64:21

effect 159:22 167:4

Eisenbacher 131:7,10 132:6

elected 100:16,23 132:1 138:6

elegant 97:5

elephant 41:23

eliminate 167:13

email 27:2,11 28:5,8,11 87:3, 9,13 88:11 89:15,16,19 90:16, 21 91:2 92:12 93:23 122:14 141:2 146:15,23 147:4 155:1 156:22 157:3

emailed 57:13 84:22

emailing 27:13

emails 27:20 91:7

employee 120:13

encompass 66:12

end 38:14 42:14 99:2 111:19

enforce 53:2,10 54:20,23 55:1 145:12

enforcement 55:8

enforces 55:3

engage 120:11,22,24

engagement 134:14

engineer 122:2 128:11

enterprise 62:23 76:11

entire 27:21 61:8 62:13

entities 82:13

entitled 85:3 160:25

entity 74:2 127:9 162:3,15,18

enumerated 123:9 125:20

equal 153:16

escaped 132:3

essential 117:16 118:3

essentially 73:17 112:14

establishing 160:3

establishment 80:14

ethics 157:6

evaluate 69:8

evaluating 40:10

Evangelical 82:9

Evans 10:15 14:11 15:25 16:2, 4 17:17,23 20:12,14,25 21:6 22:3 23:5,12 24:7,17 25:18 30:4,7 31:22 33:5 58:14 67:17 68:5,13 74:1 113:24 114:10 129:19 131:1 140:8,20 144:23 161:4

Evans' 57:23 72:22

event 67:11 134:16

events 78:24 134:14

evergreens 144:13

evidence 21:23 30:6 76:18 114:24 159:20 160:24 168:17

exact 151:5 162:18

EXAMINATION 5:21 157:22 168:24

examined 5:19

excellent 20:14

exceptional 98:15 99:6,23,24 103:2,11,22 104:17 105:14 107:1 108:21 109:7,12,20 110:1,7,12 113:4,22 114:20 115:1

exceptions 49:25

exchange 20:5

excuse 64:25 70:3 107:22 165:20 166:1

executive 89:16

exercise 69:15,20 149:19

exhibit 92:4,11 93:17 146:13

exist 98:10 99:17

existed 78:19 102:1 135:5

existence 119:7 152:20

existing 39:22 98:9,24 99:9, 21,22 101:3,24 102:12 103:1, 8,20 104:4 105:13,24 106:24 107:22,24 108:9 110:17 115:8

exists 13:19

expect 154:18

expenditure 120:8

experience 13:23 24:12 31:9 32:17 158:17 162:17 163:23

experienced 71:3

expert 130:12,18

explain 6:5 122:23,25 123:3

explained 79:21 113:11 128:3

explaining 67:18

explanation 32:2 137:25

extensive 14:1 86:14

extra 145:15

eyes 124:18

---

**F**

F-1 94:7

Facebook 138:20 143:6,7 147:17,21

fact 43:20 71:10 72:15 99:21 103:7 113:20 141:20 147:9 151:14 153:12 155:14,16 160:18 162:17 165:16 168:11

factor 56:13 78:4

factors 43:4 79:6

facts 24:1,14 102:19 103:14 162:10

fair 6:7,14 10:3 16:5 28:10 31:18 32:10,18 33:2 52:25 53:7 76:19 113:14 158:17,21 160:21,22 161:13 162:9 164:8 168:14

fairly 42:21

faith 13:10 84:24 149:19 153:17

fall 47:17

familiar 31:12 37:23 38:3 56:19,23 58:21 74:21 133:13,



14,16 135:2 137:17 149:5
152:11

**families** 12:25

**fan** 138:20 141:7 143:6,7

**Farmington** 165:2

**favor** 107:9

**features** 39:22 98:10 103:8

**Federal** 69:23 71:11 148:16
155:15 156:5

**feel** 15:23 21:18 29:3,6 144:11
149:15 155:24 169:21

**feels** 20:20 67:8 81:4

**feet** 59:12 63:22 102:10

**fellow** 22:14,22 73:25 88:18

**felt** 20:13 117:5

**festival** 34:14

**figure** 35:11 43:25 79:22

**file** 121:9 141:18 165:7,9,13

**filed** 121:8 135:12 152:22
153:21 156:4

**filing** 156:8

**filled** 29:20 63:6

**find** 17:12 22:5,10 87:13
94:16,17 132:22 147:23

**fine** 25:2 37:14 39:2 40:25
43:3 54:1,10 83:12 92:25
108:25 137:5 144:3

**finish** 6:18 7:23 19:24 44:6
45:6 109:15,18 119:18

**finished** 157:18

**finishes** 19:14

**fire** 53:3,6

**Firefighters** 13:17

**firm** 148:5,9,13 152:21 153:3
154:1

**firm's** 149:5

**fit** 76:8 157:1

**flip** 151:9

**floral** 34:10

**focused** 118:20 120:21

**folks** 73:2

**follow** 9:22 22:6,9 94:20 99:17
130:9

**follow-up** 168:22

**footprint** 118:10

**force** 69:18

**forgot** 8:21

**form** 57:25 112:6

**formalized** 15:15

**formally** 120:23

**forms** 132:16

**forward** 140:3 141:19

**forwarded** 139:20

**forwarding** 89:18

**found** 12:4 78:6 85:21 86:13
89:14,15

**foundation** 31:6 153:8,10

**frank** 106:12

**frankly** 73:1 97:2 103:24

**freedom** 149:14 155:8

**freedoms** 149:15

**freely** 149:19

**fresh** 58:20

**Friday** 34:17 134:12

**friend** 59:2 90:8 148:20,21

**friendly** 26:19,20 90:13

**front** 17:17 18:11 33:14 40:6,
8,18,19 43:14,18,20 46:21
54:15 57:25 58:7 79:19 82:21
83:9 92:21 93:3 108:19
113:19,21 114:1 120:12
138:24 141:22 147:6 159:14,
21 161:15

**fronted** 113:19

**fully** 7:2 21:9

**funerals** 64:23 134:13

**funny** 159:14

---

## G

**garage** 104:6

**gas** 82:1

**gave** 17:9 31:3 137:14,24
139:5,9,18,19 140:6

**GB** 45:24 65:9,12 115:3,6,15

**general** 22:17 43:8 47:14 61:8
84:3 91:21 97:15,16

**General's** 88:25

**generalize** 97:17

**generally** 21:6 30:1 48:21
139:21 144:9 145:3

**gentleman** 8:25 149:1

**give** 18:19 19:9 23:16 30:23
48:10 90:2 111:23 120:25
139:23,25 141:3 144:3 145:15
148:19 151:19 157:3

**giving** 11:3 28:4

**glance** 17:20

**Glenn** 5:6,18 89:16

**gloves** 38:5,8

**Gmail** 86:14

**go-around** 91:5

**go-to** 113:12

**God** 92:1

**good** 10:18 20:14 33:6 48:18
75:8,22,25 82:5 101:9 109:22
122:11 130:6,21 141:6 145:2,
18 148:21

**gosh** 13:12 132:5 136:7

**government** 71:11 92:11
93:17 112:6 139:2 146:13
148:16 152:23 155:15 156:5



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Glenn Clark
08/10/2020

11

government's 152:10

grant 44:15 102:8 144:19 145:6

granted 43:15 44:19 45:1,25 55:19 79:18 137:3 159:4

granting 145:5 163:16

grasping 128:9

great 59:3,6 86:7 98:19 104:9 119:25 137:7 142:13 154:2

Greek 34:13 96:14

green 129:12

ground 107:3

group 36:2 58:4,8 77:18 89:6 91:4 125:3 134:1 151:7

groups 89:3,4 143:1

guess 24:4,20 28:9 42:25 72:6 75:3 86:3 90:21 107:10 108:6 144:18 163:3

guidance 19:2 144:24

Guide 85:4 92:13

gut 142:20

guys 136:1 137:13 151:20

------

**H**

half 13:12,13 37:15 56:11 61:15 80:3 98:4 118:14 130:5 133:17 136:25

hall 80:11 123:20 127:18

hallway 115:12 131:18

Hamas 153:11

hand 139:14

handbook 17:5

handed 38:19 85:3 138:18

handled 152:21

handling 101:6 114:3

handouts 17:5

hands 58:16 141:2

Hang 15:1

happen 7:11 14:21 23:5,15,16 87:25

happened 7:10 54:22 60:20 61:4 67:13 112:14 135:17 136:13 141:17

happening 20:3

happy 6:11 67:14 102:6 149:3

hard 15:11 47:9 90:12 103:5 120:14 128:8 136:24

hardship 43:6,8,11 100:22 101:1

harm 118:3,4

harmful 117:16

hate 88:14

Hawk 114:5

head 7:6 107:5

health 57:6 64:18 65:1,7 127:21 142:24

hear 47:5,11 48:19 51:22 115:24 133:25 149:3

heard 5:23 20:7,8 105:21 133:8,9,11 134:19 142:23

hearing 19:3 31:25 57:17,20 66:16 72:25 73:9 74:1,17 76:19,20,25 77:17 91:10 131:4,15 140:16,17 164:22,24 166:17

Hearings 85:5 92:14

heart 58:16

heavily 67:1

held 8:16 9:11 11:16

heritage 149:13

high 119:20 123:7 126:18,19

higher 129:12

highest 153:18

highly 111:10 163:14

Highway 104:2 105:8

Hills 86:24 101:7 144:8 165:2

hire 151:1

history 154:10,11,12

hit 123:16,17

hold 12:12 16:24 27:6 80:24 117:25 118:7 134:11,15

Holy 153:7,10

home 112:8 140:22

homeowner 140:19

honestly 6:25 7:14 9:4,12 18:1 25:14 28:18 42:18 59:11 64:19 66:23 67:15 73:17 80:19 84:5 87:21 91:23 104:2 107:4 113:23 116:25 137:1,2, 16 138:21 139:2,14 140:9,24 141:3 151:7

honorable 127:3,11,12

Horlech 11:21 12:1

hot 14:12

hour 37:12,14,15 118:14 136:25

hours 34:18 127:14,17 137:1 138:6

house 49:18 62:24 73:22 76:12 79:4 100:4 104:9 106:2 108:4 117:9 130:8 135:17 143:18,23 151:10

houses 62:19

Howie's 81:25 82:15,20

huge 30:19 31:14 62:2 78:24 116:13

huh-uh 51:9 91:11 147:12

hundred 27:11

Hungry 81:25 82:15,20

hypothetical 21:23 45:7 46:6 166:4

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

## I

idea  31:10 52:25 101:18 102:7 122:12 127:23 144:9 148:21

IDENTIFICATION  92:16

identified  12:14

identify  38:16

idiot  122:24 123:1

immediately  82:14

impact  119:20 123:7 126:18, 19

impacts  35:8

impede  134:15

implicates  16:3

imply  130:20

important  103:16

impose  67:6 121:15 129:8 144:10,18 145:3 146:2 165:25

imposed  67:8 121:19 166:16

imposing  128:21

impossible  59:20

impressed  148:22

impressions  68:18 72:25

include  30:13,20 50:11

included  160:10

including  74:18 125:10

increase  124:12

indict  153:13

indictment  153:14

individual  146:10 155:19 168:8

individuals  164:2

information  21:12,19 22:5,10 24:17 27:1,4 29:25 58:18 68:15 122:6 131:1 132:11,12, 23 138:11 161:3

informed  88:21

informing  99:12

infrequent  96:17

ingress/egress  125:1

initial  31:15 68:18 125:24

input  46:25 47:4,19 48:2,11

inquire  10:17 97:4

ins  14:12

inspected  81:20

Instagram  147:20,22

instance  22:8 28:15 121:22 160:13 162:13 165:24

instances  49:5

Institutionalized  18:4

instruct  69:18 71:18

instructed  45:16 51:13,17 52:14 53:11 111:6

instruction  18:3,14 19:9 20:10 51:14

instructs  14:11

interest  152:21 153:3,25

interesting  78:6,7

interject  134:7

interpret  130:4

interpretation  40:5,7,9,13 95:1 113:24 136:2,20 141:1,5, 11 159:15 163:17,22 164:4

interpreted  73:23 144:1

invasion  155:17

involve  67:2

involved  85:14 135:8 136:19 152:23 153:9,23 155:18 158:22

irregular  33:9 44:14 104:23 111:18 159:20

irregular-shaped  35:4 76:6 110:15

irrelevant  153:23

Islam  90:16 91:21 146:24 149:22 153:16,18

Islamic  55:23 149:23 150:1 151:14

issue  16:3 21:2 22:7 25:24,25 27:7 37:4 44:11,12 56:12 68:4 70:1 71:5,25 72:13,15,18 87:24 91:25 119:6 137:12 157:13

issues  15:21 28:2 33:6,10,13 37:17 119:5,8 120:2 149:21 153:23

item  10:13 14:17 38:22 58:17 96:18 101:5 104:19 117:6 118:22 122:21 124:17,20 125:23

items  39:15 59:19 98:1 100:20 125:21,22 136:24

## J

January  84:2,10,11

Jihad  149:25

job  31:22,23 33:2,6 97:5 160:23

joined  17:9 83:22 84:4

joining  13:22

Joseph  124:24

Judeo-christian  149:13

Judges  69:7

judicial  69:2 71:10,11

JULY  92:12

Jumah  134:12

jumbled  83:7

jumping  114:13

jumps  30:5

jurisdiction  50:23 69:23

justice  42:14,19,23 154:19

justification 111:23

---

**K**

kachunk 106:18

Kathy 23:12,22 27:14,20
57:24 161:4

keeping 142:12

Kensington 56:23 74:21 75:9,
18

Kent 13:1

key 149:21

kids 79:8 142:12,22,24

kind 15:23,24 18:21 26:5
111:20,21 112:6 136:13,16
145:1

kitchen 8:19

Kmart 34:10 96:15 105:8

knew 11:1 19:16 68:8 74:9,11
90:7 91:1 135:5 139:6,11
140:20 148:12 156:3

knocking 99:19

knowledge 34:9 55:25 56:3,8
57:7 64:2,24 124:2 126:13,14
128:5 140:12 165:13

knowledgeable 20:15

Kuppa 131:16

---

**L**

lacks 134:11

lady 88:22 89:20

laid 60:16

land 13:23,25 16:9 18:3 43:12
44:10,16 46:14,17 76:4,5
130:3,5 153:7,10 158:25
159:2,5,7,8,12,13,22

lane 125:1

Lansing 165:2

lapse 164:8

laptop 33:11

large 16:2 20:12 24:23 28:14,
20 31:3 42:12 48:25 49:23
75:6 76:8 97:19 119:15

largely 17:25 49:23

largest 13:17

late 151:3

laundering 153:9

law 5:14 12:15 32:6 34:2 52:7
88:3 149:12,21 150:6,9,12,13
152:11,13,16,18,19,21,25
153:3 154:1,2,16,24 155:6,9
156:2,9,13 157:9

laws 155:19,20

lawsuit 85:16 153:22 156:5,8

lawsuits 135:24

lawyer 8:1 18:19,22 33:20,24
35:15,16 46:19 55:13 60:10
71:4 132:22 156:11 157:7

lawyers 153:23,24 154:8
156:10 157:4,5

learn 31:20

leave 128:6

leaving 149:1

led 143:2

left 115:12

legal 16:3 18:19,20 20:16,21
33:19 34:1 39:18 44:23 46:18
66:5 73:12 115:18 149:24

legislator 112:3

lengthy 87:22 125:21

letter 38:23 94:3 111:6 124:20

letting 89:24

lied 77:13,25

life 12:15 62:13 88:15

likelihood 115:9

likes 91:24

limit 52:9

limits 134:16

lines 42:21 64:19

list 112:4 125:22

listed 39:8 68:9 70:9 133:22

listen 47:10,25 48:12,16,18
49:1 58:14,15 115:25

listened 63:16

Literally 12:22

litigation 97:14

live 47:11 48:16,20 53:2 56:22
77:12,14,25 78:1,21 86:23
127:19 128:5 165:1

lived 11:2,5

lives 48:14 86:24

living 12:17 13:20 78:21 88:15

locate 73:23

located 41:19 49:16 78:14
105:1 117:18 125:25 126:15,
16 127:5,13,16 128:14

location 49:19 62:24 116:8
142:22

logical 48:12

long 8:16 9:2,7,11,13 10:25
11:2,5,12 24:23 37:11 59:11
64:11 69:20 71:1 77:5 81:8
84:6 96:13 99:11 101:19
102:20,21 122:7 140:5,23
141:17 148:12

long-time 33:22

longer 59:2

looked 57:25 58:13 111:4
154:10

Lori 20:20

losing 20:2 99:2

lost 15:6 71:4

lot 7:10 17:13 36:4 43:14,18

46:22 53:5 59:19 67:12 73:2,6
75:5 76:4,22 79:5,7 80:9 84:5
89:2 104:24 107:8 119:4,5
123:22 125:22 136:24 139:13
142:4 144:25 155:25

**lots**  50:13 127:10

**love**  88:14 130:19

---

## M

**made**  18:7,10 35:15 60:17
70:8 79:12 85:25 99:25 133:1
143:19 152:10 154:3

**magazine**  12:18,19,23,24
13:2,7,10,14

**mail**  12:24

**main**  47:6

**maintaining**  129:12

**major**  50:13

**majority**  48:5,7 98:19 146:7
158:21

**make**  8:11 54:8 59:15,17
61:12,15 68:20 71:24 74:20
79:20 85:15 86:5 88:5 92:18,
23 96:11 98:17 103:15 104:11
131:1 152:8 153:25 154:17
167:18,21 168:2

**makes**  9:18 15:3,4 19:21
116:5,15

**making**  48:11 69:2,12,15
102:14 168:8

**man**  107:5

**Manager**  25:22 136:7

**manner**  154:13

**manufacturing**  130:18,20

**manufacturing's**  130:23

**Maple**  34:11

**marathon**  8:11

**Marinelli's**  58:13

**mark**  14:1 92:20

**marked**  92:4,15 93:17

**marriages**  134:13

**masks**  6:4

**master**  30:20 31:5,11,12

**material**  29:23 149:10

**materials**  57:10,16 67:25

**matter**  84:18,23

**matters**  20:16

**Mayor**  10:25 11:20,25 26:9,11,
12,14,24 132:1

**meal**  59:6

**meaning**  21:8 101:15 138:25

**means**  42:20 71:21 118:19
124:2

**meant**  114:9 154:24 156:18
159:3,16

**media**  147:10,13,16

**medication**  7:12

**medications**  7:17

**meds**  7:16

**meet**  5:22 35:6 62:6,8,17
111:11 117:23 133:23 165:21
166:2

**meet all**  39:17 111:7,8

**meeting**  9:24 10:5,6,11 11:22
12:7 14:1,15,18,20,22 15:7
18:5,8,10 20:11,25 22:15,21
25:25 28:2,17,21 29:10,14,16
30:4,8 33:12 51:15,19 52:14
58:18 61:9 66:17,25 67:11,16,
22 68:1 74:6 78:2 89:10 97:3
99:14 119:23 136:23 137:3,8
138:18 140:23,25 160:23
161:3,14,19,24 164:10,13,23
167:1,16,20 168:2,5,17

**meetings**  10:4 15:24 17:16
32:8 47:23 67:5,13 112:1
138:23 141:7 161:18

**meets**  75:22 89:6 134:1

**member**  9:15 10:1 11:23
12:11,13 13:5 15:20,22 21:9
25:22 27:10,16 29:7 30:13
31:10 32:17 33:3,23 45:3 47:1
48:19 49:10 51:1 53:10 54:20
55:20 58:19 61:19 64:5 88:13
112:2 113:15 121:13 145:24
146:3,10 164:25

**members**  10:10 22:15,22
27:21 32:7 54:6 56:1 73:25
88:7,18 112:7 123:12 131:3
134:11 137:8 139:24 145:1,17
161:14 167:17,21 168:2

**memory**  60:19 61:1 83:21,24
101:9,10 137:7 142:6

**mention**  42:14 56:7 134:17
165:6

**mentioned**  19:2 39:14 44:9
64:18 74:17 78:8 98:3 124:6,
19 126:22,24 135:2 161:11
165:8

**mentioning**  85:22

**message**  87:3

**met**  11:23 14:6 17:7,10 25:12
75:13 101:5 116:10 117:3,12,
14,19 144:19 149:6 161:25

**method**  28:6

**Michigan**  5:1,6 12:15 47:23
88:15,25

**Miller**  137:12,24

**million**  153:9

**Min**  74:9

**mind**  40:25 122:23 129:2

**mine**  59:2 109:24

**minute**  27:6

**minutes**  151:19 169:4

**missing**  21:18

**mission**  149:11

**mixed**  145:22

**mom**  151:3

moment 122:15

Monaghan 149:7,8

Monday 5:2

money 53:4,5 107:8 121:5
153:9,11

monster 78:25 104:9

monstrously 78:24 119:15

month 17:24,25

monthly 17:16

months 29:1 85:24

morning 7:13 14:6 155:2

Morrison 70:13

Mosques 85:4,22 89:18 92:12

mother's 151:3

motion 29:14,17 70:8,10

motions 29:15

motivations 53:15 54:6

Motzny 5:16 10:12 16:1,4
18:5,10 19:3,8 20:5,12,17,25
21:5 22:2,4 28:19,24 29:5
30:5 31:23 33:5 38:3,16 39:18
49:17 58:15 63:16 73:10,18
85:17 92:18,23 93:4,6 97:4
113:25 114:11 131:1,17,24
140:25 152:7 157:16,20,22
158:4,10 168:25 169:8

Motzny's 20:13

mouth 63:18 128:16

move 40:25 102:15 112:17,20,
25 116:4

moved 11:9 58:25 124:4

multi-year 45:3

multiple 24:12 49:11 103:25

Municipal 11:21

Muslim 151:11 168:12

Muslims 146:24,25 149:23

## N

narrow 159:13

narrowness 104:21 110:14

nation 150:1

national 152:20

natural 7:9

nature 46:22 116:17,21
117:14

nay 122:11

necessarily 97:20 105:1
154:19

needed 59:22 62:3,15,25
75:24 87:1 101:20 136:1

negative 133:24

neighbor 75:22 76:1 87:23

neighborhood 36:5 48:13,22
49:7 125:9

neighbors 34:20 47:5,11,14,
21 48:5,7 49:1,4 74:16 75:8,
10,12 77:10,23 101:14 102:6
126:2,3 129:13

neighbors' 48:11

newer 142:23

newsletter 17:20,23

nice 5:22 77:20,21 125:2,4

night 52:14 58:1,18 61:9 74:15
77:18 114:23 137:18,22
138:18 139:7,11

nods 7:6

Non-use 95:19,23

noncompliance 117:5

nonconforming 160:14,20

nonreligious 162:3

nonuse 95:2 158:23

normal 8:2

north 12:25 13:11,19,20 82:16

101:7 144:8

Northfield 105:22

note 71:13

notice 80:9 84:16 85:9

noticed 58:3 128:1

November 85:24 86:11 89:20

nuances 35:16

number 15:16 26:14 37:24
92:11 121:18 135:21

numerated 94:3

numerous 67:9 106:8 109:23

## O

Oakland 165:9

oath 5:20 6:23,24

object 8:1 18:18 24:8 34:20
53:14 66:4 71:4

objected 53:25

objecting 70:4 71:5

objection 8:3 21:21 22:16
24:18 31:6 32:14,23 35:12
44:22 45:6 46:5 54:9 68:19,20
69:12,16 71:14 102:17 129:4

objections 35:15

obligation 166:23

occasional 21:5

occasionally 10:12 27:22 28:8
120:25

occupied 109:23

occurred 69:10 78:14

occurs 31:24

offensive 129:22

offer 123:10 124:7

offering 114:13 127:10,12
166:20

office 57:24 88:20,25



Glenn Clark
08/10/2020

16

**officer** 9:20 68:21 69:2 71:10, 11

**official** 11:6

**oftentimes** 15:17 140:19

**oil** 130:13,18

**one-size-fits-all** 62:21

**online** 27:16

**open** 15:24 32:8 47:23 106:12 114:12 141:7

**opened** 164:25

**operate** 34:16 63:2 108:14 111:16 124:3 130:17

**operated** 78:23 100:6

**operating** 46:2 63:25

**operative** 84:13

**opinion** 35:4 47:12

**opinionated** 91:22

**opinions** 151:3

**opportunity** 145:15

**opposed** 48:21 130:22 152:22

**opposition** 48:22 49:7

**options** 100:2

**orally** 85:18

**order** 9:22,25 39:16 98:21 100:11 101:1 106:10 108:14 144:19 145:16 159:3

**ordinance** 12:8 25:6 30:14,23, 24 31:5,11,14,20,21 32:12,19 34:15,18 35:7 36:23 37:9,20, 22 38:1,20 40:1,5,17 41:19 42:8,24 43:21 49:10 50:3,16, 20 51:5,6,11 52:17,19,23 53:2,9,23 54:18 60:4,5 61:23, 25 62:2,4,5,13 63:12 65:21,24 66:2,6 93:24 100:18,24 106:7, 11 109:7 110:2 113:5,8,18,20 129:18 130:2,8 145:8 158:14 159:25 160:10,13,18 161:7 163:17 167:8,9 168:15

**ordinances** 55:2 62:20,22 73:19 80:18 114:9 130:16

**organization** 17:18 74:14 151:14 168:12

**organizational** 10:9

**organizations** 149:23 155:25

**originally** 13:16 66:20

**Orthodox** 34:13 96:14 105:11

**outflow** 118:13

**outs** 14:12

**overreach** 155:15

**Oversight** 85:5 92:14

**oversize** 107:6

**overview** 31:3

**owner** 43:6 44:20 45:4,24 64:7 99:12 116:23 117:7 169:19

**owners** 117:7

---

**P**

---

**p.m.** 83:16,19 93:10,13 151:23 152:1 158:6,9 170:2,3

**package** 21:16

**packet** 21:13 22:6,21 23:2 24:2,15 27:14,15,20,21 28:11 29:19,25 30:10 36:18 38:13 57:11,19,23 63:11 68:11 79:19 80:1 116:14

**pages** 83:8 92:24 146:19

**paper** 8:22 17:17 74:24 94:18 139:16 151:8

**paperwork** 21:7 63:6 82:10 106:17 116:13 136:15 138:18 141:18

**paragraph** 41:2,6,24 42:4,13 94:2,3,6 95:6,8,10,21 134:9

**paragraphs** 38:23 39:17 94:4 95:25

**parcel** 33:7,9 35:5 44:11,13 48:14 73:23 75:1,21,24 96:20

109:22 111:15,20,22 144:12

**parcels** 46:16 75:13 109:2

**park** 13:17,18

**parking** 75:5 78:13,19 79:7,16 81:18 118:10,13,16 123:14,21 125:15 128:1

**part** 6:8 12:5,25 13:11 14:15, 20 15:7,9 17:4 26:16,22 29:23 30:12 31:9,21 40:1,10,20 43:22 50:19 51:2 52:9 53:23 60:5 65:22 76:18 80:1 84:16 86:16 88:14 95:6,10 99:10,22 103:21 104:16 105:14,24 106:25 108:2 110:12,19 113:6,21 114:17 121:20,24 140:12,14,17 143:10,11 145:5

**participate** 15:20

**party** 12:6,12,14 90:7

**passed** 52:7,18 138:21

**passing** 15:12 53:12 88:4 133:16

**past** 20:11 21:15 22:2 48:25 111:7 145:18

**pending** 156:6

**Pension** 12:2,5

**people** 10:18,19 19:20 22:11 28:7 48:16,19,23 66:18 67:13 69:7 76:13 77:12,21 79:7,8 82:5 84:7 87:18 109:2 123:17 125:2,3,4 127:14,17 139:6,16 144:15 145:9,19

**people's** 40:13,15 47:12 100:16 138:6

**percent** 27:11 28:20 30:2 74:7 99:2 107:16

**perfect** 128:6

**perfectly** 109:22

**period** 135:10

**permanent** 101:15

**permissible** 69:6

permission 49:22

permit 85:4 92:13 107:12

permitted 49:20

persecuted 42:20

person 6:17 27:13 42:18 57:25 76:12 91:22 138:19 139:1,5,9,23 148:4 165:7 167:8

person's 69:9

personal 90:8 116:17,21 117:14

personally 56:19 61:5 131:9

Persons 18:4

perspective 11:3 40:12,23 53:11 55:9 58:20 73:24 103:4 109:4

perspectives 90:24 91:1

persuasion 12:10

pertained 31:19

pertains 32:20

petition 100:17,23

petitioner 73:11 74:11 103:15 111:8 121:23 122:8

petitioner's 74:24 97:14

petitioners 120:11,22,24

phenomenal 31:22,23

philosophical 153:3

philosophy 48:21 156:8

phone 8:23 28:7,13 121:10

phrase 36:13,17 158:25

phraseology 35:25 46:21

phrases 36:12,18

physical 59:18 80:14 118:21

physically 105:1,4

pie-shaped 46:22

piece 39:23 40:7,21 44:19 45:2 103:3 104:4 106:24

108:8 113:18 115:8

pieces 48:17 74:23 96:20

place 56:1,12,19 62:16 63:2, 25 65:23 79:24 102:2,13 108:9 114:6 123:19 124:22 125:25 126:6,15 128:14 130:11 133:6,18 136:3 137:11 141:25 143:3

placement 103:1

places 49:12 50:8 51:11,20,24 52:11 54:17 55:16,20,24 65:20 66:1 98:21 115:2 118:23 130:18 138:1

plaintiff 73:11

plaintiff's 74:25 82:10

plaintiffs' 77:14,25

plan 30:20 31:11,12 144:16

planning 13:23,25 14:4,9 16:9 17:8,19 23:7,8 24:3,6,15,16 25:4,7 50:24 77:19 106:16 108:20 115:11 163:7

plans 31:5 118:9

play 42:17 151:15

played 143:10,11

playing 79:8

pleasant 8:12

Plop 31:1

plot 99:3

plumb 53:15 54:6

point 8:9 16:15 74:19 75:5 78:18 98:8 107:10 140:8 148:18

police 80:7 122:9,12 127:22

policy 139:22

political 12:5,10,12,14 86:22 90:7

portion 14:21 31:19 41:18 61:25 62:1,4 67:23 95:25 98:23 100:9 101:3

pose 72:10

position 8:15,16 9:11,18 10:3, 24 14:3 26:9 27:10 29:5 154:9

positions 11:16 69:8 152:12 153:4 155:1

positive 11:25 78:6 133:24

possession 84:19 85:13

possibly 7:2 44:1

postings 147:10

potentially 78:13 79:25

power 146:4

Powers 94:20

practical 37:1,6 39:13,14,16, 21 40:1,10 41:2,3 42:10 43:23 47:8,16 48:1,3 49:3 62:6,9,18 76:15 108:21 129:11 165:3

practically 50:10 78:23 96:18

practice 88:1

prayers 134:12

pre-assume 58:10

predates 75:20

premises 116:7

prepares 29:23

presence 84:17 147:13

present 167:2

presentation 68:5,13 72:23

presented 29:25 60:15,20 64:6 108:4 160:24 161:23 168:17

presenter 89:2

presenting 159:19

preserve 149:12

preserved 72:16

preserving 71:14

preside 10:6

president 157:8



Glenn Clark
08/10/2020

18

presiding 9:20

pressure 7:16,19

pretend 45:21,23 46:10,11

pretending 45:22

pretty 10:5 22:16 49:16 52:23
66:21 73:20 86:14 129:3
163:12 169:22

previous 16:14 39:4 54:9
57:10 58:24 96:13 116:23
117:7

previously 135:3 148:4

primarily 28:5

primary 45:23

printed 89:15

prior 13:7,22,25 19:11 20:4
28:17 29:10,14,17 68:1 91:1
133:5

prism 33:15

private 148:1

privilege 65:17 68:24,25
69:14,17,24 70:12,24 71:2,6,
7,15

privileged 131:25 132:19

pro 10:25 11:20,25

problem 46:16,17 76:3,5
115:4 119:15 120:1 122:16
124:5 128:1 130:3 144:11

problems 7:20 57:6 80:4
127:21

procedural 10:17

proceed 121:11

process 21:3 23:19,22 25:2,3
27:18 47:1,19 68:24 69:5,9
70:5,11 86:22 91:23 140:13,
14,18

processes 72:13

produced 156:23

professional 157:6

proficient 100:1

programs 64:17 123:10 124:6
126:24,25 127:10,12 142:10,
17

project 47:15 48:24

properly 63:19

properties 81:15 98:20 115:3,
15

property 34:22 35:6,19,24
36:10 39:23 40:7,21 44:19,21
45:2 46:1,2 58:21 59:14,18
60:3,7 61:12 63:2 64:8,15
67:19 74:3 77:12,15,20 78:20
79:10,11,13,15,24 80:17
81:15,19 82:14,18,21 97:10,
22 98:10,16,24 99:6,10,12,16,
21,23 101:2 103:3,8,9,11,21,
23 104:4,10,17,18 105:1,2,4,
13,14,18 106:10,24 107:1,23
108:8,22 109:8,11,13,21
110:7,8,13,18 111:16,21
113:4,7,18,22 114:21 115:1,
14 117:17 118:21,24 124:21,
23 125:1,5,16 126:1,16 127:5,
8,21 128:7,22 136:18 143:24
144:16 145:20,21 169:2,10,
13,20

property's 35:7 118:9

proposed 29:14 79:14 95:20
97:9 117:15 118:2

Protection 89:1

prove 160:24

provide 85:17 86:5 166:20

provided 20:21 161:3,10

provision 53:1,8 95:24

provisions 109:6

public 9:21 18:7,9,11 27:17
33:10 77:8 78:8 79:6 89:1
113:15 117:24 118:6,10,22
122:21 124:13,18,19 127:6
128:23 139:13 152:20 153:2,
25 161:19 164:13,22,24,25

publicly 41:11 74:6

published 13:9

publisher 12:18 13:7,9

pulls 30:7,11

purchase 109:3

purchased 99:24

pure 58:16 108:2

purpose 129:25 130:6 150:17

purposely 90:24

purposes 45:22 70:18 72:16
84:9

purview 160:15

put 15:14 17:14 27:19 54:7,15
63:17 76:20,22 90:10 101:11
102:2,7,13 103:19 105:17
107:5 108:18 128:15 136:13,
15 138:23 145:21 157:11
166:7 169:14

puts 17:17

putting 65:5 107:8 129:23

puzzle 48:17 96:20

## Q

Qdoba 82:12

quarterly 14:14

quasi-judicial 68:21 69:7
103:16

question 6:3,6,7,9,12 7:23
8:2,4,5,18 9:6 10:21 14:19
15:11 18:1,6,24 19:15 21:3,5,
14,22,25 23:11 24:4,10,14,24
27:25 28:25 29:4 38:11 40:3
44:6,7,17,24 45:1,6,23 46:7
47:2 48:9 51:22 52:15 53:24
54:1,4,9,13,16,24 59:11
61:11,13,21 67:3 71:18,23
72:4,8,9,22 74:1 76:2 80:24
86:1 87:21 90:12 97:13
102:11 103:24 106:1 109:18
110:23,25 111:1 112:24,25
113:17 114:7,18 115:11 118:5
123:8,23 125:8,24 126:9,21

128:18,19 137:2,21 139:8
140:10 144:17 150:22,25
152:17 154:25 165:5 166:10,
13 167:25 168:23

**questioning** 169:4

**questions** 21:10 22:23,25
23:22 28:12 41:10 54:15
60:16 72:1,17 92:6 93:2,19
116:1 150:18 152:5,9 154:6
156:19 157:16,20 168:19,21

**quick** 15:17 24:23 27:24 93:4

**quiet** 36:5

**quote** 110:14

**Quran** 153:17

---

**R**

**radical** 149:22

**raggedy** 107:7

**raise** 71:2,5 154:12

**raised** 146:10

**rang** 74:14

**rare** 21:10 23:13,18

**rarely** 17:20 28:19

**rationale** 137:9

**re-reviewing** 100:24

**reach** 10:12

**read** 17:20 41:6,7,8,9,18,25
42:4,5,13 56:7,9 58:5 67:24
68:2 72:7 74:22 77:13 84:25
86:2 87:2,6,14 90:17,21 92:5
100:20 111:2 133:12,14
146:15,17,19,21 149:10
164:13

**readily** 131:2

**reading** 143:9

**reads** 164:15

**ready** 112:16

**reason** 22:22 26:22,24 62:14
159:4,11

**reasons** 70:9 76:20,24 77:2
112:5

**rebuilt** 107:24

**recall** 16:13,15 21:14 22:12,24
23:25 25:23 28:15,18,24 30:2,
21,22 34:17 50:16 55:21,22
59:14,16,19 60:1,8 61:16,18
63:19,20 64:12,20,22 65:4
66:19 67:1,3 69:3 73:8,17,18,
25 74:7 77:1,2,3,6,7,9,22
79:14,20 80:1,3 81:10 87:22
91:17,23 96:16 98:3 99:1
101:6,20,22 102:4,10,24
104:2,15 105:15,16,18 108:15
114:3,22 116:11,12,13,14,24
117:2,13 121:21,22 126:5
127:23 128:25 131:5 132:24
134:18 135:12,16 137:14,23
140:6 143:11,19 159:1,19,23
163:1,2 166:15,19 167:3,5,22
169:21

**recalled** 64:16

**receive** 22:20 30:23 85:9
86:10 88:9

**received** 16:9 17:14 18:2,13
19:2 21:16 23:1 30:12 32:3
49:9 57:10 64:15 85:23 89:19
93:23 138:11 155:2

**receiving** 91:2

**recess** 83:17 93:11 151:24
158:7

**recognize** 26:6 74:16

**recognized** 69:1

**recognizes** 26:5

**recollection** 60:19 61:1 64:24
84:4 87:11 133:2 163:11

**reconcile** 31:13

**record** 5:5,9 38:19 41:17
60:13,22,23 76:20,23 83:15,
18 85:8 87:12 90:10 93:8,9,12
111:3 138:25 151:23,25
152:6,9 154:17,23 157:11
158:4,5,8 170:1

**recorded** 5:5

**recourse** 100:17 165:9

**redress** 100:14

**refer** 11:6 60:22 83:1

**reference** 98:1 99:14

**referenced** 17:6,11 73:8,11
89:21

**referred** 37:17

**referring** 39:7 42:9 79:13 85:2
97:13 156:22

**refers** 159:12

**refiled** 135:17

**reflected** 52:19

**Reformed** 101:7

**refrain** 153:5

**refreshed** 83:22,24

**regard** 113:16 159:18

**registered** 12:11,13

**registration** 12:15

**regularly** 10:15 14:11 17:17

**rejected** 63:7 92:2 135:23

**relate** 78:11 97:9,21 122:19

**related** 56:15 85:16 116:6
159:5,8,12,22 168:3

**relates** 69:7 72:3,17 79:10
123:3

**relating** 50:19 67:25 84:18
91:20 140:2

**relationship** 23:6,10 25:3

**relevance** 73:15

**relevancy** 18:21

**relevant** 157:13

**relief** 63:23

**religion** 13:11 153:19

**religious** 18:3 134:13 142:19
149:14,15 155:8



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

Glenn Clark
08/10/2020

20

rely 20:9

remained 80:10

remember 59:12 61:13 71:22
72:7,9 77:17 84:6,8 86:12,15
98:2 101:16 102:5 107:4
114:22 122:7,12 123:15
134:22 135:22 136:16,22,24
137:5,6,16,22 138:4 139:10,
12 141:16 142:8,14,15,20,24
143:9,12 144:1 148:20 162:18
164:9 169:3

remembering 16:18

remind 7:8

remove 167:2

removed 12:8 108:10 169:14

rented 56:5

repeat 71:23 123:25

repeated 111:3

rephrase 6:5,11 163:6,21
167:25 169:6,7

reporter 5:10 6:16 7:6 19:21
38:9 72:7 92:15 110:21

represent 5:23 120:16 131:24
156:4

representative 10:1 131:16
140:18 166:15

representatives 40:14,15
100:16,23 138:7

represented 5:25 148:1,4

representing 5:14 153:6

request 10:19 49:18 63:7 68:9
70:8 80:2 85:20 86:4,12 120:8
121:4,13 157:2 161:6 162:9,
11,15 163:5,21 164:4,16
167:24

requested 15:21 34:11 111:3
121:6,23 135:21 144:12

requesting 162:13

requests 36:1 55:6 85:10

require 63:18

required 51:11 53:4 54:18
88:3,8,10 101:14 106:9,14
107:11 108:14 111:16 145:13

requirement 53:21,22 54:17
67:6 78:12 101:21 102:9
116:16 117:20 122:19,20,22
123:4 137:10 165:21 166:1

requirements 98:18,22 116:6
137:25 162:22

requires 6:24 63:12,13 115:6
121:7,12

research 12:3 86:14

residential 43:19 49:14,19
50:11 62:19,24 81:15 82:18
88:23 104:5 130:19 144:15

residents 124:21

resolution 70:10

respect 35:19 47:12 70:23
73:3,16 114:9,19,21 116:9
124:11 129:10 151:5 154:8
168:9

respectful 115:25

respond 154:23

responded 122:13

responsibility 15:23

rest 27:21

restate 14:19 55:22 56:4 57:23
111:1 165:22

restaurant 59:6 80:5 81:1
123:20 126:7,17 127:16,18
128:2 135:13,14 138:12,14,15

restaurant/banquet 80:11

retail 80:19 126:7,17

retained 156:19

reveal 68:24

review 36:19 51:17 57:16

reviewed 60:14 63:11

reviewing 98:11 110:11

Richard 5:13,25

ridiculous 151:16

ring 102:3

rituals 134:13

RLUIPA 18:3,14,17 19:12 20:6
73:8,15,19 155:17

road 34:11,14 82:22 101:8
107:18 115:22 121:17 124:25
133:23 134:20,21

roads 49:24 50:14 52:8

Rochester 82:22 86:24 133:23
134:20,21

Rockford 12:21

Rockville 12:20

role 46:25 47:18 134:3 151:15

Roman 12:25 13:5

room 104:9 117:8

rotates 20:19 25:9

rude 128:16

rule 50:1 52:16 67:9

rules 9:22 33:3 40:18 68:22
135:18 138:4,5

run 10:5 44:10,15 45:24 46:14
125:21 158:25 159:2,7

running 44:9

runs 10:6 43:12 46:17 76:3
130:3,5 139:22 159:2

rusty 107:7

Ruthann 86:20 89:19 90:6
139:10

**S**

safety 33:10 57:6 77:8 78:9
79:6 117:24 118:6,11,22
119:5,6,7 122:21 124:18,19
127:7,21 128:24

sake 96:3

Sarnacki 161:4



Glenn Clark
08/10/2020

21

scale 129:20

school 45:24 46:1

scope 34:15

screening 101:15 102:7
144:7,12

search 85:21

section 41:20 94:2,20 96:8
110:19 161:7

seek 23:2 163:5

seeking 36:7 59:9,15,17 61:17
63:10 64:7 143:21 161:8
162:3,7,19,21 163:7

selected 152:16

self-employed 12:18

sell 46:1

send 37:25 87:18,20,25 88:2
91:7

sends 27:14

senior 88:24 89:3,6

sense 11:12 104:11

separate 14:17,21 15:7 23:8

serve 11:1,21 12:9

served 20:18 25:9 81:9

serves 101:10

service 9:16 20:23

services 123:10 124:6 126:24,
25 127:10 142:11,18

serving 113:15

set 34:10 65:24 82:21 119:4
138:4,5 162:2

setback 51:12,21,25 53:20,22
54:8,17 55:17 59:10,23 60:2,6
61:18,20 63:14,15,23 78:11
80:15 98:22 101:21 102:9,14,
16 106:11 115:2,7,10 122:19,
20,22 123:4 137:10,25 160:3
162:22,25 163:1,8

setbacks 52:12 78:19 79:17
107:25 125:12,15 127:6

135:19 143:17,22

sets 146:23

setting 30:8

shallowness 104:23 110:14
111:17

shame 132:6

shape 104:22,25 111:18
159:20

shaped 33:9 35:8 44:14
104:23 159:13

share 87:16 88:6,18 122:9
146:24

shared 115:18 121:14,16
122:6

shares 30:3

shed 101:12,13,21 102:2,13
104:6,10 105:17 107:5,7,9

sheet 8:21 151:8

sheets 143:9

shift 46:24

shocked 156:14

shop 58:25 73:6 130:13

shopped 119:12

short 83:17 93:11 151:24
158:7

shot 156:15

show 67:13 90:18

showed 25:24 56:5

showing 159:20

shows 58:24

shrubs 129:23

shrug 90:9

sic 11:21

side 75:4 78:15 82:2,4,14
115:7 123:14,15 155:10,11,
13,14,16,21

sides 40:24 51:12,21,25 52:12

55:19 63:15,22 82:4 115:3

significant 50:3 58:8 79:4

similar 56:15 65:8 125:7,8
147:23

simple 23:11 87:7

simply 12:11 22:6 51:4 54:23
62:4 111:18 122:13 131:7
150:16 154:25

simultaneous 134:16

single 31:16 44:2

sit 111:18 120:15

site 30:11 34:10 58:13 96:15
102:5 105:8 106:3 114:4
124:3 130:21 135:13 144:14

sites 62:19

sitting 16:17 18:16

situation 34:10 40:4 45:7 46:6
71:10 108:13 113:12 145:23

Sixth 68:23 69:21 70:15

size 118:25 134:14,16,19

slight 155:11

slightly 107:6

smaller 119:5

smallness 104:23 110:15
111:17

smart 123:2

social 147:10,13,16

solid 169:22

somebody's 42:20

someplace 66:6

sort 15:19 30:8 46:25 67:17
109:7 115:4 137:12 155:3

sought 98:17 116:7

soul 58:17

sound 137:17

sounded 138:10


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Glenn Clark
08/10/2020

22

sounds 99:4

south 82:15

space 59:7 80:19 129:12
132:11

speak 7:9 10:15,20 21:1 23:22
26:24 28:19 58:18 78:2,16
89:6 92:2 123:11 161:19,20
164:23

speakers 74:5

speaking 6:17,18 67:6

specific 15:21 24:1,10 30:22
32:11 35:20,21 38:21 40:18
60:7,9 72:4 88:16 97:21
114:14 133:2 143:12 162:10

specifically 8:6 33:16 57:8
60:2 65:6 91:14 98:2 108:5

speculation 21:22 24:9 32:21
45:5,7,21 46:5 52:1 102:17
108:2

speculative 129:3

speed 52:9

spend 89:2

spent 107:8

spilling 79:7

split 47:15,21

spoke 7:15 26:14 87:24 89:20
91:3 131:5,18 139:11,12
147:6 149:7 164:3

spoken 7:5 23:13,24 26:7
86:24 131:3,21,25

spontaneously 29:16

sports 64:17 65:2,3,7 142:13

St 74:18 75:1,19 124:24

staff 55:1 130:24 131:22

stand 146:25

standards 165:21 168:15

staple 83:5

start 67:22 94:13

started 6:24 9:15 12:20,22
68:5 89:10 93:15 145:9

starts 67:18,23 134:10

state 5:9 88:3

stated 76:25 77:7 113:18
126:3 128:23

statement 32:18 143:20 152:8
164:13,15,20,21

statements 133:1

states 5:12,24 68:22 134:8
149:22

station 82:1

statute 18:20

stay 79:17

Stealth 149:25

Steinbeck 14:5 120:25

Steinmark 14:5

step 83:10

Stephenson 104:2 105:8

stick 51:8

sticking 114:25

Stimac 17:7 31:1 120:22

stop 26:16 114:17

stopped 8:17,19 153:14

store 126:7,17

street 79:8 82:3 107:5 113:19
123:14

streets 49:24 118:13 123:15
124:13

strike 80:8

structure 79:25 104:4 105:13
106:24 110:17 111:11 117:11
167:2,3 169:2,14,15

structures 39:22 98:9 99:9
103:8,20 104:1 105:25

study 120:3,10,18 121:20,24
122:10,17 128:11 166:20,23

stuff 10:17 87:18 145:7,16

stupid 83:4

subdivision 36:3 49:19 75:11
78:15

subject 97:22

submit 106:16 121:12 144:16

subsequent 14:10 44:20 45:4

substance 7:12 164:20

substantial 24:25 42:14,19,23
98:23 100:8 101:3 163:13

substantially 98:18

subtitle 41:21

sue 148:16

sued 131:8,9 132:4

suggestion 146:9

suits 152:22

summer 34:14

Sunday 34:17 59:4

supplying 153:10

support 153:1 167:23

supports 10:16

supposed 7:11 9:1

suppression 53:3,6

Supreme 68:22,25 154:1
156:6

surprised 155:6 156:14
157:14

survey 122:10 128:11

Susan 5:11,23 154:19

suspect 72:12

swear 5:10

switched 80:25 81:6,8

sworn 5:19 9:13

system 149:24

systems 53:3,6

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Glenn Clark
08/10/2020

23

## T

**table** 8:19 20:13 138:23

**takes** 161:22

**talk** 23:14,18,19 25:13 28:7 58:16 82:23,25 91:24 100:5 159:11

**talked** 25:17 29:2 77:8,9 119:11,20 132:8 142:10,24 158:12 165:16 167:6

**talking** 27:7,9 33:8 37:4,8 38:25 41:1 64:17 65:6 72:14 79:2,23 93:15,22 95:15,17 96:5 97:8,15,16 107:13,15,16 110:22 118:11 124:19 126:20 135:19 138:14 142:18,25 148:13,20 153:5

**talks** 134:10 135:10 164:22

**telephone** 27:2

**telling** 155:19

**tells** 142:20

**tem** 11:1,21 12:1

**ten** 119:22

**tent** 119:4

**Tenth** 155:18

**term** 9:13 34:23,24 35:14 46:18 66:1 159:7,8

**test** 60:18,25 61:1 65:15

**testified** 5:20 22:1,3 49:9 67:24 72:24 129:7 158:11

**testify** 7:13

**testimony** 61:16 63:9 84:9 165:16

**Texas** 153:8,12

**text** 87:3

**thereabouts** 14:14 56:11 58:25

**thick** 38:14

**thing** 15:24 79:1 94:1 96:22 97:1 106:13 125:11 128:13 136:4 141:6 142:9 146:19 156:21

**things** 21:4 23:1,20 27:3 31:13 33:22 37:8 40:22 46:22 76:22 77:18,19 78:7 118:19 119:20 127:3 138:7,23 144:13 154:15 159:12 162:21 163:15

**thinking** 22:8 28:3 98:4 136:4

**Thomas** 5:14 148:24 149:8,12, 21 150:5,9,12,13 152:11,13, 16,18,19,25 154:16,24 155:6, 9 156:2,13 157:9

**Thompson** 5:13 6:1 10:21 18:18 19:14 21:21 22:16 24:8, 18 27:6 31:6 32:14,21,23 33:19,24 34:1 35:12 37:11,13 38:4,7 41:14,21 42:1,5 44:6, 22 45:5,15 46:5 51:22 52:1 53:14,17,24 54:3,11 55:10,12 60:12 61:7,21 65:13,18 66:4 68:19 70:3,22 71:1,16,19 72:3,6,11,19 83:13 85:8 86:11 87:5,10,12,17 89:14,25 90:9, 18 92:10 102:17 109:15,18 110:23 112:18,21 115:25 126:9 128:17 129:3 132:14,25 134:7,21,23 146:17 148:25 150:4,8,11,17,22 151:21 152:5,8 155:13,23 156:21 157:18,21 168:21

**thought** 15:6 20:3 41:11 46:19 68:24 69:5,9 70:5,11 72:13 76:7 86:3 91:23 99:8 135:25 139:25 140:1 143:14,16 148:18 157:12

**thoughts** 28:1 90:15,24 91:1 122:10

**threats** 149:22

**three-minute** 67:6,9

**tight** 109:1

**till** 19:14

**time** 5:7,8 6:17 8:1,4 9:2,7,14 10:25 11:3 18:13 19:8,10

20:6,23 21:10 22:17,20 24:23 25:23 28:20 29:18 31:2 47:9, 17 49:17 59:12 61:3 64:5,12 68:6,14 69:15,21 72:25 73:4 75:2,20 77:5 81:8 84:5 85:17, 19 86:12 87:22,23 89:2,9,11 91:4 96:14 99:11 100:25 101:19 102:21 107:4 110:4 120:14 122:7,15 123:9 125:20 128:9 133:9,19 136:10,12,19 140:5,21 141:17 142:9,21,23 145:1 148:12 149:7 151:8 156:6 161:13 163:24,25 164:2,6,7,8

**times** 29:2 61:22 67:9,15 76:4 105:5 106:8 109:23 119:12,23 121:18 124:1,20 128:3,4,7

**tiny** 101:11 107:13

**tireless** 130:15

**title** 86:16

**today** 5:24 18:16 70:11 72:16 76:4 84:17,20 123:16 140:1

**Today's** 5:6

**told** 8:23 45:13 63:16 83:24 84:14 108:12 111:20 117:13 118:14 120:21 133:21 134:2

**ton** 17:10 78:22

**top** 107:4 145:7

**topics** 93:19

**topography** 44:14 46:23 76:6 110:15

**tore** 107:24

**total** 63:20

**totality** 103:6,13 113:11 125:13

**totally** 8:2 44:3 152:14

**touch** 38:4 91:6

**town** 50:13 109:1

**tracts** 76:8

**traffic** 36:4 79:5 80:9 119:16 120:1,2,3,9,18,19 121:20,23



HANSON RENAISSANCE
COURT REPORTERS & VIDEO

hansonreporting.com
313.567.8100

Glenn Clark
08/10/2020

24

122:2,17,19,23 123:3,13
124:5,10,14,17 127:6 128:1,
10,23 166:20,23

**train** 15:6 20:2

**trained** 18:2

**training** 13:25 14:10,24 15:8,
19,21,25 16:9,17 17:5 30:12,
13,20,22 31:15 49:9 120:20

**transcribed** 60:23

**transcript** 15:3 19:22

**transform** 150:1

**treated** 42:22 73:2 158:15

**trees** 101:15 144:8,13 145:21

**trial** 112:1 153:8

**Troy** 5:1,6,17 8:15 11:2,5 13:9,
18,19,20 16:10 17:2 25:7
34:11 38:1,20 41:19 49:13,25
55:1,16,24 56:2,6,13,20,21
58:25 59:3 62:13,21 74:18
80:6 86:23 88:15 89:22 109:1
120:5,6,15,16 122:2 128:7
132:11,17 134:9 165:1

**true** 80:13 130:22 137:18

**turn** 38:13,21 84:7 151:19
157:24

**turned** 59:5 119:12

**turning** 37:9 57:8 66:16

**Twitter** 147:20,22

**type** 21:12 33:13

**types** 64:13 65:8,11

**typical** 25:3 27:5,18

**typically** 15:25 16:4 20:9
21:20 24:13 27:1,3,4 28:12

---

**U**

**U.S.** 70:13 153:12

**ugly** 15:3 19:21 131:20

**uh-huh** 7:4,10 21:17 26:13
29:22 39:6 47:24 90:4 95:3,7,

9 98:12 146:22 148:3 160:5

**uh-huhs** 7:7

**uh-uhs** 7:7

**ultimately** 60:16 76:16 130:25
137:11 141:8

**un** 153:7

**uncalled** 152:14

**unclear** 24:2

**unconstitutional** 155:17,24

**understand** 6:3,4,9,12,23 7:2,
6 8:7 15:10,11 18:23 19:19
29:19 32:18 33:3 35:16,18
37:1,8 40:3 42:23 47:18 50:22
53:8,13,20 54:13,21 61:2,3,4
67:17 69:20,25 71:21,22 72:2
77:23 97:2 99:20 112:9 117:1
126:19 127:1 136:13 155:5
158:13 159:8

**understandable** 19:19

**understanding** 18:17,20 31:4
32:11 33:17,22 34:6 42:16
45:2 47:9 49:12 50:2,6,8
51:10,20,24 52:11 53:22
54:16 59:22 61:2,6,8,11
62:14,17,25 63:24 64:3,13
65:20,23 66:2,9 82:17 98:25
108:11 138:16 139:22 143:21
167:7 169:5

**understood** 6:7

**unfair** 111:10

**unindicted** 153:7

**unique** 71:8

**United** 5:12,24 68:22 134:8

**unprofessional** 152:15

**unreasonable** 124:12

**unusual** 25:10 26:2,3 58:11
150:14 159:14,21 163:12,14

**updated** 17:13

**updates** 17:14

**upset** 48:23 73:20 77:10

**usage** 34:16 36:8 37:4

---

**V**

**vacant** 103:10

**vague** 22:17 32:15 61:7

**values** 127:9

**variance** 33:18 34:8,9,21,24
35:3,9,22 36:6,13,15,24,25
37:3,18 43:3,8 44:15,19,21
45:1,4,25 46:4 48:24 49:21
55:6 56:14 57:3,9 59:8 63:1,
10,14,15,19 64:1,6,15 66:17
68:9 74:3 75:24 76:2,16 79:18
80:2 82:24 96:1,4,8,9,10,16
97:8 98:17 101:6,20 102:8
107:12,21 113:8 114:3 116:7
117:16 118:2 122:18 133:20
135:9 143:22 144:20 145:16
158:19,23 159:4,5,11,18
160:25 161:6,8 162:3,7,9,14,
15,22 163:5,8,13 165:7,18,20,
25 166:24 167:9,13,14,18,22,
23,24 168:3,11 169:1,3,9,10,
13,15,19

**variances** 36:21,22 39:11
43:15 44:10 55:19 61:18,20
62:15 77:9 95:2,19 96:12,22
135:22 158:12,13 162:19,25
163:16

**vegetation** 110:15 121:17

**veiled** 156:12

**verbal** 88:12

**verbally** 30:4

**vernacular** 35:21

**versus** 36:24 89:22 134:9

**Vice** 164:16

**vice-chairman** 9:15 131:6
164:18

**video** 5:5 26:1 30:6 67:17
78:3,17 79:2 97:25 111:25
114:24 119:21 123:5

**videotape** 60:14,23 61:4 127:2

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Glenn Clark
08/10/2020

**view** 101:1 103:9 147:24

**viewpoints** 147:4

**violating** 155:17

**virus** 28:1

**volunteering** 166:16

**vote** 9:24 37:2 48:21 49:1 52:6 55:6 62:10 77:21 91:25 92:3 102:25 104:8,13 105:3 111:19,22 112:4,11,15 115:17 125:13 129:10 137:18 168:10

**voted** 12:6 43:13 48:5,6 49:3 76:14,16 101:13 103:25 104:3 107:9 125:10,11,13 141:24

**votes** 9:23 47:10 52:22 113:10 142:4

---

**W**

**waging** 149:24

**wait** 19:14,24 65:18 93:1,6,7 112:18 160:6

**waive** 69:16

**walk** 9:1 14:8 48:15 58:19 100:21 138:22

**walked** 90:24 140:22

**walking** 79:8 123:17

**walks** 141:1

**wall** 129:13

**walls** 99:19

**wanted** 14:7 22:5 29:4 34:14, 16 36:2 58:19 59:10 61:12,18 68:16 71:24 78:7 79:20 80:14, 17 101:11,12 105:17 106:2 108:18 117:10 124:25 125:21 127:4 136:7,17 152:5 153:12 154:17 155:2

**wanting** 166:7

**wash** 81:25 82:15,20

**Washington** 154:7

**watch** 97:25 119:21 123:5

**watched** 67:16 127:2

**water** 83:11

**Wattles** 34:14 82:7

**ways** 154:2 169:12

**website** 149:5,11,20 152:12

**weddings** 64:23

**week** 128:4

**weeks** 56:10,11 132:10

**weighs** 48:23

**well-worded** 166:12

**Wendy's** 82:7

**wheelhouse** 144:25

**wiggle** 27:23

**win** 132:4

**window** 8:20

**wine** 114:5

**wishes** 161:19

**withdraw** 44:7

**withdrawn** 54:4

**women's** 143:1

**wonderful** 57:24 77:17,19

**Woodside** 56:25 74:18,21 75:11,16

**word** 35:18 103:13 133:24 138:3 143:25 146:7 164:20 165:3,4

**words** 30:5 63:17 109:24,25 110:2 128:15 132:9 143:5,18

**work** 14:2 31:5,11 80:6 88:24 128:5 130:15

**worked** 17:8 23:3 148:12

**world** 128:6 147:24

**worry** 149:2

**worse** 126:6

**worship** 49:12,18 50:8 51:11, 20,24 52:11 54:18 55:16,20,

24 56:2,5,13,20 62:16,20 63:2,25 65:4,5 73:22 79:4,24 98:22 100:4 106:2 108:4,9 115:2 118:23 123:19 124:22 125:25 126:6,15 128:14 130:8,11 132:12 133:7,19 135:18 136:3 137:11 138:1 141:25 143:3,18,23 151:10

**worshipping** 132:16

**worth** 107:13

**wow** 131:20

**write** 126:22,25 144:16 145:8, 11

**writing** 88:9,11 140:2

**written** 29:17 67:25 90:16 138:25

**wrong** 34:17 54:23 55:9 56:10 63:20 67:7 74:9,25 94:5 97:11 100:1 133:23 136:9 140:9 141:4 156:9,14 158:1,2

**wrote** 8:18

---

**Y**

**yard** 40:6,18,19

**yards** 40:8 43:14,18,20 113:19,21 114:1 159:15,21

**yea** 122:11

**year** 7:10 25:10 61:15 64:16 80:3 98:4 116:19 117:21 130:4 131:17 133:17 138:8 145:13

**years** 13:12,21 15:16 20:19,20 21:4 24:12 25:9,23 31:10 34:11 36:2 46:21 49:11,15 59:1 67:8 69:3,10 81:3 88:22 120:20 121:6,25 124:24 137:4 152:20 157:10

**yesterday** 7:15

**YMCA** 66:12

**youth** 64:17,25 65:6

## Z

**ZBA** 9:9 13:22 15:20 23:7,8
25:4 26:9,16,22 27:10 31:9
32:17 33:2,23 45:3 46:3 47:1
49:11 51:1 53:10 54:20 55:20
61:19 64:5 84:4 130:1 131:3,
14 134:4 135:7 137:8 140:2
141:24 144:9 145:24 158:18
162:17 165:24 167:1,16,17,20
168:2,5

**zoning** 8:15 14:8,9 17:19 25:8,
13,17,19,24 27:7 30:14,23,24
31:4,11,14,19,20 32:12,19
33:3 35:16,20 36:23 37:9,20,
22 38:1,20 40:5,9,17 41:19
42:8,24 43:21 49:10 50:3,16,
20 51:5,6,11,15 52:17,19,23
53:1,8,9,23 54:18 55:2 59:20
60:4,5,17 62:2 65:21,24 66:2,
6 75:7,15,16,17,19,22 83:22
86:25 87:19 89:5,10 91:3
93:24 97:3 98:20 99:18 100:3,
5,15,18 106:7,13,17 109:3,6
110:2 111:12,14 112:2 113:5,
7,17,20 114:8 115:21 121:22
130:12 135:3 136:11,14,20,23
138:10 139:24 141:19 143:13,
16 155:19,20 158:13 159:24
160:2,8,10,13,15,18,22 161:2,
7,13,14,18,22 163:9,10,15,17,
20,22 164:3,12 165:17 166:22
167:7,8 168:15



**Brooke Rice**

GOVERNMENT
EXHIBIT

| | |
|---|---|
| **'om:** | Glenn Clark <glennmichaelclark@gmail.com> |
| **.ent:** | Tuesday, July 7, 2020 2:24 PM |
| **To:** | Richard Thompson |
| **Subject:** | Fwd: Current case with the ADAM Center v Troy |
| **Attachments:** | NARRATIVE OF THE 2014 MOSQUE DISPUTE IN TROY MICHIGAN.doc; Mosque_in_America Primer on Permit Hearings.pdf |

---------- Forwarded message ---------
From: Ruthann Dawley <thedawleymama@gmail.com>
Date: Thu, Nov 29, 2018 at 11:59 AM
Subject: Fwd: Current case with the ADAM Center v Troy
To: <glennmichaelclark@gmail.com>

I just sent this to Lori Bluhm and should have Bcc'd you.

Please keep me informed, Glenn.  Please let me know of any new meetings, etc.  Please also let me know what you think of the summary I wrote from 2013-14.

 don't know why you said that I wouldn't watch the meeting from Nov. 19.  I have done so!  If I had known of the
 .eeting, I would have been there without a doubt, along with Clifton.  We are vitally interested in stopping any beach head in Troy, and make no mistake--that's what a mosque is.  Their worldview states that Allah has already given them the entire world and everything in it; it's just up to them to take it.  Please keep up the good work you are doing!  We so appreciate you!

God's blessings and guidance and wisdom be yours,

Ruthann
---------- Forwarded message ---------
From: Ruthann Dawley <thedawleymama@gmail.com>
Date: Thu, Nov 29, 2018 at 11:45 AM
Subject: Current case with the ADAM Center v Troy
To: <bluhmlg@troymi.gov>

Dear Ms. Bluhm,

My husband, Clifton, and I are long-time residents of Rochester Hills who are very active in our church in Troy.  I recently learned that the city is being sued for bias by the ADAM group, and I wanted to make you aware of the history that I've had with those folks. I have attached my narrative of the first encounter that Troy had with them in 2013 and 2014 in hopes that it will be helpful to you in some way.  I plan to email this the ZBA members also.

 'ease know that I have absolutely zero negative feelings toward any Muslim personally.  My contention is with their
 ,eology taught in all of the writings they consider sacred texts, which clearly teaches and demands total world domination--one little parcel of ground at a time if need be--total submission by all to Sharia Law which is completely antithetical to our dear U.S. Constitution, and last but not least, total elimination of Jews and Christians.  No other

1

religion on earth makes such demands, and in fact the bulk (86%) of Islamic texts deal with politics, not religion. Muslims may preach tolerance and diversity all they want, but when pinned down as to their exact beliefs, if they deny these aforementioned tenants, they deny Islam; that is the most grievous sin according to their texts and worthy of Hell.

I believe that it behooves everyone in America to understand the threat posed by Islamic rule. This is not anything to ignore. Just look at England, Germany and France. Where once many churches stood, they are either destroyed or renovated into mosques. When the number of Muslims increase in a community more and more demands are made to comply with their ideology, entire doctrine and worldview. Our Republic was not founded upon an Islamic worldview, but rather upon Freedom, Liberty, individual rights and responsibilities, and a Capitalistic system. Islam denies all of these.

I have also attached a PDF of attorney Karen Lugo's book that may be helpful to you as you prepare a brief and advance your case in defense of the city of Troy. Karen has experience and essential wisdom in cases involving Muslim groups.

Sincerely,

Ruthann Dawley

# MOSQUES
# IN AMERICA

*A Guide to Accountable Permit Hearings
and Continuing Citizen Oversight*

## By Karen Lugo, Esq.

### Constitutional Law Specialist
### RLUIPA Analyst and Litigator

This book may be reproduced, distributed and
transmitted for personal and non-commercial use.
Contact the Center for Security Policy
for bulk order information.

For more information about this book, visit
SecureFreedom.org

*Mosques in America* is published in the United States
by the Center for Security Policy Press,
a division of the Center for Security Policy.

ISBN-13: 978-1540729170

ISBN-10: 1540729176

The Center for Security Policy
1901 Pennsylvania Avenue, NW, Suite 201
Washington, D.C. 20006
Phone: 202-835-9077
Email: info@SecureFreedom.org
For more information, visit SecureFreedom.org

Book design by Bravura Books
Cover design by J.P. Zarruk

# TABLE OF CONTENTS

FOREWORD............................................................................................ 1
INTRODUCTION..................................................................................... 3
1: City Hall and Mosque Building Projects .................................... 11
2: Unique Mosque Application Controversies .............................. 15
3: Religious Discrimination: Preference for Mosques? .............. 21
    Case One: Al Farooq Youth and Family Center...................... 22
    What Went Wrong?........................................................................ 26
    Residents' Points of View ........................................................... 33
    City Council and Mayor Points of View.................................. 35
    City Attorney and City Manager Points of View ................. 39
    Case Two: Resurrection Power Church.................................... 49
4: Understanding Zoning Authority .............................................. 57
5: Is RLUIPA Always a Trump Card?.............................................. 61
6: What Courts Have Said About RLUIPA ................................... 65
    When Does Local Government Substantially Burden a Religious
    Practice?.......................................................................................... 66
    RLUIPA and Equal Terms and Non-Discrimination ........... 69
    RLUIPA and Governmental Compelling Interest ................ 71
7: What Zoning Laws May Survive RLUIPA Tests?.................... 75
8: The Department of Justice, RLUIPA and Mosques................. 81
    When Government Uses Dubious Hate Crimes to Drive Law
    and Policy ....................................................................................... 84
9: Islam Is Defined as a Religion for Constitutional and RLUIPA
    Protections...................................................................................... 95
10: Mosque Building Permits: What to Expect From City Hall?............ 101
11: The Mosque Siting or Expansion Permit Process..................... 105
12: Holding the Planning Department Accountable...................... 111
13: Unique Concerns When Residential Homes Are Converted
    to Mosques .................................................................................... 117
14: Testing Conditional Mosque Permitting in Phases................. 119
15: Permit Hearings and Public Comment Strategy ...................... 121
16: Scaling Stonewalls: Public Record Requests and Open Meeting Acts.... 127
    Public Record Requests ................................................................127
    Public Officials May Not Hold Sub-Group Private Discussions .............. 129
17: Withdrawal of Unreasonable Mosque Applications ................ 131
18: Anticipating Enforcement: When Government Fails to Uphold
    the Law............................................................................................ 133
19: America's 'Dominant Traditions' Are Not for Barter................ 147
20: Free Speech: Use It or Lose It ........................................................ 157
21. Ask An Imam ..................................................................................... 173
CONCLUSION AND SUMMARY............................................................ 177
    Recommended Reading................................................................177
    Foundational Reading..................................................................178
    Mosque Permit Processing...........................................................178
    Post-Application Follow-Up with Mosques ............................179
    Exercise Your Freedoms ...............................................................180
ABOUT THE AUTHOR............................................................................ 183

# FOREWORD

America has throughout its history been characterized as a "melting pot" in which immigrants from countries, cultures, religious backgrounds and ethnic communities around the world have created "E Pluribus, Unum" – out of many, one. While there have been times when the size of a particular influx has created backlashes towards the migrants, the United States' record, on the whole, is one of extraordinary tolerance and generosity.

On balance, the country has benefited greatly from the addition of those who have come, as the poet put it, "yearning to breathe free" and willing to assimilate, become part of the fabric of this country and make it a better place for newcomers and those who came before, alike.

Never in our national experience, however, have we faced the challenges associated with the arrival here of a large population that adheres, to varying degrees, to a totalitarian ideology that is utterly at odds with the foundational principles and constitutional freedoms of this Republic. Muslims who believe their faith requires them to respect Sharia dictates above American law seek neither to assimilate nor otherwise to support American values, norms or laws.

The danger posed by such Islamic supremacists to a pluralistic and open society like ours can be acute to the extent that they conceal as religious practice what are, in fact, fundamentally autocratic efforts by clerics and others aimed at, in the words of the Muslim Brotherhood, "destroying Western civilization from within...by [non-Muslims'] hands and the hands of the believers so that Allah's religion is made victorious over all other religions."

As this book documents, such Islamist ambitions are a threat to America's peaceable, tolerant and law-abiding Muslims – many of whom came here to get away from Sharia in their native lands – as well as to non-Muslim communities. Written by Karen Lugo, an attorney with extensive experience in First Amendment constitutional law and in helping those seeking to protect our freedoms against all enemies, foreign and domestic, *Mosques in America* is a how-to manual for patriotic Americans who are ready to counter the leading edge of Islamic supremacism: its infrastructure-building through the construction of Sharia-promoting mosques that serve to alienate and radicalize.

Ms. Lugo offers a model case study to illustrate how Islamist operatives may be using our laws and regulations designed to promote free and accessible religious practice to place isolationist and extremist mosques in residential areas. She both shows how scrutiny of the process and deliberative community input is critical to assuring outcomes that protect community interests while following federal law that governs

1

religious land use. Of particular value are her insights and practical advice for activists on how to address the land use process, as well as challenge other Islamist assaults on the American way of life.

One element of Ms. Lugo's recommended approach bears special mention here: the crucial role that can be played by Muslims who reject Islamic supremacism. Those, like Dr. Zuhdi Jasser and the other signatories of the incalculably important "Muslim Reform Manifesto" – who recognize Sharia as "man-made law," not holy writ, and, therefore, reject its imposition in American mosques and American communities – are not just natural allies of freedom-loving non-Muslim Americans. They may be the single most effective force-multiplier to counter Islamists' demands for anti-constitutional accommodations.

It is our hope that this handbook will prove to be both an inspiration and an invaluable guide to our countrymen and women of all faiths in understanding – and effectively countering – the Muslim Brotherhood's civilization jihad.

Frank J. Gaffney, Jr.
President & CEO
Center for Security Policy
November 2016

2

# INTRODUCTION

Americans have to face the fact that the cultural victories won by Islamists – as distinguished from reformist and compatible Muslims – are in no small measure due to American indifference.

To be sure, many elected representatives and judges are infected by "political correctness." But this is only because Americans have allowed these attitudes to shape official actions. Many missed opportunities at the local level, over as many years, have contributed to the victories that Islamists, often in alliance with the Left, have come to expect. This book is intended to help American citizens avoid such "unforced errors."

When schools offer up so-called "dominant culture" holidays like Christmas, Thanksgiving, and Valentine's Day to appease the diversity activists; when city councils and Human Relations Commissions move to censure the speech of citizens and other local officials; when the media endorse unverified "hate crimes" and peddle Muslim victimization; when schools assign projects based on overt Islamic religious dogma; when public officials appear with Islamist activists in one-sided townhalls; when church leaders invite unapologetic Islamists into the interfaith fold – all without remarkable objection – it should be no surprise that the cultural assaults gain steam and momentum.

In light of refugee resettlement and migration trends, it is more urgent than ever for communities to set constitutional cultural standards and assimilation expectations. Tensions have run high in places like Minnesota where Muslim immigrants, most from Somalia, have been settled in large numbers. Rather than hold Muslim groups accountable to reassure Minnesota residents with integration plans and anti-radicalization programs, Governor Mark Dayton and U.S. Attorney Andrew Lugar have used their official capacities to lecture citizens on Islamophobia and intolerance.[1]

When one contemplates that the city of Hamtramck in Michigan was ninety percent Polish in 1970, and in November of 2015, was the first American municipality to elect a Muslim majority city council, it shows that minor shifts in demographics and attitudes can accrue over years to a transformational pendulum swing. This 22,000-resident Detroit suburb became one the first in America to hear the Muslim call to prayer broadcast

---

[1] Johnson, Scott W. "Islam and Minnesota: Can We Hear Some Straight Talk for a Change?" *Minneapolis Star Tribune* (23 Dec. 2015), http://www.startribune.com/islam-and-minnesota-can-we-hear-some-straight-talk-for-a-change/363426091/; *also see,* Ikeogu, Vidki. "Gov. Dayton Provides Harsh Criticism of Racial Tensions." *St. Cloud Times* (14 Oct. 2015), http://www.sctimes.com/story/news/local/2015/10/13/gov-dayton-provides-harsh-criticism-racial-tensions/73836696/.

3

five times a day from several of a half dozen[2] mosques, starting at 6:00 in the morning. Schools and city government offices now close on Muslim holy days[3] and regulations prohibit the sale of alcohol within 500 feet of any of the city's mosques.[4]

Hamtramck is a textbook case from the European experience: concentrated Islamic immigrant settlements, piecemeal accommodation, and incremental cultural concessions. We may not know the extent of the radical tendencies of the mosques in Hamtramck – mostly Bosnian and Bangladeshi extraction[5] – but if they follow the trends across America, the tenets of Islamic supremacist doctrine known as Sharia likely taught there do not uphold American principles of free speech, freedom to choose or leave a religion, separation of mosque and state, and equal rights for women.

Other American towns and cities may choose a very different path. While the following account is based upon a different religious contest, it shows that Americans are capable of coming together in resounding defense of community values. When the Freedom From Religion Foundation organization in Pittsburg, Wisconsin demanded that a post-9/11 "God Bless America" banner be removed from the town post office wall, fifteen hundred new "God Bless America" signs appeared all over town. Cars lined up for more than two blocks to pick up signs and banners but the supply was gone in forty-five minutes.[6] This community non-sectarian shout-out was irrefutable notice to any objector's attempt to suppress the town's show of cultural solidarity. This town may have lost the legal battle but it surely won the war of wills.

It is the responsibility of alert local citizens to plant the "land of the free; home of the brave" flag, and then fiercely hold the ground. Help is not coming from state or federal governments. Every time there is an impulse to apologize or concede a tradition, a reasoned and relentless counter-campaign is required. One lesson that should have been well-learned by now is that it is many times harder to regain ground lost – and then fortified – than it is to never let go in the first place.

---

[2] "Hamtramck, MI Mosques." *Yellowpages.com* (N.D). http://www.yellowpages.com/hamtramck-mi/mosques.

[3] Associated Press. "Hamtramck, A 12-Mosque Town in The Heart of America." *Daily Mail* (19 Jan. 2016). http://www.dailymail.co.uk/wires/afp/article-3406132/Hamtramck-12-mosque-town-heart-America.html.

[4] Bailey, Sarah P. "In The First Majority-Muslim U.S. City, Residents Tense About Its Future." *Daily Mail* (21 Nov. 2015). https://www.washingtonpost.com/national/for-the-first-majority-muslim-us-city-residents-tense-about-its-future/2015/11/21/45d0ea96-8a24-11e5-be39-0034bb576eee_story.html.

[5] *Ibid.* ("The city is about 23 percent Arabic, 19 percent Bangladeshi and 7 percent Bosnian.")

[6] Stavola, Michael. "Blessings - More Than 1,000 'God Bless America' Signs Given Away As Backlash Grows." *The Morning Sun*, Pittsburg, Kansas. (1 Feb. 2016), http://www.morningsun.net/news/20160129/blessings---more-than-1000-god-bless-america-signs-given-away-as-backlash-grows.

4

It may be startling to consider but Islamists are entitled to exploit liberal free speech rights to advance their political and legal operations. Up to the point that they illegally subvert American law or plan specific violent acts, they are free to coerce thought leaders by threatening public officials with charges of bigotry and intolerance name-calling. Americans are equally free and certainly entitled to employ freedom of speech in counter-offensives to challenge this narrative and thwart excessive demands.

Islamists do get away with covertly teaching Sharia compliance in many mosques. Even though they advocate an alternate system of rules and loyalties, no Western countries or states have conducted serious investigations into how widespread is this practice. The few substantive investigations have been undertaken by journalists and think tanks as exemplified by an undercover expose from Denmark where a subject Muslim woman is counseled in several mosques that "[s]he must not take a job without her husband's permission, and even if her husband continues to beat her, she must not contact the police."[7] A similar BBC undercover project in Britain showed a Sharia judge responding to a wife who complained that her husband was hitting her. The Sharia arbiter advised her to "be courageous" enough to ask whether her husband was upset by her cooking, or was it happening because she sees her friends? He cautioned the woman to only go to the police as a "very last resort."[8]

The resulting communal allegiance to Sharia rules defeats interest in joining American culture but Islamists also go further by claiming victimhood to gain societal privileged status. Examples of success at curtailing free speech, demanding unreasonable employer concessions, requiring public halal food service, and imposing affirmative action-like curriculum bias are just first steps if America is to follow Europe's path.

Government officials and judges will not stop these influence operations and, in many cases, they have no constitutional authority to suppress the sophisticated public relations campaigns. Other minority groups have little interest in competing with the aggressive Islamist agendas. Thus, if American culture is to be preserved, these Islamist strategies must be challenged in the neighborhoods and communities that will marshal necessary moral resolve and political will.

Community interest in whether new migrants or resident Muslims intend to meaningfully integrate must start at the mosque. The mosque is the heart of Islamic religious life and, beyond offering religious teaching, most imams provide the rules that govern family, professional, political, and personal life. For adherent Muslims, the mosque is central to everything

---

[7] Bergman, Judith. "Sharia in Denmark." *Gatestone Institute* (22 Mar. 2016), http://www.gatestoneinstitute.org/7648/denmark-sharia.

[8] "Panorama: Secrets of Britain's Sharia Councils, Part One, and Part Two." *YouTube/BBC* (22 Apr. 2013), https://www.youtube.com/watch?v=4gZCFdHkd4A, *and;* https://www.youtube.com/watch?v=tQ3PIhFHDdE.

5

that touches life. As former Muslim and Sharia jurist, Sam Solomon has noted: "A mosque is a seat of government. A mosque is a school. A mosque is a court. A mosque is a training center. A mosque is a gathering place, or social center. It is not just a place of 'worship,' per se, as worship only."[9]

When Muslims deny the separation between mosque and state that must underlie a legislative societal compact, there will be an inevitable clash between strict religious authority and representative-created law. Compounding this challenge, Islamic Sharia rules deny the vital attributes of self-determination and equal standing that must bind a democratic society.

As America faces increasing Islamic assimilation and radicalization challenges, the mosque is the baseline for those concerned about the clash of cultures. Either mosques and imams will become part of the solution as promoters of integration and disruptors of radicalization, or they will be increasingly recognized as part of the problem.

Whether or not law enforcement's role in surveillance of suspicious mosque activity is further questioned and re-characterized, communities will always have a unique responsibility to ask defining questions of mosque leadership. If communities do not set the expectations for integration and engagement, countries in Europe and Great Britain have proven that the consequence will be separate settlements that breed victimization and hostility.

Similar to the religiously-based groups that have confronted institutionalized scandals that also manifest as societal challenges, Muslim leaders must be held accountable. The Catholic Church and the Scientology organization provide recent example where the media, the public, and law enforcement forced internal issues out into the arena of general scrutiny and accountability. Any denominational religious organization in America that disrespects foundational human rights can expect pressure from outside forces. Why should Islamic groups be exempted? Was it any more "Cathlicophobic" to ask that church leaders confront sex sins than it is "Islamophobic" to ask Muslims to address dangerous radicalization advocacy?

Engagement should start when plans are announced to site a new mosque in town. Most cities have zoning rules but federal and constitutional law requires that planning commissions treat religious assemblies generously. Even with these relatively new advantages, religious groups still must provide honest expectations of the burden to be borne by surrounding businesses and homes. They also are required to comply with officials' final approval terms.

Giving more demanding religious groups favored treatment, or relaxed enforcement, undermines the rule of law. Islamic applicants are very experienced at leveraging political pressure, legal tools, and Department of

---

[9] "Sam Solomon, What is a Mosque?" at the 1:10 mark, *MRCTV* (11 Dec. 2011), http://www.mrctv.org/videos/sam-solomon-what-mosque.

6

Justice intervention in search of protected status. But this is where equal standards and consistent enforcement are critical. The "broken windows"[10] enforcement doctrine generally stands for the proposition that when minor infractions are not corrected for the good of the public order (like allowing taxi drivers to double park during prayer hours[11]), those illicit practices will be accepted as norms, and even larger violations will follow.

When mosques are sited in residential neighborhoods, there is special sensitivity to their meeting schedules that are more frequent, different in purpose, and more heavily attended than numbers presented at land use permit hearings. Questions have arisen as to whether unique characteristics of Islamic practices should be fully described for more clear predictability during the initial permit process. There are legal and constitutional protections against religious discrimination and unequal treatment – as compared to other religious and to non-religious assemblies – of religious permit applications. Yet zoning authorities should be equipped to apply adequate restrictions on conditional uses that represent an intolerable burden on areas, like residential neighborhoods, that are zoned primarily for other than assembly purposes.

Concerned residents often do not understand the limits on city planners or the deference that must be shown to religious organizations. Federal law now requires that state and local authorities consider religious land use applications as similar to generic assembly uses: some examples might be restaurants, theaters, buildings with meeting areas, or organized groups like Rotary Club halls. Thus, the process of noting distinctions between one and another kind of activity is complicated. Federal law also discourages municipal decisions that impose what the law considers to be a "substantial burden" on religious activity.

Based upon these issues, the public hearings for new mosques or expansions reflect frustration, uncertainty, and fear. Consequently, public comments are often confused and not focused on appropriate issues for official consideration.

In light of the consternation surrounding new mosque applications, this book is offered to provide an overview of applicable federal law, state regulatory power, and local zoning codes. It is also designed to suggest constructive roles for residents who will provide necessary oversight and

---

[10] Mac Donald, Heather. "How Broken Windows Policing Puts Fewer Men in Prison." *Time Magazine* (17 Dec. 2014), http://time.com/3638183/eric-garner-nypd-broken-windows-policing/.

[11] Licea, Melkorka. "Hundred of Cabbies Ticketed While Praying in Mosque." *New York Post* (26 Jun. 2015), http://nypost.com/2015/06/26/hundreds-of-cabbies-ticketed-while-praying-in-mosque/. (Taxi driver cited for double parking near the Islamic Cultural Center on Riverside Drive near West 72nd Street in New York is quoted: "This is a special prayer time, a time for religion. We double-park here every Friday and they [allow it], but today they gave us all tickets, almost 100 cabs.")

scrutiny. Islamic applicants have the same rights as any other religious organization but they also have the same responsibilities to follow the rules: from filing of a detailed application to providing accurate responses to city queries. Importantly, city officials should not be either intimidated or overawed by the controversy that may attend these hearings. All permits, especially those that involve variances or conditional uses, must be based upon adequate research and a fully participatory public hearing.

This guide will also address the growing concern over radicalization activities in mosques, as an increasing number of people (according to one survey, fifty-two percent across nine Western nations) say they are very concerned about Islamic extremism.[12] There is confusion over what roles law enforcement, local land-use officials, and private citizens may perform in response to this trend. And there is controversy over what are the most effective approaches to combat extremism from legal and political tactics to organized local resident efforts.

Americans have a unique window of opportunity created by committed and courageous Muslim reformers. Enabled by constitutional speech liberties, these reformers seek to hold local imams accountable to the Muslim Reform Movement's declaration for secular governance, free speech including criticism of Islam, and freedom to leave a religion (or to express fidelity to no faith).[13] Concerned citizens should seize this offer to partner with like-minded Muslims in defense of foundational constitutional principles.

As a constitutional law attorney, this author has testified at many city and county hearings, has litigated religious land use cases, and has learned the inestimable value of being able to quote America's patriotic Muslim leaders, like Dr. Zuhdi Jasser of the American Islamic Foundation for Democracy (AIFD),[14] journalists Asra Nomani and Hala Arafa,[15] author Irshad Manji, physician and "non-Islamist Muslim," Dr. Qanta Ahmed,[16]

---

[12] Poushter, Jacob. "Extremism Concerns Growing in West Especially and Predominately Muslim Countries." *Pew Research Center* (16 Jul. 2015), http://www.pewglobal.org/2015/07/16/extremism-concerns-growing-in-west-and-predominantly-muslim-countries/.

[13] "Support Muslim Reform." *Change.org* (2015), https://www.change.org/p/muslims-and-neighbors-we-support-the-muslim-reform-movement.

[14] American Islamic Forum for Democracy. http://aifdemocracy.org/.

[15] Nomani, Asra Q. and Arafa, Hala. "As Muslim Women, We Actually Ask You Not To Wear The Hijab in The Name of Interfaith Solidarity." The Washington Post (21 Dec. 2015), https://www.washingtonpost.com/news/acts-of-faith/wp/2015/12/21/as-muslim-women-we-actually-ask-you-not-to-wear-the-hijab-in-the-name-of-interfaith-solidarity/.

[16] Ahmed, Qanta. "Radical Islam Exists: Islamism IS The New Totalitarianism." *Investigative Project* (12 Feb. 2015), http://www.investigativeproject.org/4774/radical-islam-exists-islamism-is-the-new

All Islamists are incontrovertibly Muslim. Even so, the most numerous subjugates of Islamism, including its violence, are Muslims. Islamism is connected to Islam while representing no aspect of Islam. Islamism is connected to Islam at Islam's expense. Without Islam, there would be no

8

author Dr. Tawfiq Hamid,[17] Ani Zonneveld of Muslims for Progressive Values (MPV)[18] and Shireen Qudosi of CounterJihad.[19] The words of reasoned and conscientious Muslims leaders make it is very difficult for elected officials to dismiss concerns over Islamist agendas that would defeat the very efforts of valiant Muslim reformers. These courageous activists are the vanguard that challenges Islamism from within the socio-religious construct while they fight to bring Islamic practices in line with American constitutional standards.

Each of these Muslim leaders has an individual and unique approach to a belief system generally called "Islam." How they interpret and contextualize the teachings is a personal matter. As long as anyone - of any faith - stands squarely and faithfully on constitutionally prescribed principles, rights, and foundational liberties as demonstrated by emphatic public declarations and consistent conduct, they are free to choose personal beliefs. Freedom of conscience guarantees all Americans this right. Freedom of speech then gives all Americans the opportunity to debate and discuss perspectives on religious and political matters.

Like the Ahmadi Muslim shopkeeper in Scotland[20] who was brutally murdered after posting on Easter of his love for his Christian nation, some Muslims are happy to be part of Western societies. Some take great risks to declare for modernization as they courageously take on the cause of reform within their faith community. They may be the West's greatest hope in the campaign against Islamist hardliners. There is much that may be accomplished by uniting with them in defense of our neighborhoods and in the American cause of liberty, self-determination, and individual rights.

Some may turn to this book as concerned citizens and some may be municipal staff or zoning officials. In all cases, it may be a good idea to start by reviewing the Conclusion section for a survey of the content highlights and a summary of key points.

Karen Lugo, Esq.
November 2016

---

Islamism which steals both legitimacy and shelter from Islam. This parasitization is not to be blamed on Islam, but it is to be blamed on Muslims who are Islamists, and on Muslim patrons of Islamism.

[17] Dr. Tawfik Hamid, http://www.tawfikhamid.com/. ["I am a Muslim by faith ... Christian by the spirit ... a Jew by heart ... but above all, I am a human being."]

[18] Muslims for Progressive Values. http://www.mpvusa.org/ani-zonneveld/.

[19] Counter-Jihad. http://counterjihad.com/blackeid-youtube-censorship.

[20] Morgan, Tom. "Muslim Shopkeeper Murdered in Suspected Religiously Prejudice Attack After Posting Love for Christians." *Telegraph Newspaper*, London (26 Mar. 2016), http://www.telegraph.co.uk/news/2016/03/26/muslim-shopkeeper-murdered-in-suspected-religiously-prejudiced-a/

9

# 1: CITY HALL AND MOSQUE BUILDING PROJECTS

State governments are vested with the power to regulate land use according to police powers, or what is commonly understood as the regulation of state policy to further health, safety, morals, and general welfare of inhabitants[21] However, constitutional and federal law protections for religious assembly command higher status than these state powers and cities must recognize the supremacy of overarching federal laws. When politically savvy and financially capable organizations are prepared to appeal directly to the courts and federal agencies to gain the benefit of these protections, local agency proceedings will be scrutinized closely for balanced treatment and deliberative process. Dissatisfied minority-faith applicants and the Department of Justice Civil Rights Division may also initiate lawsuits over adverse land use decisions.

Although the overlapping legal layers appear daunting, there is a very important role for residents to play. And in order to provide oversight of the permitting process, concerned citizens do not need to be experts in zoning or religious land use law. Local residents must only invest the time necessary to monitor the process from start to finish, review the applicable zoning rules, and investigate the treatment of other similar applications. This simply involves research on the city or county website and attendance at hearings. Support projects may be organized according to individual interest and research may be assigned to volunteer committee members.

The real challenge for all involved in scrutinizing the zoning permitting process is to understand what role civil authorities are tasked to play and what part community members may play both inside and outside of the hearing procedures. Understanding the limits on local officials on one hand, and the tendency for some to act outside those limits when pursuing a personal agenda or bias on the other, is vital to the indispensible citizen role in oversight and input.

As mosque sponsor organizations have acquired experience and learned to anticipate land use procedures and the corresponding political component, they have become increasingly sophisticated in presenting applications to local government land planners. They often organize their membership along with subscribing interfaith community leaders to participate in a campaign that begins well before the application is filed.

---

[21] "Guide to Planning and Zoning Laws of New York State," *available at:* http://www.dos.ny.gov/lg/publications/Guide_to_planning_and_zoning_laws.pdf. (E.g., New York state law provides, *inter alia:* "Such regulations shall be designed to promote the public health, safety and general welfare and shall be made with reasonable consideration, among other things, to the character of the district, its peculiar suitability for particular uses, the conservation of property values and the direction of building development, in accord with a well considered plan.")

11

While this may be a legitimate part of the process, communities have begun to question whether officials always maintain proper objectivity. Of legal concern is whether officials apply the same inspection and verification rigors to these applications as they do the entire range of religious assembly applicants.

It is ironic that organized Muslim activists complain of disadvantaged treatment in the city planning process when many communities feel that officials seem predisposed to treat these applications favorably. Yet, the record shows that there is reason for both sides to have drawn these conclusions.

Some communities have staged highly emotional opposition to mosque applications without basing concerns in law and procedure. It is also true that some city officials have dismissed legitimate community input in what appears to be a rush to approve the mosque application. Confidence in these proceedings will suffer unless there is deliberation, transparency, full process, equal treatment, and reasoned dialogue.

*All* applicants for conditional – also called special or exceptional – land use permits bear responsibility to represent accurately the true nature, frequency, expected attendance and timing of activities planned. Otherwise, it is difficult to assess the appropriate restrictions and contractual conditions that formalize a permitted use. There is an important balance that local planners must find between accommodating a range of religious activities and allowing a very difficult mix of traffic, parking, and some cases of almost around-the-clock activity that burdens a surrounding community. It is important to anticipate the practical and real impact of the intended use and to provide code-based structure appropriate to the zoned area.

In short, mosque applicants lawfully should be treated in a manner that is equal to that applied to other religious organizations that are considered for permits to build or expand. Also of importance, Islamic applicants may not be given preferential treatment and regulatory processes should not be bypassed to avoid controversy.

While concerns over separatism and radicalization animate much of the focus on new mosque construction, *these issues are not within the purview of local officials*. These are very important cultural concerns and this manual will explain how they may be addressed in general at city hall and specifically in other community forums.

Concerned citizens must learn to express questions and reservations in a manner appropriate to the relevant civic forum's purpose. Land use officials act within a prescribed role that requires them to apply local ordinances according to state and federal statutory parameters. They are asked to interpret ordinances and engage deliberative reviews according to the goals of the municipality's Comprehensive Plan.

The following is an example from Portland, Oregon, of the broad goals of an overarching master plan:

12

Portland's 2035 Comprehensive Plan guides how and where land is developed as well as where infrastructure projects are built to prepare for and respond to population and job growth. All cities and counties in Oregon are required to have a Comprehensive Plan. Portland's new Comprehensive Plan addresses future development and describes how and when community members will be involved in land use decisions. It helps coordinate policies and actions across City bureaus as well as with regional and state agencies.[22]

The comprehensive master plan calls for district plans that specify the goals and directives of zoned areas. The zoned areas provide for uses that share common features like commercial, agricultural, industrial and residential. Some uses are called out and may exist by right in these zones. Others may be permitted, as conditional uses, if they meet a set of requirements designed to minimize activity that conflicts with the host zone's purpose and character.

Conditional use applicants especially bear a significant burden to demonstrate that the exact details of the application will conform to the requirements that govern their exceptional presence in an area not directly designed for them. City planners must be able to measure the likelihood that the applicants' use will be compatible with the already established rightful users.

The process is often so technical that many applicants hire professional expeditors to deal with the challenging details and prolonged timelines.

Religious groups are not exempt from these requirements and they must declare with methodical reliability the full range of uses, occupancy, parking and activities, even though federal law now does provide some special considerations for religious applicants. Minority religions are not granted an exemption from any part of this process.

---

[22] "City Council Proposed Comprehensive Plan Amendments Available For Review." *City of Portland* (2016), https://www.portlandoregon.gov/bps/article/569930.

13

## 2: Unique Mosque Application Controversies

Some city officials, including staff attorneys, come to the land use permitting process with little understanding of why community members may be concerned about the siting of a new mosque in town. When the land parcel intended for this religious use is in a residential zone, or near one, anxiety is often heightened.

Then, there are land-planning officials that have bought into the meme that, where there is Muslim separateness and supremacism, it is a justified reaction to vocal critics. Thus, citizens who note anti-constitutional practices and challenge the insinuation of Sharia practices into American policy-making may be considered the problem. This mindset is important to consider since it may result in a conscious – or unconscious – effort to tip the scales in favor of Islamic applicants.

Communities must anticipate both the under-informed and the already agendized city official when approaching city hall. If residents come with fact-based and relevant presentations designed to inform the process, officials are obligated to give them a. fair hearing. The key to effective advocacy is to know which issues are matters for city hall and how to express concerns properly.

Not all Muslims embrace Sharia socio-religious imam governance, but the numbers of "home grown" and immigrant Muslims that hold anti-constitutional views on such issues as freedom of conscience, women's rights, and free speech are very troubling. When Sharia-adherent mosques are central to Muslim life and culture, there are important concerns for American neighborhoods. As mosque-based life is communal to the degree that pious Muslims may be at the Islamic center most days of the week – sometimes for many hours in a day – and the lifestyle is cloistered to the point that participation is exclusive to Muslims, it is easy to see that integration trends will be heavily influenced by what is being taught in the mosque. Europe's example of separate and distinct cultures is a very troubling object lesson for Americans.

While the debate is joined as to whether the responsibility for balkanized Muslim communities lies with Western societies or with resistant Islamic Sharia subscribers, communities must deal with the practical challenges. Many local officials have no idea what to think about this conundrum and it is not their role to impose assimilation mandates. But they should understand when community concern is not based in bigotry but is a matter of residents attempting to promote awareness of the mosques that have been instrumental in perpetrating counter-American values. These residents also should be interested in hearing when any mosque leader proposes concrete, accountable, and trackable solutions.

15

The Muslim demographic that causes consternation is based in the twenty percent that responded to a Pew survey in 2011[23] by saying that Muslims should remain "distinct" from American society. This indicates resistance to integration and is reflective of those likely loyal to tribal custom, Islamic law, or Koranic doctrine rather than willing participation in secular civil society.[24] Just over half of American Muslims surveyed in this poll said that they supported assimilation into American society leaving roughly twenty-five per cent somewhere in between acceptance of American culture and remaining "distinct." If Pew Research's 2016 estimate that 3.3 million Muslims live in the U.S. were accurate, as many as a million and a half Muslims might be indifferent to, if not actually hostile to, assimilation. Another worrying data point is the finding of a 2012 survey that some fifty-eight percent of Muslims said that the First Amendment *should not* protect speech critical of Islam.[25]

Although Islamist advocacy groups like the Council on American Relations (CAIR)[26] consistently assert that Muslims in general are experiencing bigoted treatment as have other immigrant groups like the Irish, no other immigrant wave has exhibited so much intransigence, rejecting American societal underpinnings.

Furthermore, CAIR's credibility in speaking for American Muslims has been called into question by CAIR's record of connections to Muslim Brotherhood origins, distortion tactics, and known misrepresentations. From court rulings that document CAIR's troubling ties, to CAIR's pedigree, to the FBI's denunciation of CAIR, the pronouncements issued from this organization should be roundly questioned.[27]

---

[23] Pew Research Center, U.S. Politics and Policy. "Muslim Americans: No Signs of Growth in Alienation or Support for Extremism" p.1 (30 Aug. 2011), http://www.people-press.org/2011/08/30/muslim-americans-no-signs-of-growth-in-alienation-or-support-for-extremism/.

[24] Lugo, Karen J. "American Family-Law and Sharia Compliant Marriages. *The Federalist Society* Vol 3, Issue 2 (19 Jun. 2012), http://www.fed-soc.org/publications/detail/american-family-law-and-sharia-compliant-marriages.

[25] Wenzel Strategies. WND Survey of Muslim Americans. (28 Oct. 2012), http://www.wnd.com/files/2012/10/WenzelMuslimsQ8.pdf.

[26] Council on American Islamic Relations. http://www.cair.com/.

[27] Powers, Richard C. "Letter to The Honorable John Kyl." *The Investigative Project* (28 Apr. 2009), http://www.investigativeproject.org/documents/misc/265.pdf. (Assistant Director of the FBI for Congressional Affairs Richard C. Powers explained the FBI's decision to end cooperation with CAIR in a letter to Senator Jon Kyl dated April 28, 2009. In the letter Powers wrote: "As you Know, CAIR was named as an unindicted co-conspirator of the Holy Land Foundation for Relief and Development in *United States v. Holy Land Foundation et al.* (CR.No.3:04-240-P(N.D.TX.) During that trial, evidence was introduced that demonstrated a relationship between CAIR, individual CAIR founders (including its current President Emeritus and its Executive Director) and the Palestine Committee. Evidence was also introduced that demonstrated a relationship between the Palestine Committee and HAMAS, which was designated a terrorist organization in 1995. In light of that evidence, the FBI suspended all formal contracts between CAIR and the FBI."); *United States of America v. Holy Land Foundation*

16

Despite CAIR's pedigree, in 2016, the organization touted impressive numbers of consults with DC legislators and staff, as well as millions of dollars of earned media.[28]

Other Western countries are facing the same Muslim assimilation challenges, as well. For about half of Western European Muslims, and the number likely is higher for new refugees, attitudes are "somewhat" to "very hardened" against American and Western cultural foundations.[29] In parallel fashion, half of Britain's Muslims believe that homosexuality should be a crime.[30] This phenomenon is unique to the Islamic cohort that bases attitudes, politics, and practices in strict Sharia religious dogma. Sharia codes are especially uncompromising on matters of blasphemy (which conflicts with free speech guarantees that allow criticism of religion and religious figures) and apostasy (which conflicts with free choice of religion), including abandoning belief in Islam.

The challenge for American communities is to promote full assimilation that includes wholehearted embrace of key Western precepts like self-determination as expressed in the fundamental right to speak freely and the right to accept or reject any religion. Inquiring citizens should not be satisfied with vague platitudes about assimilation if there is no specific commitment to action. Americans cannot be shy about utilizing individual free speech protections to define the culture while framing

---

for Relief and Development et al. 3:04-cr-00240-P The United States District Court for Northern District of Texas, Dallas Division. *Judicial Watch* (01 Jul. 2009), https://www.judicialwatch.org/wp-content/uploads/2014/02/USA-v-HLF-Order-6282011.pdf. (Judge Jorge Solis grants in part a CAIR motion regarding its presence on an unindicted co-conspirator/ joint venture list, while noting: "The Government has produced ample evidence to establish the associations of CAIR, ISNA and NAIT with HLF, the Islamic Association for Palestine ("IAP"), and with Hamas. While the Court recognizes that the evidence produced by the Government largely predates the HLF designation date, the evidence is nonetheless sufficient to show the association of these entities with HLF, IAP, and Hamas."); In June of 2016, the D.C. Circuit Court of Appeals ruled that a case against CAIR's national office, brought by Muslims and non-Muslim plaintiffs, contained sufficient evidence of fraud that the lower court must investigate the record: http://www.americanfreedomlawcenter.org/wp-content/uploads/2016/06/Opinion-6-21-16.pdf; also see, Pipes, Daniel. "Is CAIR A Terror Group?" *National Review* (28 Nov. 2014), http://www.nationalreview.com/article/393614/cair-terror-group-daniel-pipes.

[28] "Watch: CAIR's Impact in Numbers." *Youtube.com; available at:* https://www.youtube.com/watch?v=4eaN0aUL3B4&feature=youtu.be.

[29] Koopmans, Ruud. "Fundamentalism and Out-group Hostility Muslim Immigrants and Christian Natives in Western Europe." *WZB Mitteilungen* (2013), https://www.wzb.eu/sites/default/files/u6/koopmans_englisch_ed.pdf.

[30] Perraudin, Frances. "Half of All British Muslims Think Homosexuality Should Be Illegal." *TheGuardian.com* (11 Apr. 2016), https://www.theguardian.com/uk-news/2016/apr/11/british-muslims-strong-sense-of-belonging-poll-homosexuality-sharia-law.

discussions on the vital points of conflict with what former British Prime Minister Tony Blair calls "a problem within Islam."[31]

Constitutional law scholar and self-described liberal Prof. Jonathan Turley characterized the fundamental conflict between Islamism and the West as based in individual rights: "[P]unishing apostasy (when a Muslim renounces Islam) is a 'red line' that separates a person from the free world. It is the most vile form of majoritarian tyranny and oppression [because] the right to choose your faith and the right to free speech is a human right not [only] an American right."[32]

Based upon this cultural crisis, concerned citizens have shown up in impressive numbers to speak at mosque construction permit hearings. The escalating rate of isolation and radicalization[33] occurring in American mosques – or, at least, not discouraged in many – is naturally a concern to any community contemplating a new mosque or mosque expansion.

However, rather than expressing alarm as hysteria, speaking to local government officials and media requires a strategic response based upon reason, facts, precedent, and the law. To date, much of what has been said at city hall podiums by activists is not relevant to the hearing and it falls on deaf ears. Even worse, some of what is said can be used to characterize the entire oversight effort as racially biased and ignorant.

It is true that the announcement of public hearings may provide opportunities for citizens to voice concerns but disconnected and off-point comments about Sharia, "jihad", and the Koran presented inside the hearing

---

[31] Blair, Tony. "The Ideology Behind Lee Rigby's Murder is Profound and Dangerous. Why Don't We Admit It? Tony Blair Launches a Brave Assault on Muslim Extremism After Woolwich Attack." *The Daily Mail* (1 Jun. 2013), http://www.dailymail.co.uk/debate/article-2334560/The-Ideology-Lee-Rigbys-murder-profound-dangerous-Why-dont-admit--Tony-Blair-launches-brave-assault-Muslim-extremism-Woolwich-attack.html.

[32] Turley, Jonathan. "Pew Poll Finds Overwhelming For Executing People For Apostasy in Afghanistan and Other Middle Eastern Nations." *JonathanTurley.org* (1 May, 2013), https://jonathanturley.org/2013/05/03/pew-poll-finds-overwhelming-support-for-executing-people-for-apostasy-in-afghanistan-and-other-muslim-nations/; *see also*, Fisher, Max. "Majorities of Muslims in Egypt and Pakistan support the death penalty for leaving Islam." *The Washington Post* (1 May 2013), https://www.washingtonpost.com/news/worldviews/wp/2013/05/01/64-percent-of-muslims-in-egypt-and-pakistan-support-the-death-penalty-for-leaving-islam/ ("[A]ccording to the 2013 Pew Research Center report, 88 percent of Muslims in Egypt and 62 percent of Muslims in Pakistan favor the death penalty for people who leave the Muslim religion. This is also the majority view among Muslims in Malaysia, Jordan and the Palestinian territories.)"

[33] Shea, Nina. "Saudi Publications on Hate Ideology Fill American Mosques." *Freedom House* (2005), https://freedomhouse.org/sites/default/files/inline_images/Saudi%20Publications%20on%20Hate%20Ideology%20Invade%20American%20Mosques.pdf; Kedar, Mordecai and David Yerulshalmi, "Mapping Sharia: Correlations Between Sharia Adherence and Violent Dogma in U.S. Mosques." *Perspectives on Terrorism* (2011), http://www.terrorismanalysts.com/pt/index.php/pot/article/view/sharia-adherence-mosque-survey/html; for abstract *also see*: http://mappingsharia.com/.

18

room can waste a valuable chance to hold officials to consistent application and enforcement of zoning rules. The history of these hearings in various communities shows that caustic comments, not focused on central and legitimate issues, only become fodder for the media and political Islamist groups to support accusations of bigotry and discrimination. Recent experience shows that the actions of injudicious activists who do not make this distinction will be used to fuel the impression with politicians, judges, and voters that Muslims are a persecuted group needing special privileges and protection.

With this caution in mind, there is a time and place, outside of "city hall," to voice reasonable community concerns about demonstrated radicalization trends, and assert community expectations regarding assimilation.

In reality, many mosques will be approved under liberal religious freedom laws and it is vital to recognize the congenial Muslim citizen who is not an Islamist, while identifying Islamist operators that advance radicalization. Most importantly, this is the time to seize opportunities to recognize the leadership of reformist Muslims that are working to recruit and train Muslims in the defense of the vital constitutional liberties essential to our civilization.

The audience at city hall is composed of two elements: the political decision-makers and the audience of interested citizens. When drama and theatrics overcome rational fact-finding and organized presentations, political instincts will prompt officials to default to withdrawal and detachment. Furthermore, legal obligations require officials to announce their objectivity when comments become overtly discriminatory.

The entire process – from application for a building permit to monitoring those mosques that are approved – benefits from oversight by a coordinated private citizen accountability group. Volunteer committees may be assigned to investigate all aspects of the regulatory process. These include: reviewing the zoning codes; researching and comparing prior approvals for similar treatment of other applicants; anticipating representations of event descriptions and activity levels; assessing safety concerns and impact issues; previewing comments to be presented at public hearings; and, preparing statements for other venues on radicalization countermeasures and assimilation concerns.

19

## 3: RELIGIOUS DISCRIMINATION: PREFERENCE FOR MOSQUES?

While Islamic groups may complain of community opposition, in some cases residents report that they encounter less bureaucratic resistance than other religious organizations seeking a worship site. It is true that there is often loud community opposition, but officials presiding over hearings and staff who prepare the recommendations sometimes are perceived as minimizing some regulatory processes.[34] This may also result from concern that the Department of Justice (DOJ) or the applicant may question adherence to regulatory rigors as the appearance of bias.

Islamic land use applicants often are prepared for the public relations part of the process and some have legal representation from early stages. As a minority group, Muslims are able to anticipate sympathetic intervention by the DOJ's Civil Rights Division for Religious Discrimination.[35] They are also adept at leveraging generous religious liberty legal protections that are available to all applicants, but not so assertively invoked by most.

A comparison of two recent cases, decided by essentially the same Minnesota mayor and city council, illustrates the potential for dramatically different results when a key federal religious land use statute is applied to benefit one case and ignored in the other. The first account details the application of Islamic Al-Farooq Youth and Family Center (AFYFC, also known as Dar al-Farooq) to use an existing school facility as a community center, school, and prayer space (mosque). The second profiled case describes the subsequent treatment of Resurrection Power Church, a black Nigerian Christian assembly, as this congregation applied to use a warehouse as a church.

It is critically important for any concerned citizen that is preparing to address a mosque land use application to read carefully these accounts.

---

[34] Pew Center's Forum on Religion and Public Life, "Controversies over Mosques and Islamic Centers Across the U.S." *Pewforum.org* (17 Sept. 2012), http://www.pewforum.org/files/2012/09/2012Mosque-Map.pdf (These profiles indicate community complaints addressing variance approvals for minarets, etc., conditional uses, insufficient environmental impact studies, and parking allowances. When reviewed, these issues generally survived judicial scrutiny but the complaints at hearings are often based in differential treatment as compared to other religious applications. These concerns usually do not become litigation actions unless the aggrieved party has the commitment, resources, and standing to file the complaint.)

[35] United States Department of Justice. "Religious Land Use and Institutionalized Persons Act." *The United States Department of Justice* (6 Aug. 2015), https://www.justice.gov/crt/religious-land-use-and-institutionalized-persons-act; *also see:* https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/rluipa_q_a_9-22-10_0.pdf.

21

These examples illuminate: how the process works; where there is need for oversight and accountability; how officials rely upon occupancy estimates from applicants to assess the burden on the surrounding homes or businesses; whether to restrict the occupancy permit for traffic, parking, and activity intensity; how the permitting agreement made between cities and applicants is expected to be binding; areas where enforcement should be anticipated; and, how elected city representatives ultimately must be able to rely on sound advice from staff attorneys, planning staff, and city managers.

In particular, the following profiles of religious land use permit applications should impress planning staff and officials with the vital need for: official training in religious land use law; insistence on detailed and accurate plans, renderings, and responses from the applicant; as well as, *enforceable* and explicit limitations as conditions on the use that will best provide for peaceful coexistence with surrounding community.

Naturally, the facts surrounding the following accounts of two religious sites differ in some particulars and the relevant zoning regulations vary in some aspects. But the public record videotape of the hearings, press accounts, and interviews with principal figures reveal a stunningly different approach by city officials as they considered the merits of the mosque and then the subsequent church applications. These case studies offer valuable insight into the institutional process, the political considerations and calculations, and the law that governs religious land use.

## CASE ONE: AL FAROOQ YOUTH AND FAMILY CENTER

In March 2011, Islamic Al Farooq Youth and Family Center (AFYFC; later named Al-Jazeeri Academy; also called Dar al-Farooq, or DAF) applied for a land use permit to renew the existing conditional use on a "quasi-public" site in a residential zone (R-1). Residential homes and a park surround the site that previously had been occupied by a Lutheran high school and separate evangelical church. AFYFC's application described the intended use as similar to the prior religious education functions: an elementary – private primary school, day care, and place of assembly/community center.

This section may seem to be highly technical and comprehensive but the details provided may supply useful context for planning officials and residents when contemplating similar cases. Whether it is a matter of asking more questions, providing additional and structural limits, establishing a review period, or working toward a municipal "safe harbor" measure that may shift heavy assembly uses away from sensitive areas like residential zones, it is important to start with facts and end with a realistic permit.

Testimony and applicant exhibits (CUP hearings are defined as *quasi-judicial* proceedings in most states) reveal that AFYFC planned to schedule evening lectures, fitness programs, on-site medical clinic services, weekend school for children (like "Sunday School"), and one Friday prayer service.

22

Ramadan observances were described as special evening prayers conducted between 9:00 p.m. and 10:00 p.m. nightly for the duration of the month-long observance.[36]

Even including the additional programs discussed with staff in early phases, there was little indication of the real range of activities planned, and the dramatically higher volume of participants that would immediately engage in the various AFYFC offerings. Readers will note that staff and planning officials based activity expectations, use limitations, and the final agreements on the testimony of AFYFC representatives. When accuracy in this part of the process failed, all regulations that followed were flawed.

Although some of the following statements are not included in the City of Bloomington "Synopsis" (some "City-approved minutes" of past meetings are no longer posted on the City website and a "synopsis" has replaced them) of the March 24, 2011 testimony by the AFYFC representative, the spokesperson for the institution emphatically stated that were no major changes planned for the building "from what it used to be [in the past]." He said that the weekend school would comparable to "Sunday School" and that the large gym will be used by the community at large although he demurred from offering a process for scheduling. The AFYFC spokesperson said that the large gym would be used by "50 – 100 members from 7:00 – 10:00 p.m. on weekends." He offered the community many assurances and addressed "Smith Park neighbors" to say that their interests would be included, an outreach committee would be established, and that the neighborhood would have access to the facilities, including a free weekend medical clinic (if approved by Planning Commission). He stated that leadership at the Center would "not tolerate any discomfort or inconvenience to [the Smith Park] neighbors" and he assured the community that AFYFC would promote good relations with them. At the conclusion, the spokesman apologized to local residents for overflow parking when the first "once in a blue moon" hospitality event drew "unanticipated" numbers of attendees and (reported 800-1000) cars.[37]

First, the application did not name the AFYFC assembly purpose as "mosque" use. Rather, this submission, consistent with most Islamic applications, described primarily community center and education purposes. The Friday prayer service was mentioned and appeared to be an incidental "chapel" interest. However, participation in Friday prayers has

[36] "City of Bloomington Staff Report: Conditional Use Permit for a Private School, a Day Care, and a Place of Assembly/Community Center." p.16, *Bloomingtonmn.gov* (24 Mar. 2011), https://www.bloomingtonmn.gov/sites/default/files/media/08915A_11.pdf.

[37] "City of Bloomington City Council Meeting for Review of AFYFC Permit Application," *YouTube* (24 Mar. 2011), discussion begins at appx. 21 mins. on the marker, https://www.youtube.com/watch?v=wi-9ci-gB3A&feature=youtu.be; *and*; "City of Bloomington Planning Commission Synopsis." p. 6, *Bloomingtonmn.gov* (24 Mar. 2011), https://www.bloomingtonmn.gov/sites/default/files/media/2507_032411pcs.pdf.

23

consistently been counted (per cars parked) at more than 500 attendees, rather than the maximum of 150 - 200 as submitted for the application record. Two consecutive prayer services were structured to relieve some of the parking overflow into residential streets.

The stated maximum of two hundred participants for High Holy Days (month-long Ramadan observances)[38], in reality, became attendance of well over a thousand at some services. These observances involved hundreds of cars coming and going *throughout the entire night* during the month of Ramadan. There have been heavily attended Eid ul-Fitr feasts, late night seminars, sports events, fundraisers, family festivals, and other widely promoted activities.

During the rest of the year, the site hosts ongoing regionally-promoted festivals and family gatherings, frequent seminars, coordinated – as well as unorganized – sports activities, a university administration office, university classes, concurrent weekend schools, and various other educational and social programs.

More accurate than the submitted AFYFC land use application, a YouTube video available for viewing during the hearing phase, promised "a full-time and hourly licensed Islamic Day Care Center, an Islamic Pre-School for Toddlers, an Islamic Weekend Academy, a Fitness Center for Muslim women, a state-of-the-art Multimedia Center, a Canteen, a full-time Islamic Elementary School, a Community Conference Room and a Prayer Room," as well as "educational lectures in multiple languages," and, "cultural, educational and athletic events and programs." Although the video was discovered as overuse problems grew at the facility, AFYFC management denied any intent to use the facility beyond what was described at the CUP hearing.[39]

Even AFYFC's own website advertised that it would be open "for all five daily prayers, Jumah prayers and evening lectures on Monday, Tuesday, Wednesday and Friday evenings after Salatul Isha."[40] In addition to religious prayer services and school sessions, the organization advertised regional adult education classes, sports leagues, family nights, area-wide tutoring,[41] and widely advertised all-day Saturday family events.[42]

---

[38] *Id.* at 14–16.

[39] "Al-Farooq Youth and Family Center." *YouTube.com* (29 Jun. 2011). https://www.youtube.com/watch?v=TwF7tRcjZv0.

[40] "Al-Farooq Youth and Family Center is Now Open." *daralfarooq.org* (2011), http://daralfarooq.org/index.php?option=com_content&view=frontpage; http://mosquesinamerica.org/wp-content/uploads/2016/10/40_AFYFC.pdf

[41] Al-Farooq Family and Youth Center. "After School Tutoring Program." *campaign-archive1.com* (2016). http://us6.campaign-archive1.com/?u=197ada357663d650727a8e00c&id=1f0018d6a4; http://mosquesinamerica.org/wp-content/uploads/2016/10/41_AFYFC_After_School.pdf

[42] Al-Farooq Youth and Family Center. "Shaykh Samir al-Nass Weekend Courses." *campaign-archive2.com* (23 August, 2013). http://us6.campaign-

24

Although parking restrictions included in the staff report, and affirmed by the final CUP Resolution, predicated the permit upon "strict adherence to conditions that would control any off-site or on-street parking on local residential streets,"[43] there has been consistent overflow use of residential street parking and double-parking in the lot. During Ramadan, residents report that street parking some days and evenings has extended for blocks in all directions. Some linked activities run through the night.

Of the hardships on the neighborhood, some of the worst are late night sessions, an example of which is a 10:30 p.m. fundraiser advertised during Ramadan in 2013. This meeting was planned and publicized to conclude at 2:30 a.m.[44]

The neighborhood park shares parking spaces and a field with AFYFC per a joint use agreement that was originally created to coordinate neighborhood and Lutheran school activities. On, or before, September 1, 2011, AFYFC was required to update the prior agreement to reflect new use patterns. This agreement, in part, coordinates annual sports field schedules and assures city residents access to the fields and parking space. When AFYFC instead deliberated and negotiated the joint use terms for years, neighbors reported that all spaces in the parking lot were taken when the AFYFC facility was in use, and the field use was not scheduled by the first-of-year deadline frustrating community planning for the fields. By 2016, residents were reportedly told by police that they were excluded from "Muslims only" areas at times that the agreement was invoked by AFYFC. These areas included the *public* parking lot.

One of the most egregious unauthorized uses of the property has been the addition of a university administration office and class meetings.

In the intervening years, residents have complained that the mosque was generating heavy and dangerous traffic, overlapping activities, call to prayer broadcasts at close of Ramadan, residential street parking, semi trucks parked on street and idling for hours, double- and triple-parking, parking in fire-lanes, intruders into neighborhood yards at night, cars blocking driveways, family picnics in neighborhood yards, heavy litter issues, consistent overflowing garbage preventing door to storage area from closing, rodent infestations, inadequate portable toilets, negligent grounds and retention pond maintenance, visitors coming and going when

---

archive2.com/?u=197ada357663d650727a8e00c&id=0d250624f8;
http://mosquesinamerica.org/wp-content/uploads/2016/10/42_AFYFC_Weekend_Courses.pdf

[43] City of Bloomington AFYFC Staff Report, *supra* note 36 at p. 4; *also see*, "City of Bloomington Planning Commission Synopsis." *Bloomingtonmn.gov* (24 Mar. 2011), https://www.bloomingtonmn.gov/sites/default/files/media/2507_032411pcs.pdf at Pp. 6-11; City Council Hearing Video, (24 Mar. 2011), item 3: https://www.youtube.com/watch?v=wl-9ci-gB3A&feature=youtu.be

[44] AFYFC fundraiser flyer. http://mosquesinamerica.org/wp-content/uploads/2016/10/44_AFYFC_Fundraiser_Flyer.pdf

buildings and parking lots are dark – and some nights, lights on late-and-all-night, regional weekend events without required permits, dumping of concrete and debris into berm on property shared with the city, improper disposal of asbestos, non-compliance with food service requirements, operation of an unlicensed restaurant, reckless (some due to taxis) driving, increasing police visits for burning of outhouses, etc., and frequent late-night-to-early-morning car and patron noise.[45]

## WHAT WENT WRONG?

This permitting process began as most do with the City of Bloomington planning department. Planning staff is tasked with reviewing applications and accompanying statements that answer questions about property use and occupancy. In this case, city staff applied the provisions of the Comprehensive Plan, the District Plan, and City Code for the specific zoned area, and staff then reported that the "proposed use will not create an excessive burden on parks, schools, streets, and other public facilities…; and that the proposed use was "consistent with other uses in similar locations and buildings throughout the City." Finally, "subject to Conditions of Approval, the proposed use will not be injurious to the surrounding neighborhood or otherwise harm the public, health, safety and welfare of the community."[46] Staff recommended approval of the application with conditions – or what could also be considered restrictions.[47] City staff reported during the council meeting session that they relied upon the applicant's statements indicating "200 expected maximum occupancy" to calculate the required parking provisions and to identify the venues and activities that were conditionally approved for the site.

The City Council, in turn, relied upon this set of staff recommendations when the members adopted all the research and recommendations to issue a final Resolution expressing the terms of approval for the CUP.[48] At the hearing, councilmembers noted in the presence of mosque representatives that AFYFC was in agreement with the final terms and conditions. The hearing video recording shows that the AFYFC spokesman affirmatively confirmed the projected attendance and parking numbers for the mosque and school conditional permit.[49]

---

[45] Many complaints, along with a record of City responses, have been chronicled on a resident blog: http://5yearsofcollectingdata.weebly.com/blog/about-the-restaurant.

[46] City of Bloomington Staff Report for AFYFC Application, Mar. 24, 2011, *supra* note 36 at p. 7.

[47] *Id.* at p. 6.

[48] "Bloomington City Council C.U.P. Resolution No. 2011-62." p. 3 (2 May 2011), http://mosquesinamerica.org/wp-content/uploads/2016/10/48_Bloomington_CUP_2011-62.pdf

[49] City of Bloomington City Council Meeting video, Mar. 24, 2011, *supra* note 43, at 21 minutes on the marker.

26

The CUP effectively created a contract with City enforcement power behind it. Thus, if the contract was breached or conditions violated, the City had the power to revoke the CUP. The very meaning of "conditional" in popular and legal use is that one thing is "subject to" the other; one action or inaction triggers another. All of this appeared to be a straightforward city hall transaction.

In this case though, there was another important contract that would also control the terms of the City of Bloomington's – and, possibly more intimately, the neighborhood's – relationship with AFYFC: a Joint Use Agreement (JUA) for shared city park athletic fields and a parking lot. The agreement pre-existed the AFYFC conditional permit and it was in place at the time that the CUP was granted to AFYFC. The CUP conditioned permission to operate at the site, and to share City facilities, on adherence to a September, 2011 deadline to update the JUA. However, the dramatically altered, re-negotiated, JUA was not signed until March, 2015 – three and one half years after the deadline.

These structural safeguards failed while neighbors report that they suffered inconsistent and lax enforcement of the CUP requirements as well as city ordinances. There was opportunity for some corrective language in the renewed JUA that would continue to govern the shared spaces in the athletic fields and parking lots, but the final contract, instead of updating the prior agreement, provided exceptionally lenient terms. Residents felt excluded from this process as it negotiated conditional late-night and all-night use, fluid terms governing field use, and serial warning and discussion phases instead of compliance measures.[50]

During the intervening five years, tensions have mounted, the facility went into foreclosure proceedings (although ultimately other Islamic investors purchased the property), and city staff speculated that the gas service had been turned off for non-payment. The new investors at the AFYFC campus did not indicate that closer attention would be paid to regulations or CUP requirements, and it was discouraging that some staff members that held positions of authority under the prior management kept the same or similar roles. Worst was the City's betrayal of resident trust and civic duty when the CUP was not enforced.

→ The month of Ramadan 2016 (all years have generated similar complaints) brought *all-night* noise that came with *all-night* cars and patrons coming and going, constant sessions, and days of activity with parking on the streets. For Eid ul Fitr, attendance at one service was estimated between 1500 and 2500, based upon the resident count of

---

[50] "Agreement Between The City of Bloomington And Dar Al-Farooq: Re: Smith Park and Dar Al-Farooq Property Improvements, Leases, Easements, Maintenance, and Use." (formally executed by both signatories on 3 Mar. 2015) (also known as Joint Use Agreement (JUA)) p. 7, http://mosquesinamerica.org/wp-content/uploads/2016/10/50_AFYFC_JUA_3-2-2015.pdf

upwards of 550 cars that were parked for five blocks around the mosque. Trash overflowed the storage area. Residents resorted to calling the police for cars illegally parked near driveways or fire hydrants. The call to prayer was broadcast into the neighborhood just before 7:30 a.m. One night during Ramadan, a resident confronted several youths after midnight. The boys had set up a driving course around city garbage cans on the shared parking lot. Police responded, and residents report that they were told they could not enter the parking lot when the public space was "for mosque members only" (according to the times that the JUA was activated by the use of certain facilities). Yet nothing in the JUA says that the public is excluded from public spaces, unless the question involves the contractually reserved athletic fields.

→ A City staffer noted in an email exchange that there were sixty-seven drafts of the Joint Use Agreement before it was finalized.[51] Although the CUP codified a hard deadline of September 1, 2011 for the updated use agreement governing terms of the shared parking and fields, the agreement was not finalized until early 2015, three and a half years late.[52] The protracted negotiations yielded permissive terms, incorporating all-night use of the shared facilities, to include lighting, as long as "permitted" (with no limit on number of permits). This updated JUA installed a protracted five-step – potentially more than a 120-day process – for addressing non-compliance. Even after a series of warnings (including "verbal"), negotiations, and penalty markers, the final steps leading to termination of the JUA for non-compliance were ordered such that corrective measures may be interpreted as conditional.[53]

A request was submitted for copies of any permit applications and authorizations for the subsequent Ramadan – and other – all-night activities, recreation, and sessions. Arguably, the compliance measures that control the combined use of these public spaces all hinge on the veracity the threshold verbal warning. If this initial step fails, the subsequent mechanisms may all be called into question.

---

[51] City of Bloomington staff email: "67 Versions of Joint Use Agreement." (10 Dec. 2014) http://mosquesinamerica.org/wp-content/uploads/2016/10/51_versions_of_Joint_Use_Agreement.jpg

[52] "Bloomington City Council C.U.P. Resolution No. 2011-62." p. 3 (2 May 2011), *available at* http://mosquesinamerica.org/wp-content/uploads/2016/10/52a_AFYFC_CUP_Resolution_2011-62.pdf; *and:* "City of Bloomington Study Meeting #42." City Approved Minutes, p. 7 (20 Aug. 2012), *available at:* http://mosquesinamerica.org/wp-content/uploads/2016/10/52b_2012-8-20_study_meeting.pdf

[53] Agreement Between The City of Bloomington And Dar Al-Farooq (JUA), Pp. 12,13, *supra* at note 50.

28

→ AFYFC advertised a Sudan-accredited Islamic university administrative center [54] (also called in various publications a "help desk" and "headquarters") and class offerings at AFYFC, some dismissing at 10:00 p.m. The 2013 spring class schedule shows seventeen classes scheduled at the AFYFC facility in clear violation of CUP terms.[55] A May 2016 course in "Modern Hadith" was scheduled to dismiss at 10:15 p.m.56 The website declares that "IUM is locally registered with the Minnesota Secretary of State as well the Minnesota Department of Higher Education as a degree granting institution" 57 but the Minnesota Department of Higher Education reports that this statement is inaccurate due to IUMN's "strictly religious" course content.[58] Of great concern to the community, the leadership at IUMN and some instructors have been reported to openly teach from Sharia-based curriculum[59] and some have been described as extremist.[60]

→ Double parking: During prayer and meeting times, the parking lot has been stacked with double-parked and triple-parked cars that unlawfully block emergency access.[61] The City acted to change City

---

[54] "Islamic University of Minnesota." Administration Page, *available at:* http://iuminnesota.com/administration/; see also in Appendix: "Islamic University of Minnesota Spring 2013 Semester Schedule." Note that 17 classes are offered at the AFYFC/DAF Bloomington campus in Rooms #101 – #105. (The City sent a letter to AFYFC in October 2013 stating that use of the site for a university was a violation of the CUP, yet an office, as well as various classes, some co-sponsored with AFYFC, continued to be sited at the facility.)

[55] "Islamic History Seminar." Also see, samples of notices for IUMN seminars offered at AFYFC facility in 2016: 8201 Park Ave., South, Bloomington, MN. *See* http://mosquesinamerica.org/wp-content/uploads/2016/10/55_IUMI_Spring_2013_Semester_Schedule.pdf

[56] "A Scientific Session in Modern Hadith." *See* http://mosquesinamerica.org/wp-content/uploads/2016/10/56_Scientific_Session_in_Modern_Hadith.pdf

[57] "Islamic University of Minnesota" accreditation page. *Available at:* http://iuminnesota.com/accreditation/.

[58] E-mail from Minnesota Department of Higher Education (27 May 2016), *See* http://mosquesinamerica.org/wp-content/uploads/2016/10/58_Email_from_MN_Dept_of_Higher_Ed_27May2016.pdf

[59] Dr. Hatem Ahaj M.D., Ph.D: http://www.amjaonline.org/en/dr-hatem-ahaj; http://www.thebuildingblocks.org/about-us/board-of-trustees.html; https://vimeo.com/channels/90830.

[60] Rossomando, John, "Islamic University of Minnesota a Hotbed of Extremism." *Investigative Project on Terrorism* (8 Apr. 2016), http://www.investigativeproject.org/5288/islamic-university-of-minnesota-a-hotbed#; "Islamic University of Minnesota." *Facebook.com* (N.D). https://www.facebook.com/Islamic-University-of-Minnesota-1591998911033844/timeline; "Organization Page of Dar-Al-Sarooq." (*sic.*) *Razoo.com,* (N.D), https://www.razoo.com/us/story/Dar-Al-Sarooq.

[61] Photos from AFYFC parking lot: http://5yearsofcollectingdata.weebly.com/blog/archives/02-2016.

29

Code regarding double-parking while the controversies at AFYFC were ongoing to generally permit double-parking citywide.[62]

→ Class III vehicles: Shuttle and school busses, delivery trucks and vans, semis, and auto transports, have parked at the facility and on the street although this is against City ordinances. Police responded that even warnings for this "violation" would not be a priority as the regulation was "intended" to address blight due to oversized homeowner vehicles.[63]

→ Parking and Traffic: Over more than four years, overflow curbside parking has been reduced to an average of a dozen cars on "routine" Fridays. Police have responded to complaint calls and have cited some cars parked on the street. But during the thirty days of Ramadan, festivals days, and regionally promoted events, parking limits have been exceeded with heavy street parking.

→ Public nuisance: In response to complaints, the City has presented a number of corrective notices to AFYFC on a variety of the issues that have plagued the neighborhood: trash in the holding/storm pond, trash and debris (e.g., PVC pipes, rusted goal posts, area rug, lumber, discarded fencing, snow fences) around the site – including the City Park – trash area metal doors left open, trash outside the holding area, ongoing lighting issues (property in use with no lighting, lights burned out, and lights on late into the night – and all night), and temporary signage that has remained months after the codified limits.[64] AFYFC has been fined for lighting violations only but no record of payment has been provided in response to records requests. There is no indication that penalties or fines were added for delinquency.

→ Property invasions: Police have been called for night-time intrusions into neighborhood back yards and other areas of private property.

→ Reckless traffic and bullying at playground: these anecdotal reports go to the heart of neighborhood concerns. One neighbor was involved in a

---

[62] Double-parking was a violation per City of Bloomington Code Section 8.155 and comments in the June 6, 2011 City of Bloomington Study Meeting Approved Minutes (see Appendix for p. 8). Yet, in April 2013, the City Code was revised per Code Section 8.08, *available at*: http://library.amlegal.com/nxt/gateway.dll/Minnesota/bloomington_mn/bloomingtonminnesotacodeofordinances?f=templates$fn=default.htm$3.0$vid=amlegal:bloomington_mn.
[63] October 26, 2015 Memorandum from Bloomington Police Department on low priority for Class III vehicle parking on residential streets. *See* http://mosquesinamerica.org/wp-content/uploads/2016/10/63_October-26-2015_Police_Memo_on_low_priority_parking.jpg
[64] City staff emails related to public nuisance, trash in holding pond, debris including goal posts, and discussion regarding the possibility that the City will remove goal posts: *available at:* Citizen Oversight Blog: "5 Years Later", http://5yearsofcollectingdata.weebly.com/blog/previous/2, see posts dated May 19, 2016 and August 5, 2016, down to about three-fourths marker on page.

30

traffic accident when a taxi darted around another vehicle and there
have been many pedestrian near-misses reported. Parents complain
that they cannot take their children to the playground after they have
been shooed off of playground equipment and threatened.

→ Dumping: Large chunks of concrete and debris were dumped and
buried in a shared athletic field creating an unpermitted berm in the
shared athletic field. The City performed at least surface clean-up on
the berm so that the grass could be mowed.[65] There is no record that
the City investigated the depth of the refuse site and no record that
AFYFC was charged for the partial remediation.

→ The City Council also discussed changing City Code to allow parking in
public lots past 10:00 p.m. (or 11:00 p.m. an athletic facility/field is in
use), but the effort was unsuccessful. However, the 2015 updated JUA
allowed AFYFC to have parking lot lights on, for the shared City lot, into
the night "when permitted." The AFYFC facility has been given license
to have lights on at the facility and the related AFYFC parking lots
whenever the buildings are in use.[66]

→ There have been resident reports of concurrent use of the gym for
AFYFC community events while the school and fields were also
occupied in violation of CUP terms. One example was gym use for
weekend school while a different academy session was offered
elsewhere on the campus, as well as a simultaneous carnival event held
on the field.[67] There has also been a general failure to schedule the field
and publish a calendar at the beginning of each year to coordinate field
use with the neighborhood.

→ Renting and profiting from the City fields has been a recurring issue
(apparently without required liability insurance). AFYFC was
instructed to not rent the athletic fields and yet continued to charge

---

[65] *Id.* See photos of the berm here: http://5yearsofcollectingdata.weebly.com/.

[66] Agreement Between The City of Bloomington And Dar Al-Farooq (JUA), p. 4, *supra* at note 50.
(The 2015 Joint Use Agreement between the City of Bloomington and Dar al-Farooq allows
extended night use (past 10:00 p.m., and no further limitation on end time) and permits
overflow into the City parking lot when a permit is obtained. Although, City regulations warn
that cars remaining in public park lots past 10:00 p.m. will be towed. A document request was
pending at the time this manuscript was published to learn if any such permit had been
requested by AFYFC or granted by the City.)

[67] Flyers announced a March 6, 2016 AFYFC Grand Opening beginning at 2:00 p.m.
(https://www.facebook.com/events/533984560106329/) when an Al-Jazari Academy
(separate from Dar al-Farooq Academy, DAFA) carnival began at noon, in apparent violation of
the CUP prohibition against concurrent use of the gym and school facilities. Residents reported
many hours of overlapping participation; also see photos of the festival bounce houses
installed by truck on the City field, apparently without the required permit, and in violation of
field preservation interests. *See* http://mosquesinamerica.org/wp-
content/uploads/2016/10/67_Grand_Open_House_Event.png

31

various teams and leagues fees, according to athletic coordinators. This has exacerbated the activity level issues and has also limited Bloomington resident use of the field. The summer of 2016 field calendar revealed that AFYFC had scheduled the shared field for near full-time use. The field was subdivided to allow more teams to use the venue, although there are careful provisions protecting the fields from overuse. To make matters worse, despite repeated requests, it was years before the City obtained evidence that AFYFC had purchased the JUA-*required* liability insurance for the field. The first evidence of insurance provided by AFYFC showed coverage beginning October 31, 2015 but, even then, AFYFC failed to include the City of Bloomington as "also insured." This violates the spirit of the Joint Use Agreement as well as City prohibitions against profiting from rental of public park space.

Neighbors have also reported that City staff has cleaned up the AFYFC parking lot and mowed the grass. One email from the City to AFYFC states that if an issue was not corrected that the City would provide a contractor to do the work. There was no mention of billing procedures to reimburse City costs.[68]

In July of 2016, a local attorney presented a petition of resident grievances to the City Council detailing the long list of community complaints for non-enforcement of the CUP limits, re-negotiation of the weak JUA terms, and advantaging AFYFC as compared to other religious organizations in Bloomington.[69] The neighborhood turned out and filled the hearing room. The conversation between the attorney and the residents continued with a question and answer session after the Council dismissed.

A proverbial line was drawn and Friends of Smith Park have demanded accountability. Although councilmembers did not comment immediately on the petition complaints, it will be up to the community to press relentlessly these serious concerns. Among the most egregious, was the demand for accurate and available minutes of City meetings. It is a foundational requirement in state and local law that original records must be archived and made available to the public, within a specified time period. Most cities and counties are required to take special care with records related to hearings, like a CUP proceeding. This is because there is

---

[68] See City staff e-mail discussion on cleaning up AFYFC grounds at citizen oversight blog, *supra* at note 64.

[69] "City of Bloomington City Council Meeting Video." (25 Jul. 2016). *See* public comment section at approximately 11:42 on the timer, and after two residents are denied the procedural step of yielding their time), http://bloomingtonmn.granicus.com/MediaPlayer.php?publish_id=8d3fe848-52d8-11e6-8170-f04da2064c47 and Hanks, Mike "Neighborhood Formalizes Complaints." *Sun Current* (Jul. 2106).

important *testimony* and official *findings* that must be recorded and preserved.

Finally, and this is not a matter that connects to City Hall, the AFYFC mosque has been connected to cases where at least nine Muslims radicalized to join ISIS. A lawyer and legal commentator who attended trial proceedings made these startling observations about the young Somali Minnesotans:

> Growing up Muslim, receiving religious education and attending local mosques – the Al-Farooq Youth and Family Center in Bloomington was mentioned frequently – the defendants appear to have needed little more than the videos supplied by ISIL to recruit them.... They had social lives centered on local mosques. They supplemented their education with Islamic studies. They are ungrateful for the good lives and conventional opportunities afforded them in Minnesota. They are all observant Muslims. They wanted to live under the caliphate declared by ISIL. They yearned to wage jihad and to die as Islamic martyrs. They hate the U.S.[70]

This mosque is in the Twin Cities area that consistently is mentioned when commentators list the most radical centers in America. While not generally a matter for consideration at city hall – the focus on this institution as a negative socialization factor does speak to the City of Bloomington's imperative duty to enforce fully CUP terms, city regulations, and state law – and the racialization fears that do weigh heavily on the community.

The difficult city hall process is chronicled below with a summary of comments that represent the exchanges between residents and city officials – and city officials and attorneys. This section is important to review for learning the critical need to confirm details in the application and the imperative concern for providing clear enforcement terms. (Some remarks were paraphrased to provide context. The footnotes provide sourcing to the city council or study meeting minutes, video or audio tapes, *Powerpoint* presentations, photos, emails, and news articles.):

### RESIDENTS' POINTS OF VIEW

A few residents appeared at the City Council meetings to comment regularly so what follows is a synopsis that serves to establish the continuity of the complaints heard from residents of the AFYFC neighborhood.

---

[70] Johnson, Scott W. "Somali-Minnesota Terror Recruitment: What I Saw at The Trial." *Star Tribune* (14 Jun. 2106), http://www.startribune.com/somali-minnesota-terror-recruitment-what-i-saw-at-the-trial/383038331/.

In response to many complaints about AFYFC, including issues like "hundreds of people come and go at all hours from the old high school building at Park Avenue and 82nd Street and that residential streets are clogged with parked cars ... too much noise and too much traffic,[71] the Bloomington City Council convened a public study session on September 1, 2012. This was one year past the deadline to have executed a contract with AFYFC for terms of the shared athletic fields and city parking lot.

Then, when the 2012 study session resolved little, this exchange shows that a year and a half later, the same complaints continued (there still was no agreement with AFYFC on the expired Joint Use Agreement (JUA)). Similar comments were made at most meetings between the dates shown below. These are merely samples:

April 21, 2014, City Council Meeting

RESIDENT ONE (summarized): Overflow parking in park lot and on streets is constant. City attorney says that basketball is legally protected [religious] outreach, but in the middle of the night? **The City does not have to allow basketball in the middle of the night!** Do we not expect all the other businesses in Bloomington to follow what they proposed? The CUP requires "sufficient off-street parking" but now City Attorney says there must be a trigger before City enforces. Now AFYFC wants to use the park lot for 40 – 50 late nights or all nights per year?[72]

RESIDENT TWO (summarized): AFYFC uses many blocks for street parking during Ramadan and attendees say 2000 participate. Ramadan parking is through the night until 4:30 a.m. on some nights. All parks' parking lots in the City should close at the same time. (No comment from City Council members or staff to either RESIDENT.)[73]

Editorial Comment: Almost three years after AFYFC took possession of the property, and continuous during the entire period, the activity, parking, and traffic complaints were of the same nature. In 2016, the concerns continued as reflected in the one sample below:

January 25, 2016

RESIDENT ONE – During Council meeting comment session, a resident presented data (repeat attempt as concerns had not been addressed) on

---

[71] Smetanka, Mary Jane. "Cities Tread Warily on Holy Ground: Bloomington and Other Metro-Area Cities Have Found That Restricting Religious Groups Is Dicey." *Star Tribune* (1 Sep. 2012), http://www.startribune.com/metro-area-cities-tread-warily-on-holy-ground/168230826/.

[72] "City of Bloomington City Council Meeting." (21 Apr. 2014), See appx. 29 mins and later at 42:30 on the marker, http://bloomingtonmn.granicus.com/MediaPlayer.php?publish_id=729dd983-1b18-1032-bfdc-23d7cb73de00.

[73] *Id.*

34

dangers to park users when AFYFC practices double-parking and potentially blocks emergency vehicles serving the public park, and showed how AFYFC dumping in the public athletic field diminished the park. The mayor and city manager admonished any speaker who would present repetitive concerns and the mayor informed this speaker that she would only receive a copy of previous responses.[74]

ANALYSIS:

Residents have had the same complaints for years. Over time, some councilmembers, the mayor, city manager and attorney became highly critical of citizen comments made at Council sessions. Some officials complained that the concerns were repetitive, giving rise to warnings that residents would not be allowed to speak on issues presented at prior sessions. On the other hand, some councilmembers were also on record noting the absence of religious animus in presentations of neighbor frustrations.

### CITY COUNCIL AND MAYOR POINTS OF VIEW

#### 8/20/2012 City Study Meeting

At the August 2012 public study meeting two councilmembers voiced concern: "If they're not going to obey the conditions, I'm ready to vote to pull the conditional-use permit," and "We're letting the neighbors down."[75]

COUNCILMEMBER ONE: **The City Council based parking limits on [AFYFC] numbers. [This is like] taking out a permit to build a bedroom addition that turned out to be a 10-room addition.** Then it is like saying, "Oops, I guess I lied. I guess I misrepresented what I was doing." Tough enough to make these decisions without the misrepresentations that were made. No one on the Council (including City attorney) would appreciate that kind of activity that is occurring at AFYFC across from their home.[76] Can I, as a homeowner, set up a hockey rink in my backyard with flood lights and bounce hockey pucks off the boards until midnight?[77] We said,

---

[74] "City of Bloomington City Council Meeting Video." See marker at 25:00 to 32:00 mins. (25 Jan. 2016), http://bloomingtonmn.granicus.com/MediaPlayer.php?publish_id=5b6ba654-c3e3-11e5-8170-f04da2064c47.

[75] Hanks, Mike. "Late Nights, Parking at Muslim Community Center Anger Bloomington Neighbors." *Sun Current* (15 Aug. 2012), http://current.mnsun.com/2012/08/15/late-nights-parking-at-muslim-community-center-anger-bloomington-neighbors/.

[76] City Council Study Meeting Minutes, Aug. 20, 2012, p. 4, *supra* at note 52. Comments not found in the Minutes may be located on the audio recording of the Aug. 20, 2012 study meeting at 1:14 on the timer: (URL here) http://mosquesinamerica.org/wp-content/uploads/2016/10/76_08-20-12sm1.mp3

[77] *Id.* at p.8.

'welcome to the neighborhood' but he broke the needle off in our backside.[78]

COUNCILMEMBER TWO: **We were assured time and time again that we had protections in the permit to stop this from happening.** What's concerning me is code violations. This weekend AFYFC visitors had picnics on neighbors' front lawns and residents who wanted to use the park were told they were not allowed to use the parking lot [by AFYFC members]. This community has a Neighborhood Watch program but hard to monitor activity when park is dark and people are sleeping in cars overnight [in AFYFC parking lot].  Today, there were all sorts of hand-painted signs put up on private property telling people where to park. If I put up campaign signs without permission, you would tear them down. I could go on and on ...[79]

MAYOR: It sounds like RLUIPA [federal law] has gone completely in one direction (against city zoning authority). (And, on the question of whether AFYFC was being unresponsive): It's interesting they're too busy to deal with the problems they're creating.[80]

<u>10/22/2012 City Council Meeting</u>

COUNCILMEMBER ONE: It is unrealistic to compare a one-day festival (addressing a typical church practice) with events such as Ramadan (lasting 30 days with festivals at ends). Facility (mosque) on Cedar Avenue violated its CUP but the City did nothing and it hasn't done anything about AFYFC. It hasn't and it won't and the City can't do much if it involves a church. When the City grants [CUPs like these], it gives away all of its authority to enforce conditions.[81]

MAYOR: We have been told that when there is excessive use or overflow problems, the City doesn't have the ability to discontinue or revoke the permit.[82]

ATTORNEY Response: City has the right to consider a CUP revocation when there is verified violation. But AFYFC parking issues [only] trigger need to provide more proof of parking [off streets].[83]

---

[78] *Id.; also see*: "Bloomington City Council Study Meeting Audio Recording" Part One (20 Aug. 2012), at approximately 1:15 on timer. (This statement would have appeared on page 4 of the Council-approved minutes, but it was not included in the final version of the minutes). http://mosquesinamerica.org/wp-content/uploads/2016/10/78_08-20-12sm1.mp3

[79] *Id. see* audio recording for Aug. 20, 2012 study meeting pt. 1, at appx. 1:24 on the marker. (This statement does not appear in the approved version of the minutes). http://mosquesinamerica.org/wp-content/uploads/2016/10/79_08-20-12sm1.mp3

[80] City Council Study Meeting Minutes, Aug. 20, 2012, p. 5, supra at note 52.

[81] "Bloomington City Council Approved Minutes." Pp. 6-7. (22 Oct. 2012).

[82] *Id.* at 7.

36

<u>9/23/13 City Study Meeting and discussion about CUP for Mt. Hope Church</u>

COUNCILMEMBER: "I see us punishing, probably a good church because we are all so paranoid at least I know I am. I look at these things and I say, 'Oh my God, here comes another one.' (This recognizes the restrictions imposed on other religious institutions in light of AFYFC abuses.)[84]

MAYOR: "If we go forward with this church they're going to be able to have services but they can't have day care and they can't do this and can't do that. My God, what did he (planning department) do, put the Al Farooq thing in the copy machine, and say here's the conditions?"[85]

<u>10/14/2013</u>

COUNCILMEMBER ONE: I remember spokesman telling us that if assembly exceeded 200 per assembly meeting, he would turn them away or would seek to find a way to shuttle members. I think that some parking estimates from police and City are grossly understated. When I observed in August (Eid, during Ramadan), there were cars were parked in all directions for blocks. (Answer from City Manager: This is no different than area churches and Holy Week, etc.; Response from City Attorney: **Mosque spokesperson's [attendance representations at the CUP hearing] were his "best estimate."**) They have far exceeded 500 in the gym.[86]

MAYOR: When is a special event a special event, or when is it a regular event? Is it 2, 4, 6, 8, 10 -- 20 times? That's where we have found ourselves in the unknown. Could we have anticipated this up front? Could we have defined it? Appears to be a fairly large number of special events regularly.[87]

COUNCILMEMBER TWO: When does a miscalculation become a misrepresentation? **This was brought in to us as a grade school, an elementary school, with a small prayer room. At the same time it was being presented to us as that, they were advertising on their website that this was going to be the largest mosque in the state of MN.** I mean, that's a flat out lie. You can call it a miscalculation; it's a misrepresentation. It's a lie. To say that we have no authority to back up our own CUP just tells me that you just wasted 20 years of my life – and that infuriates me, frankly.

---

[83] *Id.*

[84] "City of Bloomington City Council Meeting Video." (23 Sep. 2013), at appx. 4:31 on the marker, http://bloomingtonmn.granicus.com/MediaPlayer.php?publish_id=deed4eb7-7681-1031-bf4f-32d5966f69c1. (Year indicated under video is incorrect; see Agenda date on opposing page.)

[85] *Id.*

[86] "City of Bloomington Study Session Audio." (14 Oct. 2013), at appx. 3:00 – 3:10 on the timer. http://mosquesinamerica.org/wp-content/uploads/86_10-14-13ccsm.MP3

[87] *Id.* at 3:10.

37

(Attorney: You have no authority to amend [the CUP] at this point. We have learned a lot over the two-year-plus history working with this group. There are no violations of the CUP at this point. In every case, they have complied with City orders. There isn't a history of being a scofflaw.)[88]

### 7/28/2014 City Study Meeting

COUNCILMEMBER ONE: During discussion on whether to consult an outside attorney: There is an item on the [AFYFC] CUP that has been unfulfilled for three years.[89]

COUNCILMEMBER TWO: The Council is being asked to put some teeth in the enforcement process. It would be helpful to have more openness regarding how the facility is being used, as there is no practical leverage for the City to exert.[90]

COUNCILMEMBER THREE: The City needs to be able to respond to the needs of the community. There is no guarantee the JUA will be followed. What happens when a condition isn't being followed? How did the original CUP happen?[91]

### 10/21/2014 City Study Meeting

COUNCILMEMBER ONE: The number of users at AFYFC is considerably more than what they were three years ago when the agreement was made with them.[92]

MAYOR: Many people have expressed frustration with DAF; its structure and its management. There are [AFYFC] events listed on the internet that have not been reported by [one of the AFYFC officials] such as a restaurant with a menu and dollar amounts.[93]

ANALYSIS:

---

[88] *Id.* at 3:12:30 – 3:20:00. (Mayor comments that his notes on protracted JUA negotiations are "shame on us.")

[89] "City of Bloomington City Council Study Meeting Approved Minutes." p. 14 (28 Jul. 2014), *available at*: http://meetings.bloomingtonmn.gov:8080/agenda/cityofbloomington/286/UHJpdmF0ZSBNa W51dGVzIERvY3VtZW50/10/n/3912.doc.

[90] *Id.* at 10.

[91] *Id.* at 11.

[92] "City of Bloomington City Council Study Meeting Approved Minutes." p. 8 (21 Oct. 2014), *available at*: http://meetings.bloomingtonmn.gov:8080/agenda/cityofbloomington/314/UHJpdmF0ZSBNa W51dGVzIERvY3VtZW50/10/n/8231.doc.

[93] *Id.*

38

Several new councilmembers have replaced departing members on the council since this saga began. Generally, the frustration level with this matter has remained high: some members were exasperated with AFYFC's misrepresentations and lack of compliance with the law and other members eventually were annoyed that the same residents kept appearing at council sessions to enumerate the problems.

As with many intractable conflicts, the discrete harms were incremental; some were not significant if considered alone. But once multiple wrongs are allowed to accrue as here, the impact on the community is much the same as if the city had issued variances to allow the exceptional uses.

A number of neighbors, besides the few that consistently spoke at the podium, felt that the response to this series of challenges was an equal series of concessions, especially at these critical junctures: when City Code on double parking was conveniently changed to make it acceptable city-wide; when this group essentially was exempted from the *residential* norm that noisy group activity is concluded by 10:00 p.m. (with the understanding that traffic/parking, lights, and related noise ends by 11:00 p.m.); when consistent street parking was tolerated; when the frequency of, and attendance at, large events was well beyond what was anticipated; when neighbors reported that events during Ramadan stretch virtually through the night with perpetual in-and-out, residents felt that local government had failed to protect their family and property interests. First, the applicant had not accurately represented levels and scope of activities and then lacked commitment to comply with City and CUP regulations. Second, the City failed to uphold the agreements and regulations and, instead, adjusted the rules, norms, and agreements to accommodate the users.

Observers should also consider what would be the likelihood that other religious organizations would get a pass *for years* while officials tried to find solutions and engaged in protracted negotiations that resulted in a weakened oversight agreement.

The city attorneys, city manager, and parks director have provided context to show that some churches in Bloomington have also conducted large events and that there are annual well-attended civic festivals. But these comparisons do not represent the same kind of consistent heavy traffic, late hours, parking chaos, and periodic takeover of city park facilities that the AFYFC neighborhood experiences. The next section will demonstrate that the city attorney and manager are largely responsible for the confusion, delays and political paralysis.

CITY ATTORNEY AND CITY MANAGER POINTS OF VIEW

39

The city attorney is expected to provide legal guidance on the issues that elected city officials confront. This relationship vests a great deal of trust in the city attorney as well as a duty to provide reasoned advice before final action is taken by the Council.

The city manager is like a business manager and he or she also relies upon attorney guidance to inform decisions and to conduct management duties.

In this case, the city attorney has taken a risk-averse perspective to the AFYFC controversies. Arguably, her approach has privileged AFYFC compared to other religious applicants and institutions in Bloomington. When the City Council considered a subsequent church application, and a Councilman that had reached such a level of frustration that he opined that the Council was "punishing, probably a good church because we are all so paranoid," the attorney responded that the Council had learned not to rely on applicant statements, although "almost all" other applicants did honor what they said they were going to do.[94]

The advice provided and cases selected for justifying guidance to the Council did not represent adequately the full range of federal rulings, even in the federal Circuit jurisdiction for Minnesota. It is true that geographical regions are subject to appellate court rulings in the respective Circuit court district – unless the Supreme Court settles an issue – but federal caselaw on the Religious Land Use and Institutionalized Persons Act (RLUIPA)[95] is notoriously confused and specious rulings can be found to buttress almost any position.

It is always politically and financially safe to steer clear of Department of Justice inquiries and to avoid costly litigation. But city officials still have a fundamental duty to uphold local ordinances and permit conditions in a consistent manner.

A full discussion of federal law – chiefly RLUIPA – along with practical insight as to what elected officials and citizens may do to avoid government investigation or the litigation danger zone will follow in a later chapter. It is important here to note that in some instances the attorney appears to say that this federal law applies to permit violations and enforcement response, when the law's text and the subsequent rulings show that the law was written to protect religious groups during the highly discretionary

---

[94] Bloomington City Council Meeting Video Recording, Sep. 23, 2013, *supra*, at note 84; find discussion at approximately 4:15 on the marker; city attorney dire warnings on RLUIPA at 4:28. (Minutes have not been made available and the City-provided date of 23 Sep. 2012 under the video is apparently in error.), *available at:*
http://bloomingtonmn.granicus.com/MediaPlayer.php?publish_id=deed4eb7-7681-1031-bf4f-32d5966f69c1.

[95] 42 U.S. Code Chapter 21C – "Protection Of Religious Exercise In Land Use And By Institutionalized Persons," Legal Information Institute, Cornell University Law School, *available at:* https://www.law.cornell.edu/uscode/text/42/chapter-21C.

40

*permitting* stage. Once a permit issued, municipality authority to enforce the terms evenly is not questioned.

During the August 2012 Bloomington City Council Study Session, the city attorney provided a *Powerpoint* briefing on the applicable provisions of RLUIPA and warned councilmembers of personal liability and civil rights penalties if city officials were found to have discriminated against AFYFC (even during *enforcement* actions). The following are bullet points extracted from a copy of the slides (the substance is paraphrased if not in quotation marks):

- "Elected officials are often sued in their individual capacities. Costs could wipe out (municipal) insurance reserves." – and City insurance may not cover individual defense expenses if there is a known violation of RLUIPA. If insurance does kick in, premiums will rise.[96]

- "Decision-makers must disassociate themselves from opponents of the property use who are motivated by dislike of the religion."

- "Courts can impute the *discriminatory intent* of opponents to the decision makers." (Emphasis in original.) "This is particularly true if the land use approval is returned to the local board."

- "Never negatively comment on the religion's belief, practices, celebrations, national origin, manner of dress, or any other characteristic.

- For religious uses occupancy limits are set by the Fire Code safety limits. The limits are not enforced pro-actively – just in response to a safety concern for building occupants. The current occupancy limits only relate to parking capacity."

- "City code has no limit on hours of operation for any assembly. Some religious observances continue for days."

- "Adding conditions (to the CUP) ... may violate RLUIPA."

- "Although night-time parking in other parks is not allowed – it is allowed [for AFYFC] because of the joint use agreements. Prohibiting night-time use of the shared parking lots would violate the City's agreements for joint use. Therefore, nighttime use of these lots is allowed by the users of AFYFC."

- "A local law restricting the hours of operation for all places of assembly may violate the (RLUIPA) 'substantial burden' test."

---

[96] Bloomington City Council Study Session Audio, and Approved Minutes, Aug. 20, 2012, *supra* at note 76 (audio) and 52 (minutes) respectively. *Find* this audio discussion at approximately 58 mins. on the marker.

41

- "Requiring on-site parking capacity for peak periods during special seasons would pose a substantial burden (on a religious assembly and could trigger lawsuit)."

ATTORNEY: Representations of an applicant [documents and data submitted at formal CUP hearing to provide attendance, functions, and hours of use] are not enforceable. Unless a limitation (on activity levels, traffic, or parking) is in the CUP, what applicant said during Council deliberations is legally irrelevant.[97]

ATTORNEY: Under the terms of the pre-existing JUA, night use of the facilities are completely legal and there can be no prohibition.[98]

<u>September 23, 2013 City Council Meeting</u>
**ATTORNEY: Just remember with the RLUIPA lawsuit, here's what happens; They get punitive damages, they get attorney's fees, and they get whatever they want. This is probably your highest value lawsuit. And because the attorney's fees are paid for, there are attorneys fishing for these cases . . . because they are guaranteed to get paid. This is huge risk. The cases out there are truly frightening."[99]**

Editorial Comment:
The city attorney stressed the risk of a personal lawsuit for officials who deny a religious land use decision. Court cases just do not support this emphasis. When city officials act outside their designated authority, there is potential personal liability, but it is very rare that courts will penetrate the protections afforded public servants who are trying to perform their proper roles. The facts of the AFYFC saga do not provide reasonable support for this unqualified warning.

Additionally, there was little reason for the City to restrict night activities under the agreement with the Lutheran high school, and then Concordia High School, since night activities were minimal and only incidentally burdensome on neighborhood. And, the premise that night use must remain unrestricted per the terms of the original agreement was

---

[97] *Id.* at 57 mins. However, the March 24, 2011 AFYFC CUP Staff Report, *supra* at note 36, provides AFYFC documents that clearly show applicant-submitted data, including attendance and activity numbers, that became the basis for issuing the staff approval recommendations, as well as the conditions for the issuance of the final conditional use permit. http://mosquesinamerica.org/wp-content/uploads/2016/10/97_AFYFC-Staff-Report.pdf

[98] *Id.* at 52 mins. (Night activities, past 10:00 p.m. (or 11:00 p.m. final clear-the-parking-lot regulation), under the prior Lutheran/Concordia High School and Church use were extremely rare and comparatively much lower levels of participation.) http://mosquesinamerica.org/wp-content/uploads/2016/10/98_08-20-12sm1.mp3

[99] Bloomington City Council Meeting, Sep. 23, 2013, *supra* at note 84. *See* 4:28:30 on the marker.

42

undermined by the many other altered terms of the negotiated 2015 AFYFC Joint Use Agreement. Also, according to interpretations of RLUIPA, if AFYFC is permitted all-night use and unrestricted "night use" is "completely legal", other assembly applicants may demand the same treatment.

The Bloomington attorney stressed some extreme and unlikely hazards of disregarding RLUIPA terms, but she did not emphasize the fact that the limits in the CUP were responsive to AFYFC's own detailed application and testimony. Again, a CUP hearing is a *quasi-judicial* proceeding that includes both *testimony* and *findings of fact*. These formal processes should not be rendered sham spectacles by applicants that shirk factual presentations and answers.

Finally, when the city attorney attempted to justify overriding the CUP limits (e.g., the large gym may only be used by students during the times that there are school/day care activities, and only students may use the large gym and cafeteria when there are other on-site assemblies), as accepted at the CUP hearing by AFYFC, the applicant could reasonably conclude that much of the CUP was nullified by the much greater fire code attendance allowance that the attorney began to impose.

### 7/28/2014 City Study Meeting

CITY MANAGER: AFYFC can have their parking [lot] lights on all night if they want when they're in use. The question is if City refuses use of parking lot for overflow then they can legally park in the street (editorial: but this is in violation of the CUP).[100]

The reason that [legal opinions on the CUP] have been strung out are because there are neighbors that don't want the AFYFC in their neighborhood and staff has answered their questions over and over again.[101]

### 10/21/2014 City Study Meeting

ATTORNEY: Occupancy cannot be limited for a religious land use unless there is a health, life, safety hazard (editorial: although the CUP does provide limits through parking restrictions and occupancy of gym at 500). Neither can the City restrict nighttime use of a religious facility. Occupancy can only be limited by Fire Code and [the city attorney] had never heard of a Fire Marshall counting people as they entered a religious place of

---

[100] *Id.* at 13. http://mosquesinamerica.org/wp-content/uploads/2016/10/100_2012-Jy-to-Dc.pdf; http://mosquesinamerica.org/wp-content/uploads/2016/10/100_08-20-12sm2.mp3

[101] *Id.* at 14. (This is indicative of City Council reprimands of resident comments at Council meetings as warnings were issued that repetitive concerns would not be heard.)

43

assembly.[102] Traffic, parking, and intensity of use are not compelling government interests.[103]

Editorial Comment: This conclusion on the part of the city attorney implies that a religious group has successfully demonstrated with factual evidence that the government has imposed a substantial burden on it. However, this "burden" is subject to legal tests and is not based upon perceptions or complaints alone. And, this specific RLUIPA legal test applies at the time of the applicant's hearing; generally speaking, the test does not apply during the enforcement phase of a settled CUP.

The attorney stated that fire code limits are the only restriction that may be placed on a religious assembly (and also general assembly) use, but then she said that there is no procedure (other than a safety inspection) that would measure compliance and, therefore, trigger enforcement.

CITY MANAGER: The City has video and audio of the same people coming to the podium to complain about AFYFC, which puts the City in a bad position.[104] The CUP condition of having a new JUA in place by a certain date is moot.[105]

ANALYSIS:

What has occurred over time is that the City has accepted the city attorney's instruction that there may be no other limits on AFYFC occupancy of the large gym other than Fire Code (maximum) allowances of 1900 persons.[106] Thus, the CUP restriction on gym occupancy, and other spaces, was nullified. Parking findings in the staff report were modified accordingly to require acquisition of additional parking provisions to match occupancy. No official mention was made of traffic volume and impact on residential streets and homes. As these CUP rules were modified, did it not occur to officials that the core of the CUP had been hollowed out, and a revised or amended CUP, including legal notice and a hearing for neighbors, should replace it?

In the AFYFC case, the neighborhood never had opportunity to consider and respond to the adjusted CUP terms and negotiated rules provided to regulate the athletic field use and park parking lots. After all, neighbors were told from the beginning, by AFYFC and by the City, that the

---

[102] City of Bloomington City Council Study Meeting Approved Minutes, Oct. 21, 2014, p. 6, *supra* at note 92.

[103] *Id.* p. 7.

[104] *Id.* at p. 6.

[105] *Id.* at p. 7.

[106] *Id.* (The City Manager noted here that the CUP was tied to fire code capacity for the bleachers in the gym of 500, although full limits for the gym was 1900 occupants.)

44

usage of the property would continue as before. No changes. The neighbors were satisfied with this. AFYFC was required to report to the City on attendance, hours of events, and kind of events. AFYFC's data, submitted to a *fact*-finding body, became the basis for staff assessments of frequency and impact of the submitted reports. The neighbors trusted that these predictions would be accurate, and accepted them. The City used this data to formulate permit conditions and restrictions on use. The neighbors felt secure.

All subsequent regulatory modifications to accommodate AFYFC's dramatically higher activity have been City pronouncements that have functioned like City allowances. The neighbors have complained but they have had no meaningful input. In the final analysis, the planning staff's recommendations – as adopted by the City Council – for the approval of AFYFC's conditional permit, based upon "area, hours of use or operation, and limits[107] were rendered meaningless.

The de facto "full fire code" rule turned land use staff planning procedures on their head

Predictably, religious applicants, according to this Bloomington "full fire code occupancy" land use standard, will be held to meet parking capacity potential *as if they consistently* run full maximum capacity of the building. Using this logic, a religious organization applying to use a property that is rated for two hundred per fire code, but that has fifty attendees on average, with one hundred and fifty on Christmas and Easter, may be expected to qualify for potential parking space – even though not yet "triggered" – as if attendance is rated as two hundred.

It may be said that, as the City found a way to come to terms with AFYFC levels of activity and occupancy under fire code allowances, the same standard then had to be applied to all assembly uses going forward. Therefore, arguably, all applicants would have to qualify for what the City Council members described as "the worst case scenario." This conceivably limited options for religious organizations that desire to use a portion of a building and who cannot provide sufficient assurance that proof of additional parking will be available, or affordable, for maximum fire code occupancy limits.

In 2013, the City codified limitations on trips over residential streets such that new or *increased* institutional use (including religious use) of more than 300 additional trips per day or 100 additional trips per hour during peak times (at least once a week) – or the total of over 1000 trips per day – would be presumed incompatible with "residential livability and pedestrian and motorist safety" and only allowed with a City finding of

---

[107] City of Bloomington Staff Report regarding AFYFC, *supra* at note 36, p. 4.

sufficient mitigation.[108] With the declared opening of a university on the AFYFC campus, and if participation became the advertised one thousand students (in recognition of the attendant increased traffic burden), these standards arguably should have been considered. As stated in the AFYFC CUP, changes in "occupancy or building use" require City Council review and, if approved, an amendment to the CUP. At the point of this review, trip count rules might have been applied.

Incidentally, the City did send notice to AFYFC stating that use of the facilities for a university was not authorized. However, the office and various classes continued to be sited at AFYFC after the warning was issued.

Also, by allowing AFYFC the potential for so many burdensome events with so few restrictions, the AFYFC model provides legal precedent, under RLUIPA, for other assembly uses to expect the same kinds of rule changes and allowances that benefited AFYFC. The fire code ceiling on participants and frequency also solidified this precedent by affording all subsequent assembly uses the same mechanism. This is a cycle that is not easily broken once the applicant's own testimony detailing the type and intensity of use is delinked from the City-approved CUP license to operate.

Also, in theory, the full fire code "religious use" occupancy allowance overrides the 2013 trip count policy that the City of Bloomington attempted to implement restricting daily or hours-per-day entrances and exits in traffic-sensitive areas like residential zones. This policy also serves to limit the number of cars that may stack into a left-hand turn lane. But, how may a city limit the number of cars in and out of a driveway during a period of time when the fire-rated maximum occupancy guarantees approval for the building's maximum fire occupancy? To carry this rationale further, why even discuss attendance projections at a religious land use hearing when the decision makers may just proceed directly to fire code limits, as long as promised future parking spaces are assured?

If religious occupant non-compliance can be excused, why bother to conduct a CUP hearing and why have staff perform the studies examining the burden on streets, and injury to the surrounding neighborhood?

The attorney further instructed via a *Powerpoint* presentation that there could be no "proactive" fire code occupancy inspections and that the City would not count attendees at the door. She provided that occupancy might only be inspected in response to a safety complaint or concern.[109] One must then wonder how the limits are to be enforced, especially when an organization like AFYFC has papered over the facility's glass doors and entry area windows. It also is notable that Bloomington's Community

---

[108] Bloomington Code Sec. 21.302.06, *available at*:
https://www.bloomingtonmn.gov/clerk/city-charter-and-code-ordinances.
[109] Bloomington City Study Session Minutes, Aug. 20, 2012, *supra* at note 52, p. 3 of *Powerpoint* slide attachment.

Development Director advised planning officials that fire code occupancy varies according to the use of the room. Therefore, removal of walls (as neighbors suspected AFYFC had done) or an altered dedicated purpose for part of a facility ostensibly should trigger revision of the occupancy.[110]

A subsequent discussion will note that code-based zoning rules and enforcement may have been relaxed for AFYFC but they were in full force when the application for Resurrection Power Church was considered, and denied.

The city attorney also warned several times that defending and losing a religious land use lawsuit could mean responsibility for city legal costs in addition to paying the prevailing side's attorney fees and [punitive] damages, while insurance coverage would be in question. This was accompanied by the warning that elected officials are *often* sued in their individual capacities (but, almost as often, suits against officials in their individual capacities are removed from these cases).[111] This is a grave risk to present to political representatives who must account to voters. And, it may be overstated without proper context. In this case, the staff legal advice also strongly implied that city officials may not have normal immunity protections from lawsuit costs and damage payments to the complainant.

But the courts have not construed provisions of RLUIPA to mean that cities should refrain from enforcing generally applicable ordinances and reasonable permit conditions once the use permit was issued according to RLUIPA guidelines. There is no constitutional protection from the consequential force of law as long as constitutionally proper regulations are enforced in a lawful manner.

For the many attempts by councilmembers to suggest that a permit condition should be enforced, the city attorney had a legal reason to excuse infractions, many times based upon the opportunity for AFYFC to claim that imposing a "substantial burden" upon this religious organization would be legally indefensible.

As the Bloomington residents and city council members grew more frustrated with AFYFC's disregard for CUP requirements, the city attorney continued to advise deference to the group warning that "anti-Islamic comments" could be attributed to official hostility. However, a review of the record does not reveal anti-Islamic comments but only concern, and sometimes anger, over misrepresentations and violations of city code and the permit. In fact, City Council members on several occasions noted the lack of religious or racial animus behind comments.[112]

---

[110] Bloomington City Study Session Minutes, Oct. 21, 2014, p.6, *supra* at note 92.

[111] City of Bloomington Study Meeting Minutes, Aug. 20, 2012, p.5, *supra* at note 52.

[112] Bloomington City Council Meeting Video Recording, Sep. 23, 2013, *supra* at note 84. Discussion begins at appx. 4:29 on the marker. (This is an example of several discussions regarding whether there is animus behind citizen comments.)

47

Furthermore, it is the responsibility of city planners to put comments that are not germane to the civic land use process into context. City planners are expected to affirm their commitment to assess an applicant's qualifications, objectively and according to proper procedure. When public comments reflect personal opinion regarding the applicant's beliefs or practices, government officials should restate their focus on regulations and required procedures. They may remind commenters that productive statements are those relevant to the hearing business. But to suggest that comments should be restricted or censored runs dangerously close to violating First Amendment free speech rights.

Some judges have inquired when there is a notable record of community hostility surrounding a mosque permit hearing as to whether land planners were influenced by the atmospheric animus. When there is unusual delay or a denial, this question may arise. This does not mean that legitimate concerns should be muted, but it is important that speakers at the podium and in the audience bear in mind the defined purposes and limits of these hearings.

A resident who is irate over the unanticipated congestion and disturbance caused by many hundreds to over a thousand people flowing into and out of the neighborhood on a routine basis may simply be upset about the nuisance factors of noise and congestion. This is also the case with mega-churches. Complainers may not be expressing hostility to a group, but may just be upset that the community was not afforded opportunity to assess this eventuality. When a city is failing to enforce appropriate zoning regulations, exasperation may be aimed at city officials. The entire idea behind conditional use is defeated when the provisions for tailoring that use to the character of already established zone, and intended character of the area, are ignored.

Should the city impute "discriminatory intent" to a mosque "opponent" when the resident is just demanding that the city enforce explicit use and parking restrictions upon which the conditional use was originally granted? Is a frustrated resident out of order when questioning extravagant breaches of the conditional user's own projections provided for application purposes? Or, should resident outrage at the intentional planning of activities not even scheduled to dismiss until well after 10:00 p.m. be imputed to discriminatory animus?

The task of discerning how much of a speaker's angst may be attributed to frustration with unchecked exploitation of a use permit and whether any of it stems from pre-existing animosity towards the general group responsible for the overuse is formidable. This is the reason that the Constitution allows for robust free speech on matters of public concern.

At this point, it is important to understand that this area of Minnesota has long had a growing Muslim population and many neighborhood children grew up with – and befriended – Muslim children. Some that are

48

most disturbed today report that they were not at all concerned upon learning that the vacant school property would be occupied by an Islamic group. Residents remember being assured that the use would be much like it had been before, and there was only one resident who registered a written concern with AFYFC's original application. Repeated and excused breaches of the assurances, and the sharply contrasting treatment of another religious institution, understandably have undermined confidence in Bloomington land use governance.

### CASE TWO: RESURRECTION POWER CHURCH

About two years after the AFYFC CUP approval, on May 9, 2013, essentially the same city officials summarily denied the CUP application of Resurrection Power Church.[113] This forty-congregant non-denominational church was represented at the hearings by Pastor Eddy Udeh. The selected site was zoned as "industrial," but "assembly" use was allowed if conditional code requirements were met (CUP). Although the church had negotiated an agreement with the owner of the parcel, met with city staff to answer concerns, and worked to address the issues on the city planner's checklist, the city staff's answer was first a qualified yes, and then -- while the applicant was meeting staff demands in good faith -- officials reversed and declined the application.

Bear in mind, that this case is one of several religious land use applications considered in the years after AFYFC. This one was the first, and it provides clear contrast. There are others that also demonstrate the City's unusual treatment of AFYFC as compared to any religious case that was presented in the several intervening years.

For Resurrection Power Church, there was no mention by the city council or the city attorney of the RLUIPA obligations that government decision-makers must consider when evaluating a religious use application. Nor did anyone mention that the unique hardship this congregation suffered during an extended and confusing process – including the bewildering reversal from a qualified approval to a denial – may well qualify as "substantial" for the purposes of RLUIPA's concerns about uncertainly and delay. It did not appear that the pastor had an attorney present to raise these issues.

Just six months before the council voted to deny, permit approval was officially recommended for Pastor Udeh and his congregation. The owner of the larger parcel who intended to lease a warehouse to the church had assured the pastor that the warehouse had already received a 3-year

---

[113] "City of Bloomington City Council Meeting Video." (20 May 2013) See appx. 1:00 on the video marker, *available at*:
http://bloomingtonmn.granicus.com/MediaPlayer.php?publish_id=fd65ee4d-1310-1031-8b21-673bf20d68e3.

termed approval for what was considered an assembly use (by a youth soccer organization). All appeared to be going smoothly when the first city planning staff report, as presented to council on December 6, 2012, recommended approval for Resurrection Power Church. This approval was subject to normal conditions like a shared parking agreement and limitations on the use of excess warehouse space that was not needed for services.[114]

Not one, but two, staff reports recommended approval for the Resurrection Power Church application. The amended staff report provided on February 25, 2013 increased the number of conditions that the church would have to meet but Pastor Udeh was willing to address all concerns. He noted at the Council meeting that it would take 30 years for his congregation, at past rates of growth, to fill up parking spaces!

Yet on May 20, 2013, city council members gave "thumbs down" to the project citing myriad and speculative "what ifs": involving truck traffic (for an adjacent battery business warehouse even though the recorded agreement limited activity to hours different from the church), parking concerns, maintenance of an access point, and potential development of a freeway. Most of these issues were addressed in Pastor Udeh's proposal, including shared parking with back-up plans for additional overflow lots.[115]

Safety concerns, like co-existing with a neighbor tenant's delivery patterns, are similar to others that have been negotiated in various shared parking lot arrangements around the country. And any final questions about use of the warehouse space should have been satisfied when Pastor Udeh waived rights to use that space. Yet, the City still worried that a future user would revive the warehouse sectional use. If this concern were not simply a pretext to decline the CUP, a provision might have been included in the CUP terms for review, if, or when, the warehouse option was reconsidered.

One Councilmember surmised, "somebody else (i.e., a subsequent owner of the building) could totally abuse that site." The mayor added that

[114] "City of Bloomington Staff Report: Conditional Use Permit for a Place of Assembly in an Existing Warehouse Building." (29 Nov. 2012) and (25 Feb. 2013), *available at* https://www.pdffiller.com/24000056-10654A12pdf-Case-10654A-12---City-of-Bloomington-Various-Fillable-Forms; http://mosquesinamerica.org/wp-content/uploads/2016/10/114_Conditional_Use_Permit_Warehouse.pdf

[115] The Bloomington City Attorney risked legal jeopardy when causing legally qualified "delay, uncertainty, and expense" as mentioned in several presentations to the Bloomington City Council when discussing enforcement of the AYFPC CUP terms, but disregarded clear signs that "delay, uncertainty, and expense" may have constituted a indefensible "substantial burden" in the case of Resurrection Power Church. For example, the Seventh Circuit Court of Appeal found that the City of New Berlin caused a substantial burden when imposing "delay, uncertainty, and expense" by forcing the church either to sell its land and find another parcel or to restart the permitting process on the same parcel. *Sts Constantine and Helen Greek Orthodox Church Inc v. City of New Berlin*, 396 F. 3d 895 (7th Cir. 2005).

50

"this kind of use has proven to be unpredictable."[116] As this CUP did not have a term limit, councilmembers engaged in seemingly endless anticipation of worst-case scenarios. Rather than make a decision with clear terms that would be subject to review for non-compliance, the City effectively denied the application by declaring that this applicant or some future potential occupant – even if there was a revocable CUP in force – would not honor the contract with the City and local residents.

When the Councilmembers discussed a term-limited CUP as had existed for the soccer organization that was the previous conditional permit-holder on this property, the attorney ruled out the option as no longer available.[117] While a religious organization would expect a longer term than the three-year permit given the soccer group, Pastor Udeh likely would have considered a reasonable termed permit.

The Resurrection Power Church appears to have been punished for a prior applicant's (AFYFC) inaccuracy, insincerity, and eventual non-compliance when submitting plans and describing the scope of activities for a religious land use. Rather than give Pastor Udeh an opportunity to respect the terms of a CUP, the council just said no.

The City of Bloomington was on risky legal ground when projecting its distrust of AFYFC and the series of broken commitments onto Resurrection Power Church. Under RLUIPA, land planners may not discriminate between religious organizations. All come to the application process on equal footing. Presenting more hurdles to one group than another, like the requirement discussed for Resurrection of official traffic and site studies (not listed for AFYFC), also adds to a court's view that local government has acted in a "capricious" manner. Most importantly, speculating about how one group may violate CUP terms based upon the history of another group calls into question the warning in RLUIPA against making these procedural decisions in an arbitrary manner.[118]

---

[116] City of Bloomington Approved Minutes, Feb. 25, 2013, p.13 (These minutes were removed from the City website during a system change and have not been replaced. A data request has been submitted and the minutes will be posted when provided.)

[117] The City of Bloomington later offered a "CUP subject to six months review" to a religious applicant called Father's House in 2016, declaring that "if harm to neighborhood safety or welfare," the CUP would be revoked. "Bloomington City Council Meeting." (25 Jan. 2016), at appx. 57:00 on the marker,
http://bloomingtonmn.granicus.com/MediaPlayer.php?publish_id=4fd18265-1bd2-11e6-8170-f04da2064c47.

[118] "City of Bloomington Council Meeting Video." (20 May 2013), discussion at approximately 1:08 on the video timer; *available at:*
http://bloomingtonmn.granicus.com/MediaPlayer.php?publish_id=fd65ee4d-1310-1031-8b21-673bf20d68e3. One of the most significant congressional interests in RLUIPA was to prevent arbitrary local government decisions in religious land use cases. As in the Fortress Bible Church case where Second Circuit Court of Appeal found "that arbitrary and capricious application of land use regulation 'bolstered' a substantial burden claim," the unfounded "what if, and worst case scenario" speculation that supported the seemingly pretextual Bloomington

51

This speculation was in apparent contradiction to a constant reminder given the council members by their attorney that applicants often cannot accurately predict usage, and even if applicant lies, there is no recourse. Thus, in one case, if an applicant misrepresents or underestimates the number of attendees, number of cars, or intended activity level, the city will not hold the group accountable. But, in another case, the permit may be denied on sheer speculation that *somebody, someday* may *do something* not expressly permitted. One councilman summed up the City's decision to deny Resurrection Power Church's application when he declared that "the *potential* for problems was just too great" in this case.[119] (Emphasis added.)

Finally, as the city planner summed up his presentation as to why the church should be denied, he mentioned complaints against Resurrection Power Church's proposed use of the property but then only produced a single, vague, and uninformed penned note that expressed concern about parking if the church experienced "dramatic growth." This concern was overriding – even though this congregation had attendance numbers of thirty members on average for years!

Again, this worst-case scenario standard is not defensible and this church should not have been held hostage to the overuse of AFYFC. This unequal treatment and hostility to religious use is exactly what RLUIPA was designed to counter. Rather than choose the procedural and legal method of asking an applicant to detail the use wanted and then test that use against the zone setting and applicable General and District Plans and finally draft an agreement where the City agrees to the conditional use if the applicant accepts the reasonable restrictions, the AFYFC experience took the City of Bloomington off the rails and into the don't-even-bother-to-apply territory of worst-case-conjecture denials.

The City's overriding concern for safety also appears pretextual based upon the fact that the prior permit holder at the site was a youth soccer organization with predicted numbers of children moving through the parking lot. Furthermore, Pastor Udeh had agreed to a contractual provision for keeping separate hours from the nearby business to restrict traffic overlap. Additionally, the church had agreed to provide parking lot divisions if required.

---

City Council denial of Resurrection Power Church's application calls into question several RLUIPA protections; chiefly the question of "substantial burden," but also potentially implicating RLUIPA's nondiscrimination and equal terms provisions. *Fortress Bible Church v. Feiner*, 694 F.3d 208, 219 (2ⁿᵈ Cir. 2012); *Chabad Lubavitch of Litchfield County, Inc. v. Borough of Litchfield*, 2014 WL 4652510 (2nd Cir. 2014).

[119] "City of Bloomington City Council Meeting Approved Minutes." p.8 (4 Mar. 2013), *available at*: (These minutes were removed from the City website during a system change and have not been replaced. A data request has been submitted and the minutes will be posted when provided.) http://mosquesinamerica.org/wp-content/uploads/2016/10/119_March-4-2013_Bloomington_Council_Minutes.pdf

52

The City officials and attorney ultimately relied upon parking lot safety reasons to deny the Resurrection Power Church case but the attorney did not engage the important discussion as to the difficult RLUIPA legal tests that must be satisfied to defend this rationale. It is also interesting to consider that AFYFC was permitted to allow double-parking in the lots, arguably, a highly unsafe condition in an emergency.

This very situation illustrates why uses that are "allowed" in a zone not specifically designed for them may be permitted as *conditional* uses. The RLUIPA was passed to say that religious uses should be permitted on the same basis that secular uses are permitted. The array of zoning restrictions, conditions, and code requirements accompany permits to address the concerns of future abuse of permit terms. These restrictions and conditions serve to define what is allowed, what is not allowed, and stipulate that deviations from the terms require amendment or corrective action.

Under RLUIPA, when a city denies a religious use the city must take care to use the "least restrictive means" and courts have looked for good faith efforts on the part of cities to help religious organizations find suitable alternative locations if the city is inclined to deny the desired site. Yet, in the case of Resurrection Power church when the city planner was asked if alternate sites were available, he suggested that Resurrection Power Church consult the Realtor Multiple Listing Services to locate other options. He also advised that the church might consider sharing time with some existing school.

Finally, it is interesting to note in light of the evolution of this application from "likely to approve" to a flat denial, that another of the city attorney's slides at the August 2012 study meeting regarding the AFYFC infractions warned the council that "adding conditions and delaying the approval process may violate RLUIPA." This apparently was not a concern when Resurrection Power Church was the applicant.

To use the mayor's own words, it seemed that RLUIPA has gone "completely nuts" (but apparently only for the benefit of select congregations) – and, also in "one direction" (clearly not for all religious permit applicants).[120] In many cases, the federal RLUIPA law is ignored until invoked by either worried city attorneys or savvy applicants that have the resources and demonstrate will to fight.

In fact, RLUIPA was passed unanimously and signed by President Clinton for the very purpose of curbing what courts call "unfettered

---

[120] "Metro-Area Cities Tread Warily on Holy Ground," *supra* at note 71. (This article also contains a quote attributed to the City Attorney warning that "one of the most litigiously risky actions a city can do" is to "reverse a prior proposal, particularly in light of public protest ..." This admonition implies that official action would be responsive to public protest but it fails to qualify the aspects of public complaints that concerned violations of CUP terms and the City's duty to enforce those.)

53

discretion." This term describes the tendency of local government officials to apply regulations unequally or to make a decision based, at least in part, on personal bias. In order to prevent the political impulse of acting on whim or evidencing economic preference for non-religious land uses, Congress passed the RLUIPA for the very cases where local politician's "individualized assessments" are the basis for granting or denying applicants' religious rights. [121]

It may be that Pastor Udeh did not know of the powerful arguments that RLUIPA provides against discretionary local zoning decisions. On the evening of the official denial, Pastor Udeh spoke passionately from the podium. He told of how often he thanked God for the council and how he prayed for members every day. He spoke of "justice for all" and said he was puzzled by the inconsistent treatment. Understandably frustrated after months of working to clear changing hurdles, he was not even given uninterrupted time to express his disappointment. Instead, the mayor cut in three times to admonish Pastor Udeh to "get to the point."[122]

The irony present in the treatment of these two cases is inescapable when one considers that Christians at the time were under severe persecution in Nigeria by the Islamist Boko Haram. Pastor Udeh's heavy accent indicates that he has not lived in the United States for very long, and he must be aware of the high price that his Christian brethren in Nigeria paid to practice their faith. What a devastating blow it must have been to receive this dismissive treatment after spending sums of money and quantities of time to meet City of Bloomington demands.

Some religious groups just consider these defeats to be a manifestation of "God's will," and others who would fight often have depleted staff time and financial resources to the degree that a legal appeal is not an option. In contrast to the Islamic groups who bring attorneys to city meetings and who seek DOJ intervention, some other religious applicants seem to be unaware of the need for legal advice, whether the case qualifies for DOJ interest, or the possibility of pro-bono legal help.

---

[121] As President Clinton stated as he signed RLUIPA into law, it was needed to "protect the exercise of religion ... where State and local governments seek to impose or implement a zoning or landmark law in a manner that imposes a substantial burden on religious exercise." Statement on Signing the Religious Land Use and Institutionalized Persons Act of 2000. *Department of Justice* (22 Sep. 2000), https://www.justice.gov/sites/default/files/imd/legacy/2014/04/28/presidentialstatement-09-22-00.pdf.; The Second Circuit Court of Appeal said that RLUIPA applies when local government performs "a 'case-by-case evaluation' of a land use application, carrying as it does 'the concomitant risk of idiosyncratic application' of land use standards that may permit (and conceal) 'potentially discriminatory' denials." *Chabad Lubavitch of Litchfield County, Inc. v. Borough of Litchfield*, 2014 WL 4652510 (2nd Cir. 2014).

[122] City of Bloomington Council Meeting Video, May 20, 2013, *supra* at note 118, discussion at appx. 1:09:30 on the marker; *available at:* http://bloomingtonmn.granicus.com/MediaPlayer.php?publish_id=fd65ee4d-1310-1031-8b21-673bf20d68e3.

54

All religious organizations must seriously consider that if one group is garnering disproportionate attention and that this may afford local concessions: what is the net effect across the nation? If other religious groups are timid or reluctant to avail themselves of the legal and institutional help available, one group may be consistently advantaged. If all religious organizations began to assert the rights and protections offered by the First Amendment and RLUIPA in zoning settings, local governments would have to confront the realities of legal equal treatment requirements and would learn that preferential consideration given any group means that all other comers should obtain the same considerations.

No religious organization should expect to operate outside the legal limits placed on use terms so that there is "excessive burden on parks, schools, streets, and other public facilities," nor should the use be "injurious to the surrounding neighborhood or otherwise harm the public health, safety, and welfare."[123] It is important that area residents are able to predict government action if code terms are breached. The entire rationale for zoning is based upon providing communities some degree of predictable order, intra-zone standards that protect conditions favorable to the anchor use, and preservation of the right to peaceful enjoyment of one's property.

---

[123] Most municipalities apply similar language to the City of Bloomington Code Section 21.501.04(e) where each Conditional Use Permit must meet the following affirmative findings: The following findings must be made prior to the approval of a conditional use permit: (1) The proposed use is not in conflict with the Comprehensive Plan; (2) The proposed use is not in conflict with any adopted District Plan for the area; (3) The proposed use is not in conflict with City Code provisions; (4) The proposed use will not create an excessive burden on parks, schools, streets, and other public facilities and utilities which serve or are proposed to serve the planned development; and, (5) The proposed use will not be injurious to the surrounding neighborhood or otherwise harm the public health, safety and welfare. See the AFYFC City of Bloomington Conditional Use Permit Staff Report, *supra* at note 36. p.7, https://www.bloomingtonmn.gov/sites/default/files/media/08915A_11.pdf.

55

## 4: UNDERSTANDING ZONING AUTHORITY

For almost one hundred years, American cities and counties have worked to organize residents and businesses by grouping the most compatible uses of property into districts, or zones. The goal has been to preserve the character of these areas by keeping similar uses closely situated. Business, agricultural, industrial and residential zones then have their own categorical distinctions and technical guidelines.

Subsets of rules regulate potential annoyances like noise and pets as well as safety concerns like parking and traffic.

Under constitutional state police powers, state statutes provide the authority for cities and counties to regulate privately owned land and structures. Underlying the ability to regulate is the constitutional notion that a property owner should have notice and benefit of a public hearing when a decision that may affect his use and enjoyment of his property is proposed.

Land use decisions have become a time-consuming process and interested developers often pay substantial sums of money for expert assistance with bureaucratic demands and shifting timelines.

Many communities have established local planning boards that perform the first level of review. That board makes a recommendation to the city or county and then the staff begins an intensive process of checking off requirements as they are met, partially met, or noting those that fail. The planning staff subsequently issues a report to the city planners advising whether the use is appropriate for the zone requested. After one or more public hearings, there is often a vote taken of the appointed planning officials and in some cases a final vote by the elected city council or county official board of supervisors.

If a particular zone does not list the desired use as approved, applicants may apply to have "conditional" use considered. This process accommodates uses that are not recognized as approved per the zoning but thought to be compatible, if regulated, with area traffic flow and typical use and enjoyment of property.

In these cases, conditional uses may be approved for a few years to an indefinite period as negotiated and as per state guidelines. Most court rulings say that the permit stays with the property in the event of a change in ownership. Courts have also said that there is some level of property interest in predictable renewal of a short-term (e.g., two to ten years, or a term in between) conditional permit, unless substantive failure to comply with the permit limits is demonstrated. In all cases, a change in conditions and use may trigger a re-evaluation of the CUP.

In some cases a use not listed as permitted (as of right) or allowed (by conditional permit) may require a full variance or exception to the zoning

57

code. Many churches, temples, and mosques find no available sites in zoned areas since master development plans often do not place a high priority on religious facilities. Consequently these uses usually must apply for a zoning variance or a conditional, sometimes called "special," use permit.

Islamic, as well as other religious, groups have drawn attention for siting worship space in residential areas by obtaining an outright variance from zoning rules. Sometimes this variance application has been submitted after a private party purchased the home, stating intent to occupy, and then later an application was filed to convert the property.[124]

---

[124] Following is a sampling of controversies that involve mosques in residential areas: St. Cloud, Minnesota: Collins, Jon. "Mosque Proposal in St. Cloud Tabled After Hearing." *MPR News*, (14 Aug. 2013). http://www.mprnews.org/story/2013/08/14/news/islamic-center-st-cloud; West Chester, Pennsylvania: http://www.isccpa.org/uploads/1/0/6/7/10678234/iscc_brochure.pdf; Sheepshead Bay, New York: http://www.sheepsheadbites.com/tag/2812-voorhies-ave/; DuPage County, Illinois: Sabella, Jen. "Dupage County Debates Ban on New Religious Facilities." *Huffington Post Chicago* (27 Aug. 2010), http://www.huffingtonpost.com/2010/08/27/dupage-county-debates-ban_n_697290.html; Chino, California: Tasci, Canan. "Mosque Supporters Claim Chino Neighborhood Is Anti-Muslim." *Daily Bulletin* (17 Jun. 2013), http://www.dailybulletin.com/general-news/20130617/mosque-supporters-claim-chino-neighborhood-is-anti-muslim; Basking Ridge, New Jersey: Sadlouskos, Linda. "Mosque Traffic Expert Presents Case for Fewer Spaces." *Patch.com*, (6 Feb. 2013), http://patch.com/new-jersey/baskingridge/mosque-traffic-expert-presents-case-for-fewer-spaces; Edmond, Oklahoma: "Expansion of Edmond Mosque Causing Controversy." *KOCO 5 News* (12 May 2016), http://www.koco.com/news/oklahomanews/Expansion-of-Edmond-mosque-causing-controversy/15659760; Lomita, California: Green, Nick. "Lomita Mosque Files Religious Discrimination Suit Against the City." *Daily Breeze News* (21 Mar. 2012), http://www.dailybreeze.com/news/ci_20227062/lomita-mosque-files-discrimination-suit-against-city-nixing (Lomita, California, was zoned low-density residential then re-zoned to commercial-retail but still bordered on residential area); Temecula, California: Willon, Phil. "Temecula Approves Mosque after Contentious 8-hour Hearing." *L.A. Times* (12 May 2016) http://latimesblogs.latimes.com/lanow/2011/01/temecula-approves-mosque-after-contentious-8-hour-hearing.html; Sterling Heights, Michigan: Martindale, Mike. "Residents Protest Planned Mosque in Sterling Heights." *Detroit News* (12 May 2016). http://www.detroitnews.com/story/news/local/macomb-county/2015/08/29/residents-protest-planned-mosque-sterling-heights/71380634/ (this mosque proposal generated additional controversy due to the Islamic organization's plan to locate in a predominantly Iraqi-Christian community); Lexington, Kentucky: Wymer, Garret. "Project Leaders Respond to Concern over Proposed Islamic Center in Lexington." *WKYT* (12 May 2016), http://www.wkyt.com/home/headlines/Neighbors-concerned-over-proposed-Islamic-center-in-Lexington-288463121.html. (The project's architect told neighbors that there will be no changes to the house at the front of the property at this time, but the plan does leave open the possibility for construction of a mosque on the property in the future."); Afton, Minnesota: Divine, Mary. "Afton City Council Signs Off on Plans for Mosque in City." Twin Cities Pioneer Press (19 Apr. 2016), http://www.twincities.com/2016/04/19/afton-city-council-signs-off-on-plans-for-mosque-in-city/; Yonkers, New York: Maciaszek, Amy. "Yonkers Mayor Agrees To Landmark Status For Building Housing Mosque." *Yonkers Daily Voice* (31 Mar. 2016), http://yonkers.dailyvoice.com/politics/yonkers-mayor-agrees-to-landmark-status-for-building-housing-mosque/663379/; Kerr, Zak."Community Meeting Addresses Mosque."

A New Jersey residential single-family home purchase serves as a case in point. When the private purchase of a home in the Basking Ridge neighborhood of Bernards Township was transacted, residents were not alarmed. But as neighbors learned that this Church Street home in the Liberty Corner district was to be razed and a full-service mosque (five daily prayers) was planned for the site, they organized to investigate the process. This area is one of special sensitivity due to the loss of Liberty Corner firefighters on 9-11. The township council ultimately denied the proposal for reasons of non-compliance with code requirements almost three years -- and many hearings -- later. In response, the Islamic applicants sued, and the DOJ investigated. Neither proceeding had concluded at the time this book was published.[125]

---

*Windemere Observer* (25 Mar. 2016), http://www.orangeobserver.com/article/community-meeting-addresses-mosque; Champion, Allison Brophy. "Freeze on Permanent Pump & Haul in Culpeper County." *Star Exponent* (16 Jul. 2016), http://m.dailyprogress.com/starexponent/news/freeze-on-permanent-pump-haul-in-culpeper-county/article_735b0868-4b83-11e6-93a6-ffa2860f16db.html?mode=jqm.

[125] Perry, Jacob. "Numerous Documents Sought in Basking Ridge Mosque Case." *The Bernardsville News* (15 Jul. 2016), http://www.newjerseyhills.com/bernardsville_news/news/numerous-documents-sought-in-basking-ridge-mosque-case/article_42c29ef2-fdbb-575d-a655-07719cbf8592.html.

## 5: Is RLUIPA Always a Trump Card?

As "smart growth" goals began to drive local planners, allocation of land for religious use became a low priority. Because religious buildings and worshippers do not produce either jobs or taxes – while creating traffic, congestion, and parking concerns – it was easy to just leave them off of the grid.

Responsive to complaints that houses of worship were being squeezed out of residential and commercial areas, a federal law was enacted in 2000. This statute, the Religious Land Use And Institutionalized Persons Act (RLUIPA) prohibits outright exclusion of religious worship sites from a municipality. And the law provides that government shall not "impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution."[126]

Government may overcome RLUIPA provisions if it can demonstrate that the "imposition of the burden on that person, assembly, or institution is in furtherance of a compelling governmental interest." As courts have only rarely recognized a governmental interest so compelling that it overrides individual constitutional rights this is a formidable threshold to meet. Examples of recognized governmental interests that survive this test would involve national security or police power duties. Complaints of heavier traffic, congestion or parking often do not qualify as so compelling that the choice of a worship site can be foreclosed by a city planning analysis or zoning ordinance.

If government does impose a substantial burden on a religious institution, courts will ask that the government body justify the hardship by proving that it had a vital reason for the regulation, and that the rule was refined to the most essential expression; in other words, the burden on the religious practice must be as light as possible while government maintains its core duties. In legal speak this is called "narrow tailoring."

As interpreted by many courts, RLUIPA also prohibits discrimination among religions and it instructs against selection of a religious use in a given zone for different treatment than one not religious. An easy example to consider is that a zoned district that permits theaters, social membership clubs or recreation halls as a general assembly use usually means that a religious use should be considered on a similar basis.

---

[126] "Religious Land Use and Institutionalized Person Act." *Thebecketfund.org* (2016), http://www.becketfund.org/rluipa/; and: "ACLJ Memorandum: An Overview of Religious Land Use and Institutionalized Persons Act –RLUIPA." *Americancenterforlawandjustice.com* (2004), http://aclj.org/us-constitution/aclj-memorandum-an-overview-of-the-religious-land-use-and-institutionalized-persons-act-rluipa-2004.

RLUIPA was constructed with broad terms that are responsible for some of the difficulties in interpreting and applying the law. The vague standards meant to pave the way for religious worship sites have also opened the door to potential manipulation by applicants, land planners, and their advisors.

It is very important to know enough about the law to be able to recognize when planning departments are preparing to give so many allowances to an applicant that the very structure of the zoned area is at risk. If attorneys, commissioners, or land use staffers appear to be presenting RLUIPA as if it were meant to overcome zoning authority or remove accountability from the religious applicant, it may be a good idea to invite a lawyer with RLUIPA background to analyze the official pronouncements, and possibly make a presentation. Some commissioners have been tutored on RLUIPA while others have not. There are few experts on RLUIPA, even in the general lawyer community. In many cases, officials have appreciated a second opinion on the complex law.

When families come to a residential zone, they can expect that the zone was designed for quiet and safety as reflected in the comprehensive and district plans. Churches and other houses of worship should be allowed as long as there is a plan, usually with conditions attached to the use permit, to protect the overall residential use and enjoyment priorities.

Only a small percentage of judges have construed RLUIPA to mean that religious applicants should have almost any kind of use and level of activity as long as comparable to any other loosely-defined assembly use similarly situated in the zone. Conversely, most judges have tried to strike a balance under RLUIPA, one that allows planners to customize permits, while incorporating religious use, but not entitling the religious institution to function like a nuisance-bearing activity center.

One aspect of the RLUIPA that has been particularly challenging for cities is the definition that Congress provided for "religious exercise." Using a very broad brush, the law says that "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" is protected. In other words, depending on the judge, even social activities, sports, secular education, communal eating, etc., may be considered "religious exercise" for purpose of challenging zoning restrictions.

Localities should also consider what is called "safe harbor" policy by allowing for assembly (clubs, community centers, meeting halls, theatres, auditoriums, recreational facilities, etc.) and religious use with relaxed restrictions in the areas most hospitable to the activity and traffic.[127] Cities

---

[127] Seeman, Evan J. "Finding Salvation in Religious Law's Safe Harbor: Municipal Governments Can Take Steps to Mitigate RLUIPA Claims." *Connecticut Law Tribune* (23 Mar. 2015), https://rluipa.robinsoncoleblogs.com/wp-content/uploads/sites/9/2015/04/Reprint_Seeman_032315.pdf; *also see* this article describing Minnesota federal case where judge recognized RLUIPA safe harbor practice:

would then have more latitude to restrict additional religious use in zones like residential without appearing to generally exclude religious sites. These provisions should be considered as a matter of normal routine for updating district plans since any such activity during a religious application hearing may be construed as targeting a particular applicant.

In cases where there is concern about the predictability of the use, the accuracy of the application, or overall compatibility with the surrounding area, cities sometimes grant a shorter-term conditional use permit for a period of initial years. At this juncture, it is important just to learn that many religious applicants have received initial CUPs for seven or ten-year terms and then have applied for renewals upon demonstrating an effort to comply with the regulations and conducting their affairs in a manner that is compatible with the occupants for which the zone was created.

Some courts have ruled that there is a legally protected property interest in an extension of the term-limited use permit but violations of the terms and demonstrated disregard for the conditions would allow for challenge of this property interest. This approach is described in more detail later but it is an important tool to have available when searching for constructive approaches that may still meet RLUIPA provisions.

All of this is somewhat complicated and requires education and official training. This is the reason that the DOJ requires that entire city planning departments participate in RLUIPA training as part of some legal settlements. Accordingly, it is best to have training and any safe harbor plans in place before an applicant presents a legal challenge that leaves a municipality with only difficult options. Finally, it bears repeating that these strategies may not be inserted in the middle of an application process in light of potential discrimination complaints.

---

https://www.rluipa-defense.com/2016/09/rluipa-case-of-the-year-minnesota-municipality-uses-rluipas-safe-harbor-provision-to-avoid-liability/?utm_source=RLUIPA+Defense&utm_medium=email&utm_campaign=f73dfc0e2f-RSS_EMAIL_CAMPAIGN&utm_term=0_baf0b0c430-f73dfc0e2f-172974469.

## 6: WHAT COURTS HAVE SAID ABOUT RLUIPA

This basic overview, highlighting the range of judicial opinions on what RLUIPA terms mean, is very important for the concerned resident, as well as for municipal land planning staff. Religiously based permit decisions will be governed by local ordinances, and local interpretation of the governing state, federal, and constitutional law. Many city attorneys and managers who argued in the past that the protections for religious land use could be overcome by zoning priorities are now understanding that religious organizations are increasingly likely to complain about RLUIPA-defined declines or delays. As frustrated religious groups have learned of RLUIPA's generous protections, they have effectively used the leverage of even threats of lawsuits and Department of Justice inquiries.

What municipalities have had to learn is that essentially a religious applicant should be treated the same as an applicant that brings jobs and tax revenue. And, cities must create and apply all regulations so that they do not target a religion or religious use generally.

Municipalities most often grapple first with the RLUIPA provision that declares: "No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly." It has proven to be a very difficult task for local governments to interpret Congress's intent when applying the "substantial burden" term.

Also, although the statute prohibits discrimination "against any assembly or institution on the basis of religion or religious denomination" history shows that there is much room for interpretation as to how rules are applied and when exceptions are made. What would be called discrimination when a waiver that was given to one party is declined for another is typically justified according to the circumstances that provide context. In other words, discretionary power – or wide latitude to make and waive the rules – will stand, *unless* the wronged party has the resources to appeal.

The RLUIPA contains an "equal terms" section requiring that religious assemblies and institutions must be treated at least as well as non-religious assemblies and institutions. As interpreted by the courts, this provision generally means that religious organizations should be treated like any other broadly defined assembly use for permit consideration purposes. Thus, standards that apply to a variety of buildings where meeting use is incidental have been used comparatively as a basis for considering church, temple or mosque applications.

It is not surprising that there have been fundamental conflicts in court rulings on the standards that local officials should regard when applying the

65

RLUIPA burden and discrimination terms. The various judicial interpretations may be clarified by the U.S. Supreme Court at some time in the future. But in the interim, it is not likely that Congress will provide needed clarifying language to resolve the confusion as to what is a "substantial burden" and what standards should measure "unequal treatment."[128]

Should municipalities consider pushing the lines that may trigger a substantial burden or discrimination complaint, moreover, how do courts say that land planners might defend their decisions as overriding "compelling governmental interests"?[129]

### WHEN DOES LOCAL GOVERNMENT SUBSTANTIALLY BURDEN A RELIGIOUS PRACTICE?

As one might imagine, legally defining a substantial burden has been problematic. This author was part of a litigation team that won a major RLUIPA case. In that federal court case, the substantial burden inquiry was very fact intensive. In this instance, the church had to prove that the local planning department should accommodate this religious worship application to locate in an industrial zone. This involved addressing a series of questions: First, was the church really growing out of the existing facility; did it really need to move? Second, was any other appropriate site available? Third, would the church's budget allow it to site the new worship facility at an alternate location? Fourth, what distance did most congregants drive; would it substantially burden the parishioners if the church were to be asked to consider an alternate site?

These inquiries play out in RLUIPA cases all over the country. The following cases show the ways that courts have defined substantial burden before they then inquired as to whether facts proved that the burden was really substantial.

The Fifth Circuit Court of Appeal (circuit courts are one level below the Supreme Court), for purposes of applying RLUIPA in the jurisdiction, decided that "substantial burden" was legally defined as "government action or regulation [that] truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs."

---

[128] For the larger legal RLUIPA discussion, this article details many of the cases and conflicts: Alden, Bram. "Reconsidering RULIPA: Do Religious Land Use Protections Really Benefit Religious Land Users?" *UCLA Law Review* (2010); *available* at: http://www.uclalawreview.org/pdf/57-6-4.pdf

[129] Following is a substantive RLUIPA aid offered by Albemarle County, Virginia, and organized by tables to show the range of legal cases for every element of RLUIPA: The Albemarle County Land Use Law Handbook. "The Religious Land Use and Institutionalized Persons Act of 2000: An Introduction." *Albemarle.org* (2015), *available* at: http://www.albemarle.org/upload/images/Forms_Center/Departments/County_Attorney/Forms/LUchapter34-RLUIPA.pdf

To arrive at this conclusion the Fifth Circuit opinion noted the level of disagreement on the definition in the various circuit courts while listing the range of other appellate determinations as follows:[130]

> The RLUIPA does not contain a definition of "substantial burden," and the courts that have assayed it are not in agreement. Despite the RLUIPA's eschewing the requirement of centrality in the definition of religious exercise, the Eighth Circuit adopted the same definition that it had employed in RFRA cases, requiring the burdensome practice to affect a "central tenet" or fundamental aspect of the religious belief[131] The Seventh Circuit, in contrast, abandoned the definition of "substantial burden" that it had used in RFRA cases, holding instead that, "in the context of the RLUIPA's broad definition of religious exercise, a ... regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise ... effectively impracticable." [132] Neither did the Ninth Circuit retain the definition of "substantial burden" that it had employed in RFRA cases, which required interference with a central religious tenet or belief. Turning to Black's Law Dictionary and Merriam-Webster's Collegiate Dictionary, the Ninth Circuit defined a "substantial burden" as one that imposes "a significantly great restriction or onus upon such exercise." [133] The most recent appellate interpretation of the term under the RLUIPA is that of the Eleventh Circuit, which declined to adopt the Seventh Circuit's definition, holding instead that a "substantial burden" is one that results "from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct." [134] (Some citations omitted, underscore emphasis added.)

The Ninth Circuit appellate court has also reasoned that "for a land use regulation to impose a 'substantial burden,' it must be 'oppressive' to a 'significantly great' extent."[135]

As referenced at the end of the block quote above, the Eleventh Circuit definition has emerged as something of a "rule of thumb." It is often applied

---

[130] *Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004), *available at*: http://caselaw.findlaw.com/us-5th-circuit/1059426.html

[131] *Murphy v. Missouri Dept. Of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004).

[132] *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003).

[133] *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004).

[134] *Midrash Sephardi v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004).

[135] *Guru Nanak Sikh Society v. County of Sutter*, 456 F.3d 978 (9th Cir. 2006); *available* at: http://caselaw.findlaw.com/us-9th-circuit/1363129.html.

when religious applicants claim that an intended site is more convenient or is better suited to the group's purposes than alternative locations. In 2014, the Middle District Court in Florida used the test when ruling that "convenience" (often distance that parishioners have to travel) would not satisfy a substantial burden finding as the Court affirmed that "a 'substantial burden' must place more than an inconvenience on religious exercise;" instead, it must exert the kind of "pressure that tends to force adherents to forego religious precepts . . . or mandates religious conduct."[136]

The Eleventh Circuit *Midrash* test, in addition to the whole range of substantial burden appellate court tests, were designed for use during discretionary deliberations where government officials may be tempted to pick winners and losers. Surely, the City of Bloomington at least could have argued that there was defensible ground to stand on when asserting authority against activities in a residential area like activities planned for hours past midnight. Furthermore, cities stand on very different legal ground when the question concerns equitable enforcement rather than discretionary permitting processes.

Whether AFYFC members may have been burdened by regulations to a degree that adherents were forced to forego religious precepts (that would then require the City of Bloomington to prove a compelling government interest) would be a valid question during the application phase. But that is the point: AFYFC was happy with all the conditions at the permit hearing. There was no question then about the terms and AFYFC had not undergone such significant growth that conditions should have been re-evaluated to reflect a change in attendance. Intensity of the use was immediately and consistently more than double the levels presented in the proposal.

Rather than challenge, for example, the late-night activity in a residential area, or limit the gym use to 500 occupants as per the CUP, or enforce the prohibition against concurrent use of the gym and other assembly facilities, city officials appeared to accept the presumption that potential enforcement measures would likely impose an indefensible substantial burden under RLUIPA on this organization. They failed to make the distinction between the discretionary permit application process – where RLUIPA does apply – and the later period when the applicant has agreed, as a conditional user of property in an area that is not designed for his particular use, to live by the rules codified in the permit.

Court rulings on substantial burden have also been stern with municipalities that issue "arbitrary and capricious" decisions and courts have found a substantial burden when processes cause the applicant undue

---

[136] *Church of Our Savior v. City of Jacksonville*, 26 (M.D. FL 2014), quoting *Midrash*, 366 F.3d at 1227; *available* at: http://www.becketfund.org/wp-content/uploads/2015/10/2015.05.19-District-Court-Final-Judgment.pdf.

or significant delay.[137] These are likely complaints that Resurrection Power Church could have considered when an approval recommendation became a denial with no change in Resurrection Power Church's permit proposal. Pastor Udeh had executed a five-year lease contract and he had testified that he was prepared to meet the suggested conditions for approval at the time of the reversal.[138] The City of Bloomington essentially canceled this lease contract without offering Pastor Udeh any alternative sites. Also, when the City denied the application months into the staff findings that recommended approval, both parties lost the "opportunity time" to consider other options during that period.

Courts review RLUIPA compliance through a filter of good faith. If regulations allow religious institutions in some zones with reasonable conditions, there may be a presumption that the city is not hostile to religious land use. If an applicant's permit is denied, yet the denial is issued with opportunity to address concerns and then return for re-consideration, or if suitable alternative sites are offered to the applicant in the case of an initial denial, courts sometimes do not find the process to be substantially burdensome.

### RLUIPA AND EQUAL TERMS AND NON-DISCRIMINATION

It is important to recognize that the Constitution has been interpreted to say that land use policies when implicating religious practice must be neutral and generally applicable. As noted previously, local government may not target religion in general, or religious sects in particular, for discriminatory treatment. The motivation for the regulation as well as the application must heed these requirements.

The RLUIPA equal terms provision, where it provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution,"[139] demands generally that localities apply the same standards to religious land use applications as would be used to consider secular assembly uses.

---

[137] *Fortress Bible Church v. Feiner*, 694 F.3d 208 (2d Cir.2012), *available at*: http://law.justia.com/cases/federal/appellate-courts/ca2/10-3634/10-3634-2012-09-24.html. ("Accordingly, we conclude that the Town lacked a rational basis for delaying and denying the Church's project and therefore violated the Church's Free Exercise rights.")

[138] *Guru Nanak Sikh Society of Yuba City v. County of Sutter*, No. 03-17343 (9th Cir. 2006) ("[T]he Board of Supervisors neither related why any of such mitigation conditions were inadequate nor suggested additional conditions that would render satisfactory Guru Nanak's application.")

[139] A sample presentation of RLUIPA substantial burden provisions found *here*: https://www.law.cornell.edu/uscode/text/42/2000cc; and collection of articles relating to RLUIPA's equal terms provisions found *here*: RLUIPA-Defense Archives: Equal Terms, https://www.rluipa-defense.com/category/equal-terms/.

The Supreme Court has not ruled on the religious land use provisions of RLUIPA and each appellate circuit court has its own record of applying the statute. The "equal terms" section is especially confusing as several circuits have offered varying tests for determining unequal treatment of religious land use applications.

Appellate circuit court reasoning is exemplified by tests used in the Eleventh Circuit and the Seventh Circuit Courts of Appeal. The Eleventh Circuit inquiry takes a definitional approach and asks whether the religious use "fall[s] under the umbrella of "assembly or institution"[140] and the Seventh Circuit considers how the secular assembly use is *similarly situated* to the religious assembly with regard to "accepted zoning criteria."[141]

In other words, the first test looks for whether any other legally comparable assembly has located in the same or a similarly zoned district. If so, planners should also consider locating a religious assembly there on the same basis. There is potential that the "general assembly" comparators may be as unexpected as bus terminals, air raid shelters, restaurants that have private dining rooms in which a book club or professional association might meet, sports stadiums or hospital operating theaters.[142]

For the second test, the Seventh Circuit focuses more on preserving municipality zoning authority by looking to the text of a zoning ordinance for establishing common characteristics and zoning intentions for the existing assembly, and applied-for religious, use.

Planning officials struggle with this level of nuance, especially if staff attorneys as in the AFYFC case imply that comparators may be located anywhere in the city, failing to note that there is also an expectation of "similar situation." Practically speaking, not just any far-flung assembly example will do to measure equal treatment. Commercial zones have different rules than industrial zones or residential zones – as well as subsets of each – since all are designed to accommodate different levels of noise, traffic, and hours of use.

And importantly, the RLUIPA Equal Terms test was designed for the city planning department application phase. It does not govern post-CUP enforcement policy as implied in the AFYFC City Council deliberations.

---

[140] *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1230-31 (11th Cir. 2004).

[141] *River of Life Kingdom Ministries v. Vill. of Hazel Crest*, 611 F.3d 367 (7th Cir. 2010).

[142] Seeman, Evan and Merriam, Dwight. "City Wins When Federal Court Applies Narrow Apples to Apples Analysis to Identify 'Comparators.'" *RLUIPA-Defense* (22 Apr. 2014), https://www.rluipa-defense.com/2014/04/city-wins-when-federal-court-applies-narrow-apples-to-apples-analysis-to-identify-comparators/. ("[The court] used an "apples to apples" comparison to determine a comparator and found that a non-religious school was the only proper comparator to the religious school. It rejected the School's contention that other permitted uses, such as banks, barber shops, beauty parlors, daycare centers, coffee shops, hotels/motels, and hospitals were also comparators. The court's approach appears to restrict the types of uses that may be considered a proper comparator rather than permitting a comparison with all other secular assembly uses.")

70

There is also a RLUIPA directive against discrimination that looks at religious comparators to learn if one sect or religion has been treated less favorably than another. This element of the law seeks to prevent purposeful discrimination by planning officials on the basis of religious denomination.[143]

One indicator of potential discrimination is hostility to the group as evidenced by indicators like biased official comments. There is a difference between discriminatory comments about a group based upon religious belief or practices and inquiries into how the property will be used. In a Church of Scientology case, a Georgia federal district court judge reasoned that "[o]nly the most blatant remarks, the intent of which could be nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination."[144] The court also said that discriminatory intent was not necessarily present when a religious organization merely experienced disparate treatment based upon a parking calculation or square footage allocation while there was no other evidence of discrimination. However, in this case, the court did withhold final judgment on the matter until there was a full trial of the facts and record.[145]

When cities deliberate the merits of a religious land use they must be careful to follow sound reasoning and all prescribed processes. Courts have noted that the more arbitrary or inscrutable the decision, the more likely that discrimination is involved. (The baffling reversal in the Resurrection Power Church case when no new facts were presented comes to mind). Therefore, it may be useful to keep a record of findings and note the reasons that the determinations do not arise from bias.

Some charges of bias may be based in circumstantial evidence where there is no direct link between racist or discriminatory speech and official actions. A later section will deal with official conduct and local resident speech. But it is sufficient to say here that courts look first for a connection between biased expressions and government decisions. Therefore, it may be advisable for an official who has made a definitively discriminatory remark to recuse from the final vote so that the entire decision is not called into question. There will be a deeper discussion of how the courts view resident-private, resident-public, and official communications in the later section on public hearings.

## RLUIPA AND GOVERNMENTAL COMPELLING INTEREST

A very brief discussion of the legal "compelling interest" is important for the reason that city attorneys who are not trained in RLUIPA sometimes give

---

[143] *Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548 (4th Cir. 2013)

[144] *Church of Scientology v. City of Sandy Springs*, 843 F.Supp.2d 1328 (2012).

[145] *Id.*

advice that directs government authority in a manner that is either too cautious or too confident. Sometimes attorneys support municipal authority too much by justifying zoning authority to deny religious use when the government interest is insufficient (e.g., cities usually will not succeed in defending an assertion of zoning authority for reasons like preserving aesthetic character of the neighborhood). Or, they may advise that municipalities have almost no authority. For example, they may say that it is virtually impossible for a city to prove an interest in denial that meets the legal definition of "compelling." Yet, localities should defend zoning criteria when a serious safety or nuisance concern is presented. Whether these decisions survive judicial review also largely depends upon what hard evidence of safety or health concern that the city is able to provide in defense its authority.

The bottom line is that the Supreme Court did set a high bar when saying that local government land planning may only interfere with religious exercise when its concern is of "the highest order."

For example, when courts have considered a locality's interest in expressions of zoning authority under RLUIPA, the Second Circuit Court of Appeal noted that a city (or village) may have a justifiable compelling interest in protecting traffic flow administration. However, the issue was not adjudicated at the appellate court and was sent back to the trial court for consideration.[146]

When zoning authority was considered generally by the Seventh Circuit, the Court decided when denying the RLUIPA claims of a Christian group that wanted to build a camp facility that there was no substantial burden imposed by city zoning regulations behind the city denial (additionally, the city had offered what appeared to be appropriate alternative sites).[147] And a federal court in Massachusetts ruled that traffic concerns are not "generally compelling" interests against a RLUIPA claim of substantial burden but the court would not rule out that some specific traffic concerns may be compelling.[148]

---

[146] *Day School v. Village of Mamaroneck*, 386 F.3d 183, (2d Cir. 2004) (We know of no controlling authority, either in the Supreme Court or any circuit holding that traffic problems are incapable of being deemed compelling. It is true that one circuit opinion in the Eighth Circuit recited that "interests in traffic safety and aesthetics ... have never been held to be compelling." *Whitton v. City of Gladstone*, 54 F.3d 1400, 1408 (8th Cir.1995). However, the fact that the case reports do not reveal any case in which a court has found traffic concerns compelling does not support the proposition that traffic concerns by nature cannot be compelling. . . . In fact, there are very few rulings discussing the question, and none that we know arising under RLUIPA.) (Adam block indent?)

[147] *Eagle Cove Camp and Conference Center Inc. v. Town of Woodboro, Wisconsin*, 3:10-cv-00118 (7th Cir. 2013); for summary, *also see*: https://rluipa.robinsoncoleblogs.com/wp-content/uploads/sites/9/2015/01/7th-Cir1.pdf.

[148] *Mintz v. Roman Catholic Bishop*, 424 F. Supp. 2d 309 (D. Mass. 2006).

72

These decisions show that municipalities have to work hard to make the case to defend zoning authority against a substantial burden claim, and must provide a thorough record. In New York, a federal court instructed that "the [locality] must demonstrate that the enforcement in those zoning laws is compelling *in this particular instance*, not in the general scheme of things." (Emphasis added.)[149]

While court rulings provide confusing standards for RLUIPA deliberations, Islamic groups are often turning directly to the Department of Justice for assistance in winning permit approvals. Just the mention that the DOJ will be called upon to invoke civil rights protections and generous RLUIPA interpretations may have tipped the scales for a number of Islamic permit applications. Few cities will hazard an expensive investigation by the DOJ or a costly trial with the DOJ in opposition.

---

[149] *Cholim, Inc. v. Village of Suffern*, 664 F. Supp. 2d 267 (S.D. N.Y. 2009).

### 7: WHAT ZONING LAWS MAY SURVIVE RLUIPA TESTS?

Although the RLUIPA limits a municipality's defenses against a religious land use complaint, the law cannot mean that communities are doomed to suffer frequent traffic gridlock, overburdened utility infrastructure, and nuisance disturbances. Any of these issues may implicate property interest or public safety concerns to the point that a phased conditional permit is contemplated, or more suitable alternatives may be proposed.

In other words, just because a municipality may not summarily deny a religious application does not mean that the scales should tip dramatically the other direction. Permits should still be carefully structured with all forethought to peaceful co-existence with surrounding established uses and to enforcement mechanisms if this fails.

Additionally, in those cases where the proposed site proves unsuitable, municipalities still may show the "good faith" expected by RLUIPA when working with the applicant to find solutions, including the step of searching for appropriate alternative options.

Most Islamic center uses include an array of activities. AFYFC is an example where the site is used for services and it is also used for a school, day care, counseling, meal service, adult education, university classes, regional events, and family festivals. In fact, in this case, the application showed the prayer component of the overall use to be incidental. Also, this application, as many others, did not use the term mosque or *masjid*. A mosque proposed for the Windermere community in Florida was simply called the Windermere Religious Center. Applications are often submitted in the name of a cultural center or community center.

Any religious organization should be prepared to describe the full range of activities, participation levels, and hours of use at the time of application.

The surrounding commercial or residential neighborhood, in the case of an Islamic land uses, should prepare for much larger attendance and higher activity levels for the month of Ramadan/Eid. Some other ceremonial events and festivals also generate weekend-long crowds. Also, mosques sometimes host regional programs as advertised on internal websites. Some mosque-community center complexes offer education opportunities, workshops, and seminars. When large events exceed a specified attendance limit, permitted hours, or involve food service, a special permit is usually required. There is also typically a limit to the number of times per year that an organization may exceed the permit restrictions.

It is predictable that churches, mosques and temples will host intermittent events that draw larger crowds but frequency is the key to

75

how much the community can tolerate. Clear limits for hours of programming, parking, and traffic volume should also be accompanied by specific instructions as to when a special event permit will be required and what are standards for approval.

Additionally, infrastructure issues including environmental review, sewer capacity, soil permeability, left hand turn lanes, and water availability can be pressing questions, especially in residential areas. Online research and request for documents will reveal the history of permits for the zone in question as applied to past applications, testing, results, and requirements.

Importantly, code-based objections to mosque planning that predict high volume activities will only be taken seriously if there is a professional study that is compelling to the point of triggering a city inquiry. The presentation of personal pictures of peak-hour traffic mounted on poster boards, or ad hoc counting of cars to illustrate parking concerns, is not compelling and does not require an official response. When parking and traffic fears are described as vague complaints based upon experiences of other communities, the concerns may be dismissed as anecdotal stories. Without professional reports and credible case histories that include the record of under-estimation as it occurred in places like Bloomington, Minnesota, the concerns may not be addressed.[150]

**Density:** Occupancy allowances are fairly standard and usually require seven square feet of space per person when there is non-fixed seating.[151] Some mosques expect to qualify for a standing occupant rating since there are no seats – fixed or non-fixed – which may allot one person per five square feet. Churches often plan for seventeen square feet per person, if seated in pews, due to allocation of space for platform and choir.[152] City planners should be careful to consider that a standard church use for a 5000 square foot building would be 294 persons while an Islamic assembly could potentially be 1,000 persons. Islamic groups may plan to accommodate three times as many attendees in a space as would a conventional church assembly use. In the final analysis, fire code determines the *outer limits* of occupancy based upon exits and access to those exits, but the ability to anticipate attendance for the variety of

---

[150] Schwartz, John. "Zoning Law Aside, Mosque Projects Face Battle." *New York Times* (3 Sep. 2003), http://www.nytimes.com/2010/09/04/us/politics/04build.html?pagewanted=all& r=1.

[151] See this chart for examples of worship space allocations used in major U.S. cities: International Code Council. "Number by Table 1004.1.2" *publiccodes.cyberregs.com* (2016), http://publiccodes.cyberregs.com/st/ny/ci-nyc/b200v08/st_ny_ci-nyc_b200v08_10_sec004_par002.htm.

[152] "Church Building 101." *Churchconstruction.com* (2016), http://www.churchconstruction.com/article-churchbuilding101.php.

regularly scheduled Islamic center activities will enable planners to prepare permit limits and to structure enforcement thresholds.

Also, there likely will be areas dedicated to one or more Friday prayer services, including a designated space for women. It may be useful to ask the mosque organizers for a specific designation of the space that will be rated for either "standing assembly" or "non-fixed seating assembly."

Prayer sessions are not only observed on Friday when attendance at a mosque is highest but mosques may be open for other daily prayers sessions as well. At the informational hearing for the proposed Windermere (Florida) Worship Center, a mosque-goer told a reporter that since he travels to the mosque five times a day for prayer, it would be much easier to have a mosque located closer to his home.[153] When the Kennesaw (Georgia) mosque was approved, two weeks after an initial vote to deny triggered a DOJ inquiry, a member of the Islamic community said much the same in a PBS interview:

> Muslims try to make it five times a day to the mosque and in this day and age, it's a little difficult to be there five times a day. But usually, if you are close enough — five, ten minutes' drive — you can go there early in the morning prayers, in the evening prayers at least.[154]

While religious applicants may not be treated differently, at least these standards may forecast more accurately the actual activity levels for purpose of all religious permit construction and enforcement.

**Parking:** Parking code regulations vary per area, per type of use, and according to municipal formulas, but the typical formula for assembly use is one car per three people. Check published regulations to verify this as well as the fire occupancy code above. In both cases, variations may be requested and the community should be able to consider the impact on surrounding neighborhoods if exceptions are considered.

In 2016, Bernards Township (New Jersey) denied the Islamic Society of Basking Ridge's application for a religious use permit in a residential area. The applicants then sued the Township for unlawful discrimination, among other complaints, when the township applied different parking and occupant formulas to their unique patterns.[155] While courts have not ruled

---

[153] "Proposed Mosque Has Some Windermere Residents Concerned." *ABC WFTV* (16 Mar. 2016), http://www.wftv.com/news/local/some-windermere-residents-raise-concern-over-proposed-mosque/165185097.

[154] Brangham, William. "Freedom of Religion? Mosque Debate in Georgia Town Reveals Sharp Divide." *PBS Newshour* (20 Dec. 2014), http://www.pbs.org/newshour/bb/freedom-religion-mosque-debate-georgia-town-reveals-sharp-divide/.

[155] "Bernards Township Answer to ISBR Complaint." (Basking Ridge is an unincorporated area within Bernard Township.). http://mosquesinamerica.org/wp-content/uploads/2016/10/155_Bernards_Answer_Complaint.pdf

on exactly this question at the time of this writing, these are important factual considerations to evaluate in assessing typical religious activity patterns. As long as generally applied to all religious applicants and not adopted during the religious land use deliberations, religious applicant use patterns may be matched with formulas that logically reveal the expected activity and occupancy levels. These calculations also might be used for quantification of trip count data and realistic occupancy rates according to fire code *maximum limits*. This information can be useful especially for the formulation of final permit conditions and triggers for remedial actions.

While conducting a fact-finding process according to a quasi-judicial (as described in most states) framework, it is important to understand actual expected levels of activity and occupancy. Probing questions should be asked of *all assembly applicants* who plan to site busy multipurpose facilities in a residential area.

**Traffic:** Many municipalities now evaluate traffic levels for land use applications in light of average "daily trip counts" or "periodic trip counts" for cars entering and leaving the property during certain hours. This is key in situations where the use should be defined by the nature and frequency of actual events and not on the basis of generalized and vague plans. The codes detailing trip count regulations are shown on municipal websites and often require an authoritative assessment. In some cases, there is no published code but trip count standards may have been applied to prior applications in residential areas. Trip count data has proven to be a useful tool when there is indication that use of a facility will entail massive visits per day or heavy use both coming and going as events overlap.

**Noise:** Noise is a serious concern when many Islamic practices end late in the evening, continue through the night, or begin in the early morning. When these practices occur at times that are outside of city "quiet use and enjoyment" tolerances, an exception to local ordinances may be requested. For example, a permitted mosque in Raritan Township, New Jersey, was preliminarily approved to "begin operation" one and one half hours before sunrise. [156] And, as mentioned in the introductory section for this monograph, the Hamtramck (Michigan) mosque issues the call to prayer over a public address system five times per day with the first broadcast set ostensibly at sunrise. Before reaching a decision, communities should define exactly what this kind of proposal means in terms of burden on the surrounding area, traffic activity, frequency of gatherings and anticipated disturbance factors.

---

[156] Sievers, John. "Raritan Township Planning Board Approves Mosque." *Lehighvalleylive.com* (26 Jul. 2013), http://www.lehighvalleylive.com/hunterdon-county/express-times/index.ssf/2013/07/raritan_township_planning_boar.html.

The standard rule is that nuisance noises like loud parties should not disturb residents after 10:00 p.m. and noisy activities like construction should not begin before 7:00 a.m. Generally, there are other regulations about noise above particular decibel levels and noise that is heard over a certain distance. In the case of a religious use, these codes do not strictly apply. However, the spirit of the law should not be disregarded. There may be reasons that very late – or extremely early – activities conducted in a residential area should be held in a different space. Or, if it is important to schedule such events on a routine basis, a suitable non-residential alternative site for the mosque might be suggested. Noise disturbances should be considered carefully at the permit hearing before there are conflicts and resulting animosity over unrealistic expectations.

Any substantive concerns on these issues should be thoughtfully presented at the permit hearing. Citizen monitors and interested neighbors may consider organizing as accountability committees under several articulate spokespersons for "tag-team" serial presentations, rather than presenting concerns in a series of disjointed and repetitive comments. This entails understanding the process, providing cogent analysis, and organizing checklists for holding city staff responsible.

The objective should be to address all of the regulatory concerns that apply while also being prepared to offer factual data as to how religious groups may differ in use levels, occupancy rates, and noise factors. Accountability groups should require that full fire marshal, environmental, flood, soil, drainage, parking, traffic, and other applicable tests required by code, and as applied to other applicants, apply equally to mosque applicants. Just because RLUIPA protects minority religious assembly does not mean that generally applicable zoning regulations should be not be taken seriously.

79

## 8: The Department of Justice, RLUIPA and Mosques

Under RLUIPA, the Department of Justice is authorized to intervene, as well as sue, on behalf of aggrieved groups. This DOJ has been especially active in investigating Islamic zoning complaints through the Civil Rights Division. Under former Attorney General Eric Holder, the Department of Justice Civil Rights Division declared a special partnership between the Equal Employment and Opportunities Commission (EEOC), and the Islamic community.[157]

In 2012, Eric Treene, Special Counsel for the Justice Department's Civil Rights Division, reported that the Justice Department "ha[d] opened twenty-seven RLUIPA matters involving mosques and Muslim schools since RLUIPA passed. Of these, seventeen ha[d] been opened since May of 2010."[158] By 2016, the DOJ reported that the percentage of RLUIPA investigations involving mosques or Islamic schools had risen from 15% in the 2000 to 2010 period, to 38% during the 2010 to 2016 period.[159] The AP reported in 2016 that a DOJ review revealed data showing that mosque and Islamic school complaints grew to twenty-five percent of the Civil Rights Division's caseload from 2011 to 2015.[160] If so, it is apparent that the pace and extent of intervention is accelerating.

The DOJ also injected an enhanced warning for city halls into the July 2016 report when advising that it will press discrimination charges in mosque and Islamic school cases, even when the cases do not involve "anti-Muslim animus," but just because of the "sharp increase" in complaints.[161] The DOJ is following a legal theory that says there is discrimination if the results show a disproportionate "adverse impact" on a protected group. This legal approach is based upon cases that come from housing and

---

[157] "Justice Department Settles Discrimination Lawsuit Against Berkeley School District in Illinois." *United States Department of Justice* (13 Oct. 2011), https://www.justice.gov/opa/pr/justice-department-settles-religious-discrimination-lawsuit-against-berkeley-school-district.

[158] Amici Curiae brief for Muslim Advocates, et al: *Al Falah Center, v. Town of Bridgewater*, No. 13-4267 p. 6 (3rd Cir. 2014); *available at:* http://d3n8a8pro7vhmx.cloudfront.net/muslimadvocates/pages/216/attachments/original/1393544536/Amici_Brief_Al_Falah.pdf?1393544536.

[159] Seeman, Evan, et al. "U.S. Department of Justice Issues RLUIPA Report." RLUIPA Defense (27 Jul. 2016), https://www.rluipa-defense.com/2016/07/u-s-department-of-justice-issues-rluipa-report/.

[160] Hajela, Deepti. "Muslims See Anti-Mosque Bias in Landmarking Decision." *Bismarck Tribune* (11 Jun. 2016), http://bismarcktribune.com/muslims-see-anti-mosque-bias-in-landmarking-decision/article_ba7864fc-b2ed-5b95-87b8-e12140ae33ed.html.

[161] Department of Justice. "Update on RLUIPA Enforcement." p.6, *Justice.gov* (Jul 2016), https://www.justice.gov/crt/religious-land-use-and-institutionalized-persons-act; and, https://www.justice.gov/crt/file/877931/download.

employment law, and it does not require a finding that discrimination was intended or animus was present. This application of disparate impact legal theory has not been tested in the courts at this time.

In 2015 and 2016, city leaders began to report that DOJ case numbers were assigned at first reports of opposition to a mosque, and in Kennesaw, Georgia, even before the decision-makers held the first public meeting to consider the merits of the application. The Bernards Township (New Jersey) Planning Board's 2016 legal pleadings disclosed that the Islamic Society of Basking Ridge attorneys threated RLUIPA discrimination legal action at the very first hearing session.[162] In 2016, the DOJ filed a lawsuit against the Pennsylvania township of Bensalem, independent of the complaining Islamic organization's pre-existing and parallel litigation.[163]

Although the DOJ "RLUIPA" information webpage does not cite to appellate court rulings as authority, the nation's highest legal office provides a very generous explanation of what may constitute an unjustifiable burden on a religious group seeking a use permit: "Whether a particular restriction or set of restrictions will be a substantial burden on a complainant's religious exercise will vary based on context, such as the size and resources of the burdened party, the actual religious needs of an individual or religious congregation, the level of current or imminent space constraints, whether alternative properties are reasonably available, the history of a complainant's efforts to locate within a community, *the absence of good faith* by the zoning authorities, and many other factors.[164] (Emphasis added.)

These generalized guidelines are summarized from court cases and some would be useful if more definition had been provided. Without appellate law context, legal rules of thumb can be confusing. One especially problematic standard that needs further definition is what the DOJ calls the "absence of good faith."

Local government officials are expected to do their jobs according to state law that defines their purpose, federal law that provides protection for individual and group rights, and local zoning regulations. Committing the "absence of good faith" error - a subjective and vague standard - may occur

---

[162] Bernards Township Answer to ISBR Complaint, available at: http://mosquesinamerica.org/wp-content/uploads/2016/10/162_Bernards_Answer_Complaint.pdf

[163] McDaniel, Justine. "Justice Department: Bensalem Discriminates Against Muslims" *Philly.com* (23 Jul. 2016), http://articles.philly.com/2016-07-23/news/74648404_1_township-officials-zoning-hearing-board-joseph-pizzo. (The lawsuits may be combined by the court or the parties at a future date but, it is unusual for the DOJ to file a separate lawsuit.)

[164] "Statement of the Department of Justice on the Provisions of the Religious Land Use and Institutionalized Persons Act of 2000." *United States Department of Justice* (22 Sept. 2010), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/rluipa_q_a_9-22-10_0.pdf

when too much discretion is applied to either slight or favor an individual or a class of persons. Officials are most likely to commit these errors when not following settled procedure and zoning precedent.

While courts do pursue this "good faith" legal inquiry in religious land use cases as discretion crosses into actual bias, it is important for government officials to understand that "good faith" really just means doing their jobs regardless of the pressures. Good faith means keeping a record of procedural steps that do not reflect bias, arbitrariness, or favoritism. What it does not mean is bending over backwards to accommodate one group, thus advantaging this group over others, as a means of inoculating the city or county against a complaint of discrimination.

Local governments usually rely upon one staff attorney to advise them. Some city attorneys have attended a workshop on RLUIPA and may understand the details of the statute but the competing court interpretations complicate the application of the law to any set of local facts. In light of the challenges, it may be valuable to enlist supplemental legal advice from sources that have litigated RLUIPA cases.

In the DOJ's own words, RLUIPA investigations have sent a powerful message. And localities have responded predictably with a risk-management emphasis. Former Assistant Attorney General for the DOJ Civil Rights Division Tom Perez revealed that the many DOJ investigations had "served to educate local officials about their obligations under RLUIPA, and have led to changed policies without litigation becoming necessary."[165] When cities are coerced and intimidated by even early notices of an investigation, officials are tempted "cry uncle" without mounting a defense of zoning rationale, local resident interests may not be considered.

In fact, litigation is often not necessary because few municipalities will undertake an expensive and time-consuming legal defense. The DOJ has the deepest of pockets and an army of RLUIPA-wielding attorneys. In theory, this could be a boon to religious liberty in America. But, investigations are triggered by complaints and complaints seem to come disproportionately from one group. At least, the investigative responses are largely in the interest of one group: Islamic institutions.

In light of the size and capability of DOJ resources, it is important to bear in mind that some local government officials are volunteers, and many are part-time. They just did not sign up for intensive and politically complicated inquiries, especially given the staying power of the DOJ and the

---

[165] "Assistant Attorney for the Civil Rights Division Thomas E. Perez Speaks at the American Constitution Society for Law and Policy's RLUIPA Event." *United States Department of Justice*, (21 Sept. 2010), https://www.justice.gov/opa/speech/assistant-attorney-general-civil-rights-division-thomas-e-perez-speaks-american

all-but-inevitable result.[166] As a consequence, there is reason for concern that these early settlements advantage the complaining group by short-cutting local zoning prerogatives, land-use procedures, public comment, and important judicial review.

It is easy to understand then that the mere prospect of a looming federal investigation may cause local governments to be extremely cautious – and potentially more accommodating than in other cases – when considering a minority group religious use application. Defending against a federal inquiry, not to mention the implied next step of litigation, is costly; not just in terms of city resources but also political accountability to taxpayers. It is not surprising that many taxpayers would interpret the interest of federal investigators in local affairs as evidence that their elected city or county officials were in error. Still there is a solemn duty required of local lawmakers to formulate law, apply law, and enforce the law in a diligent manner that equally respects applicants and other interested parties. That is especially the case when the Department of Justice appears to be increasingly intervening on behalf of one religious community, as compared to - even other minority - faith organizations.

## WHEN GOVERNMENT USES DUBIOUS HATE CRIMES TO DRIVE LAW AND POLICY

The DOJ is tracking what it calls "backlash" hate crimes, as exemplified by retaliatory incidents against Muslims that are said to follow after Islamist threats and jihadist terror attacks. The "special backlash crime task force" is centered in the DOJ's Civil Rights Division and is staffed with some of the most experienced federal prosecutors within the federal system.[167] Where this backlash operation works with DOJ attorneys in the states, it documents threats of violence and refers cases of actual violence for prosecution. The backlash unit acts as a clearinghouse for documenting complaints of threats of violence and actual violence, conducting investigations, referring cases to state and local prosecutors where appropriate, and, where the facts and the law warranted federal action, prosecuting those acts.[168]

When Attorney General Loretta Lynch spoke for the Muslim Advocates organization in December of 2015, she referenced mosque opposition and tied "backlash-motivated' forces to the "bending and twisting" of law to

---

[166] Deak, Mike. "Bridgewater, Mosque Settlement Reaches $7.75 Million." *myCentralJersey.com* (2 Dec. 2014), http://www.mycentraljersey.com/story/news/local/somerset-county/2014/12/02/bridgewater-mosque-reach-settlement-million-land-swap/19775661/.

[167] "Confronting Discrimination in the Post-9/11 Era: Challenges and Opportunities Ten Years Later." p. 6, *Justice.gov* (19 Oct. 2011), https://www.justice.gov/sites/default/files/crt/legacy/2012/04/16/post911summit_report_2012-04.pdf.

[168] *Id.*

84

defeat mosque projects like in Murfreesboro, Tennessee: "That shows how strong the backlash can be; how strong is backlash to me."[169]

Since 9/11, agencies have reported increases in alleged hate incidents against Muslims and these statistics have resulted in energetic governmental inquiries. In 2001, the FBI reported more than a tenfold increase in religious bias crimes against Muslims. And, for the thirteen years following 9/11, the FBI's Uniform Crime Reports program indicated that annual hate crimes against Muslims have averaged at about five times higher than the pre-9/11 rate.[170]

If one accepts these data points at face value,[171] the FBI 2014 report on "anti-religious" hate crimes shows that anti-*Jewish* bias motivated 56.8 percent hate crimes, compared with 16.1 percent anti-Islamic (Muslim) bias crimes.[172] The Jewish population in the United States is estimated to be about twice that of Muslims living in America.[173]

A hate crime is a criminal offense that is classified according to the offender's motivational bias ("preformed negative opinion").[174] The motivational element of the crime is determined when "sufficient" facts would lead "a reasonable and prudent person" to conclude that the offender's actions were motivated (even partially) by bias against a target group.[175] Hate violations are categorized as crimes against persons, property, and/or offenses against society in general. The crime listings are reported to the FBI via templates that record eleven offense categories from the local level. These compilations include crimes like murder, rape, robbery, and vandalism, and they also provide data on the more subjective complaints like "simple assault" (FBI definition: "assaults and attempted

[169] "Attorney General Loretta Lynch at Muslim Advocates Dinner." *C-SPAN.org* (3 Dec. 2105); select the Loretta E. Lynch "speaker button" at: http://www.c-span.org/video/?401446-1/attorney-general-loretta-lynch-remarks-muslim-advocates.

[170] Ingraham, Christopher. "Anti-Muslim Hate Crimes Are Still Five Times More Common Today Than Before 9/11." *Washington Post* (11 Feb. 2015), https://www.washingtonpost.com/news/wonk/wp/2015/02/11/anti-muslim-hate-crimes-are-still-five-times-more-common-today-than-before-911/

[171] "Religious Bias Crimes 2000-2009: Muslim, Jewish and Christian Victims – Debunking the Myth of a Growing Trend in Muslim Victimization," *Center for Security Policy* (20 Aug. 2013) ("The Center for Security Policy (CSP) used official annual data published by the Federal Bureau of Investigation (FBI) to debunk the common fallacy spread by 'Islamophobia' proponents that Muslims have been the target of an increasing wave of "hate crimes" in the years following the attacks of 11 September 2001.")

[172] "Hate Crime Statistics for 2014." *Federal Bureau of Investigation*, (2014). https://www.fbi.gov/about-us/cjis/ucr/hate-crime/2014/topic-pages/victims_final.

[173] Pew Research Fact Tank, "A New Estimate of the U.S. Muslim Population," *Pew Research Center* (6 Jan. 2016) http://www.pewresearch.org/fact-tank/2016/01/06/a-new-estimate-of-the-u-s-muslim-population/.

[174] "Uniform Crime Report 2001 Hate Crime." *Federal Bureau of Investigation* (2002), https://www.fbi.gov/about-us/cjis/ucr/hate-crime/2001.

[175] *Id.* at 1,3.

85

assaults where no weapon was used or no serious or aggravated injury resulted to the victim, including stalking, intimidation, coercion, and hazing."[176]) and "intimidation" (standard legal definition: "to intentionally say or do something which would cause a person of ordinary sensibilities to be fearful of bodily harm" although "it is not necessary to prove that the victim was actually frightened, and neither is it necessary to prove that the behavior of the person was so violent that it was likely to cause terror, panic or hysteria."[177]).[178]

In 2001, the FBI's Hate Crime Data Collection Program coded intimidation as the most frequently reported hate crime at 37.9% of the annual total.[179] This trend continued through 2015 when the FBI reported "[t]he majority of the 4,048 reported crimes against persons involved intimidation (43.1 percent) and simple assault (37.4 percent).[180] Note the potential overlap in the 2015 data where "simple assault" numbers may also include "intimidation" according to the FBI's own categorical definitions.

The FBI's Civil Rights program calls the investigation of hate crimes its number one priority. According to the website, the agency finds primary fault with the "groups that preach hatred and intolerance [that] plant the seeds of terrorism here in our country."[181] Even though the FBI profiles these groups that preach hatred, the agency notes that hate itself is not a crime and the FBI includes the protection of speech and civil liberties as part of its mission.[182]

As the Justice Department also investigates hate crimes, employment discrimination, and mosque opposition under the rubric of anti-Muslim bias, the data sets for any of the areas of complaint serve to buttress causes of action for the other categories. A mosque land use case amicus curiae brief on behalf of "Muslim Advocates" in the Third Circuit Court of Appeals cited Civil Rights Division Special Counsel Eric Treene who reported in 2012 that the Justice Department had "opened twenty-seven RLUIPA

[176] "Crime in the United States: Offense Definitions." *Federal Bureau of Investigation*, (Sept. 2010). https://www2.fbi.gov/ucr/cius2009/about/offense_definitions.html#top

[177] The 'Lectric Law Library, *available at*: http://www.lectlaw.com/def/i064.htm: "to intentionally say or do something which would cause a person of ordinary sensibilities to be fearful of bodily harm. It is not necessary to prove that the victim was actually frightened, and neither is it necessary to prove that the behavior of the person was so violent that it was likely to cause terror, panic or hysteria." (Adam block indent?)

[178] Crime in the United States, *supra* at note 176.

[179] *Id.* at 5.

[180] "Latest Hate Crime Statistics." *Federal Bureau of Investigation* (Nov. 2015), https://www.fbi.gov/news/stories/2015/november/latest-hate-crime-statistics-available/latest-hate-crime-statistics-available.

[181] "Hate Crimes-Overview." *Federal Bureau of Investigation* (2016), https://www.fbi.gov/about-us/investigate/civilrights/hate_crimes/overview.

[182] *Id.*

86

matters involving mosques and Muslim schools since RLUIPA passed. Of these, *seventeen have been opened since May of 2010.*" (Emphasis in original.)[183]

The Muslim Advocates brief then concluded that "expressions of bigotry have a ripple effect, extending beyond the headlines in the next day's newspaper...." The lawyers supported this contention with expressions like this from Rep. Joe Walsh of Illinois: "There is a radical strain of Islam in this country – it's not just over there – trying to kill Americans every week. It is a real threat, and it is a threat that is much more at home now than it was after 9/11."[184] The brief claimed that such examples demonstrated "allegations of naked animus" against Muslim communities that aspired to build new mosques.[185]

This "regrettable increase in anti-Muslim sentiment" is what former Assistant Attorney General Thomas Perez told the U.S. Senate is likely the reason for "the increase in RLUIPA cases involving mosques...."[186] The DOJ's Treene has also written that anecdotal complaints from (Muslim) community groups, trends in press reports, and case studies engaged by the Justice Department are consistent with reports that show "[r]esistance to mosque proposals over the last decade was tame by comparison to what we see today." Treene referenced a strategy article written for mosque applicants to show that "Muslim American applicants [in the past] had the opportunity to respond to accusations and counter speculation with facts. Now, however, a vocal and organized opposition is in the streets with placards and bullhorns."[187]

There are obvious problems with a law enforcement policy that is devoted to searching for "backlash" conditions and tangentially connecting manifestations of anti-Islamic bias. The very mission statement relies upon finding retaliatory expressions to justify the theories behind the task force's existence. Not only is this task force effort geared to the real or perceived grievances of a named victim group, but in this case, the radicalized element of the group in question is a subset (at least by religious affiliation) of an

---

[183] *Al-Falah Center vs. The Township of Bridgewater*, No. 13-4267 (3rd Cir. 2014), Muslim Advocates Amicus Brief, p.6. *available at:* http://d3n8a8pro7vhmx.cloudfront.net/muslimadvocates/pages/216/attachments/original/1393544536/Amici_Brief_Al_Falah.pdf?1393544536.

[184] *Id.* at 23.

[185] *Id.* at 5.

[186] Eric W. Treene. "Zoning and Mosques: Understanding the Impact of the Religious Land Use and Institutionalized Persons." p.4 *The Public Lawyer* (Winter 2015), *available at:* http://www.americanbar.org/content/dam/aba/administrative/state_local_government/zoningandmosques.authcheckdam.pdf.

[187] *Id.* quoting Kathleen E. Foley. "'Not in Our Neighborhood': Managing Opposition to Mosque Construction." Pp. 8-9, *Inst. For Soc. Pol'y & Understanding* (Oct. 2010), *available at:* http://www.ispu.org/wp-content/uploads/2016/08/ISPU_Not_In_Our_Neighborhood_Kathleen_Foley-3.pdf .

aggressive and hegemonic force. There is a fine line between societal push-back that is appropriate and retaliation that is a criminal offense. This is especially true when a complaint like intimidation is perception-based, rather than being subject to forensic evidentiary standards.

Then, there are documented (some of the encounters were recorded on neighbors' cell phones and police reports are on record) hateful crimes that have originated *from Muslim groups*. Some crime is Muslim-on-Muslim, and some like the Somali gang episodes near Minneapolis are apparently Muslim on middle class white Americans. Although little noted in the media, when a Minnesota neighborhood was terrorized by marauding young (locally described) Somali men, speeding and driving cars over curbs and sidewalks over several days, and issuing detailed threats like that directed at a woman to kidnap and rape her, American citizens have every reason to challenge the source of the lawlessness. The woman who was the subject of the direct rape threat said in a television interview that she refused to be intimated and would not allow "them" to win. When the subject of the rape threat reportedly called police three times that day, it allegedly took police some three hours to arrive, and then one minor traffic ticket was issued.[188] Police were said to be continuing the investigation at the time the news interview aired.[189]

Unless and until the Muslims that disapprove of the range of Islamist affronts to American civil society say so – in no uncertain terms – Americans will, and should, continue to challenge the leadership at large. Muslim leaders should be held accountable to name names, and to identify errant doctrine. As Muslim reform leader Dr. Zuhdi Jasser has said, "If we stay silent, we give Islamists a pass to suffocate critical thinking inside Muslim communities." He urges a tough-love approach, saying, "There is nothing more American, more pro-Islam, and more pro-Muslim than taking a stand against the extremist and anti-Semitic hate spewed by Islamist individuals."[190]

Within the unique setting of city hall, officials are required to screen comments that are based in anti-Muslim bias to only consider the resident testimony that is responsive to civic hearing inquiries. When voicing concern regarding reports from other communities on unexpected intensity of use, violations of permit terms, and abuse of ambiguity in land use law, residents should apply the examples to the specific application under

---

[188] Hohmann, Leo. "Woman Gives Chilling, 1st-Hand Account of Muslim Rape Threat." Worldnet Daily (6 Jul. 2016), http://www.wnd.com/2016/07/woman-gives-chilling-1st-hand-account-of-muslim-rape-threat/.

[189] Hoffland, Brett. "Minneapolis Police Investigate 'Terroristic Threats' Made Near Lake Calhoun." *ABC Eyewitness News* (30 Jun. 2016), http://kstp.com/news/minneapolis-police-investigate-alleged-terroristic-threats-calhoun-parkway/4186341/.

[190] Jasser, Zuhdi. "It's Not 'Islamophobic' to Protest a Pro-Hamas Speaker." *National Review Online* (6 Apr. 2016), http://www.mzuhdijasser.com/18728/sheikh-monzer-taleb.

consideration by focusing on ways to inspect the details of planned use and the procedures to best insure compliance.

Finally, rather than accepting the "backlash" narrative as evidence of underlying motive for everything from actual hard crimes to intimidation and mosque opposition, an inquiring media and the general citizenry should review the reports independently. Indeed, some of the highest profile "hate incidents" (in categories with more definition than the hard-to-investigate "intimidation") have proven to be false. Some of those crimes have even proven to be incidents perpetrated by Muslims. While these individuals may not have designed a hoax, they did do damage to mosques. These reports often are not corrected until some time after the initial hate-crime headlines are generated.

Other so-called hate crimes have been so generic in nature that Muslims were not named as their targets by law enforcement. Some reported crimes do not meet the standards of a police investigation, so they remain as a filed complaint. The range of challenged examples below demonstrate why it is so critical to hold the narrators who rush to affirm hate agendas to an honest account:

Newport Beach, California: CAIR issued a press release on unconfirmed reports by a Muslim taxi driver who claimed that he was "assaulted after being questioned [repeatedly] about his religion." Facts later revealed that the brawl was between two cab drivers fighting over a fare. The CAIR statement profiled a former Marine cigar storeowner as the likely perpetrator when, later accounts revealed, the businessman was not involved in the melee and that instead he claimed to have rendered aid.[191]

Houston, Texas: A homeless man set a fire at the Quba Islamic Center and burned down one building in 2015. He admitted to setting the fire, but said he just wanted to get warm.[192]

---

[191] Hall, Sarah, "Muslim Group Says Cabbie Assault is Hate Crime," *Newport Beach Indy* (1 Apr. 2010), http://www.newportbeachindy.com/muslim-group-says-cabbie-assault-is-hate-crime/; Mickadeit, Frank, "Cigar Vendor: "I was Aiding'" Hate Accuser" *Orange County Register*, (21 Aug. 2010) http://www.ocregister.com/articles/uria-294358-cabbie-one.html; Coker, Matt, "UPDATED With CAIR Backing Off Allegations Against Lounge Owner Muslim Cab Driver's Beating in Newport Beach Spurs Call for Hate-Crime Probe," *Orange County Weekly* (31 March, 2011); *also see:* http://www.ocweekly.com/news/updated-with-cair-backing-off-allegations-against-lounge-owner-muslim-cab-drivers-beating-in-newport-beach-spurs-call-for-hate-crime-probe-6456710; (CAIR statement: "Our general procedure is that when the issue involves an alleged crime, we do not contact the alleged perpetrators in order to avoid complicating the situation or being accused of threatening or influencing a witness. Investigation is the job of law enforcement, and this is often their request. Our primary role in these cases is to assist the complainant/victim in presenting their allegations to law enforcement, and to encourage law enforcement to investigate the incident as a hate crime.")
[192] Aufdenspring, Matt & Bauer, Jennifer. "Homeless Man Arrested In Arson Fire of Islamic Center." *NBC KPRC, Houston* (15 Feb. 2015), http://www.click2houston.com/news/hfd-homeless-man-arrested-in-arson-fire-at-islamic-center

89

Houston, Texas: Also, in 2015, Gary Nathaniel Moore was arrested for setting fire to a mosque. Moore claimed that he was a regular attendee at the mosque.[193]

Bloomington, Minnesota: Edward Zahi Moses Saad was arrested for breaking into the Umatul Islam Center in 2016 and vandalizing the mosque. Police stated that the crime was one "of opportunity" and that there was no indication Saad had "targeted any specific group."[194]

Fresno, California: Asif Mohammad Khan vandalized the Islamic Cultural Center on Christmas Day in 2014. He desecrated the American flag while destroying property at the mosque. Khan told police detectives that his crime was "not meant to be hateful" since he had attended programs at the Islamic center.[195]

El Cajon, California: Kassim Alhimidi was convicted in 2014 of the brutal murder (also called an honor killing) of his wife. Alhimidi had left a note at the crime scene that said, "This is my country. Go back to yours, terrorist." Original, and pervasive, early reports called the killing a "hate crime."[196]

Chapel Hill, North Carolina: The 2015 murders of three Muslims are often a centerpiece of the hate crimes complaints. Yet the suspect, Craig Hicks, publicly disparaged all religions and there had been an ongoing parking dispute between the parties.[197] At one time, Hicks apparently wrote: "Knowing several dozen Muslims...I'd prefer them to most Christians."[198]

Middle East scholar Daniel Pipes analyzed a CAIR hate crime report from 2004 and "discovered a pattern of sloppiness, exaggeration, and distortion":

---

[193] Christian, Carol & Binkovitz, Leah. "Man Charged With Setting Houston Mosque Fire Says He Was A Devout Attendee." *Houston Chronicle* (30 Dec. 2015), http://www.chron.com/houston/article/Federal-officials-arrest-man-in-connection-with-6727623.php

[194] Davis, Angela. "Police Arrest Man Suspected In Burglaries, Mosque Vandalism." *CBS WCCO* (2 Mar. 2016), http://minnesota.cbslocal.com/2016/03/02/police-arrest-man-suspected-in-burglaries-mosque-vandalism/

[195] Lopez, Pablo. "Clovis Man Who Vandalized Mosque Gets Court Program for Mental Illness." *The Fresno Bee* (18 Sep. 2015), http://www.fresnobee.com/news/local/crime/article35757534.html.

[196] Phillips, Sandra. "Courtroom Erupts After Iraqi Man Found Guilty of Killing Wife." *Fox 5 San Diego* (18 Apr. 2014), http://fox5sandiego.com/2014/04/17/verdict-reached-in-brutal-murder-of-iraqi-mother/.

[197] Casarez, Jean & Soichet, Catherine. "Chapel Hill Shooter Suspect Indicted." *CNN: Cable News Network* (17 Feb. 2015). http://www.cnn.com/2015/02/16/us/chapel-hill-shooting/.

[198] Mack, David. "Everything We Know So Far About The Alleged Chapel Hill Shooter." *Buzzfeed.com* (12 Feb. 2015), http://www.buzzfeed.com/davidmack/everything-we-know-so-far-about-the-alleged-chapel-hill-shoo#.cp0rgLpLd.

1. CAIR cites the July 9, 2004 case of apparent arson at a Muslim-owned grocery store in Everett, Washington. But investigators quickly determined that Mirza Akram, the store's operator, staged the arson to avoid meeting his scheduled payments and to collect on an insurance policy. Although Akram's antics were long ago exposed as a fraud, CAIR continues to list this case as an anti-Muslim hate crime.

2. CAIR also states that "a Muslim-owned market was burned down in Texas" on August 6, 2004. But already a month later, the owner was arrested for having set fire to his own business. Why does CAIR include this incident in its report?

3. CAIR lists the March 2005 lawsuit filed by the Salmi family for the firebombing of their family van as one example of a hate crime report it received in 2004. However, the crime named in the lawsuit occurred in March 2003, was already reported by CAIR in 2003, and should not have been tabulated again in the 2004 report.

4. CAIR reports that "a home-made bomb exploded outside of the Champions Mosque in the Houston suburb of Spring, Texas," staking its claim on eyewitness reports that on July 4, 2004, "two white males" were seen placing the bomb. We inquired about the incident and found that Spring's sheriff department could not locate any police files about an explosion. Further inquiries to the mosque and an e-mail to CAIR both went unanswered. There is scant evidence that any crime even occurred.

5. CAIR notes that "investigators in Massachusetts are still investigating a potential hate-motivated arson against the Al-Baqi Islamic Center in Springfield." However the case was long ago ruled a simple robbery, news that even CAIR's own website has posted. The Associated Press reported on January 21, 2005, that prosecutors determined the fire was set by teen-age boys "who broke into the Al-Baqi mosque to steal money and candy, then set the fire to cover their tracks." The boys, they clarified, "weren't motivated by hatred toward Muslims."

6. CAIR describes what happened to a Muslim family in Tucson, Arizona: "bullet shots pierced their home as they ate dinner in October 2004" and two months later their truck was smashed and vandalized. But the only evidence that either incident was motivated by hate of Muslims is the Dehdashti family itself, not the police. Detective Frank Rovi of Pima County Sheriff's Department, who handled the shooting investigation, said that according to the

91

neighbors, the desert area by the Dehdashti house was often used for target practice. Neither incident was classified as a hate crime and both cases were closed by February 2005, long before the CAIR report went to press.

Of twenty "anti-Muslim hate crimes" in 2004 that CAIR describes, at least six are invalid – and further research could likely find problems with the other fourteen instances. (Hyperlinks in original omitted.)[199]

An exemplary case of media-ready Muslim bias complaints was that of seven young women who claimed that they were asked to leave Urth Caffe, a popular Laguna Beach (CA) coffee shop, in April 2016. Their attorney was quoted as saying that the women were "targeted as a way of cleansing [the predominantly white Laguna Beach] location of women that appeared to be Muslim to appease the 'Islamophobia'."[200]

However, the married owners (one is a Muslim) of the Urth Caffe have explained that the women refused to honor the outdoor seating time limits. The owners replied with a civil suit against the Muslim women, countering that the lawsuit against Urth Caffe was fraudulent and that the Muslim women were trespassing after being asked to leave. The countersuit also alleged that the Muslims planned a "defamatory social media and public relations campaign."[201]

Some of the items listed above have been used to suggest that "Islamophobia" is the motivation for an "unprecedented string of hate crimes [that] has swarmed not only Muslims, but other minorities" and that there is an "epidemic of anti-Muslim sentiment" that is responsible for the "rash of attacks."[202] Such inflammatory accounts are just as irresponsible as generalized hostility toward Muslims. Furthermore, as these activists predict retaliatory incidents to follow any jihadist attack, important attention should be paid to standards of verification and analytical consideration of whether Islamist operatives are merely trying to divert focus.

Ironically, when Islamophobia and anticipatory "backlash" smokescreens are used to assert Muslim victimization, it may be Muslims themselves who are most harmed.  When Islamic activists are afforded public platforms to accuse Americans of unfounded hate conduct, the

---

[199] Pipes, Daniel & Chadha, Sharon. "CAIR's Hate Crime Nonsense." *Frontpagemagazine.com* (18 May, 2005), http://www.danielpipes.org/2627/cairs-hate-crimes-nonsense.

[200] Ritchie, Erika. "Urth Caffe of Laguna Beach Counter-Sues Against Muslim Discrimination Claim. *Orange County Register* (23 Jun. 2016), http://www.ocregister.com/articles/women-720256-muslim-urth.html.

[201] Editorial Staff. "Urth Caffe in Laguna Countersues Muslims." *The Indy* (23 Jun. 2016), http://www.lagunabeachindy.com/urth-caffe-countersues-muslim-patrons.

[202] Siddiqi, Imraan. "7 Anti-Muslim Incidents That Have Happened Since the Chapel Hill Murders." *Alternet.com* (20 Feb. 2015). http://www.alternet.org/news-amp-politics/7-anti-muslim-incidents-happened-chapel-hill-murders.

audience includes Muslims who are not aggrieved and isolated, as well as the American media and population at large.

Many Westerners are not aware that ISIS and the Muslim Brotherhood are intent on ushering in the "caliphate" have a declared strategy[203] to label Muslims who may choose to embrace Western standards as apostates who then may be ostracized and targeted for punishment. While reformist Muslims work to encourage fidelity to Western Enlightenment standards, extremists leverage broad-brushed indictments of all Muslims to alienate and radicalize moderate "gray zone" Muslims. ISIS is known to employ these aims "to foster a deep resentment which can be exploited by smooth-tongued cult leaders" and finally to "make it simply impossible to be a Muslim in the West."[204]

There is, therefore, moral hazard when local government authorities and the media characterize the words and actions of some thoughtless residents as a mass community mindset. If many concerns – from inviting constructive engagement with Muslims to calling for accountable debate to identifying radicalization elements – are characterized as attacks, there will be little room for establishing the foundations upon which common ground may be found. In acceding to the Islamic supremacists' demands that everyone critical of their agenda be condemned as racists and bigots, a much-needed national debate about that agenda is suppressed. This is an unforced error that the West need not commit as long as public debates are had on the basis of practices and defining principles, rather than groups and labels.

---

[203] Francois-Cherrah, Myriam. "Islamic State Wants To Divide The World Into Jihadists and Crusaders." *Telegraph Newspaper* (18 Nov. 2015), http://www.telegraph.co.uk/news/worldnews/islamic-state/12002726/The-grey-zone-How-Isis-wants-to-divide-the-world-into-Muslims-and-crusaders.html

[204] *Id.*

## 9: Islam Is Defined as a Religion for Constitutional and RLUIPA Protections

Islam is understood, for American legal and constitutional purposes, to be a religion. The fact that Sharia codes [205] are promulgated in preference to American law in some mosque settings is simply not a matter for local politicians at the city and county level to adjudicate.

At present, Supreme Court rulings in religion cases mean that courts may not inquire into what extent a "religion" is more a political regimen than it is a belief system. This generally works to insulate from legal inquiry the Islamists who esteem clerical rulings more highly than civil authority, dispute the rule of secular law, and who deny the separate roles of mosque and state. If socio-religious systems and leaders engage in legally-defined conspiracies to subvert American law or institutions, there are potential legal responses although caselaw in this area is complex and dated.

At present, essentially the only line of questioning that government and the courts may pursue when querying a religious group is whether the beliefs embraced are "sincerely held."[206] Government is not authorized to consider whether beliefs are "valid" or if tenets meet some civil religious test. Some "faith" groups have stretched this allowance for purposes of RLUIPA protection to strain credibility like the Jedi believers [207] in Washington State. Yes, this is an extreme example, but it shows how far government may reach to embrace non-mainstream manifestations of "belief."

Even if legally permitted, it is not the American constitutional tradition to empower city officials to separate the Sharia adherents that follow Islamic clerical dictates over American law from those that practice Islam as a religion. As time and conditions provide the urgency for establishing this

---

[205] Sharia is Islamic orthodoxy that follows cleric-interpreted (often in the form of a *fatwa*) Koranic-based prescriptions and allows little, if any, authority for civil law or representative rule. Many Muslims who adhere to the idea that Sharia law is supreme believe that they are allowed to submit to the law in a host society only until they have imposed Sharia law by increments or have accomplished domination by other means. The Reliance of the Traveler manual, widely available in book form, is considered by many Islamic scholars to be the official Sharia guide. Andrew McCarthy, successful prosecutor of the Blind Sheikh, articulates the conflict between Sharia law and Western societal principles here: McCarthy, Andrew. "Don't Blame the Charlie Hebdo Mass Murder on 'Extremism.'" *National Review* (7 Jan. 2015), http://www.newcriterion.com/articles.cfm/If-you-see-something--say-nothing-7654.

[206] *United States v. Seeger*, 380 U.S. 163 (1965) ("The test of religious belief . . . is whether it is a sincere and meaningful belief occupying in the life of its possessor a place parallel to that filled by the God of those admittedly qualified for the exemption.")

[207] Seeman, Evan, Chaffee, Karla and Merriam, Dwight , "Star Wars Church Opens in Spokane, Washington," (1, Mar. 2016), https://www.rluipa-defense.com/2016/03/star-wars-church-opens-in-spokane-washington/. Yet the Jedi "faith" statement disavows any official doctrine or scripture (http://www.jedichurch.org/jedi-doctrine.html).

dichotomy, federal law may be re-invigorated to address legally-qualified subversive activity. But zoning boards do not have the authority to do this, nor are they authorized to consider anything beyond issues related to the zoning concerns.

Fundamentally, American government officials have not been given this authority under the Constitution. According to First Amendment interpretation, any government regulation of religion must be neutral and generally applied so as not to target religion generally or a specific religious expression. There may be no government analysis of doctrine. The Supreme Court said in *United States v. Ballard* that:

> Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. (citation omitted) It embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths. Heresy trials are foreign to our Constitution. Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs.[208]

Since Sharia-based Islam encompasses all aspects of a subscribing Muslim's life leaving little legitimacy to civil authority, some argue that Islam should be considered as an antithetical socio-political regime. Muslims for Reform has adopted a platform plank implicitly identifying Sharia as incompatible with democratically organized society: "We oppose institutionalized Sharia. Sharia is man-made."[209]

While cultural and assimilation concerns certainly underlie these arguments, the task of unraveling Sharia-based radicalism from the modernized and societally compatible approach to Islam certainly does not fall to land use planners and their elected overseers. Land use hearings are for the simple purpose of applying zoning code and determining whether an applied for use of land is appropriate given conditions that planning staff require.

Also, the First Amendment protects much of what is said and done in a religious facility. Between freedom of speech and the free exercise of religion, there is much room for what many Americans could consider objectionable – yet protected – speech. Consider that the some appellate courts recognize First Amendment religious freedom as "first and foremost, the right to believe and profess whatever religious doctrine one desires, [and] courts are not permitted to inquire into the centrality of a professed

---

[208] *United States v. Ballard*, 322 U.S. 78 (1944); *available at*: http://supreme.justia.com/cases/federal/us/322/78/case.html
[209] Muslims for Reform Declaration. Section C(1), *available at*: http://muslimreformmovement.org/declaration.

belief to the adherent's religion or to question its validity in determining whether a religious practice exists."[210]

Therefore, although some mosque activity may be culturally objectionable, it is a matter for law enforcement and not local civic officials to establish how much of what is said or planned in some mosques can be *legally* challenged. It is not within the purview of city planners to inquire about passages in the Koran, advocacy of Sharia, the source of mosque development money, distribution of hateful or anti-American materials, attitudes on freedom of speech (Sharia blasphemy code) and tolerance for those who choose a religion other than Islam (Sharia apostasy code) for purpose of land use decisions. It is left to law enforcement to determine when lines are crossed into criminal and conspiracy actions that violate the law.

This does not mean that communities have nothing to say about these cultural conflicts, many of which do indicate tendency to extremism. Far from it. Neighborhoods where mosques are sited have an array of free speech tools with which to monitor and confront counter-cultural activity. It is possible for residents, responsive to community relations overtures from mosque officials during hearings, to state that there will be community monitoring of extremist speakers and oversight of other radicalization activity at the mosque. Communities may invite vigorous debate and engagement. Invite this while promises of openness and local participation are on the table. Quite simply, the best way to counter the radicalizing speech inside a mosque is free speech outside of the mosque.

Whether website tracking, blog commentary, op-eds in local press, or group rallies to protest radicalization activity, the community may express alarm and may say "not in this town" to anti-Semitic, anti-American, violence-promoting, and other speakers that pitch radicalization.

There are also constructive political efforts to begin the legislative inquiry into when so-called religious activity may violate equal protection and civil rights provisions. It is vital that legislators and courts tread carefully here, but Great Britain is demonstrating serious intent to regulate Sharia courts (often called arbitration systems) where clerical rulings violate women's rights and other British legal principles. As the author of the bill, One Law for All, Baroness Carol Cox has explained: "I have cried with those Muslim women. They are suffering in this country and I cannot sit on those red benches and know that they are suffering out there in those closed communities. We are in a situation where we are at risk of having a parallel legal system – on the 800th anniversary of the Magna Carta. That is unacceptable."[211]

---

[210] *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570 (2d Cir. 2002), *available at*: https://bulk.resource.org/courts.gov/c/F3/293/293.F3d.570.02-7073.html

[211] Crowcroft, Orlando. "Sharia law UK: Baroness Cox – 'The Suffragettes will be turning in their graves.'" International Business Times (25 Jan. 2016), http://www.ibtimes.co.uk/sharia-law-uk-baroness-cox-suffragettes-will-be-turning-their-graves-1539577

97

Federal, or state-based, initiatives in the United States that promote similar equality ultimatums as Lady Cox's exemplary Act, would help to frame the discussion in communities. American Law for American Courts (ALAC),[212] provides the basis for American states to declare to all comers that anyone presenting a foreign law-based dispute to courts in that state will receive constitutional and legal protections. This leaves little room for confusion.

It is important to understand that ALAC does not directly confront operational Sharia tribunals in America, nor does the statute address Islamists that openly advocate criminal and unconstitutional practices. An example of a speaker that should shock any community is Bloomington-area (Minnesota), Dr. Hatem Ahaj,[213] formerly a Mayo Clinic pediatrician, and a current member of the Assembly of Muslims Jurists of America's fatwa committee, as well as dean of the Sharia Academy of America. He is also listed as the president of a social services organization that sponsors speakers to various Islamic groups called The Building Blocks of Islam. His position at the Mayo Clinic was terminated in 2012, after he published a paper in Arabic on female genital mutilation (FGM).[214] He has taught classes at Bloomington's AFYFC and has given at least this one recorded public lecture on the suggested health and sexual "benefits" of FGM for the woman ("minimal" cutting to reduce "excessive sexual excitement.").[215] He also speaks on the advantages of polygamy: including ongoing services for the husband when one wife is ill, as well as options for the husband whose biological and emotional needs are not met with just one wife, as long as he is willing to take on the burdens and responsibilities of additional wives.[216] Both practices are illegal in the United States; performing FGM is a federal crime and it is felony offense in many states. The practice is considered "gender-based violence" by the State Department.

---

[212] "Why American Laws for American Courts." http://americanlawsforamericancourts.com/. ("The goal of the American Laws for American Courts Act is a clear and unequivocal application of what should be the goal of all state courts: No U.S. citizen or resident should be denied the liberties, rights, and privileges guaranteed in our constitutional republic.")

[213] "Dr. Hatem Ahaj", *Assembly of Muslim Jurists of America*, http://www.amjaonline.org/en/about-us/our-scholars-fatwa-committee.

[214] Engstrom, Timothy, "May Clinic-Dr. Ali Part ways," (18, May. 2012), http://www.albertleatribune.com/2012/05/mayo-clinic-dr-ali-part-ways/.

[215] al Haj, Hatem, "Women in Islam – Female Circumcision", *The Building Blocks of Islam Vimeo.com Page*, (21 Apr. 2010). https://vimeo.com/album/168165/video/11916062; http://mosquesinamerica.org/wp-content/uploads/215_Women%20in%20Islam%20-%20Female%20Circumcision.mp4

[216] al Haj, Hatem, "Women in Islam - Hijab and Polygamy." *The Building Blocks of Islam Vimeo*.com (17 Mar. 2010), http://vimeo.com/album/168165/video/10417505.; http://mosquesinamerica.org/wp-content/uploads/216_Women%20in%20Islam%20-%20Hijab%20and%20Polygamy.mp4

There was much news coverage of inflammatory exhortations given by Sheikh Farrokh Sekaleshfar (a British-born medical doctor), who spoke in the Orlando area just two months prior to the Pulse nightclub massacre. The imam's pronouncements against gays in 2013 included the declarations that "death is the sentence [for homosexuals]", and "[o]ut of compassion, let's get rid of them now."[217] Residents correctly raised concerns about the imam's Orlando engagement to the point that local news coverage detailed the 2013 remarks and interviewed residents who opposed his April 2016 appearance in Orlando.[218] After the Pulse nightclub attack, Sekaleshfar countered that his remarks had been taken out of context.

These examples demonstrate the opportunities that local citizens have to engage a cultural and political debate. But when a city hall hearing is in process there is an important dividing line between what is the public and legal role of land use officials and what is the private and moral role of citizens to state that evidence of radicalization will be spotlighted and challenged in the public square.

The scheduling of a permit hearing provides opportunity for the community to gain assurances from mosque leadership as to a concrete plan to combat radicalization. Notice of a public hearing schedule also suggests the timely announcement of a community accountability committee. This is where the record should start with mosque leadership unequivocally committing to support American constitutional principles and identifying a plan to counter radicalization – or publicly demurring, or even outright declining, to do so.

It is then up to law enforcement to learn where dangerous radicalization is indeed occurring and to apprehend those involved.

Most importantly, communities have a vital role in assuring that Muslim organizations are not treated preferentially when applying for permits to build and expand. Waivers from planning codes and exceptions should not be granted due to intimidation or a rush to demonstrate inclusiveness. The purpose of zoning laws is to uphold the express goals of peaceful enjoyment of property and to provide for safe and compatible use of property within the parameters of planning authority.

Citizens must hold elected officials accountable to exercise their regulatory responsibilities even-handedly. The land use process allows for much discretionary decision-making and politicians may respond to pressure to appear inclusive. But inclusiveness does not mean giving a group that is willing to use multicultural leverage special allowances.

---

[217] Stephens, Chase. "Imam Who Spoke At Orlando Mosque In April Says Gays Must Die." *DailyWire.com* (14 Jun. 2016), http://www.dailywire.com/news/6521/imam-who-spoke-orlando-mosque-april-says-gays-must-chase-stephens.

[218] Stephens, Chase. "Imam Who Spoke At Orlando Mosque In April Says Gays Must Die." *Daily Wire* (14 Jun. 2016), http://www.dailywire.com/news/6521/imam-who-spoke-orlando-mosque-april-says-gays-must-chase-stephens.

99

Constitutional equal protection and religious freedom requirements protect individual and group rights but also provide for equal treatment of all applicants.

Public discussions that prompt scrutiny of Islamic supremacist tenets are vitally important to Western cultures when conducted outside of city hall. The right to have these debates must be protected. Yet, use of the few minutes that speakers have to address city planners for the purpose of arguing about Islamic practices is counterproductive. These hearings are convened for the exclusive purpose of considering the regulatory land use implications of a religious application. Presentations that deviate too far from this focus will be ignored and may be repudiated by planners.

It is important to remember that many Muslims who fled oppressive Sharia chauvinism are supportive of American constitutional freedoms. Some even work to counter Islamism, and they should be encouraged in every way possible. A city or county will proceed on the presumption that U.S. Muslims are here to participate in American culture and respect American laws. If there is a documented record to the contrary, that relates specifically to the organizational practice of the applicant at a former site – or a sponsor's site -- the community may publish factual exhibits of failure to comply with regulations. These data points, if properly documented, may suggest important use limitations and enforcement mechanisms if there is basis to approve the use permit.

Recognition of reformist and compatible Muslims, while making a formal request for a mosque-centric plan to target radicalization, will serve both the congenial Muslim community and local peace and safety concerns. This is where strong expression of community will is critical. Residents not only have an opportunity to speak to concerns about community order but have an obligation to ask for Islamic commitment to American ideals. While mostly symbolic at the time of a public hearing, proactive statements from the community will encourage the moderate Muslim community as well as put Islamic leadership on notice that residents are paying attention and, furthermore, will speak up when either zoning regulations or civil rights standards are not followed.

100

## 10: MOSQUE BUILDING PERMITS: WHAT TO EXPECT FROM CITY HALL?

A popular personal development guru recommends "beginning a project with the end in mind." When preparing to organize an inquiry into a mosque application hearing, it is vital to consider what can be accomplished within the context of the process. There are defining questions that should be asked before organizing an effective mosque monitoring accountability group and these should be selected according to the facts of each case, and the rules that govern the granting of a use permit.

At this point, a very important underlying premise should be established: Mosque land use applications should receive equal treatment as compared to any other religious land use application. In the cases that the mosques appear to have received favorable treatment or infractions have resulted in less consistent enforcement (see, for example, the questions surrounding the neighborhood experience with AFYFC as detailed in this monograph), why has this occurred? What may prevent or deter localities from granting exceptional concessions? What questions should officials ask, and what tests are important? And, finally, what was missed in the cases where results have been incompatible with surrounding establishments and an unanticipated burden on that community?

While RLUIPA presents a high bar for outright denial of a religious, and therefore a mosque, land use application, it is critical to understand that there are vital roles for concerned citizens at the hearings. Free speech rights afford citizens ample ability to make relevant comments on radicalization issues and to express community will on accountability measures outside of the civic, quasi-judicial hearing process. Note again: this is not a suggestion that speakers scrutinize Islamic beliefs, complain about the practice of Sharia law, or lecture on interpretations of the Koran. What is a matter of a vital community concern, in light of radicalization and home-grown terror trends,[219] is to learn from mosque officials whether there are clear and accountable policies on extremist speakers, materials, and activities.

While political officials may not offer the procedural permit hearing venue for presentation of these concerns, articulate and compelling presentations that weave in the need for community reassurance may establish foundational interest in mosque accountability. Community input during the process must be based on oversight of the technical aspects of

---

[219] Barber, Ellison, "Counterterrorism Expert: Threat of Homegrown Terror Has Escalated," *Free Beacon* (16 Aug. 2013), http://freebeacon.com/counterterrorism-expert-threat-of-homegrown-terror-has-escalated/?goback=.gde_64725_member_2670554349%23I.

101

the application deliberations, but good faith interest in proactive strategies to prevent radicalization may be reasonable and constructive.

It all starts with a strong foundation based upon facts. Good faith and good relationships must begin with basic respect and honesty. When mosque leadership misrepresents the number of attendees, frequency of activities, and need for parking, resentment is a natural result. If municipal officials are not prepared to press for facts and then enforce final terms, local citizens have every right to challenge while assuring that the full range of questions has been covered.

What will be the range of activities?

Depending on the level of detail described in the permit application, compare the indicated range of offerings to other Islamic institutions. If there is no published prospectus for the organization, ask about intentions for number of prayer services and planned attendance, day care facilities, women's programs, burial preparations, the entire array of all education programs, food service, family festivals, athletic programs, recreational sports, Ramadan/Eid observances, and frequency of regional events like seminars and family festivals. It is important to establish a record of direct answers to these questions as vague and generalized categorical "plans" leave much room for interpretation.

What have been the activity levels in the past?

If the group is expanding or relocating, what has been the pattern of attendance, rates of high traffic, and trajectory of expansion? Has the group complied with city code and permit limits at current facility? If there is a sister or parent institution, what has the record of compliance been at this facility? The answers to these questions may not be determinative but they will suggest potential permit structure.

Who is authorized to speak for the mosque project?

In some cases, organizational filings for contracts or deeds of trust do not match the names of property owners that are provided to local officials on the permit application. This may be an issue as ownership or legal title to use the property is a threshold requirement for filing a land use application in most jurisdictions. And, in a quasi-judicial hearing setting, the spokesperson is providing *testimony* and must understand that he or she is assuming the role of authorized fact provider. In some cases, accountability and enforcement have been complicated when mosque officials who were presented as

102

designated spokespersons at the hearing have subsequently claimed not to have had authorization.

Is there a sponsor organization?

Some Islamic groups are part of a larger confederation and the organizational website will usually detail the mission statement as well as indicate expected activity levels for the mosques involved in the network. Sponsorship by, and close ties to, a few organizations like NAIT and ISNA, often indicate Muslim Brotherhood connections.[220] This is background information that informs the community as to likely orientation of materials and speakers, although it is not a local government zoning consideration.

Has the imam or mosque leadership made statements that are contrary to constitutional law in the areas of women's rights, criminalization of speech that is critical of Islam or Sharia law, and what are the organization's views on religious or racial tolerance?

Imams and invited speakers enjoy free speech rights, but these kinds of statements tend to reflect a slavish adherence to Sharia law and the community should be aware of any pattern of anti-constitutional public statements. The activist imams who refuse to endorse the Muslim reformist-promulgated American standards of free speech, separation of mosque and state, and religious freedom – including the right to leave Islam without penalty – indicate fidelity to Sharia rules over American customs and legal norms.

Has this congregation associated with radical speakers or Muslim Brotherhood operatives?

Again, this is not commentary for the formal proceedings inside city hall, but these associations are of interest to the community. A community may put mosque leadership on notice that they will watch for invitations to host featured guests and may elect to notify the community of this activity as well as make fact-based public announcements via blogposts or work to generate media comment about the radical nature of hateful or anti-American Islamist individuals present in the community. Some

---

[220] Mauro, Ryan. "Senate HS Chair Endorses Bill to Name MB as Terrorists." *The Clarion Project* (11 Feb. 2016), http://www.clarionproject.org/news/senate-hs-chair-endorses-bill-name-mb-terrorists. ("The legislation explicitly identifies the Council on American-Islamic Relations (CAIR), the Islamic Society of North America (ISNA) and the North American Islamic Trust (NAIT) as U.S. Muslim Brotherhood entities and includes evidence tying them to a Hamas support network.")

communities have chosen to demonstrate or hold rallies to spotlight objectionable extremists.

There is a line to be drawn between general anti-Islamic comments and expressions of intent to hold mosque leaders to anti-radicalization promises. As long as concerns are expressed as constructive notice to work with mosque officials to target radicalization and the structure of these efforts is organized outside of the hearing sessions, this activity should not complicate the hearing setting. Some city councils may complain that such inspection is not relevant, even outside the official process, but with some prominent imams calling for the criminalization of speech, distributing violent materials, inviting radicalized speakers, condoning illicit marriages and divorces, acknowledging polygamy, and providing counter-constitutional legal arbitration services, the community is right to reinforce American civil rights traditions and to declare no tolerance for radicalization efforts.

It must be underscored that these expressive activities are not a zoning or local government function and the challenges to radicalization activities, or answers to these questions, will not come from planning officials – especially in light of RLUIPA's generous treatment of facilities categorized as religious. But, private citizens may, and should, still demand to know clear intentions of mosque leadership and express intent to monitor, publicize, and challenge extremist Islamist operators. Free speech must work both ways.

104

## 11: The Mosque Siting or Expansion Permit Process

It is of fundamental importance to any examination of the land use permitting process to consider the foregoing sections as they applied to the AFYFC mosque and the Resurrection Power Church applications in Bloomington, Minnesota. It is one thing to consider the structured process as provided on land planning websites, but quite another to understand – based upon the actual experience of applicants, land use officials, and the impacted neighborhoods – how that process may lead to very disappointing results.

City hall, as the center of local bureaucracy, is not typically known for bypassing red tape but, in these cases, there are questions officials may not know to ask. Or, they may feel pressure to demonstrate that the community will welcome an Islamic mosque or center. Whatever the reasons, success or failure in assuring full inspection of all aspects of the intended use may be up to those determined to press for accountability, accuracy, and a careful record of all answers.

When assessing a government process, one begins with the structure. Planning authority is described on the municipal website. The website will also provide the details of the overall Comprehensive or General Plan and the more localized zoned areas will be articulated in the District Plans.

As Muslim groups file applications for zoning exceptions, variances, and conditional use permits, they often characterize the facility as a cultural center or community center. Prayer space is often mentioned incidentally, if at all. A resident in Hamtramck, Michigan complained that mosque organizers "never said [the center] would serve as a mosque." But, Sakrul Islam, from the Islamic center reportedly replied, "no one ever said it would not be a mosque, and also saying an Islamic center "covers everything.'"[221]

There are likely several reasons for making application as a cultural center, or other secular-sounding purpose, but most significant may be that the application receives both religious worship protection while also public relations consideration for a use that is described many times as offering social and community services. This does not mean that additional merit points are given, but the hearings often reveal favorable comments and approving attitudes from officials who likely factor this "bonus" into their final decisions.

Mosque officials or their building plan expeditors may meet with city staff in advance of the permit application to discuss the plans, assure

---

[221] Sercombe, Charles, "Residents Complain." *The Review* (10 Nov. 2016), http://www.thehamtramckreview.com/residents-complain-that-call-to-prayer-is-too-loud/, (Resident "warned" that if she continued claiming she was lied to, a defamation lawsuit would be filed.)

decision makers of good faith, and to allege benefits to the city of recreation programs or social services.[222] Therefore, much may already have been discussed and conclusions drawn by the time that there is first public notice of plans to site a mosque in a community.[223]

Some mosque congregations may be substantially involved in community activity and charity beyond symbolic "interfaith" appearances, but those that may be cloistered facilities should not be given extra credit on permit applications when actual community offerings are unknown and unlikely probabilities.

Quite simply, if the application notes worship space or prayer space, it should be categorized as a straightforward religious land use, not a community center with incidental religious activity that, conveniently, also links to RLUIPA benefits.

For practicing Muslims generally, social and familial activity is centered in the mosque. Since Islamic practices involve individuals and families in a range of activities, these Muslims will naturally be very involved in mosque activities. Newer immigrants, used to the mosque-based communal life, will favor the familiarity of the Islamic centers that organize doctrinal segregated prayers, separate sports activities, halal food service, and unique dress codes.

Land use planners have often failed to realize the implications of the communal nature of mosque operations. They may under-anticipate the level of overall activity when the mosque is central to all aspects of Islamic life. In practical terms, city planners should expect that an application that mentions prayer space is one indicating comprehensive use including possible multiple prayer sessions, sermons, and seminars as well as a base for full familial and the range of recreational and social interaction. Queries into all of these possibilities should be considered as well as whether some activities will be planned during very late night hours.

This does not mean that there should be a template for processing mosque applications that assigns different formulas based upon unique use. For localities to adopt an Islamic-directed policy would be to implicate several laws against discrimination. But, it does mean that questions should be asked of all religious applicants to derive accurate descriptions, documents, and statements. All exhibits and responses are, indeed, testimony provided for the purpose of a formal hearing. In the case of Islamic applications, the questions might be based upon the patterns, habits, and customs of established Muslim institutions already operating in the United States.

---

[222] Foley, Kathleen. "Building Mosques in America: Strategies for Securing Municipal Approvals." *Institute for Social Policy*, p.33-41 (Oct. 2010 October). http://web.archive.org/web/20160114122511/http://ispu.org/files/PDFs/ISPU_-_Building_Mosques_Report_-_Kathleen_Foley.pdf

[223] *Id*. at 33.

106

City planning commissions may be learning to proceed more methodically in light of unique use issues posed by Islamic communities. A St. Cloud, Minnesota planning session video shows a commissioner, who is a self-described immigrant to the U.S. from a Muslim country, challenging an Islamic group to provide more honest numbers. He noted that Islam – and by extension mosque-centric life – is "the totality of all [Muslims] are." He used an example of a six-hundred member mosque organization (based upon the subject application) to say that the participation level would likely be three times that amount, or in the neighborhood of eighteen hundred. He then said that he expected that the religious education facilities, school schedule, and other concurrent activities would be "going on all the time." And he said that with those just "hanging out," it will mean that the Islamic center will be "very busy every day of the week." He instructed mosque organizers "to be realistic about number you will be serving."[224] The planning commission took the action of tabling the matter until more research and due diligence could be done.

At the start, planners should recognize that mention of Friday prayers means that the hearing process will address a defined mosque application. A recent faith-based cooperative endorsed by many Muslim scholars as an accurate depiction of the Muslim community in America today says that "a mosque is defined as a Muslim organization that holds Jum'ah Prayers (Friday Prayers), conducts other Islamic activities and controls the space in which activities are held."[225]

An attendee at the mosque in Kennesaw, Georgia, affirmed that daily prayers are observed at the closest mosque and that compliant Muslims try to participate several times a day: "If you are close enough — five, ten minutes' drive — you can go there early in the morning prayers, in the evening prayers at least." Then, he added that this is how *"you build up the community."*[226]

Organized prayer observance, including the main Friday session, and teaching meetings will be conducted as integral to mosque functions while various family activities, and seminars are offered during the week. Cities are often challenged when quantifying occupancy since Islamic prayer space requirements are not the same as the pew space of other houses of worship. Fire codes, parking, traffic, environmental impact (especially

---

[224] "City of St. Cloud Planning Commission Meeting." See discussion at approximately 2:21 marker. (13 Aug. 2013), *available at*:
http://stcloudmn.granicus.com/MediaPlayer.php?view_id=2&clip_id=482.
http://mosquesinamerica.org/wp-content/uploads/224_stcloudmn_planning_13Aug2013.mp4

[225] Bagby Ihsan. "The American Mosque 2011." p.2 (Jan. 2012), *available at*:
https://www.cair.com/images/pdf/The-American-Mosque-2011-part-1.pdf.

[226] Brangham, William. "Freedom of Religion? Mosque Debate in Georgia Town Reveals Sharp Divide." *PBS Newshour* (20 Dec. 2014), http://www.pbs.org/newshour/bb/freedom-religion-mosque-debate-georgia-town-reveals-sharp-divide/

where cemetery use is planned), and utility services must all be considered according to actual use rather than vague descriptions of numbers that may sound appropriate for purpose of the hearing audience.

Also, workers located near a mosque facility are likely to come to the facility for Friday prayers but not be part of a residential census that would be expected to attend the mosque. Since Muslims will often go to the facility that is most convenient to observe prayer rituals, this will likely entail a greater number of taxi drivers, bus, and delivery drivers. This also contributes to higher demand on Fridays for single attendee parking and so the usual ratios of building occupant per car may not reflect expected norms.[227] The courts have not ruled on whether a different standard for unique Islamic solo driver patterns is unlawfully discriminatory but some municipalities are beginning to look at whether the trend is sufficient to sustain this line of questioning. At the very least, the pattern should be considered for anticipating the totality of the use when providing conditional terms and enforcement parameters in the final permit.

Some Islamic centers have addressed the parking concerns by offering two, three, and more prayer sessions on Fridays. While this tactic may relieve parking concerns, for regular Friday observances, the in-and-out activity adds to traffic and "trip counts" over the course of the day and evening may create intolerable stress for a residential area.

Municipalities have begun to think prophylactically and some are creating easier paths to conditional approval in zones that are compatible with worship activity and assembly. If there is ample provision for religious use elsewhere, localities may offer limited opportunity within sensitive residential areas by erecting higher bars to entry. An example of this is the application of trip count limits to restrict the numbers of cars that may exit and enter a given curb cut during a period of time, whether within a period of hours or a day.

Another example would be the requirement that potentially burdensome assembly uses must be sited near, or on, arterial streets that can accommodate left-turn traffic and heavier periodic flows. The comprehensive plans and district plans undergo periodic reviews and this is a good time for planning staff to restrict conditional use availability in highly sensitive areas. At the same time, in consideration of RLUIPA expectations, an alternate zone should be made less restrictive to religious use. These adjustments may not be contemplated while a religious land use application is in process as the adoption of new rules could result in discrimination complaints.

---

[227] Sadlouskos, Linda. "Mosque Traffic Expert Presents Case for Fewer Spaces." *Patch.com* (13 Feb. 2013), http://patch.com/new-jersey/baskingridge/mosque-traffic-expert-presents-case-for-fewer-spaces.

Equal protection RLUIPA provisions will require that mosques are given the same treatment as other religious and similarly situated assembly uses. But, the community should have fair notice as to the daily activity – compounded on Friday – the traffic, noise, and burden on infrastructure concerns. Preparing for realistic use and providing enforceable limits is the key to evaluating a conditional use. If an honest assessment of the activity demonstrates that the burden on the neighboring occupants will be too great, or conditions too dangerous with no available remedy, a locality may still comply with RLUIPA by making a good faith effort to suggest suitable alternative sites.

Absolute maximum occupancy will be calculated according to fire code. Municipalities also routinely regulate parking and maximum numbers of trips according to formulas provide found in the zoning code. These formulas are structured to quantify the number cars and occupants per general tolerances. There are also additional concerns, however, if the surrounding area is sensitive to noise levels, lighting, traffic, frequent activity, and late-night usage of the property. Neighboring residents and businesses deserve to know what is the real intensity of use planned for the site and the hours that the facility will be operational. It is not unusual nor is it unreasonable for a municipality to limit a religious applicants' hours of use as well as intensity, according to generally applicable zoning provisions.

109

## 12: HOLDING THE PLANNING DEPARTMENT ACCOUNTABLE

It really is all in the details. Municipal planning is based upon what are the rules and how the rules are applied. When conditional or special uses – or even variances – are the objective of applications, the details may be reviewed with a high degree of discretion as the standing rules are adjusted when certain expectations are agreed upon and codified.

It is hard to know why it seems that Islamic permit applications may meet with lower hurdles and fewer questions. To be sure, the pendulum has swung the other way and some localities seem determined to decline the applications, under any conditions. But the times that the path to approval appears easier than for others and the conditions less restrictive, is it because officials seek to prove tolerance or because they are afraid of the potential for controversy? Or is it a combination of both?

The Staff Report Phase

Whether the application process is headed to either outcome, there is a role for citizen oversight of the entire process. That said, some parts of the process are opaque and not easily inspected. An especially determinative phase, and one that is conducted internally, is that of the planning staff research and report. This process involves staff findings on whether the intended use can meet compatibility expectations with input from other relevant agencies like police and fire.

The staff report presents a recitation of limitations on the use that will bring it into reasonable conformity with the character of the established host zone. This report is the product of extensive research into an array of technical concerns and it attempts to resolve all applicable concerns. If the property use is not deemed suitable at this point, staff recommends denial. If the applicants agree to meet an achievable range of standards, approval is recommended. The final report will be based upon the rationale for how the objectives of the Comprehensive and District Plans may still be met if this exceptional use is tailored to exist within allowable tolerances.

Most political commissions will essentially rubber stamp the staff findings as they are relied upon for accuracy and compliance with the District Plan and City Code provisions. Some would say that the "fix is in" at this point, but it is logical to acknowledge that staff planners are specially trained to process applications and analyze the appropriateness of the requests for conditional or special use. However, residents should understand that the final decision rests with the elected officials whose duty it is to thoroughly review and properly evaluate the staff report.

Many times the community will not even know that an application is pending until the staff report is finalized and the first public hearing is calendared. This is when the division of volunteers into committees or teams will allow for greater coverage of the oversight tasks. It will be

111

important to inspect the staff report immediately for compliance with standards on environmental reports, traffic studies, attendance to parking ratios, sewer and water, setbacks, hours of operations, specificity as to type and frequency of activities, potential for overlapping events, and parking. Municipal planners must devote the same level of scrutiny to all religious and assembly applications and these are questions that should be answered in all cases.

The structured rules that govern zoned areas are all available on the municipal website as are the listed requirements for special or conditional use. It is useful to keep in mind that the rationale for conditional uses intends that they are regulated to provide general *compatibility* with the prevailing zone design. Residents who are overseeing the permitting process should keep this premise in mind. They may use the language of the Comprehensive and District Plans to keep this objective at the forefront of discussions.

The Quasi-Judicial Hearing Process

The municipal websites are laid out so that inquirers start with links to the planning department or building permits. Then, it will be necessary to know the zoning for the area in which the permit is sought. If, for example, the zone is R-1 (typically single family residences), there will likely be a list of uses that are conditionally *allowed* if requirements are met. Check to see what are the requirements for religious assembly. This is where research may be done to learn what the expectations are of a religious assembly applicant seeking conditional or special approval.

This is also the part of the process that caused Congress to pass RLUIPA. Much political discretion, pressure, or potential favoritism may enter the equation at the point that staff and local political officers have the ability to tweak the guidelines. Post-RLUIPA, religious uses are not as likely to be disadvantaged. But, some planning staff have set RLUIPA provisions aside and others have relied upon them more to the advantage of some groups than others.

At this juncture it is very important to review past approved or denied religious and assembly applications for the zone. The past approvals should show similar application of code provisions from requirements for setbacks, buffer zones, sewer, left turn lanes, parking, trip counts, steeple or minaret height, waivers, hours of use, and any other test. If there are discrepancies, contact the point person for the prior-approved or prior-denied use and ask if they will testify at the hearing.

Good examples of studious resident oversight are found in the Disneyworld area of Florida. The Orange County Board of Zoning Adjustment denied a mosque application for a special exemption in the Bay Hill community, and the mosque backers then appealed to the Orange County Commissioners. In August 2014, the County Commission denied the

112

application unanimously.[228] News coverage cited the rural nature of the property, along with limited-access residential streets, as overriding concerns. Residents report that citizen oversight of applicable regulations played an important role.

Two years later, the Orange County Board of Zoning Adjustment unanimously denied another mosque application in August, 2016. In this case, the mosque needed a special exemption to be built in an R-CE zone. Although the 6,900 square foot mosque plans only showed 30 trips over local roads for afternoon prayer and 44 parking spaces, residents were adamant on enforcement of proper notice requirements for hearings, as well as regard for official designations that marked wetlands and protected habitat areas.[229]

A case in Sterling Heights, Michigan, also represents diligent community involvement and city staff adherence to zoning code. As the commissioners rejected the project, the city planner noted that "the 20,500-square-foot mosque on 4 1/2 acres of largely undeveloped property was too tall, too large and not harmonious with neighboring properties." Parking was an unresolved concern. And, even after adjustments, the minarets would still have been 27 feet taller than allowed by city regulations. Finally, the 65-foot dome would "far exceed the height of other structures."[230] The applicant is challenging the Sterling Heights' denial in court and the DOJ has announced an investigation.

Most important for residents is a complete understanding of the foregoing profiles describing the very different City of Bloomington processes and results that controlled the AFYFC and the Resurrection Power Church permit applications. These examples provide the highly discretionary practices that planners may use to defend opposite decisions when considering religious land use applications.

These profiles also reveal inconsistent rationale provided by the City to defend the opposite determinations: i.e., the AFYFC applicant was not held accountable for representations made regarding volume, level and kind of activity expected whereas the City relied upon the Resurrection Power Church's commitments and then added the planners' own "worst case scenario" speculation. AFYFC received a CUP conditioned upon "proof of [additional] parking," if needed, but the church was denied potential

---

[228] Fox, Greg. "Orange Commissioners Unanimously Vote No on Proposed Bay Hill Mosque." *WESH News.com* (19 Aug. 2014), http://www.wesh.com/news/orange-county-commissioners-hear-debate-on-proposed-bay-bill-mosque/27617032.

[229] Hendrix, Danielle. "More Details on Proposed Windermere Religious Center Emerge." *Windermere Observer* (27 Jul. 2016), http://www.orangeobserver.com/article/more-details-proposed-windermere-religious-center-emerge

[230] Chambers, Jennifer. "Feds Target Religious Bias in Zoning Fights." *Detroit News* (25 May, 2016), http://www.detroitnews.com/story/news/local/michigan/2016/05/24/feds-target-religious-bias-zoning-fights/84881958/.

alternative parking arrangements or parking lot modifications. The City of Bloomington did not review AFYFC's application in light of how future occupants would use the property but the Pastor Udeh of Resurrection Power was held to this standard. The AFYFC CUP supplied a condition restricting concurrent use of certain buildings to control parking but the City never offered similar considerations to the church when the City expressed reservations as to whether warehouse space *would ever be used* for assembly (Pastor Udeh had "eliminated" the warehouse space).

It is always advisable to consult anyone who has had experience with city hall to review documents and decisions and to advise oversight committees. Former or current building contractors or permit expeditors have had many encounters with city planners on related issues. Commercial builders and expeditors know how to read the code requirements and some have navigated the process many times. Land use attorneys may also be very helpful and may answer questions for a flat fee.

The public hearing session will provide an opportunity for comment and questions but research must be done in advance. There may be a short window between the issuance of the staff report and the city vote to act on the staff recommendations. The meeting agenda may also be the first time that the community is made aware of a pending land use application. Public notice of the hearing is issued typically after the staff report is published and it may be in the form of newspaper item, website entry, and/or letters to nearby residents. Municipal code on this varies according to state law that governs public notice requirements.

One of an accountability committee's interests is to assure that all worship groups follow the same rules. Islamic groups should not receive preferential treatment as compared to other religious groups. Comparing prior permit authorizations for the applicable zone with any attached conditions is the best way to do this. Per RLUIPA, applications for religious and general assembly permits must be treated equally. Generally this means that if a variance for a higher steeple is granted one organization, then the same amount of variance may be considered for minarets. But if the answer to one applicant for a special request is no, then planners may negatively consider similar requests in the future.

Typically, city and county websites offer a link to the Planning Department. Then it is a matter of selecting the Zoning or City Planning section. Then, locate the area where zoning sectors are described: light industrial, office, commercial, and residential are examples (these will be coded for variations of use with letter-number codes like residential "R-1"). Religious applicants will usually seek a Conditional Use Permit (CUP) since little land remains where religious use is designated as a right. The criteria for the permit may be found under the listing for "allowed" uses. If not an allowable use, then the applicants may be seeking an outright variance from the code.

114

It is possible to review the minutes from prior hearings since the documents are usually linked on the city website. Recorded minutes vary in accuracy and level of detail according to city practice and local rules. Cities are required to archive video recordings and minutes after the postings expire. The time parameters vary by municipality but all records not available by website should be provided upon written request.

Additionally, desk clerks will have access to prior permit approvals with listed conditions available for copying. Clerks will often answer questions about the various processes and may provide copies of official documents although sometimes there is a nominal printing fee.

Outright variances from the zoning code typically will be even more difficult for an applicant to obtain since they represent a deviation from the rules, rather than an effort to create compatibility through conformity with the rules. If the application is for an outright variance, the oversight process is the same. Residents should learn the procedures the govern variance policy and compare to the record of past decisions.

A request for rezoning, or re-characterization of the site to allow deviation from the District Plan is even more burdensome. This process involves exempting much of the project from the prevailing area zoning rules and detaching the project from the definitions that control the surrounding area.

If city planners are to consider sidelining staff recommendations, either in pursuit of more information or to challenge a staff finding, they generally will have to be persuaded by very compelling information. This is the reason why resident presentations must be supported with professional studies, credible sources, and historical records. Residents are able to review all of the applicant documents to compare submissions with public testimony for consistency and accuracy (including even artist's renderings). This exercise should consider whether the intended use is aligned with city code, as well as past treatment of similarly situated assembly and religious applicants. Any discrepancies should be noted and questioned according to accuracy standards, transparency expectation, and compliance with law.

When the City of Bloomington realized that AFYFC was using the property to a much greater extent than stated on the application and at the hearing, the city attorney said, "We have learned not to rely on statements in the application for the conditions." She admitted that "in the past, when [other institutions] said 'this is all we are going to do,' we expected them to honor that."[231] Localities that are on the pre-approval side of the hearing process have opportunity to ask the detailed questions, inspect the answers for conformity with zoning code, and build in enforceable conditions where

---

[231] City of Bloomington City Council Meeting Video, Sep. 23, 2013, *supra* at note 84; approximately 4:31 on the marker,
http://bloomingtonmn.granicus.com/MediaPlayer.php?publish_id=deed4eb7-7681-1031-bf4f-32d5966f69c1.

115

future developments will foreseeably stretch limits. Assuring that this process is performed according to regulations, and consistent with treatment of similar past applicants — and with all attention to detail — is where accountability overseers are most useful.

## 13: UNIQUE CONCERNS WHEN RESIDENTIAL HOMES ARE CONVERTED TO MOSQUES

When a residence purchased by private individuals is converted to a mosque, the neighbors living in the surrounding area will usually not expect this development. Although this change in the residential designation typically involves a variance from zoning code, the notice to the neighborhood will likely only be what is required to meet the hearing requirements. Many will first notice it as a matter of an agenda item listed for consideration at the next city or county planning session. Planning staff may already have prepared a full report.

Since city staff reports take months to process, the hearings to formalize staff recommendations will take place after much of the fact-finding is done. Yet, it is very important for residents to be involved in this process at the earliest phases. If a permit for religious use is approved in a residential area, residents should have input into all of the various concerns over activity levels and impact, but especially the requirements for traffic and parking management, whether a parking lot may be created on a residential lot, limitation on street parking, reasonable provisions for off-site parking, and enforcement mechanisms. Since typical residential quiet hours are from 10 p.m. to 7 a.m., activities should not be scheduled as a matter of routine during residential zone's quiet time.

If there is confusion regarding the difference between a home that may host a weekly meeting like a Bible study for a small group of people (usually less than 50) and a mosque, Bible study meetings have been treated in the courts on the same basis as other home gatherings like football game viewings.[232] By definition, a mosque facility is a full-fledged worship site and it likely encompasses many weekly functions and full participation – plus observant Muslims who work in the area – for prayer attendance on Fridays and other days, in some cases.

---

[232] "San Juan Capistrano Adopts Changes to Shield Home Bible Studies." *CBS KCAL, Los Angeles* (21 Jun. 2012), http://losangeles.cbslocal.com/2012/06/21/san-juan-capistrano-adopts-changes-to-shield-home-bible-studies/

117

## 14: TESTING CONDITIONAL MOSQUE PERMITTING IN PHASES

Some religious applications for non-conforming, but allowable, uses are granted permits in stages. The applicants receive the permit to operate in terms of years: two, five, ten, etc. Terms as low as two years do not give institutions sufficient time to amortize the investment in improvements, or to do even intermediate planning. But terms as long as five, seven, and certainly ten years provide predictability and opportunity to establish good relationships with the surrounding zone occupants.

The reason for limited conditional use is to provide officials opportunity to review the compatibility of the use after a period of time. If the religious organization has not exceeded the permitted limits and the operations at the site have not been detrimental to the prevailing establishments or residents, the use will be extended.

When contemplating a termed CUP, officials should know that courts in many jurisdictions have determined that there is an actual property interest in renewal or transfer of a CUP. Thus, there is a rebuttable presumption that the CUP should continue unless the local officials can demonstrate that the user or the use is simply not a good fit for the area in which it is situated. In the case of an outright denial of a religious CUP term extension or transfer, the reasons should be based upon a record that will show the locality's legal compelling interest to overcome the institution's assertion of a substantial burden.

Even so, in the case of a CUP holder like AFYFC that refuses to follow the rules and a city that enables the abuses, much comfort would be available to the community and the councilmembers who would use the leverage of a comprehensive future review.

In fact, the prior Lutheran occupant at the AFYFC facilities was granted a limited-term five-year CUP. It is hard to know why the City of Bloomington deviated from this policy for AFYFC rather than continuing to issue the permit with a review and conditional re-issue date. In 2016, Bloomington issued a two-year CUP to religious applicant, The Father's House. This short a term likely would not survive judicial review if challenged, and the organization certainly had RLUIPA equal terms and non-discrimination claims based upon the generous AFYFC grants, but the City clearly was willing to treat other religious applicants on an earned trust basis.

The phased permit approach works well in conjunction with legally-described safe harbor methods that assure a degree of predictability and later recourse in the event of overuse or abuse of permit limits. The termed CUP may be especially useful when municipalities are unsure about the veracity of projections and commitments made during the application process.

119

## 15: PERMIT HEARINGS AND PUBLIC COMMENT STRATEGY

When government processes implicate property interests there must be safeguards that protect private ownership. Part of the process that is due to property owners is notice of government deliberations regarding policies that potentially impact the value, use and peaceful enjoyment of property. Local zoning regulations will specify the kind of notice required and will describe the geographical area that will be notified of pending applications for exceptional uses.

Another part of due process concerns is the requirement that governments conduct a hearing to allow public questions and input. The hearing process for zoning decisions includes allotted time for questions or comments from interested citizens. Speakers during these sessions are typically given three minutes to speak from a podium. In most hearing rooms, the podium is equipped with a light system that indicates time expired when light turns from green to yellow to red. Each speaker is expected to fill out a form (or some method of registration), usually prior to the public comment session for the purpose of providing name and subject matter that the speaker wishes to address.

Many planning authorities will accept printed material from speakers at the podium. In some cases, there may be an overhead projector for speaker use in presentation of documents and studies at the podium. If there is *relevant* study material or a printed presentation of useful resources to underscore remarks, make enough copies for council members or planners with a few extra for staff. Any handouts are usually accepted by a clerk and then distributed to the officials. Use this opportunity wisely to provide useful documentation that supports remarks.

An accountability group should decide well in advance of public sessions who will speak for the group. Speakers should address regulatory concerns like environmental and traffic studies (as discussed elsewhere in detail) with a focus on accountability. After studying similar religious and assembly hearings and the conditional use code provisions, speakers should hold officials to exacting standards. At this point, readers should review again the chapter on the AFYFC experience in Bloomington, MN, to consider how attention to every detail with subsequent enforcement provisions in mind is important. Again the vote whether to approve, and what conditions will apply, should also be considered in light of comparable treatment of other religious or assembly applications.

Overall, the tone of speakers is critically important. Speakers must stay on point and speak to issues that the decision makers are authorized to address. Speakers should organize material so that each has a topic and an area of expertise. It is also helpful to structure the presentations so that there is as little repetition as possible. Not every interested resident needs

121

to have a speaking role for the level of interest to be noted. The larger the supportive group in attendance, the more emphasis that speaker points will be given. It should be noted that this is not the time for outbursts or applause.

The most important instruction to remember when making a presentation at a public hearing is to speak in a thoughtful and credible way. If remarks are dismissed as hysterical or rant-like, the comments only serve to discredit the entire effort. This is the reason that the 3-minute allotment of podium time should not be used to discuss the dangers of Sharia, civilizational jihad, or violent passages from the Koran. This is likely to be counterproductive as these issues have no place in a local government hearing. In fact, over the top religiously animated remarks may prompt city officials who are working to apply the zoning standards in a deliberative manner to disregard even the potentially credible points that these speakers, and those they represent, hope to make.

As one will observe in the footnoted video segment, the impact on Temecula city planning commissioners, after over eight hours of 3-minute comments, was not what was intended.[233] During the endless hours of short comments, only a handful of speakers attempted to address relevant issues like traffic, parking, and measurable impact on the surrounding residential zone.

It should go without saying that lecturing officials in public is not an effective method of persuasion. There is a difference between matter-of-factly explaining a concern or questioning the rationale behind a regulatory procedure, and scolding or ranting. The decision makers were popularly elected and they have strong political instincts. Many desire to be elected again and some intend to run for higher office. Some are very uncomfortable with this kind of controversy and they feel tremendous pressure to find the fastest route to negotiated compromise. The best rule of thumb is to stick to matters of substance relating to the hearing business and to clearly articulate the interests of the community.

In the event that an elected representative has betrayed the public trust or conducted himself in a manner that is negligent or irresponsible, these are political matters and a response may be organized away from the hearing procedures.

Furthermore, it may be a good idea to ask an attorney who is familiar with zoning law to give a prepared summary of legitimate concerns and to offer to answer questions that the council or planners may have. Many city attorneys have been to seminars on the religious land-use protections

---

[233] "Temecula Planning Commission Vote on Mosque." *YouTube* (9 Aug. 2012). https://www.youtube.com/watch?v=Z6DReyBKviE; *also see*: "Temecula Approves Mosque After Contentious 8-Hour Hearing." *Los Angeles Times* (26 Jan. 2011), http://latimesblogs.latimes.com/lanow/2011/01/temecula-approves-mosque-after-contentious-8-hour-hearing.html

122

covered under RLUIPA, but may not be as familiar with current rulings on the statute as an attorney that specializes in the field.

As has been noted elsewhere, commercial contractors may also have invaluable insight as they know the system and they have learned how to make effective presentations to planning committees and support staff.

From a legal and ethical perspective, city officials are required to make a statement distinguishing their objective duty to apply the rules equally from commenters that sound religiously or racially biased. Many cities will open the public comment period with a disclaimer saying that comments do not reflect the views of city planners and they will remind speakers to address only matters relevant to the application review process. If city officials do not stay above the fray while carefully executing civil duties, litigants may attempt to impute the hostility of vocal opposition speakers to the decision-makers.

Take, for example, the case of the Al Madany Islamic Center that settled in 2014 with the City of Norwalk, Connecticut, for $1.8 million and an agreement that the city would locate a suitable alternative site for the Islamic organization. Interestingly, in light of the parking concerns at AFYFC as related previously, the proposed settlement shows that careful parking management plans to avoid on-street parking were included.[234]

The Al Madany legal complaint was based, in part, upon discrimination charges. In an unusual move, the lawyers included private comments from outside the hearing hall that were entered into a community blog: "Yay, just what the USA needs, another house where they teach to kill those that disagree with their ideology; Why don't the locals just defile the ground with pork products; Let 'em build it. Then we burn it."[235] According to news coverage, officials did ask speakers who attended the hearing to refrain from comments about "religion" and to limit remarks to zoning issues. There was no record of official discriminatory remarks. This case involved a protracted settlement process and no final judicial ruling that referenced the extra-hearing comments.

As in the Al Madany case, even though there may be no direct link between local hostility and official action, some attorneys have asked judges to consider whether a denial in the presence of hostility constitutes circumstantial evidence of bias. As mentioned previously, the DOJ is

---

[234] Chapman, Nancy. Al Madany Plans to Make Union Park Church into a Mosque." *NancyonNorwalk.com* (12 Nov. 2015), http://www.nancyonnorwalk.com/2015/11/al-madany-plans-to-make-union-park-church-into-a-mosque/; copy of proposed settlement *available at*: http://www.nancyonnorwalk.com/wp-content/uploads/2014/08/Settlement-Terms.pdf.

[235] Seeman, Evan. "Can the Publics Discriminatory Comments Play a Role in RLUIPA Claims?" *Rluipa-defense.com* (11 Sep. 2012), https://www.rluipa-defense.com/2012/09/can-the-publics-discriminatory-comments-play-a-role-in-rluipa-claims/. ("When such statements are made in a public forum, local officials may wish to take corrective action, such as having the chairperson immediately renounce any discriminatory statements. ...")

123

planning to build cases on the legal theory that adverse impact, or disproportionate outcome, is the same as legally-defined discrimination.

If these attempts to shift more authority from local government officials to federal overseers succeed over time, it will be even more difficult to draw proper lines between hostility or animus, and residents who are seeking straight answers and work to ensure predictable levels of use. Resident comments should be evaluated for proper and thoughtful lines of questioning in search of reliable facts and proper limits. There must always be a valid and vital role for the community to play in oversight of the many planning department procedural requirements. Residents have every right to speak to the enforceable limits that should accompany a special, or conditional, use.

The determined attempts by Islamic civil rights groups and the DOJ to link adverse decisions and delays directly to discrimination are ominous. And, the attempts to connect critical comments, issued outside of civic hearings, to official animus serve to chill First Amendment protected speech. This disregards the Supreme Court's highest level of protection covering robust debate on matters of public concern. Even so, the line between public domain and formal civic speech must be carefully considered. It bears repeating that prudent elected officials should clearly distinguish their deliberative roles from surrounding commentary in the public arena, or inappropriate opinion expressed in the hearing hall.

There have been clear examples of decision makers crossing the animus line and courts do correct these displays of direct discrimination. In an example involving a church application, a lawsuit resulted after a religious application met with such fierce official resistance to "another church" that a councilwoman's instructions to the planners were to "kill" the project. In this case, the court ruled that this "open hostility" contributed to a violation of RLUIPA protections.[236]

While there are important presentation protocols for formal hearing sessions, individual free speech interests in the issue generally must be protected. When residents in Pittsfield Township, Michigan, organized to petition against an Islamic school and community center mosque based upon traffic and infrastructure concerns, the permit application was denied. In response, in 2012, the Ann Arbor chapter of CAIR sued for civil rights violations and subpoenaed records including emails from the citizen activists. After the American Freedom Law Center responded on behalf of

---

[236] *Fortress Bible Church*, 694 F.3d 208, *supra* at note 137. ("Karaman (planning board member) asked what he could do to move the process along, and Feiner responded that the Church could agree to make yearly financial contributions to the fire department. Another Board member suggested to Russo on multiple occasions that he should 'stop' or 'kill' the project.")

124

seven community members, the judge ordered CAIR to pay attorneys fees and the "harassing" subpoenas were quashed.[237]

But this judicial reprimand did not deter an Islamic group in Basking Ridge (Bernards Township), New Jersey, from also issuing subpoenas to residents who opposed a mosque application. In 2016, the township of Basking Ridge denied a mosque land use application, after several years of hearings, determining that essential questions regarding parking and activity levels had not been answered in sufficient detail. The Islamic Society of Basking Ridge complained to the DOJ and filed a lawsuit. Part of the litigation included subpoena "commands" for residents to produce communications and documents, including social media posts, that, for example, referenced "Muslims, Islam, mosques, the Quran (also known as the "Koran"), Muslim worship or prayer services, wudu, imams, burkas, hijabs, Sharia (also known as "Shari'ah"), jihad, or anything else associated with or related to Muslims or Islam."[238] At the time of this writing the federal judge had not ruled as to whether constitutional First Amendment protections would prevail, and whether potential overbreadth or vagueness concerns would defeat these "commands."

Some local politicians forget at times that their authority is law-based and that discretionary decisions must be squared with the law. Even though they are popularly elected, they cannot just make up new rules and "because we said so" is not a sufficient answer. It may even be a matter for the courts when the exercise of discretionary political power exceeds constitutional boundaries or legal parameters. However, citizens do perform an important oversight role when they have studied the law governing the process and then when they question officials for assurance that zoning codes are applied accurately and even-handedly.

---

[237] "Federal Court Orders CAIR to Pay AFLC $9,000 in Legal Fees." *americanfreedomlawcenter.org* (28 Aug. 2015),
http://www.americanfreedomlawcenter.org/press-release/federal-court-orders-cair-to-pay-aflc-9000-in-legal-fees/.

[238] Perry, W. Jacob. "Mosque Subpoenas Stir Anger in Bernards Township." *The Bernardsville News* (16 May, 2016), http://www.newjerseyhills.com/bernardsville_news/news/mosque-subpoenas-stir-anger-in-bernards-township/article_79cc47d4-6015-51d9-a680-ccbd1d59d914.html; *also see*, Islamic Society of Basking Ridge (ISBR) subpoena, *see* http://mosquesinamerica.org/wp-content/uploads/2016/10/238_mosque-subpoenas-stir-anger-in-bernards-townsh.pdf

## 16: SCALING STONEWALLS: PUBLIC RECORD REQUESTS AND OPEN MEETING ACTS

### PUBLIC RECORD REQUESTS

Most Americans have heard of the federal Freedom of Information Act (FOIA). State laws govern similar mechanisms that apply to local government proceedings and these are usually called something like "public record act requests." An internet search will provide references to state laws that govern the format of the requests. It may also be possible to find several sample presentations.[239] These requests can be a very powerful tool for obtaining documents, inter-agency communications, and study results that are not routinely made available to the public.

State data requests may also be used to access original records of municipal meetings. Most localities are required to archive these complete records. In the event of heavily-summarized minutes, old, or missing videos, an original transcript usually must be retained and offered to the public for inspection upon request.

There are resources that provide insight into the various "state records act requests" as they also offer insight into the respective procedures.[240] When utilizing any guides or handbooks, it is always advisable to check city codes for any updates or revisions.

The records request tool does something to level the playing field where it provides resident access to copies of submitted documents, tests, emails, notes, and other records. When the proceedings are scheduled to run quickly and much seems to have been already decided, submit the records requests early. There is a municipal code to regulate the number of days allowed for responsive documents but it may take the full allotment to receive the requested items.

Some localities do allow documents that are "under consideration" to be withheld for a time. This may mean that they are legally sensitive under attorney-client privilege rules or that the items are still the subject of a decision under consideration by the body, but not yet finalized.

Such requests require that parties follow the protocol as recorded in the state statute and often further defined in local procedural code. It may be best to have an attorney or legal practitioner write or review these

---

[239] Sample Public Records Act Request (California) letter sample: https://firstamendmentcoalition.org/public-records-2/sample-cpra-request-letter/; New Jersey form: http://www.nj.gov/grc/public/request/.

[240] A useful guide provided here: "Open Records Law: A State by State Report." http://www.naco.org/sites/default/files/documents/Open%20Records%20Laws%20A%20State%20by%20State%20Report.pdf

requests since compliance and responsiveness often hinge on how closely specific requirements are followed.

Some localities charge a minimal amount to make copies of the requested documents, so residents should be prepared to provide the required funds when a public records act request is made. Alternatively, residents may use a room provided for the purpose of reviewing and copying the documents on site. Whether photographing items with a cell phone or scanning pages digitally, it is possible that the session will take some time as municipal employees do not always sort documents.

The "public records act" request is a very important mechanism for local residents to employ when there is concern about transparency and consistency in the land use permitting process, but the relevant procedures must be followed closely.

State "open meeting" acts govern local government proceedings, and they serve to impose the methodical and transparent process that is foundational to the rule of law. Many of these regulations also provide definitions for the legislative and quasi-judicial responsibilities assigned to local representatives. For example, the CUP *formal* hearing process, involving *testimony* and *findings of fact,* is a quasi-judicial act.[241] Just because applicants are not sworn in by raising the right hand does not mean that they may mislead the panel of official fact-finders in order to then violate the agreed upon CUP limits with impunity.

Many states will require local municipalities to keep detailed records and follow specific procedures when officials perform legislative quasi-judicial functions. Open meeting acts often provide the framework for local rules regarding notice, video recordings of public meetings, agendas, and minutes. These local regulations are essential tools for use in obtaining *accurate records* of past proceedings and the keeping track of ongoing deliberations. These records must be published and presented per specific procedures, and back-up data produced according to local deadlines.

Open meetings acts also define what is a quorum and they enunciate rules prohibiting private council-member conversations on matters that will be voted upon by the local government body. These rules protect citizens from private deliberations on matters that will become local government pronouncements. These acts vary state-by-state and it is very important to find the law in each respective state and to hold local officials to the letter of this law.

---

[241] Example: "Minnesota Open Meeting Law." *Minnesota Department of Administration*; available at: http://www.ipad.state.mn.us/docs/omlnotice.html.

## PUBLIC OFFICIALS MAY NOT HOLD SUB-GROUP PRIVATE DISCUSSIONS

Most states have "open meeting" laws enacted to assure that discussions regarding the people's business is conducted in an open, accountable, and transparent fashion. These laws typically announce that government and quasi-government meetings must be open to the public and written notice must issue of the subject of each meeting held. Posted minutes that record the details of the meeting are also usually required.

A meeting is usually defined as the consideration of any official business between a majority, or quorum, of the members. The "meeting" may occur in person, by email, or telephone. Many municipalities have established a best practices policy of not discussing any matter that could be construed as "business" at an informal gathering, or on the phone, or by e-mail, or via the Internet.

If, during a permit application process it appears that officials have come to conclusions that were not deliberated during a public session, it is time to remind officials that citizens are aware of the open meeting law provisions and expect adherence to the rules.

Also, if Islamic organizers have had meetings with planners before the permit application was filed or anytime during the staff investigations and hearing procedures, "open meeting" regulations may apply, and sessions may only be allowed with one council member at a time. The local Open Meeting Act code sections will provide all regulatory terms.

Some issues may be considered during a closed session but the posted regulations must be followed for this alternative to a public session. Most municipalities require posting of the closed session subject matter and provide that notice of the executive session be posted in advance by a specified number of days.

Also, there are rules that govern local executive sessions. These closed sessions may only be used for specific deliberations. It is very important for residents to know how these procedures apply so that proper challenges may be registered if the rules are not followed.

129

## 17: WITHDRAWAL OF UNREASONABLE MOSQUE APPLICATIONS

In 2013, concerned residents in St. Cloud, Minnesota were alarmed when the township used the procedural vehicle of an amendment to consider whether to allow a mosque with attendant facilities and housing in a residential area. The special application was for a parcel situated in a single-family residential area and the mosque complex would have included a religious school, two two-unit residential dwellings, a community building with a gymnasium, offices, and retail and restaurant space. Residents complained that this kind of dramatic departure from residential use required a full variance process.

Local citizens formed committees to study the regulations that governed the utilization of the amendment process to achieve zoning modifications and they reviewed examples of how the amendment process had been used in the past. They decided that this application really represented what amounted to something like "re-zoning" and they formed a citizen action committee around a "No Re-Zone" theme.

Residents then organized a multi-fronted challenge to the township's decision to call the process for permitting the mosque complex an "amendment to the Planned Use Development (P.U.D.)." Local residents saw this exceptional use as a re-characterization of the residential neighborhood zoning designation.

These residents developed a website[242] for stating the issues and posting updates, printed posters, car signs, yard signs, bought radio air time and newspaper space, organized press communications, and prepared questions for public hearings. Organized neighbors held press conferences, monitored press coverage, and wrote letters to the editor when the coverage was not complete.

The focus of the resident group was restricted to only regulatory issues including impact, compliance with zoning regulations, original intent of zoning, and infrastructure burdens. When the St. Cloud planning commissioners and the City Council expressed grave concerns about the re-zoning proposal, even in light of a modified application for fewer buildings, mosque officials withdrew the application. The applicants ultimately

---

[242] "St. Cloud Citizens for Reasonable Zoning. St. Cloud. MN City Council: Deny the Application to Amend Paradise Park." *Change.org* (24 Jul. 2013), avail: https://www.change.org/p/st-cloud-mn-city-council-deny-the-application-to-amend-paradise-park-pud-dated-7-24-2013 (The organizational website is no longer available but the link shows what could be called the group's mission statement): http://mosquesinamerica.org/wp-content/uploads/2016/10/242_Deny_application_Paradise_Park.pdf

131

decided that they would consider other sites or might submit a revised application for the original site.[243]

An Islamic Center in Fredricksburg, Virginia, offered to sell a proposed mosque site to a builder for a housing project, pending county re-zoning, after encountering opposition from the community based in parking and activity concerns.[244]

Another exhibit in the category of withdrawn mosque applications is one in Brentwood, Tennessee, where neighbors united to voice concerns about traffic and flooding (most of the proposed site was on a flood plain and there had been recent storms).[245]

---

[243] Collins, Jon. "St. Cloud Islamic Center Withdraws Mosque Proposal Before Final City Council Vote." *MPR News* (8 Oct. 2013), http://www.mprnews.org/story/2013/10/08/religion/st-cloud-islamic-center

[244] Branscome, Jeff. "Islamic Center May Stay At Its Current Location If Residents Agree To A Compromise." *The Free Lance-Star* (31 Jul. 2016), http://www.dailyprogress.com/starexponent/news/islamic-center-may-stay-at-its-current-location-if-residents/article_7d911b40-dca3-530f-8b4c-a29d1b41076f.html

[245] Smietana, Bob. "Brentwood, TN: Mosque Not Alone in Defeat." *Virtueonline.org*, from *The Tennessean* (23 May, 2010), http://www.virtueonline.org/brentwood-tn-mosque-not-alone-defeat.

132

### 18: ANTICIPATING ENFORCEMENT: WHEN GOVERNMENT FAILS TO UPHOLD THE LAW

When law enforcement prioritizes keeping the political peace above upholding the law, the officer becomes a seeker of the path of least resistance. Conflict avoidance is a disastrous policy when Islamists design to replace the American rule of law with a counter cultural mindset and Sharia-based practices. As police step back, even when the infractions seem to be of little consequence, they telegraph weak commitment to consistent application of the laws. Political managers may intend this approach to speak tolerance and welcome, but the special treatment is understood by Islamists to be symptomatic of a lack of conviction and moral resolve.

Recall the AFYFC case: What were the Islamic leaders of that mosque in Bloomington to think when the City altered the ordinance that prohibited double-parking, and when police consistently declined to ticket attendees for unsafe parking in lanes needed for access and emergency vehicles? Would Class III vehicles be allowed in other residentially coded parking lots? What about when the City decided that the only occupancy limit was the fire code rating for the buildings, contrary to attendance limitations in the CUP? And, how would the decision to ignore wildly low applicant activity level testimony that committed to maximum attendance of two hundred persons be interpreted? And, what of the finally updated Joint Use Agreement that allowed for periodic "permitted" all-night activity? And, why did that agreement create a series of negotiation phases rather than penalties? Worst, what comes next when various widely advertised activities and programs are advertised as running concurrently and/or consecutively, although not authorized by the CUP?

None of the apparent individual singular concessions granted AFYFC may seem shocking, but when considered in their totality, it would not be surprising if the AFYFC mosque's leaders expected to continue to obtain exemptions from rules that apply to everyone else. What could be called a sense of entitlement only grows when government is increasingly reluctant to enforce the law evenhandedly.

When law enforcement is reduced to walking a delicate public relations line between hostile mosque-goers and disturbed homeowners, the rule of law becomes a mediation negotiation. As law enforcement practices something more like containment policy – keeping the aggressive party from further encroaching on the turf of complaining party – than hewing to a commitment to the rule of law, the encroaching party has nothing to lose by continuing to push the limits. Respect for rules cannot help but be undermined when officials give *de facto* assent by ignoring

133

infractions. Ultimately, it becomes very difficult to draw the line when enforcement should begin.

Is it just an early stage in "no-go" zone development when local government essentially decides to look the other way? What likely happens next when police and local authorities do not recognize baselines from which rules will be upheld? What is at the core of European zones that reject accountability to the host society? It all has to start with pockets of isolation that refuse to recognize civil authority and the legitimacy of consensual government.

Andrew McCarthy, the successful prosecutor of the Blind Sheikh and estimable author on issues of Islamist hegemony finds that America's unique demographic, geographical, and historic experience with immigrants has deterred the development of the balkanized zoned areas. He warns, however, that America's better assimilation success rate is the only real insurance against Islamic separatism. McCarthy expects that the "voluntary apartheid" conditions – what he calls "the strategy by which Muslims of the fundamentalist bent integrate but quite intentionally resist assimilation" – found in Europe will embed in the United States if historic assimilation expectations fail.[246] As McCarthy perceptively urges, "It is very difficult to assimilate a subpopulation that comes to a host country with the specific intention of changing the country, rather than becoming part of that country's culture."[247]

As a warning of what may repeat if American communities fail to erect bulwarks against Islamist separatism, McCarthy provided an example of the rapid transition experienced by a suburb of Chicago called Bridgeview:

> In 1981, the Muslim Brotherhood enjoyed a middle American coup, using the [North American Islamic Trust – a Brotherhood organization that buys up American real estate for the establishment of mosques and Islamic community centers] to wrest the Bridgeview Mosque in Chicago from its moderate founders. The mosque became an anchor for the Brotherhood's voluntary apartheid strategy.
>
> As the Chicago Tribune reported in 2004, the mosque's leaders "are men who have condemned Western culture, praised Palestinian suicide bombers and encouraged members to view society in stark terms: Muslims against the world." Those leaders drove out moderates, they enforced Islamic dress codes and strict separation of the sexes, and they imported Salafist clerics, whose

---

[246] McCarthy, Andrew C. "European-Style Islamic Enclaves in the United States?" *PJ Media* [31 Mar. 2016], https://pjmedia.com/andrewmccarthy/2016/03/31/european-style-islamic-enclaves-in-the-united-states/?singlepage=true
[247] *Id.*

134

salaries were paid by Saudi Arabia. [Salafism is a fundamentalist form of Sunni Islam.]

The mosque's communiqués reeked of Brotherhood's doctrine: one brochure, for example, warned that Chicago Muslims were at risk of "melting in the American society, culture and lifestyle"; a plea to a Saudi charity sought funding "before it becomes too late and we may lose our children because they are living in an un-Islamic society."

A whole new community sprang up. The area became an upscale enclave, featuring new houses with Arabic script over the doors and sparkling chandeliers. Mosque leaders built two schools and started a youth center for basketball and religious classes. New clothing stores, groceries and restaurants opened in Bridgeview. A floor-covering store turned into a Middle Eastern restaurant. A music store became an Islamic hair salon. Men who attended the mosque grew their beards and traded their T-shirts for long tunics. Women draped themselves in loose, ankle-length robes. Cook County was fast becoming home to more Palestinians than any other part of the nation. And the mosque was now one of the area's largest Islamic centers....

Most non-Muslims moved away from the mosque neighborhood, frustrated by traffic jams on Fridays and the call to prayer that rang out over mosque loudspeakers. Muslims were happy to take their places. ...[248]

Europe may have difficulty defining a no-go zone, but such areas are generally considered those where police are not confident that they will be respected. While there is not a physical barricade to the point of a moat and drawbridge to bar police entry, police only dare enter with full back-up and, even then, they may be swarmed as mob assemblies converge on them.

Middle East scholar Daniel Pipes has concluded that European local governments when allowing "partial" no-go zones are "shirking responsibility" and are acceding to a "Muslim drive for exclusion and domination." He observed that these zones are declared for a particular purpose:

[T]hey are no-go zones in the sense that representatives of the state — police especially, but also firefighters, meter-readers, ambulance attendants and social workers — can only enter with massed power for temporary periods of time. If they disobey this

---

[248] *Id.*

135

basic rule (as I learned first-hand in Marseille), they are likely to be swarmed, insulted, threatened and even attacked.[249]

Soeren Kern, an investigative reporter known for in-depth analysis of Islamization in Europe, researched the question of no-go zones in Europe in 2015 and presented his findings in two articles. These reports are replete with links to interviews, academic studies, news exposes, and governmental assessments concerning the "Muslim dominated neighborhoods" that were "de facto off-limits to non-Muslims due to a number of factors, including the lawlessness, insecurity or religious intimidation that often pervades these areas."[250]

If America is to avoid the ominous trajectory and possible final fate of Europe, the early signs of separatism here must be confronted. Local authorities should assure enforcement of the constitutional rule of law by providing clear requirements that they are prepared to consistently enforce. It should be a routine matter when zoning code violations occur that they will first trigger a notice of warning with subsequent infractions entailing either a fine or other penalty for non-compliance. Ultimately, cities should be prepared to call the very permit to use into question if the conditional terms are violated and corrective process has not been followed.

It is true in Europe that government and law enforcement officials have stepped back while Islamic demands for accommodation have been stepped up. There are ample illustrations from European countries that are experiencing an incremental transfer of power in Islamic districts to provide lessons on the "culturally sensitive zones" that have become increasingly assertive in their refusal to submit to civil authority.

Whether it is taxi drivers in New York that park in stacked up fashion during prayer sessions, or it is a mosque administration that is allowed to re-interpret a conditional use permit, relaxation of the rules will be expected, if not respected, and it will become the new status quo.[251] It should be understood that, when a segment of society esteems an alternate system of law as transcendent, any success that it enjoys in undermining local law will be seen as a significant symbolic accomplishment.

---

[249] Pipes, Daniel. "The Danger of Partial No-Go Zones." The Washington Times. (28 Dec. 2015), http://www.washingtontimes.com/news/2015/dec/28/daniel-pipes-the-danger-of-partial-no-go-zones/

[250] Kern, Soeren. "European 'No-Go' Zones: Fact or Fiction? Part 1: France" *Gatestone Institute* (20 Jan. 2015), http://www.gatestoneinstitute.org/5128/france-no-go-zones; *also see:* Kern, Soeren. "European 'No-Go' Zones: Fact or Fiction? Part II: Britain" *Gatestone Institute* (3 Feb. 2015), http://www.gatestoneinstitute.org/5177/no-go-zones-britain; *also see:* Kern, Soeren. "European No-Go Zones Proliferating" *Gatestone Institute* (2011), http://www.gatestoneinstitute.org/2367/european-muslim-no-go-zones.

[251] "Upper West Side Parking Dispute Breaks Out Between Muslim Cab Drivers, Residents." *CBS WCBS, New York* (9 Dec. 2011), http://newyork.cbslocal.com/2011/12/09/upper-west-side-parking-dispute-breaks-out-between-muslim-cab-drivers-residents/; (strong language warning for second video): "NYC Parking Cop- 'We Do Not Ticket If Wurshepin.'" *Liveleak.com* (6 Sep. 2013), http://www.liveleak.com/view?i=b16_1378500208.

136

## 20:  Radicalization Detection Is a Legitimate Community Cause

According to state authority, local officials are charged with the administration of general health, safety, and welfare matters. Communities then delegate to law enforcement the duties of surveillance, detection, and apprehension of those planning to commit violent or unlawful acts.[252] Law enforcement oversight is separate from zoning decisions and it is triggered by activities that meet legally measured probable cause patterns. Thus, it is important to understand the separate functions of these agencies and to recognize their prescribed roles. The land use hearing must follow published procedures and must satisfy zoning checklists. Under existing law, it is not within local land planning responsibilities to make forays into religious organizational beliefs, project funding sponsorship, or leadership bona fides.

Thus, states authorize cities, according to their constitutional police power mission, to apply zoning power for the safe enjoyment and use of property. It is not the role of municipalities to adjudicate an understanding between the community and the mosque directors on the leadership role that officials will assume if and when the mosque is established.

There are some who may find the term "radicalization" lacking specificity as it generally is used to convey alarm on the full spectrum from failure to assimilate to joining jihad campaigns. It is sufficient for the purposes here that it is the term used to communicate a cultural threat level sufficient to merit local concern. It is the term used in the public square and the media. It is a term that is defined by the context of the particular crisis.

Consider the tragic 2009 radicalization case of Carlos Bledsoe (a.k.a. Muhammad) who shot two Army privates, killing one, at a military recruiting center in Arkansas. His father, Melvin Bledsoe, testified before Congress, and also gave interviews to media outlets, to describe the "evildoers" who "brainwashed his son." He warned, "If it can happen to my son, it can happen to anyone's son."[253]

Melvin Bledsoe chronicled the brainwashing process that resulted in observable "personality changes" like his son changing his name and removing a picture of Dr. Martin Luther King from his bedroom wall, and turning his dog loose in the woods (because Muslims consider dogs to be

---

[252] "NYPD Designates Certain Mosques as Terrorist Enterprises." *The Clarion Project* (1 Sep. 2013), http://www.clarionproject.org/news/nypd-designates-certain-mosques-terrorist-enterprises.

[253] Dao, James. "A Muslim Son, A Murder Trial, and Many Questions." *New York Times* (16 Feb. 2010), http://www.nytimes.com/2010/02/17/us/17convert.html?_r=0.

137

dirty creatures).[254] This is exemplary of the radicalization process and it begins with alienation from Western democratic norms. It ends, if the process is completed, with allegiance to contrary Islamist dictates. This is the radicalization that threatens European and American communities.

Even though there is no direct municipal role, in light of known radicalization trends[255] that have produced disturbing levels of anti-Americanism and "homegrown" Islamist terror agents, municipalities should understand that residents may engage in constructive efforts outside of the hearing process to articulate the means of identifying situations that promote radicalization and hold imams accountable to help. It is reasonable for concerned citizens to ask imams for assurance that radicalization centers will not develop in their neighborhoods. This overture should be an affirmative one and should not be stated in or around a city forum as accusatory.

The request for a concrete and public commitment to a clear plan to foster assimilation and disrupt radicalization may be taken to the Islamic organization's office, a local church, or even a coffee shop. When respectfully submitted outside of city hall, commitments to confront radicalization and declarations of intent to uphold human rights are proper concerns of citizens in light of some glib public pronouncements made by American imams that serve the interest of getting zoning approval, but may be abandoned once the mosque is established. This is just a simple matter of setting a baseline expectation that community values will be upheld. And, it is a matter of establishing a record for future review.

In the context of asking any religious group for a broad policy statement, it is useful to consider that various mainstream faiths hold doctrinal positions on abortion, homosexuality, and other matters of conscience that may not be aligned with American statutory or constitutional provisions at any given time. The important distinction here is that Americans agree to submit to civil authority as they consent to live in accord with a society of free individuals organized according to a system of popularly adopted law.

Presumably, nearly half of American Muslims would be relieved to have a community-wide focus on extremism in mosques as forty-eight percent say that "Muslim leaders in the United States have not done enough

---

[254] Hearings Before The Committee on Homeland Security, House of Representatives. "Compilation of Hearings on Islamist Radicalization, Vol. 1." , p.58 (10 Mar., 15 Jun., and 27 Jul. 2011), *available at*: https://www.gpo.gov/fdsys/pkg/CHRG-112hhrg72541/pdf/CHRG-112hhrg72541.pdf.

[255] Kassam, Raheem. "Young Muslims in the West: A Ticking Time Bomb?" *Middle East Forum* (22 Mar. 2016), http://www.meforum.org/5917/young-muslims-ticking-timebomb.

138

to speak out against Islamic extremists." According to this Pew survey, only thirty-four percent say that Muslim leaders have done enough.[256]

American Muslim reform leader, Dr. Zuhdi Jasser, is very concerned about the influence on his own children of anti-Western imams and wonders what will be the stronger influence on them: American patriotism or hardline Islamism that rejects reason in favor of radicalism. His words are worth quoting to public officials that see any attempt to mention radicalization as generally anti-Muslim:

> We cannot ignore the fact that radicalization occurs within our faith communities. We also cannot ignore the fact that this radicalization does not occur in a vacuum. Nidal Hasan did not wake up one morning and decide to be a radical. He over time was exposed to an ideology that led him down the path to radicalization. There is a continuum that begins with a non-violent separatist, Islamist narrative and ends with an adherence to a violent militant ideology that believes in the supremacy of the Islamic faith.

> That does not mean that every Muslim travels the full continuum, but it does mean that a narrative that is commonplace in Muslim communities is the starting point. That narrative preaches a victim mindset and a separation of Muslims from American society. It is a narrative that is preached by supposed moderates and radicals alike. It is a narrative that as a Muslim father I do not want to ensnare my children....

> But the foundations of the Islamist narrative are being laid each time my children come to pray at our Mosque. Soon they will be of an age where this Imam and those that follow will have impact on the way my children identify themselves as Muslims and as Americans....

> The only way to change the damage that is being done to the Muslim community, and particularly to our youth, is to demand transparency and accountability, and to have an open, honest debate over what is preached at American mosques and what exactly is the real ideology, self-identity, and agenda of Muslim speakers and leaders.[257]

Many non-Muslims are reluctant to believe that isolationism and radicalization can happen when American Muslim populations are not

---

[256] "Muslim Americans: No Sign of Growth in Alienation or Support for Extremism" p.7, *Pew Research Center*, (30, Aug, 2011) http://www.people-press.org/2011/08/30/section-6-terrorism-concerns-about-extremism-foreign-policy/.

[257] Jasser, M Zuhdi. "AIFD Analysis: The Power of the Pulpit: An American Muslim's Struggle to Define Faith In An American Perspective For His Children." *American Islamic Forum for Democracy* (27 Sep. 2011), http://aifdemocracy.org/aifd-analysis-the-power-of-the-pulpit-an-american-muslims-struggle-to-define-faith-in-an-american-perspective-for-his-children/.

organized in colonies, as they are in Europe and the UK. But the Islamic separatist mentality may still be prevalent in the mosque and the defiant mindset it cultivates may prove to be just as toxic here as it is in the geographical enclaves in Europe.

The city of Bloomington, Minnesota, is an American story that exemplifies this Islamic isolationism, although it also includes a strong element of Somali tribalism. When a reporter for Fox News visited the Minneapolis/St. Paul suburb, it was difficult to find a Somali resident who could converse in English and a local Muslim community organizer described the mindset of first generation immigrants as increasingly isolated and separate.[258]

Europeans and Americans are also learning another hard lesson about the Muslim attitudes and it is that younger Muslims are much more likely to be culturally defiant and radicalized. Even back in 2007, a comprehensive study of Muslim opinions in the UK revealed that 37% of 16-24 year-olds would prefer to live under Sharia law than British law compared to just 17% of 55+ year-olds. The interviews also showed that 36% of 16-24 year olds believe if a Muslim converts to another religion they should be punished by death, compared to 19% of 55+ year-olds. While 74% of 16-24 year-old respondents would prefer Muslim women to choose to wear the veil, only 28% of 55+ year-olds favored the veil.[259]

Young Muslims also expressed alarming support for violent jihad in 2013: sixteen percent in Belgium believed that state terrorism is "acceptable," while 12 percent in Britain said that suicide attacks against civilians in Britain can be justified.[260]

Two more recent studies coming out of France led former career journalist for *Le Monde*, Yves Mamou to draw this conclusion: "One out of every two young French Muslims is a Salafist of the most radical type, even if he does not belong to a mosque."[261]

Former UK Equalities and Human Rights Chief, Trevor Phillips, used to think that the most difficult issue facing Muslims and Westerners was anti-

---

[258] Fox&Friends. "How Terrorists Recruit in 'Little Somalia': Interview with Pete Hegseth." *Fox News Channel* (6, May 2016), http://video.foxnews.com/v/4881244287001/how-terrorists-recruit-in-little-mogadishu-of-minneapolis/7#sp=show-clips;
http://mosquesinamerica.org/wp-content/uploads/2016/10/258_Little_Somalia_Fox.mp4

[259] Munira, Mirza, Senthilkumaran, & Ja'Far, Zein. "Living Apart Together: British Muslims and the Paradox of multiculturalism." *Policyexchange.org* (2007),
http://www.policyexchange.org.uk/images/publications/living%20apart%20together%20-%20jan%2007.pdf.

[260] Kassam, Raheem "Young Muslims in the West Are a Ticking Time Bomb, Increasingly Sympathising with Radicals, Terror," *Breitbart.com* (22 Mar, 2016)
http://www.breitbart.com/london/2016/03/22/polling-muslims-in-the-west-increasingly-sympathise-with-extremism-terror/.

[261] Mamou, Yves. "France: The Ticking Time Bomb of Islamization." Gatestone Institute (3 Oct. 2016) https://www.gatestoneinstitute.org/9058/france-islamization.

Muslim hostility. He was commissioner on a "British Muslims and Islamophobia" task force project in 1997 known as the "Runnymede Report."[262] This study was largely responsible for introducing both the concept and the word "Islamophobia" into common parlance.[263]

But by 2016, Phillips confessed that the report was wrong on the main issues and he admitted that "there is a widening gap in society with many Muslims segregating themselves." Observing the alarming hostile tendencies of younger Muslims, he noted that "the gaps between Muslim and non-Muslim youngsters are nearly as large as those between their elders." Phillips referenced a recent poll that confirmed a hardening of Muslim mindsets on "issues such as marriage, relations between men and women, schooling, freedom of expression and even the validity of violence in defense of religion."[264]

The West is losing this socio-religious war of attitudes and allegiances and it starts at the mosque. Local officials and media rarely have a clear understanding of the unique role of the mosque and imam in the Sharia-adherent Muslim's family and civic life. Not only is the mosque the hub around which all aspects of life revolve, they sometimes function as city hall and family law legal centers, as well.

Many may remember press coverage of Rifqa Bary's story, but her book[265] fills in disturbing details of official insistence to interpret attitudes and practices of hardline Islamists through an American mindset. Time and time again, officials refused to believe that Rifqa left home as a vulnerable teenager to run across state lines in an attempt to escape what she was convinced would be her "honor" killing for converting to Christianity. It is not hard to understand that Americans simply have no frame of reference for this behavior and prefer wishfully to think that only ISIS or tribal Mid-Eastern attitudes have remained so ossified. But there is ample evidence that these practices have been condoned in America, too, and even protected, and encouraged, in some mosques.[266]

---

[262] ."Islamophobia: A Challenge For All Of Us." *Runnymede Trust* (1996), http://www.runnymedetrust.org/uploads/publications/pdfs/islamophobia.pdf.

[263] Bikhu Parekh. "Report Introduction." *Runnymede Trust* (2016), http://www.runnymedetrust.org/reportIntroduction.html.

[264] Kassam, Raheem. "UK Equalities Chief Who Popularised The Term 'Islamophobia' Admits: 'I Thought Muslims Would Blend Into Britain… I Should Have Known Better.'" *Breitbart London* (10 Apr. 2016), http://www.breitbart.com/london/2016/04/10/thought-europes-muslims-gradually-blend-britains-diverse-landscape-known-better/

[265] Barry, Rifqa. *Hiding In The Light: Why I Risked Everything To Leave Islam And Follow Jesus.* Available at: *Amazon.com* (May 2015). http://www.amazon.com/Rifqa-Bary/e/B00NW9PD6C/.

[266] Stutzman, Rene. "Rifqa Bary: Attorney for Muslim-Christian Teen Runaway: Columbus mosque a threat." *Orlando Sentinel* (7 Jul. 2016), http://www.orlandosentinel.com/news/breaking-news/orl-bk-rifqa-teen-convert-mosque-083109-story.html, ("Rifqa ran away, Stemberger said, after other mosque members contacted

There is an acronym used when citizens declare a particular land use to be objectionable and it is "NIMBY," or not-in-my-backyard. The NIMBY mindset reflects popular will regarding proposed land uses and it works well to indicate neighborhood attitudes on radicalization. In the course of allowing Islamic religious practice on the same basis as any other religious belief system, private citizen Americans may and should still say "no go" to radicalization efforts in their communities. So, in the event of known radicalization efforts in mosques, communities should emphatically say, "Not in This Town!"

It is difficult for unsuspecting "interfaith" groups and busy local officials to understand that the Islamists' narrative is designed to enroll those blindly seeking ways to "get along." Therefore, the speeches at mosque hearings often include promises of appealing openness, community involvement, and neighborhood recreational programs that rarely materialize.

Despite commitments to feed the hungry, clothe the homeless, and offer a range of after- school activities to area young people at public hearings, mosques like the ones in Bloomington, Minnesota;[267] Falls Church, Virginia;[268] the sister mosques in Boston, Massachusetts;[269] as well as others suggested in this list compiled by The Clarion Project,[270] have radicalized fighters and militant agents. Representatives for these mosques undoubtedly worked to achieve a benign and compliant profile at the time of application for a permit to establish a mosque facility.

The role of an accountability group at a permit hearing is to anticipate the "clothe- the-homeless-feed-the-hungry" social service emphasis in presentations at city hall. They are routine in the number of times the same words have been repeated before city planners across the nation. But, instead of getting swept up in the rhetoric, vigilant citizens should instead press for a firm commitment outside of city hall that mosque officials will repudiate counter-cultural, and radicalization activity. One of the most effective methods to accomplish this is presentation of the Constitution-affirming Muslims for Reform declaration mentioned throughout this work. Residents should also put mosque officials on notice that they expect transparency and will hold them accountable.

---

the girl's father and pressured him 'to deal with this matter immediately.' That 'matter' was Rifqa's conversion to Christianity.")

[267] Yuen, Laura. "Suspicions, Speculation Grow as FBI's Minn. Terror Probe Churns." *MPR News* (13 Nov. 2014), http://www.mprnews.org/story/2014/11/13/mn-fbi-terror-probe.

[268] "Why is Virginia a Haven for Would-be Jihadists?" *The Investigative Project* (18 Jul. 2016), http://www.investigativeproject.org/5512/why-is-virginia-a-haven-for-would-be-jihadists.

[269] Mauro, Ryan. "Boston Bomber's Mosque Has Muslim Brotherhood Ties." *The Clarion Project* (20 Apr. 2013), http://www.clarionproject.org/analysis/boston-bombers-mosque-has-muslim-brotherhood-ties.

[270] Mauro, Ryan. "Radical Mosques in America." *The Clarion Project* (26 Nov. 2015), http://www.clarionproject.org/analysis/radical-mosques-america-there-one-near-you.

142

City governments should understand that communities will want to define constructively the standards for good-neighbor practices, while expressing interest in affirmative plans for integration into the local culture and larger American civil society. This will involve defining assimilation according to full embrace of American law and constitutional principles, as also expressed by the four corners of Muslim Reform Manifesto.

These challenges must be issued in clear distinction to lectures on fine points of Sharia law and speculation about terrorism. Muslims have the same freedom of speech and religious belief rights as all Americans, even when there are areas of deep cultural or political disagreement. Unless mosques are being used to hide the actual practice of Sharia law in violation of American constitutional and state or federal law (e.g., polygamous or underage marriage, referrals for female genital mutilation (FGM)[271], unequal marital property distribution, marital contracts that disregard wife's informed consent, arbitration proceedings without sufficient due process, or forms of sedition including *legally defined* conspiracy to subvert the Constitution or to defy lawful authority), their pietistic practices are protected under the First Amendment. In the event there *is* reason to believe such mosques are tied to terrorism and jihad the responsibility for responding lies with law enforcement authorities, not land use or zoning officials.

A great example of appropriate community activism is the alert issued by Kansas Rep. Pompeo when a known Hamas-supporting Islamist speaker was scheduled for a fundraiser at the Islamic Society of Wichita. Rep. Pompeo provided documentation of Monzer Taleb's open support for Hamas – a designated terrorist organization – and challenged the Islamic Society of Wichita to disinvite Taleb. Local citizens joined the campaign and Taleb's invitation was canceled.

Whether such events are sited on public land (expressive rights may be regulated by public safety, or "time, place or manner" concerns) or private property (constitutional protections of expressive rights may be limited), residents and community leaders have the right and, even a duty, to issue an alert as to the known profiles of Muslim Brotherhood operatives. Concerned citizens have used the vehicles of blogs, commentaries, talk radio, civic group e-mail lists, and organized demonstrations to inform the community as to this kind of radicalization agent.

---

[271] Westcot, Lucy. "Female Genital Mutilation On The Rise In The U.S." Newsweek (6 Feb. 2015), http://www.newsweek.com/fgm-rates-have-doubled-us-2004-304773; *also see*: United States Government Accountability Office. "Female Genital Mutilation/Cutting: Existing Federa Efforts to Increase Awareness Should Be Improved." (Jun. 2016), http://www.gao.gov/assets/680/678098.pdf. (The Centers for Disease Control and Prevention (CDC) estimated that 513,000 women and girls in the United States were at risk of or had been subjected to female genital mutilation/cutting (FGM/C) in 2012, a threefold increase from its 1990 estimate. CDC attributes this change primarily to increased immigration from countries where FGM/C is practiced ...)

143

On this occasion, former Assistant U.S. Attorney Andrew McCarthy penned an op-ed which the *Wichita Eagle* declined to publish (although the paper did accept a column written by former Rep. Pete Hoekstra[272] several days later) but it ran in the *National Review Online.* McCarthy endorsed Rep. Pompeo's action and explained why America's supportive Muslims have the most to lose when radical agents come to town:

> Radical Islam poses a serious threat to America and the West, very much including a threat against American Muslims, our fellow citizens who reject radical Islam's authoritarianism and savagery. While terrorists and their atrocities grab the headlines, much of the real battle takes place in Muslim communities.

> A key to winning that battle and protecting our security involves distinguishing our radical Islamic enemies from our patriotic Muslim allies. The Muslim Brotherhood and its Palestinian branch, Hamas, which is a terrorist organization and has been formally recognized as such under American law for some 20 years, are on the wrong side of that divide.

> Recent events in Paris and Brussels underscore that violent jihadism thrives in safe-haven communities that sympathize with the terrorists' aims, or where people who might object are intimidated into silence. It is therefore essential to our national security, and to the ability of pro-American Muslims to practice their faith free from Islamist intimidation, that we identify, marginalize, and reject terrorist sympathizers. Representative Pompeo did just that.[273]

At the very least, imams should be asked to set an Open Mosque Day and visitors should plan to pose pointed questions in response to presentations on religious tolerance and fidelity to American values. If all this is true, then mosque leaders should be very willing to make emphatic and unequivocal statements denouncing civil rights abuses at home and abroad in the name of Islam. This is not the time to settle for a generalized platitude that all cultures could do more to protect human rights or work harder to get along.

This author's visits to mosques on Open Mosque Day have not been encouraging as mosque leadership responded to questions regarding concerns about radicalization with blame for lack of American efforts to

---

[272] Hoekstra, Pete. "Pompeo Correct To Speak Out Against Islamic Speaker." *The Wichita Eagle* (11 Apr. 2016), http://www.kansas.com/opinion/opn-columns-blogs/article71233447.html.

[273] McCarthy, Andrew C. "Islamophobia Is Still Not The Problem: In Kansas, Another Case Study." *The National Review* (11 Apr. 2016), http://www.nationalreview.com/article/433918/mike-pompeo-right-criticize-wichita-mosques-invitation-hamas-sympathizer.

144

provide better immigrant welfare benefits. Questions regarding free speech prompted the vehement answer from a mosque official that there should be criminal penalties equal to that of burning a mosque for those that publicly challenge Islamism. This is the kind of information that should be publicized in the communities hosting these mosques. Imams and Islamic leaders are free to hold anti-constitutional beliefs and to agitate for constitutional changes. American citizens are obligated to join this debate and defend the constitutional order as foundational to America's survival and even continued success.

The core tenets of *Islamist supremacist* groups are rooted in a disdain for America's secularly organized systems. The Sharia supremacist agenda that would impose a transcendent and comprehensive doctrinal order on both Muslims and the society at large is not compatible with American notions of civil law, individual liberty, and due process.

Communities should seek agreement with Islamic institutions that profess good faith citizenship and full participation in civil society by asking for public production of explicit and concrete efforts to confront Islamist advocates and their schemes. The evidence of these challenges to Islamist campaigns must prove to be serious endeavors beyond mere lip service. It is this unequivocal public request for – and formal response to – documented challenges to Islamism that provides a baseline for any potential expectations of good faith and future cooperation.

145

## 19: AMERICA'S 'DOMINANT TRADITIONS' ARE NOT FOR BARTER

America's national identity, as it relies upon a core sense of shared principles and is based in a deep respect for individual liberty, depends upon respect for underlying history and traditions. Impulses to deny this philosophical identity can become an existential threat and they will ultimately compromise the nation's ability to assimilate newcomers. In short, America's soul is in its historical heritage – what some are calling our "dominant traditions." And once vital precepts are undermined, the European model warns that mosque-based Islamic supremacism is geared to push into the void as America's traditions, ideals, and national identity are hollowed out.

As France especially has learned, the withdrawal of identity-fortifying religious heritage and shared tradition, while making an effort to accommodate activists who intend to supplant those traditions, leads to cultural suicide.

If Americans are willing to concede their Judeo-Christian precepts, their claim to exceptionalism, their public traditions, and their shared holiday observances, what remains of any core identity for immigrants to join? As Supreme Court cases, have affirmed, the philosophical recognition of foundational religious underpinnings is not a First Amendment violation and it is an essential part of American constitutionalism. If assimilation is expected, there must be a dominant culture to join.

The English-Scottish Enlightenment principles that inspired America's founders can be rationally defended. These compelling ideals earned recognition from even liberal Supreme Court Justice William O. Douglas who wrote in *Zorach v. Clauson* of American institutional references to "the Almighty" and declared that "We are a religious people whose institutions presuppose a Supreme Being...."[274] Yes, there is room to acknowledge philosophic traditions that are the reasons for America's celebrated freedoms and virtues. While contemporary Supreme Court rulings demand balance and avoid governmental sectarian endorsements of religion, many long-held and originally religiously-based traditions may still be embraced as venerated cultural practices.

From the days of America's founding, "common schools," or public schools were expected to play a strong role in the assimilation of immigrants. "The schools were actively involved in promoting the values and beliefs that were considered part and parcel of the American experience."[275] The role of public schools has been radically altered with

---

[274] *Zorach v. Clauson,* 343 U.S. 306 (1952).

[275] DeForrest, Mark Edward. "Locke v. Davey: The Connection between the Federal Blaine Amendment and Article I, 11 of the Washington State Constitution." p.5, *Tulsa Law Review, Vol.*

emphasis now on encouraging loyalty to original country and culture identities.

As more migrants arrive, bringing practices that are, to them, familiar and often ancestral, it is incumbent upon communities to announce American societal norms. Tribally-based attitudes can be very difficult to overcome. But practices that disadvantage women and assert clerical rule over civic law cannot happily co-exist with constitutional self-determinism and individual expression.

Americans are now more inclined to rearrange their lives and reorder their priorities on demand from groups with contrary agendas than they are to defend the principles of life, liberty, and property that the Founders envisioned.

It is one thing to have a tussle over cultural practices. But when Americans simply cave and offer up time-honored traditions, national holidays, and even "school fun days," this sends an unambiguous message about how little Americans even care about keeping the cultural core.

It is hard to believe, yet it is true: Americans are apologizing for honoring long-held traditions, customs, and rituals, often giving them up with little or no fight. A case in point is the New York schools that agreed to excuse attendance for a small minority of Muslim students on religious holidays. Then, when that was not enough, Islamists demanded that schools close on those days so that Muslim students did not miss class instruction.[276] The next phase was to insist that "dominant culture" holidays like Thanksgiving, Christmas, and Valentine's Day (who knew that Valentine's Day was especially objectionable to hardline Muslims?[277]) had to be removed from the school calendar.[278]

---

40 (2004), *available at:*
http://digitalcommons.law.utulsa.edu/cgi/viewcontent.cgi?article=2476&context=tlr.

[276] Mangla, Ismat Sarah. "Eid Al-Adha 2015: NYC Muslim Students Celebrate Victory As Public Schools Observe Religious Holiday For The First Time." *International Business Times* (23 Sep. 2015), http://www.ibtimes.com/eid-al-adha-2015-nyc-muslim-students-celebrate-victory-public-schools-observe-2110623. ("It's been a long seven years, but on Thursday, Bucaram's daughter, now in eighth grade, will have the day off from school – alongside some 1.1 million other public school students in New York City's 1,800 schools. It's the first time the school system will be closed for Eid al-Adha.")

[277] "Why Do We Muslims Not Celebrate Valentine's Day?" *Islamweb.net* (2 Dec. 2015), https://www.islamweb.net/en/article/142698/why-do-we-muslims-not-celebrate-valentines-day. ("Because Valentine's Day goes back to Roman times, not Islamic times, this means that it is something which belongs exclusively to the Christians, not to Islam, and the Muslims have no share and no part in it. If the Christians have a festival and the Jews have a festival, which belongs exclusively to them, then no Muslim should join in with them, just as he does not share their religion or their direction of prayer.")

[278] Walsh, Paul. "St. Paul School Kiss Valentine's Day, Other 'Dominant Holidays' Goodbye." *Minneapolis Star Tribune* (2016 Jan. 29), http://www.startribune.com/st-paul-school-pulls-plug-on-celebrating-dominant-holidays/366834081/.

148

Not only do concessions like these deny time-honored American traditions, but the progression of accommodations usually ends with a de facto promotion of *Muslim* practices. That is also the case with educational revisionism in classroom assignments and textbooks. The process starts with complaints of too much emphasis on "dominant culture" or Western exceptionalism. Then, as accounts of Western successes, innovations, and reforms are pushed out of textbooks by leftist apologists and Islamists, historically dubious claims of historic Islamic superiority have been introduced.[279]

Indeed, such diminutions of core American values are vital to any agenda that demands that we co-exist with Sharia and related practices wholly at odds with our Constitution and norms. The Islamists that would introduce Sharia-based rules as favorable or transcendent, are present in many city halls and public schools. They urge that minor episodes of Western error are fatal to claims of moral exceptionalism, while Islamic history is selectively presented and not questioned.

Just the idea that Western ideals are exceptional must bring attacks from Islamists. Where secular republican government, foundational equal rights, and a reasoned approach to self-determination are vindicated, there is no room for clerical rule that imposes arbitrary life codes and punitive religious mandates.

So, when an American public school system hosts an Islamist program that denigrates American practices, disparages Christianity, and promotes a selective rendering of Islam, there should be outrage. But when, for example, Kennedy High School in Bloomington, Minnesota, hosted such a presentation called "One Nation, Many Beliefs," there was no challenge from the audience.

This event was hosted by a public high school and held on taxpayer funded middle school property. Reports show that teachers were offered credit for attending and students were included in the audience. Local officials and members of law enforcement also attended. The program was covered by at least one news columnist who gave it a positive review.[280]

---

[279] "Islam And The Text Books: A Report Of The American Text Book Council." *Middle East Quarterly* p.69-78 (Summer 2003), http://www.meforum.org/3182/history-muslim-conquests; Ibrahim, Raymond. "The Historic Concept Of Muslim Conquests." *Middle East Forum* (1 Mar. 2012), http://www.meforum.org/3182/history-muslim-conquests; and, "ACT For American Education. Education or Indoctrination? The Treatment of Islam in 6th Through 12th Grade American Text Books." *ACT For America* (2011), http://www.actforamerica.org/downloads/education/Full_Report_version_7.31.12.pdf.

[280] Heinzman, Don. "Opinion: Community Forums Can Foster Interfaith Relationships." Sun Current Newspaper, (26 Feb. 2016), https://sailor.mnsun.com/2016/02/26/opinion-community-forums-can-foster-interfaith-relationships/.

149

The presentation was promoted [281] as important because school children in that community were so tormented by "Islamophobia" that they were afraid to attend school. This forum, advertised to "widen cultural understandings," was a straightforward propaganda session for Islam. During the discussion, an imam and a sympathetic pastor touted such themes as: Christians were the exemplars of killing in the name of religion (based on the Crusades); Americans use carpet bombs in response to .1% of Muslims that cause havoc; Islam came to the Arabian Peninsula and brought full rights to educational opportunity and economic prosperity for women; jihad is simply doing what is good for you; Christians failed to stop the Holocaust; women currently have full rights under Islam (contrary practices are cultural); and, the Crusades brutally interrupted an Islamic period of respect and honor for Jews and Christians.

Now, many of these are complex issues that may provide framework for university level debates. But a public high school setting requires a balanced presentation. Instead, these bizarre assertions were served up in a manner that lacked historical proportion, standards for accuracy, sourcing, logic, and any attempt at critical reasoning. An open question and answer segment might have allowed for at least some inspection of the emphatic statements, but all the questions were pre-screened.

In fact, forms on audience tables suggested the format for the "Facilitated Question Session," and they featured this shockingly biased and condemnatory example:

"There is a desperate attempt out there to create hatred, divide Muslims and mainstream Americans, and incite young people into joining militant terror groups. How can we prevent this from happening in our school/community?"[282]

When a concerned citizen who attended the forum registered a complaint with the school district, a district representative agreed to an appointment. The citizen consulted an attorney who recognized the likely violations of First Amendment Free Speech and Establishment Clause provisions. The two attended the meeting with the district representative together. At this meeting, school officials immediately agreed to the following guidelines for future programs:

1. Have opposing points of view represented when debatable topics are presented.

2. School presentations will not be conclusory. Open inquiry through free dialogue will be mandatory.

---

[281] "One Nation, Many Beliefs" notice. *See* http://mosquesinamerica.org/wp-content/uploads/2016/10/281_bloomingtononenation.png

[282] "Religious Forum Agenda Questions" document. *See* http://mosquesinamerica.org/wp-content/uploads/2016/10/282_Religious_Forum_Agenda.pdf

3.  A reasonable proportion of time will be reserved for questions from the audience. Questions will not be written and turned in for screening by anyone. No questions will be screened out, and no participants will be screened out or prevented from questioning.

4.  A school representative will be present and will not allow viewpoint discrimination or other violations of existing policy.

The potential for a follow-up event with proper balance and perspective was discussed but the school waffled, saying that, there was not sufficient time on the school calendar to organize an event. More to the point, had the parent-citizen not attended and not complained, apparently the city officials, school administrators, and law enforcement representatives did not see that there were problems with this program sufficient to lodge an inquiry.

There are also examples of public school curricula and lesson plans that present tenets of Islamic doctrine, biased comparative culture exercises, and history units that are currently being challenged. Many have read of the surprising assignments like the exercise that asks students to recite the "Five Pillars of Islam."[283]

Less well known, and probably even more pernicious, is utilization of the film, "30 Days Living As A Muslim"[284] in the classroom to teach tolerance. The film depicts a young Christian man who consents to live with a Muslim couple for a month. During the course of the film, an imam mocks Christianity and Judaism while Islamic doctrine is presented favorably. By the end of the forty-minute reality show, the young Christian essentially converts to Islam by saying the Shahada and agrees to go back to his community as an emissary of Islam.[285] Presentation of this film in a public school setting calls into question a number of educational and legal-constitutional concerns like government preference for a religion, cultural bias, propaganda, and indoctrination.

Then, there are examples of outrageous analytic exercises where middle school students are asked to compare the treatment of Jews in the period leading to the Holocaust to "simmering Islamophobia" and "anti-Muslim hatred" in America – but this assignment was based upon one

---

[283] Jinkerson, Greg. "Maury Parents Angered Over Islamic Unit." (2015 Sep. 3), http://springhillhomepage.com/update-12-30-p-m-maury-parents-angered-over-islam-unit-mcps-to-release-statement-thursday-cms-5213.

[284] "30 Days Living As A Muslim." Vimeo.com. (2012). https://vimeo.com/35186644.

[285] "30 Days Living As A Muslim." transcript. Pp. 12 – 17. http://mosquesinamerica.org/wp-content/uploads/2016/10/285_30_Days_Living_As_a_Muslim_transcript.pdf

151

anecdotal, mostly inaccurate, and incendiary commentary written by a Muslim writer.[286]

Again, concerned parents confronted teachers and education officials with each of these issues. But how many parents understand the potential harm that may be done when teaching materials function like propaganda tools? And, how many parents who may understand the dangers are even aware that these exercises are assigned in public schools?

Another example where parents could have creatively mobilized is over the removal of pork products from student menus (but according to popular television cooking channels, Americans are in love with bacon!). If elementary schools like that in Kent, Washington state, caved to minority group pressure, it becomes easier to replicate a wider campaign for imposing Islamic dietary preferences in other places.

Sure, parents may not care so much if their children have no pork selections on the hot lunch tray, but that is not the point. There was a time when Americans did not so easily allow hegemonist groups to tell them what they could, or could not, do – or what their children could not have. If these dictates are accepted, it will be one thing after another.  The lines will become harder to draw after serial concessions have been made.

This stands in contrast with past practice. Historically, Americans have fought to keep important traditions. When Jehovah's Witnesses students refused to recite the Pledge of Allegiance, the Supreme Court weighed the value of government's role in training children to be good citizens against limits on governments' coercive power. The Court decided that students may not be expelled for opting out of saluting the flag.[287] American history provides a record of respecting individual rights of conscience but it does not compel cancelation or removal of citizenship-promoting practices on the demands of small factions.

With evolving standards of agency sensitivity to small group complaints, dissenting factions have gained greater leverage. The recent introduction of federal and state "hostile environment" protocols[288] for schools, has called for administrators to develop anti-discrimination and anti-harassment policies, including redress procedures. When a platform such as this invites complaints from groups based upon "outsider" status, how much emphasis may still be afforded assimilation priorities? What has

---

[286] Hameed, Mustafa. "When The Tide Of Islamophobia Reached My Hometown Mosque." *New York Times* (5 Mar. 2016), http://www.nytimes.com/2016/03/06/opinion/sunday/when-the-tide-of-islamophobia-reached-my-hometown-mosque.html?_r=1.

[287] *West Virginia State Board of Education v. Barnette*, 319 US 624 (1943). ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, *or force citizens to confess by word or act* their faith therein.") (Emphasis added.)

[288] "Protecting Students From Harassment and Hate Crime: A Guide For Schools." *United States Department of Education* (Jan. 1999), https://www2.ed.gov/offices/OCR/archives/Harassment/policy1.html.

152

happened to Americanization elements that used to be reflected in the core school curriculum?

The Department of Education (DOE) Civil Rights Division regulates and investigates the "hostile environment" complaints, and also adjudicates settlements. This closed institutional oversight and resolution process represents a troubling trend that bypasses state authority and skirts judicial review by authorized courts. The efficacy of these "hostile environment" remedy programs may be debated elsewhere but the tendency to overcompensate should be a real concern.

An example of the pendulum swinging far enough to cause potential violations constitutional provisions occurred in the cities of St. Cloud and St. Paul, Minnesota. According to media reports, several school districts responded to Department of Education investigations by offering "multi-purpose" student prayer space (at the request of Muslims) and allowing religious-time dismissal from classes.[289] This prayer space is technically available to all faiths. In practice, though, it may be argued that this arrangement has resulted in a *de facto* institutionalization of Islamic prayer space.

Constitutional First Amendment Establishment Clause and Equal Protection considerations depend, in part, upon whether students of other faiths feel that the space is accessible, whether religious symbols are present, if schools officials dedicate time to supervision and coordination, whether the practice compromises instructional time, and whether students of all faiths have equal opportunity to address worship or prayer interests. What will happen when this practice, as established, is deemed too short, or how may a response be formulated when additional sessions are requested by these students? If the standard is defined by subjective considerations of what is a congenial academic environment, what limits will there be to institutional negotiations?

When the Supreme Court says that institutional Christian prayer is not allowed during the public school day[290] and once-a-week "released time" for Christian study[291] may not be organized by school officials and may not

---

[289] "How One Minnesota School District Handles A Rising Immigration Population." *PBS News Hour* (23 Mar. 2016), http://netnebraska.org/node/1017935.

[290] *Engel v. Vitale*, 370 US 421 (1962).

[291] Zorach, 343 U.S. at 308-9, *supra*, note 274. ("A student is released on written request of his parents. Those not released stay in the classrooms. The churches make weekly reports to the schools, sending a list of children who have been released from public school but who have not reported for religious instruction. This "released time" program involves neither religious instruction in public school classrooms nor the expenditure of public funds. All costs, including the application blanks, are paid by the religious organizations."); *also see*: McCollum v. Board of Education, 333 U.S. 203, 209-212 (1948). ("This utilization of the State's tax supported public school system and its machinery for compulsory public school attendance to enable sectarian groups to give religious instruction to public school pupils in public school buildings violates the First Amendment of the Constitution.")

153

utilize school funds or occupy rooms on campus, then there are questions as to whether Islamic-driven established school prayer periods would survive court challenges.

Students and parents should be interested to learn how much total class time is compromised for prayer sessions and they could also investigate proposals of equal time for exercise of other faith practices and customs. At some point, the idea of providing equal access to school space and officially administered time to all requesting students may prove impractical and educationally indefensible.

Another example of Islamic demands occurred when Disneyland was asked to allow a themed restaurant employee to wear her hijab at work. Disney resisted and the federal court employment discrimination case was dismissed at the request of both parties (presumably reflecting a settlement with undisclosed terms). The outcome of this case may have been different if it had been tried after the 2015 Supreme Court ruling[292] in favor of a Muslim woman employed by Abercrombie and Fitch who demanded to wear her hijab on the sales floor and the subsequent passage of a California law that requires employers to "reasonably accommodate" religious dress practices.[293]

But where should individual symbolic religious expression overtake a famed corporate brand or entertainment theme, especially where a published dress code is provided at the employment interview? There generally has been a distinction made between discrete incidental religious jewelry and a prominent symbol that fundamentally alters a themed dress code.

Law is an expression of the political climate and popular will. Laws, as long as constitutionally observant, may be changed by legislative enactments or redefinition by elected or appointed judges. Activist groups that mobilize as CAIR did when backing the California labor law that addresses religious apparel demonstrate the power of a minority group to have influence on the culture.[294] The new law, among other employer restrictions, required "that 'religious belief or observance' includes religious dress and grooming practices."[295] In practice, these terms will offer

---

[292] *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.* No. 14–86 (2015).

[293] "Disney Worker Launches California Labor Lawsuit Alleging Religious Discrimination." *California Labor Law News* (19 Dec. 2012), https://calaborlawnews.com/legal-news/california-labor-law-lawsuit-32-18319.php?frm=b&utm_expid=102602370-11.5ULpIdA8OiG55W5kv_Qjhg.1&utm_referrer=https%3A%2F%2Fwww.google.com%2F.

[294] "CAIR-CA: Gov. Brown to Sign Workplace Religious Freedom Act Into Law." (8 Sep. 2012), https://www.facebook.com/notes/cair/cair-ca-gov-brown-to-sign-workplace-religious-freedom-act-into-law/10151093739329442/. ("CAIR-CA helped draft the legislation and worked with local Muslim community members and Sikh allies to mobilize support for AB 1964 during the year, beginning with the first-ever Muslim Day at the Capitol, where 50-plus California Muslims visited Sacramento and engaged their lawmakers.")

[295] Filla, Cynthia L. "California's Workplace Religious Freedom Act Lowers Bar for Employees in Religious Discrimination Cases." *JacksonLewis.com* (11 Jan. 2013),

154

broader religious accommodation than express terms of federal laws. There seemed to be no real pushback when there was a straightforward counter-argument: It is possible to protect individual religious expressive rights without imprinting them on secular institutions.

It is baffling that privileged accommodations of Islamic practice reach the point of institutionalization before significant resistance is registered. Recently, it was the ACLU that stepped up to litigate on behalf of a Christian woman in the state of Alabama when she was not allowed to wear a religious head covering for the taking of her driver's license photograph but county officials were offering an accommodation to only Muslim women.[296]

When opportunities to define and defend American culture arise, communities should take the occasion seriously. Whether the issue is curriculum or school menus, there are willing volunteers and experts who will lend useful advice and experience. To this point, some responses have been ineffective due to failure to target the agencies responsible. Records act requests are invaluable as tools to learn how policies have been developed, who was the catalyst for action, and where leverage is needed to mount a challenge. Research usually begins online to learn where there is agency accountability and how an initiative may be brought. In many cases, the tried and true committee approach, with assigned roles and shared time-commitments, works best.

A lesson that has been learned in many communities is that it is much easier and eminently more achievable to mount swift and organized opposition when the initial complaints are registered and unsupported changes are demanded.

An effective cultural campaign requires slogans that resonate and an ability to strike a chord deep within the community. Informing families as to what is at stake based upon examples from other localities is the first step.

Consider how difficult it would have been in some communities to even think about canceling a public holiday the celebrated the national patron saint. In Britain, it would have been shocking a few years ago to imagine, that in 2016, the city of Bristol would not observe St. George's Day. Yet, this national feast day – a holiday since 1415 – was simply cast aside by the city fathers as they declared the city "too multicultural" to celebrate England's patron saint.[297]

http://www.jacksonlewis.com/resources-publication/californias-workplace-religious-freedom-act-lowers-bar-employees-religious-discrimination-cases

[296] Volokh, Eugene. "Alabama ACLU Sues Government, Claiming Pro-Muslim Discrimination." *The Washington Post* (31 Aug. 2016), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2016/08/31/alabama-aclu-sues-government-claiming-pro-muslim-discrimination/?utm_term=.fd42539de7f7.

[297] "Bristol "Too Multicultural" for St George's Day." *Bristol Post* (24 Apr. 2016), http://www.bristolpost.co.uk/Bristol-multicultural-St-George-s-Day/story-29167059-detail/story.html; and,

A very different response was heard from the city fathers of Owego, New York[298] when an "interfaith" group asked the town to remove the words "Islamic terrorist" from a 9/11 memorial. The town supervisor responded: "We don't whitewash things, especially here. And we just think that we've done the accurate citing of what happened."

Americans have so many opportunities to restore and share America's proud history. When one travels to Boston, it is apparent that many families are taking advantage of Boston's wonderful Freedom Trail, a brick-laid path through the city that signals stops at all of the fascinating places where the Founders and Framers spoke, rallied, argued, bled, died, and birthed our incomparable constitutional compact. The parents and grandparents who take this pilgrimage are surely the ones who provide us with young people like the teens in Heber City, Utah who organized a public demonstration around American flags in a town shopping center after a friend's flag, displayed daily as a banner from his pick up truck, was burned at school.[299]

Americans who do not want to find themselves in the position of trying to recover lost ground, should be vigilant *now*. Groups of British citizens saw the need to walk through areas understood as "no go" zones with signs while chanting that British law and British ways do prevail. It used to be hard to imagine this kind of wholesale cultural takeover in parts of the United States, but it is now apparent that bits of culture and tradition are easily being abandoned here, too.

---

Bond, Anthony. "St George's Day 2016: What Does It Mean and Why Do We Celebrate The Patron Saint of England?" *Mirror.co.uk* (23 Apr. 2016), http://www.mirror.co.uk/news/uk-news/st-georges-day-2016-what-7739228.

[298] Interfaith Group Wants 'Islamic Terrorists' Text Removed From 9/11 Monument." *Fox News Insider* (6 Sep. 2016), http://insider.foxnews.com/2016/09/06/muslim-group-wants-islamic-terrorists-text-removed-owego-ny-911-monument.

[299] Starnes, Todd. "American Flag Burned at School - and You Won't Believe How Students React." *ToddStarnes.com* (6 Sep. 2016), http://www.toddstarnes.com/column/american-flag-burned-at-school-and-you-wont-believe-how-students-react.

156

## 20: FREE SPEECH: USE IT OR LOSE IT

As we have discussed, free speech is essential to countering assaults on American constitutional exceptionalism. Even so, the ability to speak out on controversial issues is being undermined from many directions, including Islamist campaigns against "hate speech," or "inflammatory speech," that is considered "incitement to hate." Either Americans will confront the mounting threats to freedom of expression or they will lose the ability to engage Islamist imams and mosques that encourage and institutionalize Muslim separatism.

The fight against speech codes entails more than just refusing censorship and new "hate speech" laws. It also means fighting the even more pernicious "chilling" of speech. While speech censors work to carve away constitutional protections, they have also been creating a climate of self-censorship.

The government tells us if we "see something," we must "say something." Yet, how many times have citizens wanted to speak up or known they should report something, but they did not do so out of fear of being called "racist" or "intolerant"?

First Amendment speech rights were prominent in the minds of America's Founders for the primary reason that they protected the citizen's right to criticize government and to "petition the government for a redress of grievances." Accordingly, an almost unanimous Supreme Court recently declared controversies of "public concern" as receiving the highest levels of speech protection.[300] But some in government, local Human Relations Commissions and like quasi-government agencies, university speech minders, minority groups, and media commentators are determined to punch holes in free speech guarantees.

If speech minders are allowed even incremental success, America starts down the road to censorship by government-authorized grievance groups. As European immigration dissenters who are now subject to criminal action for critical social media posts[301] have learned, Western governments are capable of summarily shutting down inconvenient public debate.

This book is not intended to engage in a full discussion on free speech developments in the United States. It is, however, very important to

---

[300] "Facts and Case Summary-Snyder vs. Phelps." (2016), http://www.uscourts.gov/educational-resources/educational-activities/facts-and-case-summary-snyder-v-phelps.

[301] Brooks, Libby. "Man Arrested for Facebook Posts about Syrian Refugees in Scotland." *The Guardian* (16 Feb. 2016), https://www.theguardian.com/uk-news/2016/feb/16/man-arrested-facebook-posts-syrian-refugees-scotland.

157

consider the Islamist drive to censor speech and to understand the extent to which many in the United States are already willing to concede.

That Muslims must embrace Sharia-based blasphemy restrictions is a consistent feature of the public advocacy of those like one of New Jersey's most prominent Islamists, Mohammad Qatanani. His calls "for limits and borders [on] freedom of speech," include the demand that the Department of "Homeland Security...prevent artists from producing works that are critical of Islam."

Americans should look behind the general admonitions to learn that imams like Qatanani really desire to supplant constitutional protections:

> The freedom of the American people is so different from their [Muslims'] freedoms. We believe freedoms have limits and rules, otherwise we will get people into trouble....Freedom according to Islam must be according to the Quran and Sunnah. You can do [anything] you like within the teachings of these two resources.[302]

Many remember that Chris Cuomo tweeted in response to the Pamela Geller Mohammed cartoon contest that the First Amendment doesn't cover hate.[303] Former DNC chair Howard Dean tweeted: "Free speech is good. Respecting others is better." Reflective of a generational shift, a November 2015 Pew survey revealed that "four-in-ten Millennials say the government should be able to prevent people publicly making statements that are offensive to minority groups."[304]

There is even erosion in the Supreme Court as evidenced by Justice Breyer's equivocation, writing in his *McCutcheon v. FEC* dissent, that the purpose of the First Amendment was not to prevent government abuses, but to ensure "public opinion could be channeled into effective governmental action." [305] But the Constitution encourages citizens to

---

[302] Newby, Joe. "New Jersey Imam: Free Speech Critical of Islam a 'National Security Threat." *The Examiner* (20 Sep. 2012), 'http://www.examiner.com/article/new-jersey-imam-free-speech-critical-of-islam-a-national-security-threat.

[303] Carroll, Lauren. "CNN Chris Cuomo: First Amendment Doesn't Cover Hate Speech." *Politifact.com* (6 May, 2015), http://www.politifact.com/punditfact/statements/2015/may/07/chris-cuomo/cnns-chris-cuomo-first-amendment-doesnt-cover-hate/.

[304] Poushter, Jacob. "40% of Millenials Okay With Limiting Speech Offenses to Minorities." *Pew Research Center* (20 Nov. 2015), http://www.pewresearch.org/fact-tank/2015/11/20/40-of-millennials-ok-with-limiting-speech-offensive-to-minorities/.

[305] Bernstein, David. "Breyer's Dangerous Dissent in McCutcheon." Washington Post. (2 April, 2014). https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/04/02/breyers-dangerous-dissent-in-mccutcheon-the-campaign-finance-case/; and, constitutional scholar Tim Sandefur points out: "Actually, the framers devised the constitutional structure to *prevent* public opinion from being channeled into effective government action." Sandefur, Tim. "Wow, Talk About Getting It Backwards." *Freespace.com* (2 Apr. 2014), http://sandefur.typepad.com/freespace/2014/04/wow-talk-about-getting-it-backwards.html.

158

vigorously question government and to assemble for the purpose of petitioning government representatives.

Justice Breyer also commented that burning the Koran may not be protected expression and he likened the act to shouting "fire" in a crowded theater. He said he "wasn't convinced the First Amendment would protect such an action if the case were brought to the court in the future."[306] This statement, if committed to practice, would create special status for a group that works to control both debate and political action by threatening violence. The reasoning also serves to undercut citizen engagement in constitutionally protected debate by handing complaining minorities the power to silence opponents.

Local governments tie themselves in knots trying to please constituencies that demand apologies for speech, while not admitting that they are creating speech codes. This author has appeared before many governing councils as part of various local efforts to impress upon elected officials that complying with Islamist interest group demands to declare cities "hate free zones" or to censor a councilmember's offending remark or social media posts is hazardous. In each case, we successfully reminded local governments that these issues are between voters and their elected officials. Although statements may be inartful or even crude, unless an elected official acts on discriminatory animus, personal expressions of opinion and social media posts usually should be a matter between the voters and their elected representatives.

Human Relations (or Human Rights) Commissions are also sources of unconstitutional local censorship. When partially- or fully-funded by local governments, these bodies must refrain from becoming arms of the minority grievance industry. And, when they are funded by private industry, it is up to shareholders and community members to watch for unconstitutional censorship. It is true that the organizational mission for these units centers on detecting – and responding to – discrimination. But these are advisory bodies; they are not commissioned to act on behalf of complaining groups unconstitutionally to chill speech. When only one side of a story has been presented by an offended party and a local government (or quasi-government entity) acts publicly to condemn speech, great harm may be done to constitutional due process and to First Amendment speech as well as assembly rights.

In all such cases, government resolutions and condemnations are without official force, but they are symbolically powerful tools to the speech extortionist that demands them. These censures, city apologies, and reprimands serve to accommodate interest group speech codes, and cities

---

[306] Madison, Lucy. "Stephen Breyer Questions Right to Burn Quran." *CBS News* (14 Sep. 2010), http://www.cbsnews.com/news/stephen-breyer-questions-right-to-burn-quran/.

who choose to begin appeasing these groups will not find a defensible place or time to stop.

Islamist groups like CAIR often come to city hall on a mission to shape policy according to Islamic Sharia speech codes. These blasphemy-based rules quite simply dictate that speech critical of Muslims or their Prophet Mohammed is not allowed. To advance this agenda in Western cultures, Islamists begin by exerting pressure on all public levers to discourage critical or philosophically confrontational speech. Europe generally has already consented to such speech bans and that is why debate on vital issues of immigration, assimilation and Islamist separatism there is near impossible.

Americans will only remain free to engage in full debate on these issues if they halt the incremental concessions. As Andrew McCarthy, the former Assistant U.S. Attorney who successfully prosecuted the Blind Sheikh and who has written extensively on the civilizational Sharia threat, puts the warning this way in his book *Islam and Free Speech*:

> Free speech does not exist in a vacuum. It is the plinth of freedom's fortress. It is the ineliminable imperative if there is to be the robust exchange of knowledge and ideas, the rule of reason, freedom of conscience, equality before the law, property rights, and equality of opportunity. That is why it must be extinguished if there is to be what al-Qaradawi calls a "place of religion" – meaning his religion. For all its arrogance and triumphalist claims, radical Islam must suppress speech because it cannot compete in a free market of conscience.[307]

So far, most American leaders have been reluctant to endorse an international push to impose Islamic-based speech codes but there is, nonetheless, a sustained effort underway. Then-Secretary of State Hillary Clinton and some on the Left have been involved with an initiative sponsored by the 57-member Organization of Islamic Cooperation and adopted by the UN Human Rights Council in 2011. This resolution, promulgated at the UN as Resolution 16/18 targets "the advocacy of religious hatred" and links it to "incitement to discrimination, hostility, or violence."

Blending advocacy and incitement with illegal discrimination and violence opens an array of constitutional issues for Americans. Further, American defamation law already provides an individual right to bring a complaint; this cause of action is civil and does not encompass the offended sensibilities of an entire group. These are important distinctions since the Islamic effort to criminalize defamation of religion would see government as the prosecutor of a new civil-rights-based offense.

---

[307] McCarthy, Andrew C. *Islam and Free Speech* 19 New York, Encounter Books (2015).

160

Also, any law that bases criminal charges on "incitement" places the burden on the speaker to anticipate an unlawful response from a listener. This hands to the listener tremendous extortion power based upon threats of violence and mayhem alone. Free speech attorney, Deborah Weiss, has written about the many conflicts this approach raises with basic American individual liberty and due process guarantees.[308]

In December 2011, Secretary Clinton hosted in Washington D.C. a three-day meeting of "the Istanbul Process" – an international effort aimed at furthering implementation of UN Human Rights Council Resolution 16/18. Prior to that session, Pakistani Ambassador to the UN and OIC spokesperson, Zamir Akram spoke to the core Islamist agenda and warned that the OIC would not compromise on offensive speech described as: "anything against the Quran, anything against the Prophet, and anything against the Muslim community in terms of discrimination."[309]

The parallel UN International Covenant on Civil and Political Rights (ICCPR) Article 19 entitled, "Combating Intolerance, Negative Stereotyping and Stigmatization of, and Discrimination, Incitement to Violence and Violence Against, Persons Based on Religion or Belief"[310] provides assurances that freedom of expression will be protected and advises that blasphemy laws should be repealed.[311] It concurrently recommends, however, that member states criminalize speech-that-incites according to these vague and highly subjective standards: "the context of incitement to hatred, the speaker, intent, content, extent of the speech, and likelihood of causing harm."[312]

In June 2015, another Istanbul Process session took place in Saudi Arabia. Participants called for a consensual framework *universally* to "combat incitement to religious hatred and violence" while sharing "best

[308] Weiss, Deborah, *The Organization of Islamic Cooperation's Jihad on Free Speech*, Washington, Center for Security Policy Press (2015)

[309] Lugo, Karen. "Free Speech For Me – Unless It Offends Thee." *Townhall.com* (13 Dec. 2011), http://townhall.com/columnists/karenlugo/2011/12/13/free_speech_for_me_unless_it_offends_thee.

[310] US Mission Geneva." United States State Department (2016): "The United States strongly supports today's resolution, which like its predecessor rejects broad prohibitions on speech, and supports actions that do not limit freedom of expression or infringe on the freedom of religion." Notably this statement rejects "broad" speech restrictions but this leaves the government room to carve out civil rights claims against speech called so insulting that it is considered "incitement." *Available at*: http://geneva.usmission.gov/tag/resolution-1618/.

[311] "Human Rights Council States Must Implement Resolution 1618 And Rabat Plan Of Action." Article 19 (28 Mar. 2014), https://www.article19.org/resources.php/resource/37505/en/human-rights-council:-states-must-implement-resolution-16-18-and-rabat-plan-of-action.

[312] "Between Free Speech and Hate Speech: The Rabat Plan of Action, A Practical Tool To Combat Incitement To Hatred." Office of the High Commissioner United Nations Human Rights (21 Feb. 2013), http://www.ohchr.org/EN/NewsEvents/Pages/TheRabatPlanofAction.aspx.

practices used to effectively address these challenges including legal and non-legal measures...." [313]

As if at the behest of the Istanbul Process, House Democrats (one hundred co-sponsors at last count) introduced Resolution 569 in December 2015 on behalf of "the victims of anti-Muslim hate crimes and rhetoric [that] have faced physical, verbal, and emotional abuse because they were Muslim or believed to be Muslim." This House resolution also "expressed condolences for the victims of anti-Muslim hate crimes." [314] Ostensibly this legislative initiative was responsive to what sponsors called "weeks of anti-Muslim bigotry and acts of hatred" [315] in the wake of the jihadist attack in San Bernardino, California that left fourteen people dead.

In this instance, a familiar cycle ensued. First, an act of jihadist violence, then pre-emptory calls to quell an anticipated backlash against Muslims, then the backlash does not happen, and then there are spotty – and many unverified – claims of "anti-Muslim" hate reported, and finally, there are symbolic institutional overtures from media and government that acknowledge the "hate" mantra. It is astonishing during these episodes to watch the focus turn from barbaric acts of slaughter to the meme of Muslim victimization.

On the heels of introduction of House Resolution 569, Attorney General Loretta Lynch keynoted the Muslim Advocates' [316] gala dinner where she described her "greatest fear" as an "incredibly disturbing rise of anti-Muslim rhetoric (accompanied by acts of violence)." She endorsed government action against those "lifting the mantle of anti-Muslim rhetoric" that "edges toward violence." Lynch noted that "over forty-five prosecutions" had arisen from hate-crime investigations that included "rhetoric" since 9-11. [317]

---

[313] "From Resolution to Realization – How To Promote Effective Implementation of HRC Resolution 16/18." *Organization of Islamic Cooperation* (3-4 Jun. 2015), http://www.oic-oci.org/oicv2/subweb/istanbul_process/5/en/docs/IP_Session5_Concept%20Paper_Apr-2015.pdf.

[314] United States House of Representatives. "Condemning Violence, Bigotry, and Hateful Rhetoric Towards Muslims In The United States." (17 Dec. 2015), https://www.congress.gov/bill/114th-congress/house-resolution/569/text.

[315] "Beyer-Honda House Democrats Welcome 100th Co-Sponsor To Condemn Anti-Muslim Bigotry." *Alexandria News* (8 Jan. 2016). http://www.alexandrianews.org/2016/01/beyer-honda-house-democrats-welcome-100th-co-sponsor-to-condemn-anti-muslim-bigotry/.

[316] According to the Muslim Advocates website the group has "powerful connections in Congress and the White House" to ensure that "the concerns of American Muslims are heard by leaders at the highest levels of government." Muslim Advocates describes its role as "a watchdog of justice" using "the courts to bring to task those who threaten the rights of American Muslims." Muslim Advocates Website. *Available at*: https://www.muslimadvocates.org/.

[317] "Attorney General Loretta Lynch at Muslim Advocates Dinner." *C-SPAN.org* (3 Dec. 2105); select the Loretta E. Lynch "speaker button" *at*: http://www.c-span.org/video/7401446-1/attorney-general-loretta-lynch-remarks-muslim-advocates.

162

The Attorney General's suggestion, in principle, of criminal prosecution of speakers employing "anti-Muslim rhetoric" could indicate an institutional interest in removing such speech from protected status. Several years earlier, U.S. Attorney for the Eastern District of Tennessee Bill Killian suggested that some inflammatory material on Islam might implicate federal civil rights laws. This admonition was in response to complaints about a Tennessee politician who posted a picture of a man pointing a shotgun bearing the caption "How to wink at a Muslim." Killian was host of a townhall meeting to "educat[e] people about Muslims and their civil rights."[318]

General Lynch, and others in federal law enforcement, often characterize the type of speech that borders on being too provocative for constitutional protection as "inflammatory." This descriptor is generally used in contexts where the act of "incitement" is implied. Neither inflammatory, nor generally inciting, words are illegal unless accompanied by a legally defined threat. This conflation of terms blurs the line between unlawful and potentially offensive, yet protected, speech.

In 2016, the U.S. Attorney in Idaho, during an investigation into an alleged sexual assault of a 5-year-old girl by several juvenile Sudanese-Iraqi apparent refugees, warned that, "The spread of false information or *inflammatory* or threatening statements about the perpetrators or the crime itself reduces public safety and may violate federal law." (Emphasis added.) She chided residents on spreading falsehoods "about refugees [that] divides our communities."[319]

This federal prosecutor's blanket castigation of speech on an issue of public concern, as generally protected by Supreme Court rulings, was misleading. Her ominous warning provided no definitional line between legally threatening (or libelous) speech and the otherwise robust zone of First Amendment-preserved speech rights. After criticism ensued, the federal attorney said that her statement had been misinterpreted and that she did not intend to threaten to prosecute anyone for First Amendment-protected speech.

Former CIA Director and retired four-star Army general David Patraeus joined this assault on free speech, when penning an op-ed for the *Wall Street Journal*, he declared that he has "grown increasingly concerned about inflammatory political discourse that has become far too common both at home and abroad against Muslims and Islam. He cautioned that

---

[318] Tau, Byron. "Feds Suggest Anti-Muslim Speech Can Be Punished." *Politico* (31 May, 2013). http://www.politico.com/blogs/under-the-radar/2013/05/feds-suggest-anti-muslim-speech-can-be-punished-165163#ixzz40FJLRNvQ.

[319] Volokh, Eugene. "Chief Idaho Federal Prosecutor Warns: 'The Spread of False Information or Inflammatory or Threatening Statements ... May Violate Federal Law.'" *The Washington Post* (26 Jun. 2016), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2016/06/26/chief-idaho-federal-prosecutor-warns-the-spread-of-false-information-or-inflammatory-or-threatening-statements-may-violate-federal-law/.

163

"those who flirt with hate speech against Muslims should realize they are playing directly into the hands of al-Qaeda and the Islamic State."[320]

Social media sites, when allied with government actors, are increasingly wield censorship power. In September 2015, Facebook's Mark Zuckerberg committed to Germany's Chancellor Angela Merkel that he was working on issues like offensive posts on the refugee crisis.[321] Months later, Facebook announced the "Initiative for Civil Courage Online" to find and remove hate speech from the site.[322] Social media knows no borders, nor will any of these censorship measures. In fact, in June of 2016, many American Facebook users reported that the social media site blocked an article summarizing these anti-speech developments.[323]

With the ultimate capitulation of the social media giants that have signed on to EU hate speech codes: Facebook, YouTube, Twitter, and Microsoft, platforms for American-style robust and unfettered public policy debates are severely jeopardized.[324] The parameters of controversial discussions in these arenas will now be controlled by those that claim offense, or feign offense to impose speech limits.

Even lawyers, the vanguards of the Bill of Rights, are under a new speech code. Once the American Bar Association passed a model rule for the purpose of state review and adoption, lawyers in compliant states when engaging in activity "related to the practice of law" will run the risk of sanction or disbarment for "harmful verbal conduct that manifest bias," among other things.[325]

---

[320] Patraeus, David. "Anti-Muslim Bigotry Aids Islamist Terrorists." *Wall Street Journal* (13 May 2016), https://www.washingtonpost.com/opinions/david-petraeus-anti-muslim-bigotry-aids-islamist-terrorists/2016/05/12/5ab50740-16aa-11e6-924d-838753295f9a_story.html?hpid=hp_no-name_opinion-card-c%3Ahomepage%2Fstory.

[321] Chasmar, Jessica. "Angela Merkel Caught on Hot Mic Confronting Mark Zuckerberg over Racist Facebook Posts," *Washington Times*. (30, Sept 2015). http://www.washingtontimes.com/news/2015/sep/30/angela-merkel-caught-on-hot-mic-confronting-mark-z/.

[322] Griffin, Andrew. "Facebook Launches Initiative for Civil Courage Online to Delete Racist and Threatening Posts," *Independent*. (19 Jan, 2016). http://www.independent.co.uk/life-style/gadgets-and-tech/news/facebook-launches-initiative-for-civil-courage-online-to-delete-racist-and-threatening-posts-a6821581.html.

[323] Murray, Douglas. "The EU IS Coming to Close Down Your Free Speech," *Gatestone Institute*, (11, Jun, 2016), http://www.gatestoneinstitute.org/8234/eu-free-speech.

[324] Hern, Alex. "Facebook, YouTube, Twitter and Microsoft Sign EU Hate Speech Code." *The Guardian* (31 May 2016), https://www.theguardian.com/technology/2016/may/31/facebook-youtube-twitter-microsoft-eu-hate-speech-code.

[325] Volokh, Eugene. "A Speech Code for Lawyers, Banning Viewpoints That Express 'Bias,' Including in Law-Related Social Activities," *The Washington Post* (10 Aug. 2016), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2016/08/10/a-speech-code-for-lawyers-banning-viewpoints-that-express-bias-including-in-law-related-social-activities-2/?utm_term=.2ea9ac5cf565; *also see*: Eugene Volokh's Federalist Society teleforum

164

These are but a few of the signs pointing to the increasingly precarious nature of American speech protections. Government officials and courts have not always upheld the First Amendment's broad guarantees. From the Alien and Sedition Act where the "sedition" component generally allowed the government to punish "malicious, false, or scandalous" expression, to the era of the so-called "bad tendency doctrine" where government was authorized to suppress speech if it was likely to cause harmful results, the nation has a somewhat checkered record on free speech. Americans should note that the "bad tendency doctrine" was applied to suppress the speech of abolitionists on the rationale that slaves *may* revolt if abolitionist activity encouraged them. Some local governments then acted on this authority to suppress speech based upon a surmised "tendency" rather than an evidentiary finding of "harmful results."

It wasn't until the 20th Century that the "clear and present danger" test asked the government for more justification before restricting speech. As judges were expected to test "whether the gravity of the 'evil', discounted by its improbability, justified such invasion of free speech as is necessary to avoid the danger,"[326] there were factual determinations required as to both the gravity of the harm and the likelihood that harm would result. Still, this was vague enough that it was hard to know where a judge might draw the line as the test involved the subjective balancing of several factors.

The rule that now determines what is controversial, but protected, speech and what is a potentially criminal utterance is based upon whether words "incite imminent lawless action including violence."[327] The speech typically called "hateful" is usually not specific in prompting imminent violence although hateful speech may be so provocative that it justifiably triggers the interest of law enforcement and suggests further investigation.

More to the point for this legal discussion, is the standing Heckler's Veto doctrine that denies coercive power to the dissenting group that threatens or does violence when offended by speech. In late 2015, the Sixth Circuit in an unusual en banc (full court) review decided one of the most dramatic Heckler's Veto cases. The fifteen-judge bench overturned the lower court, as well as a Sixth Circuit panel decision, to uphold speech protections. Very interestingly, four Republican-nominated judges voted that the speakers went too far to expect police protection.[328]

---

discussion, "Free Speech for Lawyers?" on podcast, *available at*: http://www.fed-soc.org/multimedia/detail/speech-code-for-lawyers-podcast..

[326] *Dennis v. United States*, 341 U.S. 494, 510 (1951).

[327] *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (recognizing the First Amendment rights of Ku Klux Klan members to advocate for white supremacy-based political reform achieved through violent means).

[328] Volokh, Eugene. "Sixth Circuit Rejects 'Heckler's Veto' as to Anti-Islam Speech by 'Bible Believers." *Washington Post* (28 Oct. 2015), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/10/28/sixth-circuit-rejects-hecklers-veto-as-to-anti-islam-speech-by-bible-believers/.

In his majority opinion, Judge Clay described the facts of the case this way:

> This case involves a group of self-described Christian [Bible Believers] evangelists preaching hate and denigration, even carrying a pig's head on a spike, to a crowd of Muslims, some of whom responded with threats of violence. The police thereafter removed, and ticketed, the evangelists to restore the peace. Bearing in mind the interspersed surges of ethnic, racial, and religious conflict that from time to time mar our national history, the constitutional lessons to be learned from the circumstances of this case are both timeless and markedly seasonable.[329]

He concluded that "[m]aintenance of the peace should not be achieved at the expense of the free speech"[330] and he said this about the efforts of hostile listeners to silence a speaker:

> The freedom to espouse sincerely held religious, political, or philosophical beliefs, especially in the face of hostile opposition, is too important to our democratic institution for it to be abridged simply due to the hostility of reactionary listeners who may be offended by a speaker's message. If the mere possibility of violence were allowed to dictate whether our views, when spoken aloud, are safeguarded by the Constitution, surely the myriad views that animate our discourse would be reduced to the "standardization of ideas ... by ... [the] dominant political or community groups. Democracy cannot survive such a deplorable result. (Quotation marks and citations removed.)[331]

This clarion affirmation of the American right to robust debate, even when highly provocative, was hard won. But this result was a very close call. The prior two court renderings produced opposite results. Since an *en banc* (full federal appellate court) or Supreme Court review is not guaranteed (some cases are not appealed, appellate courts may decline an *en banc* review, and the Supreme Court does not agree to consider all cases presented) this case could easily have been finalized at the first appellate hearing where judges ruled that the speech in question was too provocative for First Amendment protection.

An important, but rarely utilized, American free speech legal doctrine is the First Amendment-based prohibition against "prior restraint." Basically, this Supreme Court-affirmed principle says that neither government nor judges may prevent most speech, and thus the remedy for

---

[329] *Bible Believers vs. Wayne County*, United States Court of Appeals, No. 13-1635 (6ᵗʰ Cir. *en banc*, 2015); *available at*, http://www.ca6.uscourts.gov/opinions.pdf/15a0258p-06.pdf.
[330] *Id.*
[331] *Id.*

unprotected expression is lawful punishment, *after the speech is uttered*, through civil lawsuits (i.e., defamation) and criminal prosecutions in the case of specific exhortation to violence. This means that government officials may not, discretionarily, create ad hoc rules to silence points of view that they do not want to hear. Legally speaking, government may not restrict speech based upon content or viewpoint.

In the context of a civic hearing, government agents may only respond to irrelevant comments to say that the input will not be considered in the application analysis. Officials then must keep an accurate and complete record of deliberations to show that such comments did not infect the objectivity of the process. To repeat a theme that runs through this book, succinct speech that addresses the civil process underway, will be the only constructively *persuasive* speech.

One controversial example of the prior restraint legal theory at work is that of Pastor Terry Jones who wanted to speak in 2011 and 2012 on issues of Islamist Sharia at a site across from the Dearborn, Michigan, mosque (at the time this mosque was called the largest in America). City and county government responded generally that the pastor's speech and demonstration may engender a violent response. The governments tried two different tactics: requiring, at one time, a "peace bond," and also, a "hold harmless agreement." By holding Jones liable for costs and fees, it seemed that government had discouraged the pastor(s) without issuing an outright denial. However, the court saw these discretionary tactics as content-based restrictions on speech and denied the constitutionality of both maneuvers.[332]

The Michigan chapter of the American Civil Liberties Union submitted an amicus brief in the "peace bond" case and called the city hall requirement "an unconstitutional

'prior restraint' on [Pastor Jones'] free speech."[333]

It bears repeating that speech related to matters of public concern receives a special level of protection and government efforts, whether the DOJ or local government, to restrict speech based upon content run counter to essential prior restraint warnings. There is no doubt though, that lawfare tactics utilizing even-failed legal methods, punish speakers by requiring a costly and traumatic legal defense. This predictably has a chilling effect on others in the community, the state, and the nation. This reality is not lost on those that would control speech rights.

---

[332] *Stand Up American Now v. City of Dearborn*, No. 12-11471, Eastern Dist. of Michigan, *available at*:
http://www.thomasmore.org/sites/default/files/files/ORDER%20Granting%20TRO%20-%20Pastor%20Jones,%20Dearborn%20040512.pdf.

[333] *Michigan v. Terry Jones, et al*, Amicus Curiae Brief of The American Civil Liberties Union Fund of Michigan, *available at*:
http://www.aclumich.org/sites/default/files/TerryJonesACLUAmicus.pdf.

167

And, as this historical overview demonstrates, America may be only one or two Supreme Court justices away from a return to the "bad tendency" days where speech may be proscribed for its tendency to provoke a societally difficult response. Judges who should recognize the coercive power of the Heckler's Veto, instead, try to find a category of insults that they believe to be too provocative.

Troubling free speech indicators show that robust speech protections are under societal and institutional assault. If Americans begin to self-censor and cower into the corners, the generous space afforded public debate will shrink accordingly. At the same time, Islamists will not stop complaining until they have reached their goal of censoring and criminalizing expression that scrutinizes and challenges their supremacist agenda.

When speaking or engaging in any part of this culture debate, research is critical preparation. Not all sources strive for factual information while providing sourcing that will be necessary for a credible presentation. An excellent tutorial is an Intelligence Squared debate on the proposition that "Islam Is Not a Religion of Peace."[334] Former Muslim Ayaan Hirsi Ali and British writer Douglas Murray won the debate by convincing more of the audience to support this proposition, than their opponents did to reject the statement. They were effective because Ali took a reasoned position based her comments on personal experience and philosophy. Hers was also a human story, and so powerfully compelling. Murray employed powerful logic, as well as irresistible wit. They spoke confidently; they argued their cases, and let the audience draw their own conclusions.

The following are some highly recommended information outlets. For those sites that do not offer an email subscription, it is possible to set up a search engine-generated news alert with an author's name to receive notifications of any new publications:

- The Investigative Project on Terrorism[335]
- Islamism Watch[336]

---

[334] Ali, Ayaan Hirsi and Douglas Murray. "Proposition: Islam Is A Religion of Peace." *intelligencesquaredus.org* (17 Apr. 2016), http://www.intelligencesquaredus.org/debates/islam-religion-peace; *also see*, Ayaan Hirsi Ali for PragerU on "Is Islam A Religion of Peace?" for a useful, incisive, 5-minute, essay on defending Western traditions by supporting the efforts of vital Muslim dissidents and reformers: https://www.facebook.com/prageru/?hc_ref=NEWSFEED&fref=nf.

[335] The Investigative Project, http://www.investigativeproject.org/.

[336] David Swindle, blogger at Middle East Forum's *Islamist Watch* says: "I want to support moderate Muslims as they make the case from within their own religion against the Islamists. - For many years I hesitated to stand with moderate Muslims because I feared theirs was a lost cause. I think the new technologies that have already emerged and that will emerge in the coming decades will effectively level the playing field, such that the Muslims whose theology reconciles with modernity will ultimately be able to triumph. They just need to be emotionally

- Gatestone Institute: features highly credible investigative writers like Soeren Kern and Giulio Meotti[337]
- Andrew McCarthy, *National Review*[338]
- Center for Security Policy[339]
- Daily Roll Call: Exploring and Exposing Islam in America[340]
- ACT! for America Education Reform Project[341]
- Gates of Vienna blog[342]
- Clarion Project: information consolidator
- Fousesquawk monitors UC Irvine and Southern California radicalization efforts
- Counter Jihad Coalition,[343] known for provocative stance, but exemplary of local efforts

It should always be the goal to speak artfully while understanding that even well-intentioned and informed comments will be taken out of context. This is an arena fraught with emotion and deeply held convictions. There are times that additional clarification or perspective may be needed but, if a speaker is thoughtful when making his or her case, an apology is rarely in order.

Consider the firestorm that hit Mayor Beth Van Duyne of Irving, Texas in October 2015 when the "clock boy" controversy landed in her city. This incident followed on the heels of the mayor's hotly contested opposition to an Islamic tribunal's establishment in her city and her support for the "American Laws for American Courts" state legislation. The mayor was pressured from many national sources (while receiving vulgar email threats[344]) to abandon her support for school district policies and standard

---

encouraged, financially supported, and their future leaders promoted in the media."
http://www.islamist-watch.org/

[337] See biographies and archives for these analysts *at:*
http://www.gatestoneinstitute.org/author/Soeren+Kern, *and*
http://www.gatestoneinstitute.org/author/Giulio+Meotti.

[338] Andrew C. McCarthy, http://www.nationalreview.com/author/andrew-c-mccarthy.

[339] Center for Security Policy, http://www.centerforsecuritypolicy.org/

[340] Daily Roll Call, http://dailyrollcall.com/. (Much of the site's substance addresses Islam as a monolithic problem, and does not distinguish the reformist Muslims from Islamist activists, but the creator, Cathy Hinner, is a thoughtful former police officer who provides thought-provoking material.)

[341] "Textbook Reform Project." *Actforamerica.com* (2016), http://www.actforamerica.org/get-the-facts/our-issues/empowering-women-protecting-children/textbook-reform-project.

[342] Gates of Vienna, http://gatesofvienna.net/.

[343] Counterjihad Coalition, http://counterjihadcoalition.org/brochures/..

[344] Hope, Merrill. "Texas Mayor Target of Vile Online Attacks over 'Clock Boy' Ahmed." *Breitbart Texas* (10 Oct. 2015), http://www.breitbart.com/big-government/2015/10/10/exclusive-texas-mayor-target-vile-online-attacks-clock-boy-ahmed/.

169

police protocols.[345] Rather than back down, she repeated reasonable and rational reasons for her positions. She was calm, and confident that her decisions best served her constituency and furthered her civic duty to protect schoolchildren. Much of the community rallied around her leadership.

Another constructive example was offered when Colonial Williamsburg was attacked for referring to 9-11 and the terror attack on the Twin Towers in a February 2016 Super Bowl commercial about adversity that the nation has overcome. The city also issued this tweet: "Including WTC is powerful & subject to debate. But Am. Hist. is full of tragedies & triumphs. It made us who we are today. We must remember." Controversy ensued, but the city did not back down or apologize. Colonial Williamsburg simply explained that America should "not shy away from these difficult moments in our history because they have made us who we are just as surely as our many triumphs."[346]

A very different process and result played out in a Washington State community when an effort to involve residents in a mosque permit hearing went off track and ended badly. Not only did the effort result in a series of apologies, but the entire episode was also used to underscore anti-Muslim "hate" and to associate such speech with crimes. This is the worst outcome for the cause of free speech, as the public often reacts with emotion and calls for a reflexive policy action.

When a mosque was planned for Mukilteo, a suburb of Seattle, a local aerospace business owner mailed out an informational postcard to local residents providing basic hearing details.[347] He intended the post cards to be anonymously mailed but, over time, businessman Steve Zieve was identified as the author and various past "anti-Islamic" email communications were revealed. The Washington State Commission on Human Rights launched an investigation into the matter and media reports revealed that the result, in part, was to require Mr. Zieve to participate in several meetings apparently designed to instruct him on tolerance, including some sessions with CAIR officials.[348] The upshot was a series of

---

[345] Hope, Merrill. "Texas Boy Arrested Because of Zero Tolerance Policies Not Islamophobia." *Breitbart Texas* (16 Sept. 2015), http://www.breitbart.com/texas/2015/09/16/texas-boy-arrested-because-of-zero-tolerance-policies-not-islamophobia/.

[346] Mendoza, Jessica. "Colonial Williamsburg Ad Evokes 9/11: Tasteful Tribute or Blatant Exploitation?" *The Christian Science Monitor* (8 Feb. 2016), http://www.csmonitor.com/USA/Society/2016/0208/Colonial-Williamsburg-ad-evokes-9-11-tasteful-tribute-or-blatant-exploitation.

[347] Zieve first post card, http://mosquesinamerica.org/wp-content/uploads/2016/10/347_Zieve1.jpeg

[348] Sayler, Sharon, "Community Turns Out to Hear About Proposed Mukilteo Mosque," *The Herald* (25, May, 2016), http://www.heraldnet.com/article/20160525/NEWS01/160529444; and see the Washington Human Rights Commission Website for mission statement that relates

170

apologies and a second mass mailing, this time the post card conveyed Mr. Zieve's apology for speech that may incite others to act in a hateful manner.

Only Mr. Zieve knows all of the details involved in this process and the reasons for his final actions, but the result played directly into the meme that certain speech causes others to attack Muslims.[349]

It does take some finesse to construct an explanation that does not cross into an apology, in the cases that an apology is simply not warranted. When a position is based thoughtfully upon historic and moral foundations, there is ample room to expand and explain by providing additional context. However, an unwarranted rush to an apology can be tacit participation in censorship. If speech that is offensive is censored, the offended operator learns that he can shape society by wielding veto power over selected speech.   Pointed lessons from history and contemporary Europe offer ample illustration of this point and underscore the imperative of preserving free speech.

If Americans voluntarily vacate the robust protection afforded speech on matters of public concern, this surrender cannot be blamed on the courts or on government. The Constitution and the Supreme Court have limited what government and the courts may do to restrict speech. No, various surrenders on free speech are first coming from citizens who feel the chill of disapproval and decide to shrink into the corners. Free and robust speech will only continue to be protected in the public square if citizens exhibit determined interest in exercising their expressive rights.

---

to cases like the Mukilteo Mosque inquiries: "About Us," *Washington State Human Rights Commission*, http://www.hum.wa.gov/about-us.

[349] Zieve final post card, http://mosquesinamerica.org/wp-content/uploads/2016/10/349_Zieve2.jpg

## 21. Ask An Imam

Imams are the hub around which mosque activity revolves. And unlike Western religious norms, the mosque is often the center of personal, familial, and civic life. The clerics in Sharia-centric mosques seek to fulfill the roles of political and legal authorities. American Muslims report that marriages and divorces are often only filed at the mosque, bypassing civil authorities. Local residents are beginning to ask what right they have to know if the mosque on the corner is working to supplant the American societal compact.

Imams often say that they want to be accessible to the community at large, will offer programs that include locals, and that they plan to be accountable to residents. The chairman for the AFYFC mosque generously promised at the CUP hearing to maintain an open and friendly relationship with neighbors.[350] Instead, this Islamic center and many others may be described as generally closed, exclusive, and hostile to the community.[351]

These imams do seem, however, very anxious to be involved in strategically arranged interfaith public relations. In many showcase interfaith events, imams are happy to be featured if the script is closely controlled and all pastoral participants agree to present the politically palatable version of Islam and life as a Muslim.

As with leadership from any religious organization, mosque leaders in America are not exempt from challenge. Americans are not just concerned about unequivocal imam condemnations of what happens beyond our borders where unimaginable brutality is occurring in the name of Islam. It is their business, as well, to be highly concerned about whether newcomers in their neighborhoods are fully assimilating.

It starts with laying a concrete foundation. Is mosque leadership participating in public forums where they can refer to a record of lectures, op-ed commentary, or interviews that demonstrate unwavering commitment to American imperatives of individual liberty and self-determination? Have they called for critical thinking and have they challenged imam control of all issues including mosque and state? Have

---

[350] City of Bloomington City Council Meeting for Review of AFYFC Application, Mar. 24, 2011, https://www.youtube.com/watch?v=wJ-9ci-gB3A&feature=youtu.be. (Sampling of pledges: "All problems will be solved. A new webpage will be constructed to help Smith Park neighbors communicate suggestions, ideas, complaints or even appreciation with the center from work or home. We will not tolerate any discomfort or inconvenience to the Smith Park neighbors and we will promote good relations with them. If the neighborhood would like to have meetings on a monthly basis to discuss neighborhood improvements, etc. that can be done as well. Our door will always be open for neighbors.")

[351] Hegseth, Pete. "How Terrorists Recruit in 'Little Mogadishu' of Minneapolis." Fox News (6 May 2016), http://video.foxnews.com/v/4881244287001/how-terrorists-recruit-in-little-mogadishu-of-minneapolis/?#sp=show-clips.

173

they demanded an end to the genocide of Christians and others in the Middle East? Have they worked to expose and reform the unequal treatment of women under Sharia codes?

Some American Muslims have proven their patriotism and commitment to reform by doing all this at every opportunity. The standard that they have set is an example of how Muslims may be a powerfully positive benefit to American culture. Imams should be asked if they endorse their Muslim pledge of alignment with American constitutional standards: the important and declarative Muslim Reform Manifesto.[352]

It is not out of line for neighbors to keep a religious leader honest. Americans would have no qualms about holding leaders of other faiths to their pledges. Of course, there is no way to force transparency or interaction. But there is a way to put local imams on record – or the record becomes *avoidance of a record*. And a record of even that pattern of avoidance is important to chronicle.

There is a known Koranic instruction that Sharia adherents have used to justify the practice of making false statements with the intent of obfuscating Islamic practices and tactics that would be repugnant to Western sensibilities.[353] Whether Islamists employ this tactic known as taqiyya, or just seek to push the envelope, engagement with local mosques and leadership is the only method of knowing where there are Islamic communities that are committed to combating radicalization.

From every Open Mosque Day to all open public forums where Islamic leadership participates, the questions regarding what plan is in place for encouraging assimilation and what strategy exists to defeat radicalization should be asked. The Muslims for Reform declaration should be presented at every opportunity as it enunciates the four main constitutional conflicts that Islamists have with American cultural precepts: separation of mosque and state, free speech, freedom to choose a religion or no religion, and equality for women.[354]

Alternatively, accountability committees may present a fundamental human rights manifesto like key sections from the 1948 United Nations Declaration of Human Rights. Public recognition of sections like Article 18 and Article 19 demonstrate recognition of foundational rights like "freedom of thought, conscience, and religion, including the freedom to change religion or belief" and "freedom of opinion and expression."[355] These are

---

[352] Muslim Reform Movement Facebook page:
https://www.facebook.com/MuslimReformMovement/timeline.

[353] Ibrahim, Ray. "Tawriya: Islamic Doctrine Permits 'Creative Lying.'" *Raymond Ibrahim* (28 Feb. 2012),
http://www.raymondibrahim.com/2012/02/28/tawriya-lying/.

[354] Muslims for Reform, *supra*, at note 209.

[355] "Universal Declaration of Human Rights." *The United Nations* (10 Dec. 1948),
http://www.un.org/en/universal-declaration-human-rights/index.html.

174

indisputable cornerstones to Western civilizational cultures and can be presented as an affirmative endorsement of widely recognized societal norms.

If Muslims who have not committed to the reform elements are engaged in interfaith activities, public venues are an excellent time to establish clear loyalties to constitutional principles and assimilation goals. Also, pastors, priests, and rabbis should be urged to inquire as to what serious challenges these Islamic leaders have issued to the radical and extremist elements that persecute Christians, Jews, and minority faiths around the world. Non-Muslim faith leaders have no business giving public credibility to Muslim clerics who have not taken a strong stand in the media, in the mosque, and in the public square on this issue, as well as having publicly committed to the aforementioned foundational American principles.

Accountability groups may consider inviting informed pastors and rabbis to speak as counterweights to the unquestioning "interfaith" priests, pastors and rabbis that often show up to tout the virtues of Islamic practices. Unfortunately, too many Christian and Jewish leaders offer the hand of ecumenical fellowship without inspecting the record of a particular Islamic group or its affiliations. It is up to thinking faith leadership to vet interfaith representatives who claim to speak on behalf of a particular denomination or belief.

Islamist leaders may be representing an organization that not only tolerates religious persecution in other countries of all "others," but approves of it. The now systemic exclusion and barbaric punishment of religious minorities in many Islamic countries is epidemic and Muslim leaders should be aware that Americans expect Muslim leaders emphatically to both condemn it, and use their influence to counter it. Maajid Nawaz, Muslim founding chairman of the Quilliam Foundation in the United Kingdom agrees, and he urges, "We Muslims must admit there are challenging Koranic passages that require reinterpretation today. Reformers either win, and get religion-neutral politics, or lose, and get ISIL-style theocracy."[356]

This is not to say that other religious communities should shun Muslims by any means. The reality is that there is an obligation to deny credibility and support to Islamists who will then exploit the bona fides of the interfaith fraternity to insinuate themselves further into the pluralistic system with the intent to undermine it.

Also, Christians and Jews owe it to their brothers and sisters that are being cruelly persecuted elsewhere in the name of Islam to demand

---

[356] Qureshi, Nabeel. "The Quran's Deadly Role in Inspiring Belgian Slaughter:." *USA Today* (22 Mar. 2016), http://www.usatoday.com/story/opinion/2016/03/22/radicalization-isil-islam-sacred-texts-literal-interpretation-column/81808560/

condemnation of these practices from American Muslim leaders. Statistics show Christians to be the most persecuted religious minorities in the world today.[337] If American Muslim leadership does not take a much more active role in criticizing these abuses and demanding reform, Americans are left to conclude that they condone it.

If past examples are any indication, Islamic leaders will likely respond that requests for such a commitment will be taken under advisement. But such deflection gives community members the opportunity to present these statements again at future public events for the purpose of holding Muslim leaders to basic American constitutional and internationally-recognized fundamental human rights conventions. If imams and Islamic authorities continue to shirk public commitment to these accepted Western precepts, a skeptical media and uninformed public will learn they cannot square the platitudes and double-speak with a refusal to adopt a very basic statement reflecting foundational values.

One distraction tactic that Islamists will often employ when asked for a commitment to indisputable and well-settled human rights is to complain of various American or Western so-called "violations" of international law norms or human rights understandings: e.g., the U.S. military's use of Predator drones and the incidence collateral damage. However, just as the land-use hearing context is simply for the purpose of considering the merits of a particular application, citizens are on solid and high moral ground when simply asking the mosque leadership, publicly and emphatically, to embrace non-controversial human rights standards.

---

[337] "Persecution Report." (2016), http://www.persecutionreport.org/; *also see*, "Subcommittee on the Middle East and North Africa: Testimony of Nina Shea, Director of the Hudson Institute's Center for Religious Freedom." U.S. House of Representatives (25 June, 2013). http://docs.house.gov/meetings/FA/FA16/20130625/101036/HHRG-113-FA16-Wstate-SheaN-20130625.pdf.

176

# CONCLUSION AND SUMMARY

This book has laid out the challenge facing the American people from Islamists who seek to undermine Western civilization, and who have become skilled in using America's celebrated liberties to build an infrastructure for that purpose. It behooves those of us who love this country, its Constitution and the freedoms it guarantees to protect what we have inherited for future generations.

Throughout these pages, practical steps for doing that have been offered, born of first-hand experience with zoning boards, city councils, school boards, newspaper editorial committees, state legislatures and courts across the United States. To summarize, here are some of the most important take-aways:

### RECOMMENDED READING

Read these books both to understand and to gain perspective on the civilizational clash with Islamism. The first grouping does not deal with history or religion; rather these selections present the insights of thoughtful individual authorities and their very personal valiant struggles to wake up citizens of the West. These are the vital accounts that tell the powerful backstories as these are what must inform the debate in the public square. Use the words of these authors to share their first-hand insights:

- Dr. Zuhdi Jasser's A Battle for the Soul of Islam: An American Muslim Patriot's Fight to Save His Faith to learn of the reformers' sincerity, courage, and commitment.

- Ayaan Hirsi Ali's *Heretic: Why Islam Needs a Reformation Now* for a former Muslim's practical and passionate pleas to Americans to defend Enlightenment ideals against Islamism.

- Dr. Qanta Ahmed's *In the Land of Invisible Women: A Female Doctor's Journey in the Saudi Kingdom* for sensitive insight into an intellectual woman's fight to identify Islamism as totalitarian and toxic to Muslims in general, and the West at large.

- Rifqa Bary's *Hiding in the Light: Why I Risked Everything to Leave Islam and Follow Jesus* to learn how badly our system treated a young Muslim girl that chose to exercise freedom to leave a religion, in this case, Islam.

**FOUNDATIONAL READING**

- Andrew McCarthy's *The Grand Jihad: How Islam and the Left Sabotage America* for an expert and relevant tutorial on the nature of the threat.
- Mohamed Akram's *The Explanatory Memorandum on the General Strategic Goal of the Group in North America*, which was entered into evidence in the <u>United States v. Holy Land Foundation et al.</u> trial in 2007-2008.

**MOSQUE PERMIT PROCESSING**

- Organize an accountability group and create committees that will: perform research; conduct outreach to public officials; designate and prepare individuals to make public comments; and hold government officials, imams and mosques accountable.
- Get the facts regarding permit applications for community centers and mosques *early in the process*. Hold the city or county to an assessment of *actual* use, rather than idealized projections, by researching the prior activity level of the applicant organization, or its parent or sister organizations. Analyze the application for disclosure of *full range* of activities and participation compare to *similar* assembly or religious uses that have been approved. Compare conditions and restrictions placed on prior permits.
- Prepare for enforcement. Ensure that limitations on capacity, concurrent uses of buildings and parking are clearly enunciated and that triggers for enforcement and CUP review are unequivocal.
- Do thorough homework. Master the applicable zoning codes and ascertain that *all* requirements are met. Watch video recordings of other mosque land use hearings to learn how staff reports are used and what is line of questioning for applicants. This is important for the purpose of organizing focused presentations. Also, understand what is considered constructive questioning and commentary during the open public comment sessions.
- Insist upon technical accuracy and full details. The community is entitled to answers that describe the complete scope and intensity of the proposed use.
- Understand the role of RLUIPA (federal religious land use statute) and anticipate institutional awareness of the restrictions placed upon zoning officials. Also, be prepared for an official mindset that RLUIPA ties the hands of city zoning officials. In a broad sense, it does, but when attorneys or city managers oversimplify RLUIPA and impress officials with fear of lawsuits or government

178

intervention to the point that zoning questions are not satisfied, make it clear that the application of RLUIPA protection likely has gone too far.

- Inspect the process to establish that published requirements are not waived in an exceptional fashion and that officials are not communicating outside of public hearings (in violation of state open meeting act terms). Be prepared to use the state records act request mechanism to learn of applicant to staff communications, staff to official board communications and discussion content between official voting members.

- Do *not* use the comment session at a land use public hearing to berate Muslims, lecture about Sharia, or quote the Koran. Questions about anti-radicalization strategies or discussion of applied Sharia may be legitimate subjects of debate in the public square, but a land use hearing is not the venue to introduce these issues. Stick to relevant issues that implicate zoning regulations and the concurrent community concern of the ancillary threat of radicalism to safety and security.

- Establish a fund for possible attorney consultation and preparation of potential professional traffic, parking, trip count, fire code, or infrastructure studies if needed to demonstrate likely – rather than idealized – impact of the use. Also, funds may be needed for a public records act requests or copying of archived documents.

- Keep comments brief, but elegant, accurate, and appealing. As important as it is to exercise the American right to full and free debate, it is also smart to craft compelling arguments. Consider the audience and work to persuade. Telling personal stories and citing anecdotal examples is a powerful way to establish common ground. The ability to convince the uninformed depends upon getting them to stop and listen.

### POST-APPLICATION FOLLOW-UP WITH MOSQUES

- In the event of mosque application approval, prepare statements to outline zero community tolerance for radicalization activities and issue challenges to transparency and openness. Establish your community as a "no-rad zone" and demonstrate that Islamist radicalization will not be tolerated in this town. This means involving the smallest units of neighborhoods within cities and counties. Ask for public commitment (videotape where allowed) to fundamental rights by presenting mosque leadership with the cornerstone principles from Dr. Zuhdi Jasser's writing and the Muslims for Reform Manifesto: the separation of mosque and state,

179

free speech, freedom of religion, and equal rights for women.[358] Some follow-on public forums may provide opportunities for presentation of the "Muslim Pledge for Religious Freedom and Safety from Harm for Former Muslims" statement for signature (and the aforementioned freedom of conscience and expression affirmations from the 1948 United Nations Declaration on Human Rights):

> I renounce, repudiate and oppose any physical intimidation, or worldly and corporal punishment, of apostates who leave Islam, change their religion from Islam to another religion, or express unbelief in Islam, in whatever way that punishment may be determined or carried out by myself or any other Muslim including the family of the apostate, community, Mosque leaders, Sharia court or judge, and Muslim government or regime.[359]

- Prepare to monitor mosque activities. Whether via blogs or websites, identify radical speakers and materials. Exercise the same level of free speech as Islamist operatives and counter radical events with demonstrations to expose such Islamists, using their own words.
- Monitor enforcement of permit terms to ensure there is no slippage. The city or county must be held accountable for timely enforcement of code violations or permit infractions. These matters should be brought to the attention of those who are politically responsible for maintaining the peace and public safety as soon as any violations occur. It is difficult to evade the issue if many residents present concerns at the very next public meeting of the councilmembers.

## EXERCISE YOUR FREEDOMS

- Speak out, or watch speech freedoms shrink.
- Reasoned and human-interest based speech is persuasive speech.
- Above all, plant the flag and hold the ground. Every skirmish is important: For example, keep Christmas, Thanksgiving and Valentine's Day on the calendar and Islamic-biased curriculum out of the classroom.
- Keep interfaith dialogue to faith and not an embrace of unexamined and radical clerics.

---

[358] Muslims for Reform, *supra*, note 209.

[359] "2012 Freedom Pledge." *Former Muslims United* (4 Jul. 2012), http://formermuslimsunited.org/the-pledge/cover-letter-pledge/

180

Some mosques operate within permit allowances and have proven to be good neighbors. The mosques that have exceeded limits, misrepresented use intentions, and exploited the constitutional religious veil between church and state to radicalize, however, have created potential concerns for all communities that are anticipating mosque construction.

Radicalization trends add another layer of concern in light of current and past mosque extremist activity. Permanent accountability committees that will begin by monitoring the permit hearing process and then will continue to watch the character of speakers and content of materials can do much to hold local officials and mosque leadership to clear legal and cultural standards.

Efforts to engage the Muslim community while upholding American constitutional ideals, cultural mores, and legal guidelines will provide a strong foundation for good will and assimilation outreach.

Contrary to popular thinking, multiculturalism and tolerance should not be ends in themselves. Rather, these goals, as clearly re-defined, should be reached via commitments to exceptionally American values. Former Muslim, Ayaan Hirsi Ali, writes that Western preference for tolerance over fidelity to core values has left moderate Muslims without true defenders. Her experience as a translator for social services agencies in Holland has compelled her to warn America of the dangers of Islamic separatism:

> Holland's multiculturalism – its respect for Muslims' way of doing things – wasn't working. It was depriving many women and children of their rights. Holland was trying to be tolerant for the sake of consensus but the consensus was empty. The immigrants' culture was being preserved at the expense of their women and children and the detriment of the immigrants' integration into Holland. Many Muslims never learned Dutch and rejected Dutch values of tolerance and personal liberty. They married relatives from their home villages and stayed, inside Holland, in their tiny bubble of Morocco or Mogadishu.[360]

Europe's experience with segregated Muslim communities is a lesson to Americans. The most prescient warning, often attributed to the widely regarded and authoritative Muslim Brotherhood cleric, Yusuf Al-Qaradawi, illustrates the intentional migration design to exploit Western freedoms while working to establish Sharia supremacy: "With your democratic laws, we will colonize you. With our Koranic laws, we will dominate you."[361]

---

[360] Ayaan Hirsi Ali, *Infidel* 246 (Free Press 2007).

[361] Usually attributed in French writing to Sheikh Yusuf Al-Qaradawi but an early version of the quote appears in an October 1999 article appearing in the French newspaper *La Croix* where it is attributed to "influential Muslim": http://www.la-croix.com/Archives/1999-10-22/Rassemblement-interreligieux-_NP_-1999-10-22-485627.

181

If Muslim immigrants are to be persuaded to reject the "bubble" settlements that Ms. Ali describes, and instead, embrace Western-styled communities, the invitation best comes from modernized Muslims. Giulio Meotti, cultural editor for *Il Foglio* in Italy, heralds Muslim dissidents as heroic in the tradition of Cold Warriors like Lech Walesa and Alexander Solzhenitsyn. He urges "financial, moral and political support" for these "Friends of Western Civilization" and he faults the "elites of the West" for slandering them.

Meotti notes that these Muslim dissidents are considered "traitors" within their communities, and that they must feel they are standing "alone against all."[362] He points to, among others, the example of Paris imam Hassen Chalghoumi who preaches while wearing a bullet-proof vest and is accompanied on the streets by five police officers with semiautomatic weapons. Chalghoumi is known for backing the ban on burkas and paying tribute to the victims of Charlie Hebdo.[363] If these convicted Muslims are willing to confront the Islamic supremacists, why would we not stand with them?

Dr. Qanta Ahmed, a British-born Muslim of Pakistani origin, who practiced in Saudi-Arabia, calls herself an "anti-Islamist Muslim." She warns Westerners who refuse to identify totalitarian Islamists: "It is *nonviolent* Islamism that legitimizes Islamism's escalating jihadist terrorism. It is nonviolent Islamism that preaches virulent anti-Americanism and anti-globalization, seducing both Western academics and Islamist sympathizers." (Emphasis in original.)[364] Dr. Ahmed appears regularly on CNN and other media outlets to urge Americans to support the pluralistic Muslims who stand against Islamism and for individual liberty and rights of conscience.

When Islamic organizations appear before local government boards to promise openness, adherence to the rule of law, and support for American cultural customs, American constitutional generosity is pre-disposed to give them the benefit of the doubt. Therefore, it is up to local citizens to monitor these commitments and prove their veracity. If Americans do not run to this opportunity in their own communities, we have only ourselves to blame when the American identity is splintered and ultimately re-defined.

---

[362] Meotti, Giulio, "The West's Most Important Ally: Islam's Dissidents," *Gatestone Institute*, (12, Jun, 2016). http://www.gatestoneinstitute.org/8227/muslim-dissidents.

[363] *Id.*

[364] Ahmed, Qanta. "As Islamism Marches West, Pluralist Muslims Must Stop Its Advance." *National Review* (Apr. 2016), http://www.nationalreview.com/article/434339/islamism-marches-west-pluralist-muslims-must-stop-it.

182

## ABOUT THE AUTHOR

Karen Lugo has worked at the intersection of law, politics, and culture for years. As a lawyer, constitutional law instructor, and clinical professor, she taught foundational constitutional principles and also co-authored briefs to the United States Supreme Court with some of the nation's leading constitutional scholars. These appellate briefs covered issues like expressive religious rights, material support for terrorism, First Amendment free speech, NSA surveillance, government-sponsored prayer, federalism, and separation of powers. Her father was a minister and Ms. Lugo has defended religious assembly interests under RLUIPA (federal law) provisions. She is known for her interest in building alliances with America's compatible Muslims who are seeking constitutionally sound responses to Islamism's challenges.

183